IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
Charleston

FILED

OCT - 6 2010

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

**ELTON E. BRYAN,**

　　　Petitioner

v.

**UNITED STATES OF AMERICA**

　　　Respondent

2:93-CR-00898

CA 2:10-1196
CR 2:93-00089

**PETITION FOR A WRIT
OF ERROR CORAM NOBIS**

　　　Now into Court through undersigned counsel comes Elton E. Bryan and, pursuant to 28 U.S.C. §1651, (the All Writs Act), brings this action in the nature of a petition for a Writ of Error Coram Nobis and for cause of action shows:

**I**
*Jurisdiction and Venue*

　　　Petitioner was convicted in this Honorable Court in September, 1993 of the following federal crimes: (1) two counts of mail fraud in violation of 18 U.S.C. §§1341, 1346; (2) one count of wire fraud in violation of 18 U.S.C. §§ 1343, 1346; (3) one count of securities fraud in violation of 15 U.S.C. §§ 78(j)(b), 78ff and 17 C.F.R. §240.10b-5; and, (4) one count of perjury in violation of 18 U.S.C. §1623. Jurisdiction, then, is proper because Petitioner Bryan was convicted in this Court and a writ of error coram nobis is always directed to the court in which the petitioner was convicted.

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

Page 1 of 21

Petitioner has served his sentence, paid the fine required by the order of conviction, and has been released from all restraint.

This petition for a writ of error coram nobis is proper under the All Writs Act by virtue of the existence of the writ of error coram nobis at common law[1]; its issuance in the circumstances of petitioner is authorized by *United States v. Morgan*, 346 U.S. 502 (1954)[2] and more recently in the Fourth Circuit by *United States v. Mandel*, 862 F.2d 1067 (4th Cir. 1988).[3]

---

[1]

 Although at common law the writ of error *coram nobis* was issued out of chancery like other writs, Stephens, *Principles of Pleading* (3d Amer. ed.), 142, the procedure by motion in the case is now the accepted American practice.

[2]

 "The writ of *coram nobis* was available at common law to correct errors of fact.  It was allowed without limitation of time for facts that affect the "validity and regularity" of the judgment,  and was used in both civil and criminal cases. While the occasions for its use were infrequent, no one doubts its availability at common law.  *Coram nobis* has had a continuous although limited use also in our states.  Although  the scope of the remedy at common law  is often described by references to the instances specified by Tidd's Practice, see note 9, *supra*, its use has been by no means so limited.  The House of Lords in 1844 took cognizance of an objection through the writ based on a failure properly to swear witnesses.  See the *O'Connell* case, note 11, *supra*.  It has been used, in the United States, with and without statutory authority but always with reference to its common-law scope -- for example, to inquire as to the imprisonment of a slave not subject to imprisonment, insanity of a defendant, a conviction on a guilty plea through the coercion of fear of mob violence, failure to advise of right to counsel.  An interesting instance of the use of *coram nobis* by the Court of Errors of New York is found in *Davis* v. *Packard*, 8 Pet. 312. It was used by the Court of Errors, and approved by this Court, to correct an error "of fact not apparent on the face of the record" in the trial court, to wit, the fact that Mr. Davis was consul-general of the King of Saxony and therefore exempt from suit in the state court." *Morgan, supra* in text at 507-508. [footnotes omitted.]

[3]

"In United States v. Morgan, 346 U.S. 502, 98 L. Ed. 248, 74 S. Ct. 247 (1954), the  Supreme Court established that federal courts have the power under the All-Writs Act, 28 U.S.C. § 1651(a) to grant a writ of error coram nobis to vacate a conviction after the sentence has been served. The Court held that the extraordinary remedy should be issued, however, "only under circumstances compelling such action to achieve justice." 346 U.S. at 511. An error "of the most

NEELY & CALLAGHAN
159 Summers Street
Charleston
W VA 25301-2134
(304) 343-6500

## II
### *The Facts of This Case*

The Petitioner, Elton E. Bryan (more commonly called "Butch Bryan"), was the director of

the West Virginia Lottery from April, 1990 until his indictment in this case. The facts that the

government alleged are described at length in *United States v. Bryan*, 58 F.3d 933 (4th Cir., 1995),

which opinion is attached hereto as Exhibit I. On appeal to the Fourth Circuit, the Court <u>reversed</u> Mr.

Bryan's conviction for securities fraud, to-wit "insider trading," on the grounds that the so-called

"misappropriation theory" under which he had been convicted had never been accepted by the Fourth

Circuit.[4] That reversal, then, left the convictions for two counts of mail fraud, one count of wire fraud

---

fundamental character" must have occurred to warrant issuing the writ, and no other remedy may
be available. We follow the Second Circuit, which, in an opinion by Judge Friendly, has
specifically allowed the granting of a writ of error coram nobis in light of a retroactive
dispositive change in the law of mail fraud. United States v. Travers, 514 F.2d 1171 (2d Cir.
1974)." *Mandel, supra* in text, at 1074-1075.

[4]

"We conclude that neither the language of section 10(b), Rule 10b-5, the Supreme Court
authority interpreting these provisions, nor the purposes of these securities fraud prohibitions,
will support convictions resting on the particular theory of misappropriation adopted by our sister
circuits. Section 10(b), insofar as concerns us, see infra pp. 18-19, prohibits only the use of
deception, in the form of material misrepresentations or omissions, to induce action or inaction
by purchasers or sellers of securities, or that affects others with a vested interest in a securities
transaction. In contravention of this established principle, the misappropriation theory authorizes
criminal conviction for simple breaches of fiduciary duty and similar relationships of trust and
confidence, whether or not the breaches entail deception within the meaning of section 10(b) and
whether or not the parties wronged by the breaches were purchasers or sellers of securities, or
otherwise connected with or interested in the purchase or sale of securities. **Finding no
authority for such an expansion of securities fraud liability -- indeed, finding the theory
irreconcilable with applicable Supreme Court precedent -- we reject application of the
theory in this circuit. We hold therefore that the district court plainly erred in instructing
the jury that it could convict Bryan of securities fraud on the basis of the misappropriation
theory of Rule 10b-5 liability.** See, e.g., United States v. Olano, 123 L. Ed. 2d 508, 113 S. Ct.
1770 (1993); United States v. Piccolo, 835 F.2d 517, 519 (3d Cir. 1987) (jury instructions
"allowing conviction for conduct outside the proscription of the mail fraud statute" constitute

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

and one count of perjury.

Mr. Bryan's conviction for mail and wire fraud was based on the theory that he had deprived the citizens of West Virginia of his honest services. Yet there was never evidence presented that Mr. Bryan had received any bribe or kickback. The gravamen of the mail fraud convictions were two fold: (1) Mr. Bryan had rigged the bidding process to favor one provider of advertising services, namely Fahlgren Martin of Parkersburg; and, (2) Mr. Bryan had rigged the bidding process to favor one provider of electronic equipment, namely Video Lottery Consultants (VLC). The conviction for wire fraud was based on Mr. Bryan's trading in stocks that stood to gain from decisions of the Lottery Commission. Yet at <u>all</u> stages of the proceedings, in both the District Court and the Fourth Circuit, Mr. Bryan conclusively showed that: (1) there was no benefit or gain accruing to Mr. Bryan; and (2) there was no evidence of any bribe or kickback. The most that was shown was that a particular provider of advertising services was favored by the Caperton administration acting through Mr. Bryan and that another provider of electronic equipment was favored by the administration because that provider promised to build a manufacturing facility in West Virginia. *See*, *U.S. v. Bryan*, *supra*, at 938.[5]

_____

plain error affecting substantial rights)."

58 F.3d 933 at 944 [emphasis added, footnotes omitted.]

[5]

"Several video lottery manufacturing companies began lobbying for a piece of the anticipated video gaming business in July 1991, after they became aware of the proposed expansion of video lottery in West Virginia. One company in particular, Video Lottery Consultants (VLC) of Bozeman, Montana, aggressively sought to maximize its share of the potential West Virginia video lottery market. VLC ultimately gained favor with Governor Caperton in the summer of 1992, when it promised to locate a manufacturing plant in West Virginia in exchange for a statewide monopoly on the sale of video lottery machines. Governor Caperton developed a strong

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

The Fourth Circuit conceded that Mr. Bryan (1) did not profit from any of the acts for which he was indicted; (2) did not cause any actual loss to the citizens of West Virginia; and (3) did not commit any act illegal under the laws of the State of West Virginia. Nonetheless, the Fourth Circuit affirmed the mail and wire fraud convictions under the "deprivation of honest services theory" for the following reasons:

> The Court in Carpenter was only interpreting 18 U.S.C. §§ 1341 and 1343, Congress not having enacted 18 U.S.C. § 1346 until after Carpenter was decided. **We see no reason, however, to read into the mail fraud statute an independent criminal violation requirement when the fraud conviction is based on the deprivation of the right to intangible services as opposed to the deprivation of property or money, as in Carpenter.** We therefore reject Bryan's contention that the government was required to prove that he violated a criminal statute independent of the mail fraud statute in order to establish a violation of 18 U.S.C. §§ 1341, 1346.
>
> In what we take to be an alternative argument, Bryan argues that if section 1346 does not define a "deprivation of the right to honest services" by reference to a statute or regulation, then he "had no reasonable way to know, at the time of his actions, that his conduct in dealing with his staff, the Lottery Commission, and the Purchasing Department would be deemed by the government to be unlawful." Appellant's Reply Br. at 9. To the extent that this amounts to an argument that section 1346 should be declared void for vagueness, we are unpersuaded.

_____

interest in the proposal and ultimately decided that VLC would be granted a "single source" contract, under which VLC would be the exclusive supplier of video lottery gaming terminals in West Virginia.

> After Governor Caperton decided upon VLC, Bryan sought to ensure that VLC would receive a single source contract and that West Virginia would receive a manufacturing facility, as per the agreement. In much the same way he rigged the award of the $ 2.8 million advertising contract, Bryan undertook to ensure that the Lottery Commission would award a single source video lottery contract to VLC. From August 1992 through November 1992, Bryan and William Woodford, the Deputy Director of the Lottery, held a series of meetings with VLC officials to finalize the agreement reached by Governor Caperton and VLC executives earlier that summer."

*U.S. v. Bryan* at 938.

NEELY & CALLAGHAN
159 Summers Street
Charleston
W VA 25301-2134
(304) 343-6500

*U.S. v. Bryan* at 941. That, then, was the Fourth Circuit's reasoning with regard to the mail fraud allegations involving the fixing of the contract bidding process.

The Fourth Circuit's reasoning with regard to the wire fraud conviction based on so-called "insider trading" was as follows:

> Bryan also challenges his conviction for violating the federal wire fraud statute, 18 U.S.C. §§ 1343, 1346, which was based upon his trading in the stock of companies that stood to gain from the decisions of the West Virginia Lottery Commission. Bryan contends that the government's case against him was flawed because it included no evidence of benefit or gain accruing to him, and "no proof of actual or constructive fraud." Appellant's Br. at 27. Once again, Bryan's sufficiency challenge reflects a misunderstanding of the elements of the crime charged. The gravamen of the offense of wire fraud is simply the execution of a "'scheme to defraud,'" Barber, 668 F.2d at 784 (quoting United States v. George, 477 F.2d 508, 512 (7th Cir.), cert. denied, 414 U.S. 827 (1973)), and "the fraud need not succeed" for a defendant to be convicted of wire fraud, Dischner, 974 F.2d at 1521. Bryan's claim that the jury was presented with insufficient "proof of actual or constructive fraud" likewise fails. The jury was presented with ample evidence that Bryan was engaged in a scheme to defraud the citizens of West Virginia of their right to his honest services, and that he traded on confidential information. Cf . Carpenter, 484 U.S. at 26 (confidential information is "property," the deprivation of which can constitute wire fraud).

*U.S. v. Bryan* at 943.

### III
### *The Case of* Skilling v. United States

The case of *Skilling v. United States*, ___U.S.___, 130 S.Ct. 2864, decided 24 June 2010 requires this Honorable Court to grant to Petitioner Bryan a writ of error coram nobis and overturn his convictions for mail fraud and wire fraud. *Mandel, supra.* Jeffrey K. Skilling was famously the CEO of Enron Corporation--the seventh largest revenue generating company in the United States. When Enron went bankrupt, causing catastrophic losses to thousands of employees, stockholders and creditors, Mr. Skilling was indicted for mail fraud predicated on the theory of "deprivation of honest services." The Supreme Court reversed and held that the mail fraud and wire fraud statutes that

NEELY & CALLAGHAN
159 Summers Street
Charleston
W VA 25301-2134
(304) 343-6500

proscribe the fraudulent deprivations of "the right to honest services" is unconstitutionally vague except when applied to persons who accept bribes and kickbacks in return for corrupt actions.

The Supreme Court traced the origins of "the right to honest services" and then concluded that the statute, as applied, was unconstitutionally vague. The basic holding of the Court in *Skilling* is as follows:

> The Government urges us to go further by locating within § 1346's compass another category of proscribed conduct: "undisclosed self-dealing by a public official or private employee -- i.e., the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." Id., at 43-44. "[T]he theory of liability in McNally itself was nondisclosure of a conflicting financial interest," the Government observes, and "Congress clearly intended to revive th[at] nondisclosure theory." Id., at 44. Moreover, "[a]lthough not as numerous as the bribery and kickback cases," the Government asserts, "the pre-McNally cases involving undisclosed self-dealing were abundant." Ibid.

> Neither of these contentions withstands close inspection. McNally, as we have already observed, supra, at 36-37, 43, involved a classic kickback scheme: A public official, in exchange for routing Kentucky's insurance business through a middleman company, arranged for that company to share its commissions with entities in which the official held an interest. 483 U.S., at 352-353, 360, 107 S. Ct. 2875, 97 L. Ed. 2d 292. This was no mere failure to disclose a conflict of interest; rather, the official conspired with a third party so that both would profit from wealth generated by public contracts. See id., at 352-353, 107 S. Ct. 2875, 97 L. Ed. 2d 292. Reading § 1346 to proscribe bribes and kickbacks -- and nothing more -- satisfies Congress' undoubted aim to reverse McNally on its facts.

> **Nor are we persuaded that the pre-McNally conflict-of-interest cases constitute core applications of the honest-services doctrine. Although the Courts of Appeals upheld honest-services convictions for "some schemes of non-disclosure and concealment of material information," Mandel, 591 F.2d at 1361, they reached no consensus on which schemes qualified. In light of the relative infrequency of conflict-of-interest prosecutions in comparison to bribery and kickback charges, and the intercircuit inconsistencies they produced, we conclude that a reasonable limiting construction of § 1346 must exclude this amorphous category of cases**.

> Further dispelling doubt on this point is the familiar principle that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." Cleveland, 531 U.S., at 25, 121 S. Ct. 365, 148 L. Ed. 2d 221 (quoting Rewis v. United States, 401 U.S. 808, 812, 91 S. Ct. 1056, 28 L. Ed. 2d 493 (1971)). "This interpretive guide is especially appropriate in

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

construing [ § 1346] because . . . mail [and wire] fraud [are] predicate offense[s] under [the Racketeer Influenced and Corrupt Organizations Act], 18 U.S.C. § 1961(1) (1994 ed., Supp. IV), and the money laundering statute, § 1956(c)(7)(A)." Cleveland, 531 U.S., at 25, 121 S. Ct. 365, 148 L. Ed. 2d 221. Holding that honest-services fraud does not encom pass conduct more wide-ranging than the paradigmatic cases of bribes and kickbacks, we resist the Government's less constrained construction absent Congress' clear instruction otherwise. E.g., United States v. Universal C. I. T. Credit Corp., 344 U.S. 218, 221-222, 73 S. Ct. 227, 97 L. Ed. 260 (1952).

In sum, our construction of § 1346 "establish[es] a uniform national standard, define[s] honest services with clarity, reach[es] only seriously culpable conduct, and accomplish[es] Congress's goal of 'overruling' McNally."

*Skilling* at 2932-2933 [emphasis added.]

Certainly Mr. Bryan never waived the issue of unconstitutional vagueness: Mr. Bryan

consistently raised the vagueness issue and challenged the whole "deprivation of honest services"

theory.

Bryan argues that the evidence was insufficient to support his convictions under these provisions because "there was no evidence that [he] violated any law, statute or binding regulation in his conduct with respect to the Fahlgren-Martin contract or the video lottery contract." Appellant's Br. at 11-12. Relatedly, he claims that "there was no standard by which [he] could be expected to know whether his conduct would deprive the citizens of West Virginia of fair and honest governmental services." Id. at 12.

*Bryan* at 940. Therefore, but for the reluctance of the U.S. Supreme Court to review the issue of the

vagueness of the post-McNally amendment to the mail and wire fraud in a timely way,[6] Mr. Bryan's

---

[6]

The issue of whether an act that did not constitute a securities violation could, nonetheless, sustain a mail fraud and wire fraud conviction was actually raised in the U.S. Supreme Court in a timely way by William Edward ReBrook, III in a companion case to Mr. Bryan's case, namely *United States v. ReBrook* and certiorari was denied at 516 U.S. 970 (1995). Both before and during his trial, Mr. ReBrook had argued that the "intangible right to honest services" provision of Title 18 U.S.C. §1346 was unconstitutionally void for vagueness. The District Court rejected that argument in both *United States v. ReBrook*, 837 F. Supp. 162 (S.D.W.Va., 1993) and *United States v. ReBrook*, 842 F. Supp. 891 (S.D.W.Va. 1994).
Furthermore, even at the time Mr. Bryan was being tried in District Court, there were many members of the Bar and editors at the *West Virginia University Law Review* who were outraged

NEELY & CALLAGHAN
159 Summers Street
Charleston
W VA 25301-2134
(304) 343-6500

conviction would have been overturned.

## IV
### *This Case is Controlled by* United States v. Mandel

This case is controlled by *United States v. Mandel*, 862 F.2d 1067 (4th Cir., 1988). There

Maryland Governor Marvin Mandel was convicted of mail fraud under a loss of honest services

theory. After serving his sentence, the U.S. Supreme Court issued its decision in *McNally v. United*

*States*, 483 U.S. 350 (1987), holding that the mail fraud statute does not protect against schemes to

defraud persons of their intangible rights such as the right to honest government.[7]

Based upon McNally, Governor Mandel filed a petition for a writ of error coram nobis seeking

to have his mail fraud conviction set aside. In reviewing Governor Mandel's conviction, the Fourth

---

at a totally standardless prosecution. Undersigned counsel, who at the time was a justice of the
West Virginia Supreme Court of Appeals, wrote a contemporaneous article entitled "Insider
Trading Prosecutions under the Misappropriation Theory: New York's Joke on Heartland
America," (*see, Exhibit 2*) which was scheduled to be published as 96 *W. Va. L. Rev.* 873 (1994).
Indeed, this article had been peer reviewed and set up in type. And, because Mr. Bryan's and Mr.
ReBrook's appeals were likely to be decided before the law review appeared in print, the law
review editors sent advance copies to every member of the Fourth Circuit Court of Appeals.

Thereupon, federal prosecutors and/or the chief district judge exerted pressure on the President of
West Virginia University, who in turn ordered the Dean of the Law School to forbid publication.
Because the article was sent to West Publishing along with the rest of Volume 96 of the *W. Va.
Law Review,* the article is still available on WestLaw with a statement that it was ordered
removed from the Law Review. Lexis, which does not have the article, simply has a note that
because of a "dispute over editing" (*see*, Exhibit 3) the article was not published. This is totally
incorrect: The article was ordered removed in its entirety, and over the objection of such former
*Law Review* editors-in-chief as Michael O. Callaghan, who was then an assistant U.S. attorney!

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

7

A year after *McNally* was decided, Congress amended the mail and wire fraud statutes to read
"the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the
intangible right of honest services." It was this provision under which Mr. Bryan was convicted
and that the U.S. Supreme Court found unconstitutionally vague in *Skilling*.

Circuit initially noted, "In *Mandel*, there was one theory of the case before the jury which would alone permit conviction, that the State of Maryland and its citizens were defrauded of the honest and faithful services of Mandel, and this was sufficient to convict the petitioners of mail fraud." 862 F.2d at 1074. Based upon this conclusion, the Fourth Circuit rejected any attempts by the United States, after the trial was over, to assert other possible theories in support of the mail fraud convictions because the jury was presented with only the honest services theory.

The Fourth Circuit concluded that Governor Mandel's mail fraud conviction could not be upheld under the *McNally* standard, which prompted the Fourth Circuit to grant coram nobis relief, setting aside the convictions and ordering the repayment of any fines paid.

## V
### *The Perjury Conviction*

In light of the reversal of Mr. Bryan's conviction for securities fraud by the Fourth Circuit in 1994 and the necessity now to overturn Mr. Bryan's convictions for mail fraud and wire fraud in light of *Skilling*, the perjury conviction cannot stand. Even at the time the Fourth Circuit sustained the perjury conviction, the Court itself had misgivings concerning whether the required showings for perjury had been made. This is such an important issue that it is worth quoting the Fourth Circuit opinion at length:

> Bryan finally challenges his conviction for perjury under oath before a grand jury. See 18 U.S.C. § 1623. This conviction relates to Bryan's responses to prosecution questions before a federal grand jury regarding the drafting of the RFP for the video lottery contract. The government contended at trial that Bryan deliberately lied in response to government questioning to cover up the fact that VLC representatives had participated in the drafting of the RFP.
>
> The grand jury questioning on which the perjury conviction is based proceeded as follows: Q. Who wrote the RFP? A. The RFP was put together by a committee of specialized people

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

at the Lottery. . . .Q. I want you to tell me everybody on the committee who had any input into the document. . . .

[Omitted here are several questions and answers pertaining to Bryan's identification of the committee members who worked on the RFP.] Q. Who else participated in the RFP? A. Tammy Gunnoe is a specialist in the division of marketing. All of those components are required in this proposal and they all worked on this document.Q. Who else worked on the RFP? A. I obviously had some input on it. . . . I made recommendations that I would like to see and they worked from that. . . .Q. Anyone else have input into the drafting of the RFP, as far as you know? A. Well, they may have called upon people within their sections to provide information. Q. As far as you know, did anyone else have input into it? A. No, they were the people that I assigned to prepare it. Q. Okay, and so we would have to ask them if they received input from others, right? A. Yes, Ma'am.

Appellee's Br. at 34-35. Bryan contends that the questioner's initial focus on "everybody on the committee who had input into the document" led him to believe that the entire line of questioning was concerned only with which employees at the Lottery worked on the RFP. Appellant's Br. at 45.

The federal statute proscribing perjury before a grand jury provides that Whoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined . . . or imprisoned.

18 U.S.C. § 1623. In interpreting the analogous federal perjury statute, 18 U.S.C. § 1621, the Supreme Court has stated that the perjury statute is not to be loosely construed, nor the statute invoked simply because a wily witness succeeds in derailing the questioner -- so long as the witness speaks the literal truth. The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry.

Bronston v. United States, 409 U.S. 352, 360, 34 L. Ed. 2d 568, 93 S. Ct. 595 (1973). The Court also stated that "precise questioning is imperative as a predicate for the offense of perjury." Id. at 362.

**Given the Supreme Court's command to construe the perjury statute narrowly, we are sympathetic to Bryan's claim**. **The questioner's initial focus on committee members could well have led Bryan to believe that the question, "Did anyone else have input into it," only pertained to committee members. Bryan's response of "No, they were the people that I assigned to prepare it" evinces such an understanding**. Nonetheless, we are satisfied that the prosecution's repeated inquiry into whether "anyone else" contributed to the RFP provided the jury an adequate basis upon which to conclude that Bryan understood that the focus of the questioning had changed from the committee members to anyone else who might have had input into the RFP and that he deliberately lied to the grand jury when he answered that no one else had been involved.

Page 11 of 21

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

*Bryan* at 960 [emphasis added.]

## VI

### *The Conflation of the Perjury Prosecution with Two Invalid Prosecutions is NOT Harmless Error*

#### a. <u>THE LAW</u>

It is rare, indeed, for the U.S. Supreme Court to find a criminal statute unconstitutional. Counsel has searched diligently to find <u>any</u> other reported case in the United States where, by virtue of a subsequent determination that a criminal statute is unconstitutional, a convicted defendant has challenged the legitimacy of a related conviction. Thus, there is no case directly on point in the Federal system.

Therefore, Mr. Bryan must repair to some general principles of "harmless error" that have been around for over fifty years. Rule 52, *Fed. R. Crim. Pro.* generally provides:

Rule 52. Harmless and Plain Error.

(a) Harmless error. Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

(b) Plain error. A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.

Applying a predecessor to Rule 52(a) but noting that the rule was merely a restatement of existing law, the Court in *Bihn v. U.S.*, 328 U.S. 633 (1946) described the harmless error rule as meaning that a criminal appeal should not be turned into a quest for error, but that an erroneous ruling which related to the substantive rights of a party was grounds for reversal unless the record affirmatively showed that the error was not prejudicial. Thus, the cynosure of the "harmless error rule" is: (1) a review of the entire record; and (2) a determination whether there is a likelihood that the error affected the result.

NEELY & CALLAGHAN
159 Summers Street
Charleston
W VA 25301-2134
(304) 343-6500

Page 12 of 21

Thus, in *Kotteakos v. U.S.*, 328 U.S. 750 (1946) the Court held that in applying the rule, the proceedings below must be <u>examined in their entirety</u>, with a view to determining not only whether the jury was correct in its judgment regardless of the error, but also what **effect** the error had, or <u>could reasonably be taken to have had</u>, upon the jury's decision. Thus the verdict could not stand if it could not be said with fair assurance that the judgment was not substantially swayed by the error. The (1) character of the proceeding; (2) what was at stake upon its outcome; and (3) the effect of the error on the balance for decision were material factors in deciding whether the error was harmless.

The cases applying these standards are legion and collected in the annotations to Rule 52. However, one example will suffice. In *Hawkins v. United States*, 358 U.S. 74 (1958) the defendant was convicted of transporting a woman across state lines for immoral purposes. His wife testified against him and presented evidence that she had been a prostitute before he married her and was a prostitute in the receiving state at the time of the alleged transportation. The Supreme Court reversed based on the error of admitting the testimony of the wife in violation of the spousal privilege and held:

> The mere presence of a wife as a witness against her husband in a case of this kind would most likely impress jurors adversely. When to this there is added her sworn testimony that she was a prostitute both before and after marriage we cannot be sure that her evidence, though in part cumulative, did not tip the scales against petitioner on the close and vital issue of whether his prime motivation in making the interstate trip was immoral. See Krulewitch v. United States, 336 U.S. 440, 444-445. At least, use of the wife's testimony was a strong suggestion to the jury that petitioner was probably the kind of man to whom such a purpose would have been perfectly natural.

*Hawkins,* 358 U.S. 74 at 80-81.

This is still very much the modern law of the Fourth Circuit and was reaffirmed in *United States v. Morris*, 988 F.2d 1335 (4th Cir., 1993) where the Court said:

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

Page 13 of 21

Finally, in considering whether or not the error was harmless, we measure the effect of the error under Kotteakos v. United States, 328 U.S. 750, 90 L. Ed. 1557, 66 S. Ct. 1239 (1946). The rule is: If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . . But, if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand. 328 U.S. at 764-65.

*Morris* at 1343.

### b. **THE FACTS**

Imagine that a person were indicted for only one count of lying before the grand jury and no other charges. Yet during the course of the trial, evidence was admitted over objection that the Defendant was a rapist, that he had once burned down his mother's house, and that he had recently been found with child pornography on his computer. Clearly introducing this evidence would be prejudicial and contrary to Rule 404(b), *Fed. R. Evid.* which says:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Let us now consider all of the "other bad acts" evidence that the jury had to consider when

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

deciding whether Mr. Bryan lied to the grand jury.[8]    The following list comes directly from the recitation of facts in the Fourth Circuit's opinion:

✓    After completing the evaluation process, Gunnoe met with Bryan to brief him on the results. She informed Bryan that the Arnold Agency had received the committee's highest rating and that the committee had decided to recommend that the Arnold Agency be awarded the contract... After meeting with the Governor... Caperton and Bryan decided to award the contract to the Fahlgren Martin Agency, notwithstanding the committee's recommendation of the Arnold Agency.

✓    Fully aware of the Commission's authority and fully aware that hearings had already been scheduled, Bryan, without the Commission's knowledge or approval, sent letters on April 16 notifying those agencies bidding for the contract that Fahlgren Martin had been awarded the advertising contract.

✓    At Bryan's direction, Gunnoe falsely testified to the Commission that the evaluation committee had decided to recommend the Fahlgren Martin Agency for the contract. To support her falsified testimony, Gunnoe presented to the Commission altered versions of her notes of the evaluation committee's meetings and characterized those notes as reflective of the committee's deliberations.

✓    Bryan's scheme to have Fahlgren Martin awarded the contract hit a snag in June 1991, when Harold Curtiss of the Department of Administration's Purchasing Division found Bryan's

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

---

[8]  Even the Fourth Circuit admitted (*see* quote *supra* in text) that the perjury conviction was had on the flimsiest of evidence.

contract proposal recommending Fahlgren Martin to be deficient.... When Curtis inquired of the Lottery whether a quantitative analysis had been used in the evaluation process, he was falsely advised that the committed had not used a quantitative analysis.

✓ Bryan instructed Gunnoe to have some of the evaluation committee's members prepare memoranda falsely evidencing their support for Fahlgren Martin.

✓ After Governor Caperton decided upon VLC, Bryan sought to ensure that VLC would receive a single source contract and that West Virginia would receive a manufacturing facility, as per the agreement. In much the same way he rigged the award of the $2.8 million advertising contract, Bryan undertook to ensure that the Lottery Commission would award a single source video lottery contract to VLC.

✓ Bryan directed Woodford to draft a Request for Proposal calling for a single source provider of video lottery technology. At the same time administration officials assured VLC executives that the RFP would also specifically call for a type of electronic network that only VLC could supply.

✓ The Lottery Commmission voted in favor of the expansion [of the lottery] on November 30, 1992, and ordered the formation of a subcommittee.... Despite the Commission's decision to form an investigatory subcommittee, Bryan directed Woodford, without the Commission's knowledge or approval, to proceed with the issuance of the RFP that had already been drafted prior to the Commission's vote of approval for the expansion plan.

✓ Two bid packages were submitted in response to the RFP: one by VLC and one by International Game Technology (IGT), a rival of VLC. Although Woodford formed a

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

committee to evaluate these bid packages, Bryan had specifically informed Woodford that he wanted VLC to be awarded the contract.

✓ [I]n September 1992, soon after the decision had been made to select VLC as the exclusive supplier of terminals in the statewide expansion of video lottery, Bryan purchased 300 shares of VLC stock.

✓ Bryan made all his stock trades on the basis of nonpublic, confidential information entrusted to him in his capacity as Lottery Director.

Of course, in addition to hearing the evidence of live witnesses concerning these "other bad acts," the jury had the opportunity to hear a summary of the "bad acts" in the opening statement and then to hear the same "bad acts" recited all over again when the prosecution summed up.

Almost all the evidence in the trial went to proving crimes that <u>did</u> <u>not</u> <u>exist</u>! The Fourth Circuit itself reversed the insider trading conviction because it was based on the made-up "misappropriation theory" never approved in the Fourth Circuit. Now, of course, the U.S. Supreme Court has held that the mail and wire fraud convictions were based an <u>unconstitutional</u> application of a federal statute.

In the real world, everyone knows that the perjury count was an after thought! The prosecution for perjury essentially used evidence proving crimes that didn't exist! And, because the Supreme Court has found the application of the mail and wire fraud statutes <u>unconstitutional,</u> Mr. Bryan's trial was rife with constitutional error, so the conflation of the perjury prosecution with the mail and wire

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

fraud prosecutions must be shown to be <u>harmless</u> <u>beyond</u> <u>a</u> <u>reasonable</u> <u>doubt</u>![9] *Chapman v. Cal.,* 386 U.S. 18 (1967); accord *Brecht v. Abrahamson,* 507 U.S. 619, 630 (1993).

In light of *Chapman* and *Brecht,* the Court must look at what a <u>proper</u> conviction for perjury would have looked like: Had Mr. Bryan been tried correctly, then the <u>only</u> thing the jury would have decided would have been whether Mr. Bryan was guilty of perjury. But in the actual prosecution, the perjury allegation was simply a garbage, kitchen-sink part of the indictment[10] (designed, presumably to enhance the likelihood of a plea) that was not the primary focus of the trial. In a proper trial, however, it would have been the <u>entire</u> focus of the trial.

Therefore, can this Court honestly say that without the mountain of evidence tending to show that Mr. Bryan was corrupt, self-dealing and generally unsavory, the jury would have convicted him on the flimsy evidence that the Fourth Circuit itself had a hard time swallowing? The answer is obviously "no."[11]

---

[9]

"There is little, if any, difference between our statement in Fahy v. Connecticut about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our Fahy case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was **harmless beyond a reasonable doubt**."

*Chapman* at p. 24, emphasis added.

[10]

"[W]e are admonished that we may not as judges ignore what we know as men..."

*United States v. Maze,* 414 U.S. 395, 403 (1974).

[11]

It should be remembered that the Fourth Circuit simply said that it could sustain the jury's

NEELY & CALLAGHAN
159 Summers Street
Charleston
W VA 25301-2134
(304) 343-6500

Strangely, the perjury conviction did no real harm in the context of the original case. After all, all the sentences were to run concurrently, and the sentencing guidelines made the wire fraud and securities fraud convictions substantially more serious than the perjury conviction. Furthermore, Mr. Bryan was going to lose his right to own firearms, be debarred from serving in certain public offices, be debarred from participating in certain governmental activities and be prohibited from joining certain organizations regardless of whether he had one federal felony conviction or five. That, then, probably entered into the Fourth Circuit's decision to affirm the perjury conviction.

But now the restoration of Mr. Bryan's civil rights depends upon the reversal of his perjury conviction which, obviously, was tainted by the admission of mountains of "inadmissible" Rule 404(b) "other bad acts" evidence.

## VII
### *Return of the Fine*

There is <u>absolutely</u> <u>no</u> <u>evidence</u> in this case that Mr. Bryan received <u>anything</u> in the way of a bribe or kickback from the acts the Government alleged supported his convictions. And, the Fourth Circuit opinion admitted that there was <u>no</u> bribe or kickback to Mr. Bryan. Nonetheless, pursuant to the convictions for <u>mail</u> <u>fraud</u>, Mr. Bryan was required to pay $120,000 in "restitution" to Fahlgren Martin and to International Game Technologies (IGT). When these payments were sent to Fahlgren and IGT, Mr. Bryan indicated that he was sending them under protest and that if his conviction were overturned, he would be entitled to a refund.

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

---

finding of guilt on the perjury conviction: The court was careful not to indicate that the court would have found Mr. Bryan guilty of perjury. So all the Fourth Circuit really said was that the jury's verdict was not "clearly wrong."

Page 19 of 21

These restitution payments were ordered by the Court as a result of the mail fraud convictions and not as a result of the perjury conviction: Therefore, regardless of whether the perjury conviction is reversed, Mr. Bryan is entitled to the return of the money wrongfully taken from him: The *Mandel* case, *supra*, clearly stands for that legal proposition. And, once it is determined that Mr. Bryan's $120,000 was wrongfully taken from him, it becomes axiomatic that Mr. Bryan is entitled to the return of this money with interest at the statutory interest rate from the date of payment until the date of return. In addition Mr. Bryan was assessed a $250 fee, $50 of which were returned when his securities fraud conviction was overturned by the Fourth Circuit. Now, Mr. Bryan is also entitled to the return of his $200 with interest.

**Wherefore,** Petitioner prays that this Honorable Court grant a writ of error coram nobis and enter an order annulling all of Mr. Bryan's convictions and order the return of his fine/restitution of $120,000 and special assessment with interest.

Respectfully submitted,
Elton E. Bryan
 by Counsel

Richard Neely
**NEELY & CALLAGHAN**
159 Summers St.
Charleston, WV 25301-2134
304-343-6500 voice
304-343-6528 fax
RNeely@NeelyCallaghan.com

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

Page 20 of 21

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
Charleston

**ELTON E. BRYAN,**

Petitioner

2:93-CR-00898

v.

**UNITED STATES OF AMERICA**

Respondent

## CERTIFICATE OF SERVICE

I, Richard Neely, counsel for Petitioner, do hereby certify that I served the foregoing Petition for a Writ of Error Coram Nobis upon the following members of the staff of the United States Attorney's Office for the Southern District of West Virginia, to-wit:

Hon. R. Booth Goodwin, II
*United States Attorney*
Hunter Paul Smith, Jr., Esq.
*Assistant United States Attorney*
Larry R. Ellis, Esq.
*Assistant United States Attorney*

by hand delivery on the 6th day of October, 2010 to the United States Courthouse in Charleston.

Richard Neely
**NEELY & CALLAGHAN**
159 Summers St.
Charleston, WV 25301
304-343-6500 Voice
304-343-6528 Fax
RNeely@NeelyCallaghan.com

NEELY & CALLAGHAN
159 SUMMERS STREET
CHARLESTON
W VA 25301-2134
(304) 343-6500

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

EXHIBIT
1



# LexisNexis®

LEXSEE 58 F.3D 933

**UNITED STATES OF AMERICA, Plaintiff-Appellee, v. ELTON E. BRYAN, a/k/a Butch, Defendant-Appellant.**

**No. 94-5124**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

*58 F.3d 933; 1995 U.S. App. LEXIS 15893; Fed. Sec. L. Rep. (CCH) P98,787*

**December 9, 1994, Argued**
**June 27, 1995, Decided**

**PRIOR HISTORY:** [**1] Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. Charles H. Haden II, Chief District Judge. (CR-93-89-2-1).

**DISPOSITION:** AFFIRMED IN PART, REVERSED IN PART

**COUNSEL:** ARGUED: Jerald Elton Jones, WEST & JONES, Clarksburg, West Virginia, for Appellant.

Michael Lee Keller, Assistant United States Attorney, Charleston, West Virginia, for Appellee.

ON BRIEF: John S. Kaull, WEST & JONES, Clarksburg, West Virginia, for Appellant.

Rebecca A. Betts, United States Attorney, Charleston, West Virginia, for Appellee.

**JUDGES:** Before LUTTIG, Circuit Judge, MICHAEL, United States District Judge for the

Western District of Virginia, sitting by designation, and CURRIE, United States District Judge for the District of South Carolina, sitting by designation. Judge Luttig wrote the opinion, in which Judge Michael and Judge Currie joined.

**OPINION BY:** LUTTIG

**OPINION**

[*936] OPINION

LUTTIG, Circuit Judge:

Appellant, Elton "Butch" Bryan, is a former director of the West Virginia Lottery. In September 1993, a federal jury in Charleston, West Virginia found Bryan guilty of two counts of mail fraud in violation of *18 U.S.C. §§ 1341, 1346*, one count of wire fraud in violation [**2] of *18 U.S.C. §§ 1343, 1346*, and one count of securities fraud in violation of *15 U.S.C. §§ 78j(b)*, 78ff and *17 C.F.R. § 240.10b-5*. These convictions stemmed from Bryan's fraudulent manipulation of two government contracts and from Bryan's use of

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

confidential, non-public information in the purchase of securities of companies doing business with the West Virginia Lottery. Bryan was also convicted of perjury in violation of *18 U.S.C. § 1623*, for giving false testimony before a grand jury. The district court sentenced Bryan to 51 months in prison.

Bryan challenges each of his convictions on appeal. We affirm both mail fraud convictions, the wire fraud conviction, and the perjury conviction. We reverse Bryan's conviction for securities fraud.

[*937] I.

Bryan became Director of the West Virginia Lottery (the Lottery) in April 1990, when he was appointed by West Virginia Governor Gaston Caperton. As Lottery Director, Bryan was charged with negotiating and securing contracts on behalf of the Lottery. In January 1991, with its existing advertising contract due to expire that summer, the Lottery began the selection process for its award of a $ 2.8 million advertising contract. Although the Lottery [**3] previously had relied on subcontractors to secure the Lottery's advertising services, it was decided in 1991 that the Lottery would contract with the new advertising agency directly and that the forthcoming contract would be awarded through an open bidding process.

Bryan assigned responsibility for the selection process to Tamara Gunnoe, the Lottery's Deputy Director of Marketing. Gunnoe in turn formed a seven-member evaluation committee, which included five Lottery employees and two advertising consultants, to review presentations made by agencies bidding on the contract. In early April 1991, six agencies made presentations before the evaluation committee in formal one-hour sessions. The committee members scored each presentation on a numerical evaluation sheet designed to rate the merits of the presentations. Among the companies bidding for the $ 2.8 million contract was the Fahlgren Martin Agency, the agency that had provided the Lottery's advertising services under the expiring contract. Tabulation of the scoresheets, however, revealed that the Arnold Agency had received the committee's highest rating.

After completing the evaluation process, Gunnoe met with Bryan to brief him [**4] on the results. She informed Bryan that the Arnold Agency had received the committee's highest rating and that the committee had decided to recommend that the Arnold Agency be awarded the contract. Gunnoe also presented Bryan with a sheet summarizing the results the committee had reached. Bryan advised Ms. Gunnoe that he would have to give the matter further consideration before making any decisions.

After meeting with Gunnoe, Bryan discussed the matter of the advertising contract with Governor Caperton. Caperton and Bryan decided to award the contract to the Fahlgren Martin Agency, notwithstanding the committee's recommendation of the Arnold Agency. Bryan informed Gunnoe of this decision and directed her to surrender to Edward ReBrook, legal counsel for the Lottery, all of the evaluation committee's forms documenting that the Arnold Agency had received the committee's highest evaluation.

Neither Bryan nor the Governor, however, had unilateral power to award the advertising contract. Rather, the seven-member West Virginia Lottery Commission (the Commission) had to approve the contract before it could officially be awarded. Hearings before the Commission to consider the contract had [**5] already been scheduled for April 24, 1991.

Fully aware of the Commission's authority and fully aware that hearings had already been scheduled, Bryan, without the Commission's knowledge or approval, sent letters on April 16 notifying those agencies bidding for the contract that Fahlgren Martin had been

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

awarded the advertising contract. Although he had already notified the interested parties that Fahlgren Martin had been selected, Bryan nonetheless decided to seek the approval of the Commission at the April 24 hearing and to represent to the Commission at the hearing that the selection process was still open.

Deputy Director Gunnoe appeared before the formal session of the Commission on April 24 to testify about the evaluation committee's findings and recommendations. At Bryan's direction, Gunnoe falsely testified to the Commission that the evaluation committee had decided to recommend the Fahlgren Martin Agency for the contract, that the committee had not used a numerical scoring procedure in evaluating the bid proposals, and that there existed no numerical scoresheets reflecting the committee's evaluations. To support her falsified testimony, Gunnoe presented to the Commission altered **[**6]** versions of her notes of the evaluation committee's meetings and characterized those notes as reflective of the committee's deliberations. The Commission voted to adopt the evaluation **[*938]** committee's "recommendation" of Fahlgren Martin on May 29, 1991.

Bryan's scheme to have Fahlgren Martin awarded the contract hit a snag in June 1991, when Harold Curtiss of the Department of Administration's Purchasing Division found Bryan's contract proposal recommending Fahlgren Martin to be deficient. In particular, Curtiss questioned the absence of any quantitative data to support the Commission's recommendation. When Curtiss inquired of the Lottery whether a quantitative analysis had been used in the evaluation process, he was falsely advised that the committee had not used a quantitative analysis. Fearing that Curtiss might persist in challenging the Lottery's contract proposal, Bryan instructed Gunnoe to have some of the evaluation committee's members prepare memoranda falsely evidencing their support for Fahlgren Martin. Bryan and Gunnoe later met with Curtiss and

his supervisor and continued in their misrepresentation that the only quantitative data to support the recommendation were Gunnoe's **[**7]** altered notes, which had earlier been provided to the Commission.

As a result of Bryan's and Gunnoe's misrepresentations, the Purchasing Division ultimately approved the proposed $ 2.8 million advertising contract, which was signed by the Lottery and Fahlgren Martin on August 6, 1991. The Lottery immediately thereafter began sending checks through the mail pursuant to the terms of the contract. The mailing of these checks, in conjunction with Bryan's conduct in manipulating the award of the advertising contract, served as the basis for Bryan's first mail fraud conviction.

At about the time Bryan was completing the advertising contract, he began to investigate the possible expansion of video lottery gaming throughout West Virginia. "Video lottery" is the gaming trade name for those lottery games played by individuals on interactive electronic terminals. The state-run video lottery industry in West Virginia was in its infancy in the summer of 1991, with the only authorized video lottery machines located at Mountaineer Park, a horse-racing track in Chester, West Virginia.

In July 1991, high-level members of Governor Caperton's administration, including Bryan, decided to launch a statewide **[**8]** expansion of video lottery gaming. The plan called for the installment of approximately 5,000 machines in race tracks, bars, restaurants, and other locations throughout the state. Due to the perceived political unpopularity of expanding video lottery, however, it was decided in the summer of 1991 that the implementation of a statewide video lottery system would not take place until after Governor Caperton's anticipated re-election in November 1992.

Several video lottery manufacturing companies began lobbying for a piece of the

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

anticipated video gaming business in July 1991, after they became aware of the proposed expansion of video lottery in West Virginia. One company in particular, Video Lottery Consultants (VLC) of Bozeman, Montana, aggressively sought to maximize its share of the potential West Virginia video lottery market. VLC ultimately gained favor with Governor Caperton in the summer of 1992, when it promised to locate a manufacturing plant in West Virginia in exchange for a statewide monopoly on the sale of video lottery machines. Governor Caperton developed a strong interest in the proposal and ultimately decided that VLC would be granted a "single source" contract, under **[**9]** which VLC would be the exclusive supplier of video lottery gaming terminals in West Virginia.

After Governor Caperton decided upon VLC, Bryan sought to ensure that VLC would receive a single source contract and that West Virginia would receive a manufacturing facility, as per the agreement. In much the same way he rigged the award of the $ 2.8 million advertising contract, Bryan undertook to ensure that the Lottery Commission would award a single source video lottery contract to VLC. From August 1992 through November 1992, Bryan and William Woodford, the Deputy Director of the Lottery, held a series of meetings with VLC officials to finalize the agreement reached by Governor Caperton and VLC executives earlier that summer.

In August, Bryan and Woodford flew to VLC's headquarters in Bozeman to hammer **[*939]** out details with VLC executives. After returning from Bozeman, Bryan directed Woodford to draft a Request for Proposals (RFP) calling for a single source provider of video lottery technology. At the same time, administration officials assured VLC executives that the RFP would also specifically call for a type of electronic network that only VLC could supply.

Later that same month, a **[**10]** VLC agent flew to West Virginia to inspect several locations in Barbour County, West Virginia, that Bryan had suggested as possible sites for VLC's proposed manufacturing facility. Bryan and Woodford met with VLC representatives again in September, this time in Charleston, West Virginia. Woodford's notes from this meeting were used to draft the RFP for a single source contract that would be submitted to the Lottery Commission. In October 1992, Woodford supplied VLC representatives with an advanced copy of the unpublished RFP.

Governor Caperton was re-elected in the general election of November 1992, at which time the Caperton administration immediately began to implement the previously undisclosed plan to expand video lottery. The Lottery Commission voted in favor of the expansion on November 30, 1992, and ordered the formation of a subcommittee to investigate the best way to proceed with the expansion. Despite the Commission's decision to form an investigatory subcommittee, Bryan directed Woodford, without the Commission's knowledge or approval, to proceed with the issuance of the RFP that had already been drafted prior to the Commission's vote of approval for the expansion plan. **[**11]** Two bid packages were submitted in response to the RFP: one by VLC and one by International Game Technology (IGT), a rival of VLC. Although Woodford formed a committee to evaluate these bid packages, Bryan had specifically informed Woodford that he wanted VLC to be awarded the contract. Shortly thereafter, Woodford submitted the committee's report, with VLC's bid receiving the highest evaluation.

Bryan scheduled a meeting for January 20, 1993, to announce that VLC had been awarded the video lottery contract. Bryan cancelled that meeting, however, after he received a federal grand jury subpoena on January 19, 1993, calling for records pertaining to video lottery. The video lottery contract was never awarded. Bryan's handling of the video lottery contract gave rise to his second conviction for mail

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

fraud.

Bryan's convictions for wire and securities fraud were based upon his trading in the shares of companies doing business with the West Virginia Lottery. In 1991 and 1992, Bryan purchased shares of IGT and GTech, both of which were bidding for valuable contracts before the Lottery, and in September 1992, soon after the decision had been made to select VLC as the exclusive supplier of [**12] terminals in the statewide expansion of video lottery, Bryan purchased 300 shares of VLC stock. Bryan made all of these trades on the basis of nonpublic, confidential information entrusted to him in his capacity as Lottery Director.

Bryan appeals all four of his fraud convictions, as well as his conviction for providing false testimony before a grand jury in connection with this case.

II.

We first address Bryan's challenges to his two mail fraud convictions. *See 18 U.S.C. §§ 1341, 1346.* The first count relates to Bryan's role in orchestrating a scheme of deception against the West Virginia Lottery Commission to ensure that the Commission would award the state's $ 2.8 million advertising contract to Fahlgren Martin. The second count relates to Bryan's role in rigging the bid process for the state's video lottery contract to ensure that VLC would prevail. The government secured these convictions on the theory that Bryan defrauded the people of the State of West Virginia by depriving them of the right to the "honest services" of their government officials.

The federal mail fraud statute prohibits the use of the mails for the purpose of executing "any scheme or artifice to defraud." [**13] *18 U.S.C. § 1341.* In 1988, Congress enacted *18 U.S.C. § 1346,* which provides that for the purposes of the mail and wire fraud statutes, "the term 'scheme or  [*940]  artifice to defraud' includes a scheme or artifice to

deprive another of the intangible right of honest services."

Bryan argues that the evidence was insufficient to support his convictions under these provisions because "there was no evidence that [he] violated any law, statute or binding regulation in his conduct with respect to the Fahlgren-Martin contract or the video lottery contract." Appellant's Br. at 11-12. Relatedly, he claims that "there was no standard by which [he] could be expected to know whether his conduct would deprive the citizens of West Virginia of fair and honest governmental services." *Id.* at 12.

As to Bryan's claim that a conviction under *section 1346* requires proof that the defendant violated some law or regulation other than the mail fraud statute itself, we considered, and rejected, an essentially identical argument in *United States v. Mandel, 591 F.2d 1347 (4th Cir. 1979) (Mandel I), aff'd in relevant part, 602 F.2d 653 (en banc), cert. denied, 445 U.S. 961 (1980),* [**14] and we reject it again here. In *Mandel I,* the Governor of Maryland and several associates were convicted of mail fraud and racketeering charges resulting from a scheme involving the manipulation of the Maryland horse racing industry. The appellants argued, *inter alia,* that their convictions were "based on an unwarranted overextension of the mail fraud statute . . . since the government's theory of the case did not depend upon the violation of any state or federal law, including the common law in the execution of the alleged scheme to defraud." *Id. at 1359.* We rejected this argument, noting that "the several courts that have been called on to decide the question are uniformly of opinion that the fact that a scheme to defraud may or may not violate state law does not determine whether the scheme is within the proscription of the mail fraud statute." *Id. at 1361* (citing *United States v. McNeive, 536 F.2d 1245, 1247 n.2 (8th Cir. 1976); United States v. Keane, 522 F.2d 534, 544 (7th Cir. 1975), cert. denied, 424 U.S. 976 (1976); United States v. States, 488 F.2d 761,*

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

767 (8th Cir. 1973), cert. denied, 417 U.S. 909 (1974); United [**15] States v. Edwards, 458 F.2d 875, 880 (5th Cir.), cert. denied, 409 U.S. 891 (1972)); see also United States v. Shamy, 656 F.2d 951, 957 (4th Cir. 1981), cert. denied, 455 U.S. 939 (1982).

The convictions in *Mandel I* were vacated following the Supreme Court's opinion in *McNally v. United States*, 483 U.S. 350, 97 L. Ed. 2d 292, 107 S. Ct. 2875 (1987). See United States v. Mandel, 862 F.2d 1067 (4th Cir. 1988) (*Mandel II*) (affirming United States v. Mandel, 672 F. Supp. 864 (D. Md. 1987)), cert. denied 491 U.S. 906 (1989). However, they were vacated not because the government had failed to demonstrate a violation of some state law or regulation, but rather because the defendants' "scheme or artifice to defraud" deprived the citizens of Maryland only of "the intangible right to good government," and not of property. The Court in *McNally* had rejected the "intangible rights" theory of mail fraud, and it was for this reason that we affirmed the vacatur of the *Mandel* defendants' convictions. See id. at 1072-73. Thus, although the convictions in *Mandel I* did not survive *McNally*, the holding of *McNally* did not affect our ruling in [**16] *Mandel I* that the mail fraud statute contains no predicate violation requirement. [1]

    1 Although the *McNally* holding did not do so, *dicta* in *McNally* suggested that, were the Court faced with the question, it might not uphold the widely-accepted rule that a mail fraud conviction is not dependent on a violation of state law. *See McNally*, 483 U.S. at 361 n.9 ("It may well be that Congress could criminalize using the mails to further a state officer's efforts to profit from governmental decisions he is empowered to make or over which he has some supervisory authority. But if state law expressly permitted or did not forbid a state officer . . . to have an ownership interest in an insurance agency handling the State's

insurance, it would take a much clearer indication than the mail fraud statute evidences to convince us that having and concealing such an interest defrauds the State and is forbidden under federal law."). Although we consider the Court's statement significant, it ultimately does not alter our conclusion that a predicate violation is not required to establish a violation of *section 1341*. Not only was this statement *dicta* to begin with, but it appears that *McNally* "has since been nullified by statute," through Congress' enactment of 18 U.S.C. § 1346. United States v. Dischner, 974 F.2d 1502, 1518 n.16 (9th Cir. 1992), cert . denied, 122 L. Ed. 2d 682, 113 S. Ct. 1290 (1993); see also United States v. DeFries, 310 U.S. App. D.C. 56, 43 F.3d 707, 709 n.1 (D.C. Cir. 1995) (18 U.S.C. § 1346 "overturned *McNally*"); United States v. Thomas, 32 F.3d 418, 419 (9th Cir. 1994) (same); United States v. Holley, 23 F.3d 902, 910 (5th Cir.) (same), cert. denied, 130 L. Ed. 2d 542, 115 S. Ct. 635 (1994); see also West Virginia Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 114, 113 L. Ed. 2d 68, 111 S. Ct. 1138 (1991) (Stevens, J., dissenting) ("[The Court's] refusal to accept the widely held view of lower courts about the scope of fraud, see *McNally* . . . , was quickly corrected by the 100th Congress" through enactment of 18 U.S.C. § 1346). That Congress enacted *section 1346* so soon after *McNally* strongly suggests that *section 1346* was intended as precisely the sort of "clear indication" that Congress was content with the pre-*McNally* interpretations of the mail fraud statute such as that evidenced in *Mandel I*.

[**17] [*941] That the mail fraud statute contains no predicate violation requirement is seemingly confirmed by Carpenter v. United States, 484 U.S. 19, 98 L. Ed. 2d 275, 108 S. Ct. 316 (1987), decided by the Supreme Court in the Term following *McNally*. Had *McNally*

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

interpreted the mail fraud statute so as to require a predicate violation, the mail fraud convictions in *Carpenter* would surely have been overturned, because the government had not alleged the violation of any law or regulation aside from the mail fraud statute itself. The fraud prosecutions in *Carpenter* were based on the theory that the petitioner, a reporter for the *Wall Street Journal*, had violated the *Journal*'s "official policy and practice," *id. at 23*, when he traded securities on the basis of information gathered for a newspaper column. The petitioner thus had breached only his "fiduciary obligation to protect confidential information obtained during the course of his employment." *Id. at 27* (citation omitted). [2]

> 2    Bryan, similarly, violated the oath he signed upon assuming office, in which he pledged to administer the West Virginia lottery in an honest, legal, and efficient manner, and agreed to conduct his personal affairs and those of the Lottery in such a manner that the two interests would not conflict or appear to conflict. J.A. at 81.

[**18] The Court in *Carpenter* was only interpreting *18 U.S.C. §§ 1341* and *1343*, Congress not having enacted *18 U.S.C. § 1346* until after *Carpenter* was decided. We see no reason, however, to read into the mail fraud statute an independent criminal violation requirement when the fraud conviction is based on the deprivation of the right to intangible services as opposed to the deprivation of property or money, as in *Carpenter*. We therefore reject Bryan's contention that the government was required to prove that he violated a criminal statute independent of the mail fraud statute in order to establish a violation of *18 U.S.C. §§ 1341, 1346*.

In what we take to be an alternative argument, Bryan argues that if *section 1346* does not define a "deprivation of the right to honest services" by reference to a statute or regulation, then he "had no reasonable way to know, at the time of his actions, that his conduct in dealing with his staff, the Lottery Commission, and the Purchasing Department would be deemed by the government to be unlawful." Appellant's Reply Br. at 9. To the extent that this amounts to an argument that *section 1346* should be declared void for vagueness, we are unpersuaded. [**19] [3]

> 3    Again, this is consistent with pre-*McNally* practice, in which vagueness challenges to prosecutions under the mail fraud statute were generally rejected. *See, e.g., United States v. Margiotta, 688 F.2d 108 (2d Cir. 1982), cert. denied, 461 U.S. 913 (1983); United States v. Bohonus, 628 F.2d 1167, 1173-75 (9th Cir.), cert. denied, 447 U.S. 928 (1980); United States v. Louderman, 576 F.2d 1383, 1388 (9th Cir.), cert. denied, 439 U.S. 896 (1978).*

It is axiomatic that "due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Buckley v. Valeo, 424 U.S. 1, 77, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976)* (quoting *United States v. Harriss, 347 U.S. 612, 617, 98 L. Ed. 989, 74 S. Ct. 808 (1954))*; *see also Kolender v. Lawson, 461 U.S. 352, 357, 75 L. Ed. 2d 903, 103 S. Ct. 1855 (1983)* ("The void-for-vagueness doctrine requires [**20] that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary [*942] and discriminatory enforcement."); *Grayned v. City of Rockford, 408 U.S. 104, 108-09, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972).* The Supreme Court has repeatedly held, however, that "vagueness challenges to statutes which do not involve *First Amendment* freedoms must be examined in the light of the facts of the case at hand." *United States v.*

*Mazurie, 419 U.S. 544, 550, 42 L. Ed. 2d 706, 95 S. Ct. 710 (1975); see also Chapman v. United States, 500 U.S. 453, 467, 114 L. Ed. 2d 524, 111 S. Ct. 1919 (1991).* Bryan's is not a challenge implicating *First Amendment* concerns, *compare Buckley, 424 U.S. at 76-82* (vagueness challenge to Federal Election Commission Act), and he therefore must contend with the general rule that "one to whose conduct a statute clearly applies may not successfully challenge it for vagueness," *Parker v. Levy, 417 U.S. 733, 756, 41 L. Ed. 2d 439, 94 S. Ct. 2547 (1974).*

The mail fraud statute's honest services provision clearly applies to Bryan's conduct. The legal meaning of "a deprivation of the intangible right to honest services" has been extensively developed by the courts, **[**21]** and indisputably includes conduct such as Bryan's. In *United States v. Barber, 668 F.2d 778, 784 n.4 (4th Cir.), cert. denied, 459 U.S. 829 (1982),* for example, we held that state officials owe a "fiduciary duty . . . to the state and its citizens," and that one who schemes to deprive citizens of "the honest and faithful performance of an official's duties" violates *section 1341.* Accordingly, we affirmed the mail fraud conviction of the Commissioner of the West Virginia Beverage Control Commission, who had manipulated warehouse records and otherwise abused his position in order to obtain free liquor for himself and other officials. *Id. at 781.* Similarly, in *Mandel I,* we found the mail fraud statute violated by the Governor of Maryland and several of his associates, who had manipulated the state's horse racing industry. The Governor's associates were guilty of failing to disclose their ownership of various racetracks during their dealings with the Maryland Racing Commission; the Governor, meanwhile, had failed to disclose his involvement with the race track owners to state legislators who were considering a bill benefitting the track owners. *Mandel I, 591* **[**22]** *F.2d at 1355.*

Other circuits likewise have held that schemes involving various types of dishonesty by public officials come within the ambit of the mail fraud statute because such schemes defraud citizens of their intangible rights to honest and impartial government. *See, e.g., United States v. Silvano, 812 F.2d 754, 755-57 (1st Cir. 1987)* (affirming mail fraud conviction of city budget director who schemed to have city insurance contract awarded to company in which friend held significant interest); *United States v. Brown, 540 F.2d 364, 368-70 (8th Cir. 1976)* (affirming mail fraud convictions of city building commissioner who, in exchange for rent payments, manipulated bid process for demolition projects to benefit associate); *United States v. Bush, 522 F.2d 641, 643-46 (7th Cir. 1975)* (affirming mail fraud conviction of city Director of Public Relations, based on his failure to disclose to other city officials his ownership of a company bidding for city projects and on his subsequent concealment efforts), *cert. denied, 424 U.S. 977 (1976).*

Under these authorities, there can be little doubt that Bryan's use of the mails in the course of rigging **[**23]** the bids relating to the West Virginia Lottery is a species of mail fraud. While these authorities pre-date *McNally's* invalidation of the "honest services" theory, we do not question their general applicability, now that the "honest services" proscription has been codified in *18 U.S.C. § 1346. See United States v. D'Alessio, 822 F. Supp. 1134, 1148 (D.N.J. 1993)* ("In the wake of *section 1346,* the pre-*McNally* caselaw relied on by the Government still has persuasive effect."). Nor, given the likelihood that these authorities would be applicable under the new statute, do we believe that Bryan should be heard to complain that he lacked adequate notice that the conduct upheld as fraudulent in these cases might be considered fraudulent under the newly-enacted statute.

In short, Bryan should have known that his conduct might be unlawful, and it appears from the extensive measures he undertook to **[*943]**

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

disguise his behind-the-scenes scheming that he in fact did believe in the illegality of that conduct.

III.

Bryan also challenges his conviction for violating the federal wire fraud statute, *18 U.S.C. §§ 1343, 1346*, which was based upon his trading in the stock of companies that [**24] stood to gain from the decisions of the West Virginia Lottery Commission. Bryan contends that the government's case against him was flawed because it included no evidence of benefit or gain accruing to him, and "no proof of actual or constructive fraud." Appellant's Br. at 27. Once again, Bryan's sufficiency challenge reflects a misunderstanding of the elements of the crime charged. The gravamen of the offense of wire fraud is simply the execution of a "'scheme to defraud,'" *Barber, 668 F.2d at 784* (quoting *United States v. George, 477 F.2d 508, 512 (7th Cir.), cert. denied, 414 U.S. 827 (1973))*, and "the fraud need not succeed" for a defendant to be convicted of wire fraud, *Dischner, 974 F.2d at 1521*. Bryan's claim that the jury was presented with insufficient "proof of actual or constructive fraud" likewise fails. The jury was presented with ample evidence that Bryan was engaged in a scheme to defraud the citizens of West Virginia of their right to his honest services, and that he traded on confidential information. *Cf . Carpenter, 484 U.S. at 26* (confidential information is "property," the deprivation of which can constitute wire fraud).

IV.

Bryan [**25] next challenges his conviction for securities fraud under section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C. §§ 78j(b)*, 78ff, and *Rule 10b-5, 17 C.F.R. § 240.10b-5*. [4] The government proceeded against Bryan under the so-called "misappropriation theory" of securities fraud liability, a theory that, although novel to this circuit, has been embraced by the Second, Seventh, and Ninth Circuits. *See United States v. Newman , 664 F.2d 12 (2d Cir. 1981), aff'd after remand, 722 F.2d 729* (2d Cir.), *cert. denied, 464 U.S. 863 (1983); United States v. Chestman, 947 F.2d 551 (2d Cir. 1991) (en banc), cert. denied, 503 U.S. 1004 (1992); SEC v. Cherif, 933 F.2d 403 (7th Cir. 1991), cert. denied, 502 U.S. 1071 (1992); SEC v. Clark, 915 F.2d 439 (9th Cir. 1990)*. [5] The Supreme Court has yet to address whether the misappropriation theory is reconcilable with the language and purposes of section 10(b) and *Rule 10b-5*, having evenly divided on the validity of a conviction based on this theory in *Carpenter v. United States, 484 U.S. 19, 24, 98 L. Ed. 2d 275, 108 S. Ct. 316 (1987)*. [6] *See also Chiarella v. United* [*944] *States, 445 U.S. 222, 235-36, 63 L. Ed. 2d 348, 100 S. Ct. 1108* [**26] *(1980)* (declining to address merit of misappropriation theory because theory not submitted to jury).

4    Section 10(b) provides, in relevant part, that

It shall be unlawful for any person, directly or indirectly . . . (b) To use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

*15 U.S.C. § 78j(b)*. *Rule 10b-5*, promulgated by the SEC pursuant to section 10(b), provides, in relevant part, that

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce . . .

(a) to employ any device, scheme, or artifice to defraud, [or] . . .

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b-5.*

[**27]

5    As do many of the courts that have addressed the misappropriation theory, the government also identifies the Third Circuit as having adopted the theory, citing *Rothberg v. Rosenbloom, 771 F.2d 818 (3d Cir. 1985), rev'd after remand, 808 F.2d 252 (1986), cert. denied, 481 U.S. 1017 (1987)*. The court in *Rothberg*, however, merely adverted to the theory in a single sentence, and even then, not by name. *Id. at 822.*

6    Although the Court in *Carpenter* evenly divided over the securities fraud conviction, one cannot help but detect a note of skepticism in the manner in which the Court framed the government's argument in that case:

Although the victim of the fraud, the Journal, was not a

buyer or seller of the stocks traded in or otherwise a market participant, the fraud was *nevertheless* considered to be "in connection with" a purchase or sale of securities within the meaning of the statute and the rule.

*Carpenter*, 484 U.S. at 24 (emphasis added).

We conclude that neither the language of section 10(b), *Rule 10b-5*, the Supreme Court authority interpreting [**28] these provisions, nor the purposes of these securities fraud prohibitions, will support convictions resting on the particular theory of misappropriation adopted by our sister circuits. Section 10(b), insofar as concerns us, *see infra* pp. 18-19, prohibits only the use of deception, in the form of material misrepresentations or omissions, to induce action or inaction by purchasers or sellers of securities, or that affects others with a vested interest in a securities transaction. In contravention of this established principle, the misappropriation theory authorizes criminal conviction for simple breaches of fiduciary duty and similar relationships of trust and confidence, whether or not the breaches entail deception within the meaning of section 10(b) and whether or not the parties wronged by the breaches were purchasers or sellers of securities, or otherwise connected with or interested in the purchase or sale of securities. Finding no authority for such an expansion of securities fraud liability -- indeed, finding the theory irreconcilable with applicable Supreme Court precedent -- we reject application of the theory in this circuit. [7] We hold therefore that the district court [**29] plainly erred in instructing the jury that it could convict Bryan of securities fraud on the basis of the misappropriation theory of *Rule 10b-5* liability. *See, e.g., United States v. Olano, 123 L. Ed. 2d 508, 113 S. Ct. 1770 (1993); United States v.*

*Piccolo, 835 F.2d 517, 519 (3d Cir. 1987)* (jury instructions "allowing conviction for conduct outside the proscription of the mail fraud statute" constitute plain error affecting substantial rights).

   7   It is important to emphasize that we are not addressing whether trading on the basis of misappropriated information can ever give rise to criminal liability; in many instances it will, such as where a corporate executive trades in shares of his own company, without disclosure, on the basis of information entrusted to him solely for corporate purposes. *See Chiarella, 445 U.S. at 230.* We address only the particular theory of misappropriation described herein, which has been adopted by the other circuits and on which Bryan's conviction was based.

   A.

   Those courts [**30] that have adopted the misappropriation theory with which we are concerned in this case have read section 10(b) and *Rule 10b-5* to authorize the criminal conviction of a person who

       (1) misappropriates material nonpublic information (2) by breaching a duty arising out of a relationship of trust and confidence and (3) uses that information in a securities transaction, (4) regardless of whether he owed any duties to the shareholders of the traded stock.

   *Clark, 915 F.2d at 443.* Under this misappropriation theory, the "fraud" requirement of *Rule 10b-5* is deemed to be satisfied when a person "misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence." *Chestman, 947 F.2d at 566;*

*see also Newman , 664 F.2d at 17* (by stealing information from their employers defendants "defrauded those employers as surely as if they took their money"). The source of the nonpublic information need not be a purchaser or seller of securities, be affiliated with a purchaser or seller, or be in any way connected to or even interested in the purchase or sale of securities. *See Chestman, 947 F.2d at 567* (referring to misappropriation [**31] theory as a "fraud-on-the-source" theory of 10b-5 liability); *see also id. at 566* ("In contrast to *Chiarella* and *Dirks,* the misappropriation theory does not require that the buyer or seller of securities be defrauded."). Even though the defendant owes no duty of disclosure to the purchaser or seller of the securities, the completed fraud (*i.e.,* the misappropriation) is deemed to be "in connection with the purchase or sale of [a] security," because the misappropriated information is thereafter used in a securities [*945] transaction. *See, e.g., SEC v. Materia, 745 F.2d 197, 202 (2d Cir. 1984)* ("Whether a defendant has breached a duty to a particular plaintiff" is not "germane" in a criminal prosecution under section 10(b)), *cert. denied, 471 U.S. 1053 (1985); Clark, 915 F.2d at 443.*

   Bryan's conduct clearly constituted criminal activity under this theory of misappropriation. The theory's "fraud" requirement was satisfied when, in breach of his duty of confidentiality and his statutory obligation to refrain from using his position for personal gain, Bryan misappropriated information pertaining to the awarding of the video lottery contract, entrusted [**32] to him as the West Virginia Lottery Director. The fraud was "in connection with the purchase or sale of any security," because Bryan subsequently used the misappropriated confidential information in the purchase of shares of VLC. This is so, even though, as the government concedes, Bryan "occupied no relationship of trust and confidence with respect to the companies bidding for video lottery business or to their shareholders," Appellee's Br. at 28 n.9, and

therefore owed no duty of disclosure to the market participants with whom he traded. The question for us, however, is not whether Bryan's conduct violated section 10(b) under this particular misappropriation theory, but rather, whether criminal liability under section 10(b) of the Securities Exchange Act of 1934 and *Rule 10b-5* can be predicated upon such a theory.

The language of section 10(b) and *Rule 10b-5* sweeps broadly. The statute prohibits the use of "any" manipulative or deceptive device or contrivance "in connection with" the purchase or sale of "any" security. Similarly, *Rule 10b-5* prohibits the use of "any" device, scheme, or artifice to defraud and criminalizes "any" act, practice, or course of business that operates **[\*\*33]** as a "fraud or deceit" upon "any" person. Absent guidance from the Supreme Court, the language of the Rule, if not of the statute, could plausibly accommodate the misappropriation theory. *See, e.g., Clark , 915 F.2d at 448-49* (concluding that "the misappropriation theory fits comfortably" within "the notoriously vague" terms of section 10(b) and *Rule 10b-5*); *Cherif, 933 F.2d at 410 n.5* ("There is little question that the vague term 'fraud' as used in Section 10(b) and *Rule 10b-5* can encompass the misappropriation theory."); *see also Chestman, 947 F.2d at 564* (referring to the "expansive language" of *Rule 10b-5*). For at least two decades, however, the Supreme Court has repeatedly warned against expanding the concept of fraud in the securities context beyond what the words of the Act reasonably will bear. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 128 L. Ed. 2d 119, 114 S. Ct. 1439, 1446 (1994)* ("With respect . . . to . . . the scope of conduct prohibited by § 10(b), the text of the statute controls our decision."); *Chiarella, 445 U.S. at 234* ("As we have emphasized before, the 1934 Act cannot be read '"more broadly than its language and **[\*\*34]** the statutory scheme reasonably permit."'" (citation omitted)). It is with this simple, but oft-forgotten, admonition in mind that we adjudge the validity of the misappropriation theory.

Manipulation and deception are the touchstones of section 10(b) liability: "The language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception." *Santa Fe Indus., Inc. v. Green , 430 U.S. 462, 473, 51 L. Ed. 2d 480, 97 S. Ct. 1292 (1977)*. Section 10(b) thus makes it "unlawful for any person. . . to use or employ, in connection with the purchase or sale of any security . . . any *manipulative* or *deceptive* device or contrivance," in contravention of SEC rules. *15 U.S.C. § 78j(b)* (emphasis added). For purposes of assessing the validity of the misappropriation theory, we need focus solely on the scope of the statutory phrase "deception" "in connection with" a securities transaction and the *Rule 10b-5* phrase "fraud" "in connection with" a securities transaction, because "manipulation" is "virtually a term of art" in the securities context, *see Santa Fe Indus., 430 U.S. at 476* (quoting *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976)*), referencing **[\*\*35]** "practices, such as wash sales, matched orders, or rigged prices," that are "intended to mislead investors **[\*946]** by artificially affecting market activity," *id.* Our specific concern is whether the Rule's prohibition of "fraud" "in connection with the purchase or sale of any security," which can be read no more broadly than the statutory prohibition of "deception" "in connection with the purchase or sale of any security," *see infra* note 17, may extend to breaches of fiduciary duty involving the misappropriation of confidential information from one who is neither a purchaser nor seller of securities, or otherwise connected with a securities transaction.

In *Santa Fe Industries*, the Supreme Court defined the "deception" proscribed in section 10(b) as the making of a material misrepresentation or the nondisclosure of material information in violation of a duty to disclose. In so defining the term, the Court

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

squarely rejected the Second Circuit's interpretation of section 10(b) that "neither misrepresentation nor nondisclosure [is] a necessary element of a *Rule 10b-5 action*." *Santa Fe Indus., 430 U.S. at 470*. Indeed, the Court in *Santa Fe Industries* specifically rejected [**36] the notion that a breach of fiduciary duty, in and of itself, is prohibited by section 10(b), reasoning that "to the extent" the lower court, in imposing liability,

> relied on the use of the term "fraud" in *Rule 10b-5* to bring within the ambit of the Rule all breaches of fiduciary duty in connection with a securities transaction, its interpretation would . . . "add a gloss to the operative language of the statute quite different from its commonly accepted meaning."

*Id. at 472* (quoting *Ernst & Ernst, 425 U.S. at 199*); *see also id. at 473-74* ("Thus the claim of fraud and fiduciary breach in this complaint states a cause of action under any part of *Rule 10b-5* only if the conduct alleged can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute."). Only last Term, the Court reaffirmed that the term "deception" in section 10(b) references only the misrepresentation or omission of a material fact:

> As in earlier cases considering conduct prohibited by § 10(b), we again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.

*Central Bank of Denver* [**37] , *114 S. Ct. at 1448* (citing *Santa Fe Indus., 430 U.S. at*

473; *Ernst & Ernst, 425 U.S. at 214*). Significantly, the Court also repeated what it characterized as the "holding" of *Santa Fe Industries*: that section 10(b) does not "reach[] breaches of fiduciary duty . . . without any charge of misrepresentation or lack of disclosure." *Id. at 1446* (quoting *Santa Fe Indus., 430 U.S. at 470*). That these principles established in *Santa Fe Industries* and *Central Bank of Denver* are applicable in criminal and enforcement actions under section 10(b) was confirmed by the Court in *Dirks v. SEC, 463 U.S. 646, 77 L. Ed. 2d 911, 103 S. Ct. 3255 (1983)*, an SEC enforcement action:

> Not "all breaches of fiduciary duty in connection with a securities transaction" . . . come within the ambit of *Rule 10b-5*. There must also be "manipulation or deception." . . . Thus, an insider will be liable under *Rule 10b-5* only where he fails to disclose material nonpublic information before trading on it [in violation of a duty to disclose or abstain] and thus makes "secret profits."

*Id. at 654* (quoting *Santa Fe Indus., 430 U.S. at 472*) (other citations omitted).

At the same time that the Court [**38] has repeatedly emphasized that section 10(b) is concerned only with deception in the form of material misrepresentations and omissions, it has equally clearly instructed that the section is primarily if not exclusively concerned with the deception of purchasers and sellers of securities, but at most extends to purchasers and sellers, other investors, and persons with a similar stake in an actual or proposed securities transaction. It is only the breach of a duty to these persons that can give rise to a criminal conviction under section 10(b), if the statutory requirement that the fraud be in connection with the purchase or sale of securities is not to

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

be rendered meaningless.

The Court has left no doubt that the principal concern of section 10(b) is the **[*947]** protection of purchasers and sellers of securities. This was the very premise of the Court's leading cases in *Chiarella* and *Dirks*, and most recently, *Central Bank of Denver*. The Court observed in *Chiarella* that the duty to disclose material, non-public information or abstain from trading under section 10(b) exists only when a trader is under an affirmative duty to disclose information, *Chiarella, 445 U.S. at 228,* **[**39]** a duty which only "arises from a relationship of trust and confidence *between parties to a transaction*," *id. at 230* (emphasis added). *Dirks* "reaffirmed . . . that '[a] duty [to disclose] arises from the relationship between parties . . . and not merely from one's ability to acquire information because of his position in the market.'" [8] *Dirks, 463 U.S. at 657-58* (quoting *Chiarella, 445 U.S. at 231-32 n.14).* [9] And in holding that section 10(b) does not authorize civil liability for aiding and abetting securities fraud, the Court in *Central Bank of Denver* again articulated this limitation on the scope of section 10(b):

> Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5.

*Central Bank of Denver, 114 S. Ct. at 1455.*

[8] *Chiarella* referred to the relationship giving rise to a duty both as one "between parties to a transaction," *Chiarella, 445 U.S. at 230,* and as one, more generically, "between parties," *id. at 231 n.14. Dirks* refers only to the latter

passage, but apparently only because of its interest in reemphasizing that mere possession of market information does not give rise to a disclosure duty, a point made only in the latter passage from *Chiarella*.

**[**40]**

[9] *Chiarella* and *Dirks* arose in the context of alleged nondisclosure. We presume, though the Court has not so stated, that a larger pool of investors is subject to the duty of fair representation than that subject to the duty to disclose or abstain, in that a party to a transaction who makes a representation will ordinarily be under a duty of fair representation even if he does not qualify as an insider, quasi-insider, or tippee under *Chiarella* and *Dirks*. However, we can discern no basis under the reasoning of those cases or in the statutory language for concluding that the duty of fair representation under section 10(b), like the duty to disclose or abstain, runs to anyone other than a purchaser or seller of securities, or to some other party connected with or otherwise interested in a securities transaction.

We believe that *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975),* may also be understood as recognition that section 10(b) is primarily concerned with purchasers and sellers of securities. [10] In *Blue Chip Stamps*, the Court held that only actual purchasers **[**41]** and sellers of securities may bring an implied private action under *Rule 10b-5*. Although many, including Members of the Court, have characterized *Blue Chip Stamps* as exclusively a policy-driven opinion, [11] the Court **[*948]** rested its decision in that case first upon the statutory language of section 10(b). As the Court explained in reaching its holding, the language of section 10(b) would "surely [be] badly strained [if] construed to provide a cause of action, not to purchasers and sellers of securities, but to the world at large." *Id. at 733*

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

n.5; *see also id.* at 733 (Section 10(b)'s "wording . . . directed toward injury suffered 'in connection with the purchase or sale' of securities . .. argues significantly in favor" of a purchaser/seller requirement). Thus, *Blue Chip Stamps* is informed in no small part by the statute's language. *See id.* at 733-37; *see also id.* at 756 (Powell, J., concurring) (emphasizing that the Court's opinion recites "impressive evidence in the texts of [the 1933 and 1934 Acts] demonstrating clearly that Congress selectively and carefully distinguished between offers, purchases, and sales"); *Musick, Peeler & Garrett v. Employers* **[\*\*42]** *Ins. of Wausau,* 124 L. Ed. 2d 194, 113 S. Ct. 2085, 2095 (1993) (Thomas, J., dissenting, joined by Blackmun and O'Connor, JJ.) ("We based [our] conclusion [in *Blue Chip Stamps*] largely on the language of § 10(b) and *Rule 10b-5,* which by their terms govern only 'the purchase or sale of any security.'"). Three Members of the Court even wrote separately to emphasize that the plain language of section 10(b) limited any action to purchasers or sellers of securities. *See Blue Chip Stamps,* 421 U.S. at 760 (Powell, J., concurring). Of course, to the extent that *Blue Chip Stamps* does rest upon the language of section 10(b), it is "applicable whenever a violation of § 10(b) or *Rule 10b-5* is alleged," *Aaron v. SEC,* 446 U.S. 680, 691, 64 L. Ed. 2d 611, 100 S. Ct. 1945 (1980), whether in the civil or criminal context.

10     We appreciate the technical inapplicability of *Blue Chip Stamps* in the criminal context. *Cf. United States v. Naftalin,* 441 U.S. 768, 774 n.6, 60 L. Ed. 2d 624, 99 S. Ct. 2077 (1979) (noting in context of prosecution under section 17(a) that purchaser/seller standing limitation of *Blue Chip Stamps,* applicable in implied civil actions, is "inapplicable" in a criminal prosecution); *SEC v. National Sec., Inc.,* 393 U.S. 453, 467 n.9, 21 L. Ed. 2d 668, 89 S. Ct. 564 (1969); *see also Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258,

281, 117 L. Ed. 2d 532, 112 S. Ct. 1311 (1992) (O'Connor, J., concurring in part and concurring in the judgment) ("The purchaser/seller standing requirement for private civil actions under § 10(b) and *Rule 10b-5* is of no import in criminal prosecutions for willful violations of those provisions."). B*ut see id.* at 283 (stating view, in context of analogous civil RICO provision, that "Congress' use of the word 'sale' in defining the predicate offense does not *necessarily* dictate that a RICO plaintiff have been a party to an executed sale" (emphasis in original)).

**[\*\*43]**

11     *See, e.g., Holmes,* 503 U.S. at 284 (O'Connor, concurring in partand concurring in the judgment) ("The purchaser/seller standing limitation in *Rule 10b-5* damages actions . . . does not stem from a construction of the phrase 'in connection with the purchase or sale of any security.'"); *id.* at 285 ("In *Blue Chip Stamps,* we adopted the purchaser/seller standing limitation in § 10(b) cases as a prudential means of avoiding the problems of proof when no security was traded and the nuisance potential of vexatious litigation."); *id.* at 289-90 (Scalia, J., concurring in the judgment) ("I think . . . that the limitation we approved in *Blue Chip Stamps* was essentially a legislative judgment rather than an interpretive one.").

Where the Court has not expressly limited the scope of the statute to frauds upon purchasers or sellers, it has, for the most part, described the statute as reaching no further than to frauds upon investors. *See, e.g., Dirks,* 463 U.S. at 663 n.23 ("[A] violation [of section 10(b)] may be found only where there is 'intentional or willful **[\*\*44]** conduct designed to deceive or defraud *investors* .'" (emphasis added) (citation omitted)); *Central Bank of Denver,* 114 S. Ct. at 1446 ("Broad congressional purpose[]" of Act is "to protect

investors from false and misleading practices that might injure them."); *cf. Santa Fe Indus., 430 U.S. at 476-77* (purpose of prohibition on manipulation to protect investors from being misled).

The only other persons whom the Court has intimated may come within the purview of section 10(b) are likewise closely linked to securities transactions. For example, the Court in *Blue Chip Stamps* acknowledged that the purchaser/seller requirement that it adopted in the civil implied action context "undoubtedly excludes plaintiffs who have in fact been damaged by violations of *Rule 10b-5*." *Blue Chip Stamps, 421 U.S. at 743.* But the only parties excluded from bringing a civil action as to whom the *Blue Chip Stamps* Court expressed concern were "potential purchasers of shares" and "actual shareholders" who decide not to purchase or sell due to material misrepresentations or omissions, and "shareholders, creditors, and perhaps others related to an issuer who suffered loss in the [**45] value of their investment due to corporate or insider activities." *Id. at 737-38.* Similarly, in the analogous context of section 17(a) of the 1933 Act, the Court in *United States v. Naftalin, 441 U.S. 768, 60 L. Ed. 2d 624, 99 S. Ct. 2077 (1979),* noted that protection of investors is not the sole purpose of the Securities Acts, *id. at 775,* and held that section 17(a) protects financial intermediaries such as stockbrokers, because their welfare is "inextricably linked" to that of investors, *id. at 776; see also id. at 773* (describing section 17(a)(1) as reaching fraud "in any particular phase of the selling transaction"). [12]

12   In identifying the set of persons protected by section 10(b) in the manner we do, we should not be understood as holding that a fraud upon any of these persons will necessarily give rise to criminal liability under section 10(b). The Supreme Court purposely has not defined the contours of the statute with precision, and we need not, and do not,

attempt in this opinion what the Court has wisely avoided. We define the set of persons in the broadest terms for purposes of this opinion merely to highlight that the misappropriation theory we reject requires essentially no connection between the fraud and a securities transaction. In other words, even under the broadest understanding of the statute's scope, the misappropriation theory that we are considering is invalid.

[**46]   [*949]   In light of the Court's consistent interpretation of section 10(b) as proscribing only the deception, by material misrepresentation or omission, of a purchaser or seller of securities, or of a person in some way connected with or having a stake in an actual or proposed purchase or sale of securities, we believe that the misappropriation theory cannot be defended. Although the misappropriation of information in breach of a fiduciary duty may, in a generalized sense, involve deception, [13] in most cases such misappropriation will not constitute a "misrepresentation" or "nondisclosure." [14] In any event, by its own terms, the misappropriation theory does not even require deception, but rather allows the imposition of liability upon the mere breach of a fiduciary relationship or similar relationship of trust and confidence. Such a theory obviously cannot be squared with the holding of *Santa Fe Industries* that a breach of fiduciary duty, even in connection with a purchase or sale of securities, does not give rise to liability under section 10(b), absent deception. *See Santa Fe Indus., 430 U.S. at 473-74.* [15]

13   *See, e.g., Carpenter, 484 U.S. at 28* (playing role as loyal employee while appropriating confidential business information for one's own use is "deceit"); *Superintendent of Ins. v. Bankers Life & Casualty Co., 404 U.S. 6, 10-11 n.7, 30 L. Ed. 2d 128, 92 S. Ct. 165 (1971)* ("Misappropriation is a 'garden variety' type of fraud."); *Clark, 915 F.2d*

*at 448* ("By becoming part of a fiduciary or similar relationship, an individual is implicitly stating that she will not divulge or use to her own advantage information entrusted to her in the utmost confidence. She deceives the other party by playing the role of the trustworthy employee or agent; she defrauds it by actually using the stolen information to its detriment.").

[**47]

14   *See, e.g., Chestman, 947 F.2d at 578* (Winter, J., concurring in part and dissenting in part) ("Theft rather than fraud or deceit, seems the gravamen of the [misappropriation] prohibition."); *Pross v. Katz, 784 F.2d 455, 457-58 (2d Cir. 1986)* (citing *Santa Fe Indus., 430 U.S. 462*) ("Making a specific promise to perform a particular act in the future while secretly intending not to perform may violate Section 10(b) . . . if the promise is part of the consideration for a sale of securities. . . . However, generalized promises to act as a faithful fiduciary stand on a different footing than other promises of future performance [and] . . . the failure to perform a promise not to breach such a duty also does not violate federal law." (citations omitted)); *Santa Fe Indus., 430 U.S. at 471-74* (mere breach of fiduciary duty, even one in connection with a securities transaction, does not constitute fraud within meaning of section 10(b)); *Chiarella, 445 U.S. at 225 n.5* (noting dismissal of *Rule 10b-5(b)* charge relating to nondisclosure on ground that "petitioner made no statements at all in connection with the purchase of stock").

15   Of course, to the extent that *Rule 10b-5* may be read to prohibit conduct that is not subject to prohibition under section 10(b), the Rule is invalid. As the Supreme Court reminded specifically with respect to *Rule 10b-5* in *Santa Fe Industries*, because the SEC's rulemaking

power is not the power to make law, the scope of *Rule 10b-5* "cannot exceed the power granted the Commission by Congress under § 10(b)." *Santa Fe Indus., 430 U.S. at 472-73* (quoting *Ernst & Ernst, 425 U.S. at 214*); *see also Central Bank of Denver, 114 S. Ct. at 1446* ("We have refused to allow 10b-5 challenges to conduct not prohibited by the text of the statute."); *Santa Fe Indus., 430 U.S. at 472* ("In deciding whether [conduct constitutes] 'fraud' under *Rule 10b-5*, 'we turn first to the language of § 10(b).'" (citation omitted)); *id.* ("The statute must control the interpretation of the Rule.").

[**48]   Even if the misappropriation theory required deception, or deception were otherwise present, the theory still does not require deception violative of a duty of fair representation or disclosure owed to a market participant, *i.e.*, deception in connection with a purchase or sale of securities. [16] Section 10(b), it   [*950]   bears repeating, reaches only deception of persons with some connection to, or some interest or stake in, an actual or proposed purchase or sale of securities. The misappropriation of information from an individual who is in no way connected to, or even interested in, securities is simply not the kind of conduct with which the securities laws, as presently written, are concerned. [17]

16   The misappropriation theory likewise does not attempt to give meaning to the materiality requirement of section 10(b), nor could it. The only relevant misrepresentation or nondisclosure under the misappropriation theory, assuming such is present, is that to the source of the information. Because the source generally is not connected to or interested in the securities transaction, it would be meaningless to ask whether that misrepresentation affected the source's investment decision. *See Basic Inc. v. Levinson, 485 U.S. 224, 231-32,*

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

*99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)* ("To fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" (citation omitted)).

[**49]

17   Those courts that have adopted the misappropriation theory have reconciled the theory with the statute's requirement that deception occur "in connection with the purchase or sale of any security" by concluding that the deception need only "touch" a securities transaction, citing *dicta* from *Superintendent of Ins. v. Bankers Life & Casualty Co., 404 U.S. 6, 12-13, 30 L. Ed. 2d 128, 92 S. Ct. 165 (1971)* ("The crux of the present case is that Manhattan suffered an injury as a result of deceptive practices *touching* its sale of securities as an investor." (emphasis added)). *See, e.g., Newman, 664 F.2d at 18* (Act requires merely that the fraud "touch" the securities transaction, a "very tenuous" connection); *Clark, 915 F.2d at 449* (requiring only that "the fraud must somehow 'touch' upon securities transactions").

Not only can the isolated passage from *Bankers Life* not fairly be read to eliminate the requirement of fraud upon a purchaser or seller, or some other person linked to a securities transaction, it would not occur to us to so read it, given that the fraud victim in *Bankers Life* was the seller of securities, who suffered injuries "as an investor." *Bankers Life, 404 U.S. at 10.* In fact, in *Bankers Life* the Court stated its understanding that section 10(b) only "barred deceptive devices and contrivances *in the purchase or sale of securities.*" *Id. at 12* (emphasis added). We therefore remain as skeptical

today as we were a decade ago about reading too much into the "touch" language of *Bankers Life*:

The *Bankers Life* "de minimis touch test" might be read literally and expansively to make any securities transaction actionable under *Rule 10b-5* so long as there was some deceptive practice remotely "touching" the transaction. But we think the test could not have been intended to be applied in so unlimited a way.

*Head v. Head, 759 F.2d 1172, 1175 (4th Cir. 1985)* (citation omitted).

[**50]   In essence, the misappropriation theory disregards the specific statutory requirement of deception, in favor of a requirement of a mere fiduciary breach, and then artificially divides into two discrete requirements -- *a* fiduciary breach and *a* purchase or sale of securities -- the single indivisible requirement of deception upon the purchaser or seller of securities, or upon some other person intimately linked with or affected by a securities transaction. In so doing, the theory effectively eliminates the requirement that a person in some way connected to a securities transaction be deceived, allowing conviction not only where the "defrauded" person has no connection with a securities transaction, but where no investor or market participant has been deceived. In allowing the statute's unitary requirement to be satisfied by any fiduciary breach (whether or not it entails deceit) that is followed by a securities transaction (whether or not the breach is of a duty owed to a purchaser or seller of securities, or to another market participant), the misappropriation theory transforms section

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

10(b) from a rule intended to govern and protect relations among market participants who **[**51]** are owed duties under the securities laws into a federal common law governing and protecting any and all trust relationships. If, as the Supreme Court has held, the fraud-on-the-market theory is insupportable because section 10(b) does not ensure equal information to all investors, *Chiarella, 445 U.S. at 233-34, a fortiori* such a general fraud-on-the-source theory in pursuit of the same parity of information cannot be defended.

Though the text of section 10(b) as interpreted by the Supreme Court is itself a sufficient basis upon which to reject the misappropriation theory, the principles that inform interpretation of the securities fraud provisions also counsel rejection of the theory. The Supreme Court has repeatedly emphasized that the securities market "demands certainty and predictability," *Central Bank of Denver, 114 S. Ct. at 1454* (citation omitted), and that "it is essential . . . to have a guiding principle for those whose daily activities must be limited and instructed by the SEC's inside-trading rules," *Dirks, 463 U.S. at 664; see also id. at 658 n.17* ("imprecise" rules "prevent[] parties from ordering their actions in accord with legal requirements"); **[**52]** *id.* (market participants **[*951]** must "have some guidance as to where the line is between permissible and impermissible disclosures and uses"); *id. at 664* (rejecting "rule adopted by the SEC" because it "would have no limiting principle"). Absent clearly defined rules, investors find themselves the targets of *ad hoc* decisionmaking or pawns in an overall litigation strategy known only to the SEC. *See Central Bank of Denver, 114 S. Ct. at 1454* (noting "undesirability . . . of decisions 'made on an ad hoc basis'" (citation omitted)); *Dirks, 463 U.S. at 664 n.24* (investor reliance upon the reasonableness of SEC's litigation strategy "can be hazardous").

It would be difficult to overstate the uncertainty that has been introduced into the already uncertain law governing fraudulent securities transactions through adoption of the misappropriation theory, with its linchpin the breach of a fiduciary duty. As the Second Circuit noted in *Chestman,* "the existence of fiduciary duties in . . . common law settings" outside the shareholder relations context "is anything but clear." *Chestman, 947 F.2d at 567; see also id.* ("Fiduciary duties are circumscribed with some clarity **[**53]** in the context of shareholder relations but lack definition in other contexts."). Indeed, although fifteen years have passed since the theory's inception, no court adopting the misappropriation theory has offered a principled basis for distinguishing which types of fiduciary or similar relationships of trust and confidence can give rise to *Rule 10b-5* liability and which cannot. After repeatedly grappling with its own misappropriation theory, the only guidance that the Second Circuit has been able to provide, apart from its observation that the misappropriation theory rests on general notions of "dependency and influence," *id . at 569,* is that it "will not apply outer permutations of chancery relief in addressing" whether a fiduciary duty or similar relationship of trust and confidence has been breached, *id. at 570.*

Thus far, the misappropriation theory has been invoked by federal prosecutors and securities regulators to regulate such diverse relationships as that between an employer and employee, *see Newman, 664 F.2d at 17,* between an employer and an employee's tippees, *see id.,* between a newspaper and its reporters, *see United States v. Carpenter, 791 F.2d 1024, 1026* **[**54]** *(2d Cir. 1986), aff'd in part and aff'd by equally divided Court in part, 484 U.S. 19 (1987),* between an employer and a former employee, *see Cherif, 933 F.2d at 411,* between a psychiatrist and his patient, *see United States v. Willis, 737 F. Supp. 269 (S.D.N.Y. 1990),* between a husband and wife, *see Chestman, 947 F.2d at 564,* between a father and son, *see United States v. Reed, 601 F. Supp. 685 (S.D.N.Y.), rev'd on other*

*grounds*, *773 F.2d 477 (2d Cir. 1985)*, and, as in this case, between a government official and his constituency. If a categorical rule applicable to each class of relationship were possible, the scope of the theory would yet be broad. But whether a fiduciary or similar relationship of trust and confidence will be held to exist can be expected to vary from state to state, from family to family, from employer to employer, and from division to division and even from employee to employee within a single employer. Moreover, while the courts adopting the misappropriation theory incant that the breach of a fiduciary relationship is a necessary element of the offense, in principle, if not in reality, these courts would be obliged **[\*\*55]** to find liability in the case of simple theft by an employee, even where no fiduciary duty has been breached, for the *raison d'etre* of the misappropriation theory in fact is concern over "the unfairness inherent in trading on [stolen] information." *Chiarella*, *445 U.S. at 241* (Burger, C.J., dissenting) (citation omitted); *see, e.g., Cherif*, *933 F.2d at 412* & n.6 (reserving the issue of whether *Rule 10b-5* applies "even to 'mere' thieves") (citing *Chiarella*, *445 U.S. at 246* (Blackmun, J., dissenting); *Bateman Eichler, Hill Richards, Inc. v. Berner*, *472 U.S. 299, 313 n.22, 86 L. Ed. 2d 215, 105 S. Ct. 2622 (1985)).

The only alternative to the inevitable patchwork of criminal standards that will develop under the theory would be the effective federalization of relationships historically regulated by the states. The superimposition of a "federal fiduciary principle," *Santa Fe Indus., 430 U.S. at 479*, **[\*952]** however, would usurp the states' common law and statutory authority over fiduciary relationships, violating the Court's injunction in *Santa Fe Industries* against use of the federal securities laws to regulate areas of conduct "traditionally relegated to state law," *id. at 478* (citation **[\*\*56]** omitted); *see also id. at 479* ("Absent a clear indication of congressional intent, we are reluctant to federalize" significant portions of state law in the name of regulating the federal

securities markets.) Though there may well be a need for uniform federal standards governing the handling of confidential, market-sensitive information within the many common-law relationships customarily regulated by state law, the Court has instructed that such standards "should not be supplied by judicial extension of § 10(b) and *Rule 10b-5* to 'cover the corporate universe.'" *Id. at 480*.

We realize that the expansive definition of fraud the Supreme Court has adopted in interpreting analogous statutes accommodates a theory of fraudulent misappropriation similar to that we reject herein for purposes of section 10(b) and *Rule 10b-5*. *See, e.g., Carpenter*, *484 U.S. at 27* (holding with respect to the federal mail and wire fraud statutes, *18 U.S.C. §§ 1341, 1343*, that "the concept of 'fraud' includes the act of embezzlement, which is the "'fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another'""). However, we are not especially concerned **[\*\*57]** with any inconsistency in the scope of fraud prohibited by these various statutes. *Compare Clark*, *915 F.2d at 449* ("finding no linguistic reason not to apply [the *Carpenter*] conception of fraud to the securities context," and therefore "concluding that the misappropriation theory fits comfortably within the meaning of 'fraud' in § 10(b) and *Rule 10b-5*"). *See also Newman*, *664 F.2d at 18* ("In other areas of the law, deceitful misappropriation of confidential information by a fiduciary, whether described as theft, conversion, or breach of trust, has consistently been held to be unlawful."). In *Santa Fe Industries*, the Supreme Court could not have been clearer that resort to statutes analogous to section 10(b) in interpreting *Rule 10b-5* is to be avoided, given the different language in section 10(b) and the distinct purposes underlying the securities fraud provisions. The Court reversed the Court of Appeals, in part, for the very reason that the lower court

construed the term "fraud" in *Rule 10b-5* by adverting to the use

of the term in several of this Court's decisions in contexts other than the 1934 Act and the related Securities Act of 1933.

*Santa Fe* **[**58]** *Indus., 430 U.S. at 471; see also Carpenter, 484 U.S. at 24* (unanimously affirming mail and wire fraud convictions based on same facts that evenly divided Court on defendant's securities fraud convictions). In the end, the terms "fraud" or "deception" as used in the securities context are, like the term "manipulation," virtually terms of art, the definition of which must be found in the language of section 10(b) alone.

Accordingly, we hold that criminal liability under section 10(b) cannot be predicated upon the mere misappropriation of information in breach of a fiduciary duty owed to one who is neither a purchaser nor seller of securities, or in any other way connected with, or financially interested in, an actual or proposed purchase or sale of securities, even when such a breach is followed by the purchase or sale of securities. Such conduct simply does not constitute fraud in connection with the purchase or sale of securities, within the meaning of section 10(b). *See, e.g., Blue Chip Stamps, 421 U.S. at 733 n.5* ("The wording of § 10(b), making fraud *in connection with the purchase or sale of a security* a violation of the Act, is surely badly strained when **[**59]** construed to provide a cause of action, not to purchasers and sellers of securities, but to the world at large." (emphasis in original)). Section 10(b) is not concerned with the general fairness of securities transactions themselves, so long as there is no evidence of deception in connection with a securities transaction, in the form of material misrepresentations or omissions made to persons connected with a securities transaction. *See Santa Fe Indus. 430 U.S. at 478.* It should come as no surprise that the provision is unconcerned with the fairness **[\*953]** of conduct toward persons such as family

members, employers, medical patients, or other parties to the infinite number of similar trust relationships who are not in any way connected with or even interested in a purchase or sale of securities.

B.

We do not believe that rejection of the particular misappropriation theory that we address today will ultimately have a notable impact on federal efforts to combat fraud in the securities markets. Much of the conduct rendered criminal under the misappropriation theory is already criminalized under section 10(b) as interpreted in *Chiarella* and *Dirks*, or under the mail and wire fraud statutes, *18 U.S.C.* **[**60]** *§§ 1341, 1343*, as interpreted by the Court in *Carpenter* and as expanded by Congress in *18 U.S.C. § 1346*.

Many of the people who would fall within the ambit of the misappropriation theory urged in this case already owe a duty to purchasers and sellers of securities to disclose or abstain from trading, duties recognized by the Supreme Court in *Chiarella* and *Dirks* as legitimate predicates for criminal liability under section 10(b). The Second Circuit has acknowledged as much. *See, e.g., Chestman, 947 F.2d at 566* (acknowledging that conduct on which early misappropriation convictions were based would now likely be reached without misappropriation theory). After *Dirks*, corporate insiders, such as directors and managers, and so-called temporary insiders, such as underwriters, accountants, lawyers, or consultants working for a corporation, are under a duty to disclose or abstain, as are tippees of either group. *Dirks, 463 U.S. at 655 n.14, 659-61.* In fact, those Justices who would have reversed the misappropriation convictions in *Carpenter* might well have believed that these are the only persons whose misappropriation of information could give rise to **[**61]** criminal liability under section 10(b). It was this limitation on the scope of the misappropriation theory for which the defendants argued in *Carpenter*. *See*

*Carpenter, 791 F.2d at 1028-29* (noting defendants' argument that "the misappropriation theory may be applied *only* where the information is misappropriated by corporate insiders or so-called quasi-insiders, who owe to the corporation and its shareholders a fiduciary duty of abstention or disclosure" (emphasis added) (citation omitted)).

Those who trade on purloined information but who do not come within the *Chiarella/Dirks* definition of "insider" are still almost certain to be subject to criminal liability for federal mail or wire fraud. *18 U.S.C. §§ 1341, 1343.* Under *Carpenter* 's expansive notion of "fraud," the embezzlement of confidential information, coupled with the use of mail or wire to execute a securities transaction, will likely be sufficient to establish criminal liability under *sections 1341 and 1343. Carpenter* itself, in which the Court unanimously affirmed the defendant's wire fraud convictions but divided evenly over the securities fraud conviction, is illustrative.

Congress' recent adoption **[**62]** of *18 U.S.C. § 1346,* which prohibits "a scheme or artifice to deprive another of the intangible right of honest services," further ensures that many of the fiduciary breaches giving rise to criminal liability under the misappropriation theory may also serve as the predicate fraud under the mail and wire fraud statutes, leaving only the use of wire or the mails to complete the crime. Finally, we are also confident that the fiduciary breaches proscribed by the misappropriation theory will in many instances give rise to criminal and civil liability under the array of state laws addressing fraud and unethical conduct.

## C.

We regard the somewhat harrowing evolution of the misappropriation theory as almost a testament to the theory's invalidity. When the Second Circuit first adopted the theory fourteen years ago in affirming a criminal conviction for securities fraud, that court was unattuned to the differences in language employed in section 10(b) and *Rule 10b-5* and was seemingly unaware of the existence of the Supreme Court's decision in *Santa Fe Industries.* When confronted with the theory a second time, the Second Circuit rejected the theory's application in the civil context, **[**63]** though employing reasoning that undermines **[*954]** the theory altogether. The Circuit then resurrected the theory in the criminal context one year later, but only by unconvincingly distinguishing its decision undermining the theory. Now, although other courts have followed suit without serious analysis, the Second Circuit has begun finally to acknowledge, and express its resignation, that the theory is in substantial tension with Supreme Court precedent and is virtually incapable of principled limitation.

The Second Circuit first adopted the misappropriation theory in *United States v. Newman, 664 F.2d 12 (2d Cir. 1981),* aff'd *after remand, 722 F.2d 729* (2d Cir.), *cert. denied, 464 U.S. 863 (1983).* In adopting the theory, the *Newman* court cited, but did not quote or discuss, section 10(b) of the 1934 Act, and did not even cite the Supreme Court's decision in *Santa Fe Industries.* And, contrary to the Court's instructions in *Santa Fe Industries,* the *Newman* court proceeded to consider only whether the potentially broader language of *Rule 10b-5* could accommodate the misappropriation theory, instead of addressing in the first instance the statutory language **[**64]** of section 10(b).

Freed from the constraints of the Court's interpretation of the statutory term "deception," *Newman* concluded easily that the misappropriation of information constitutes "fraud" under *Rule 10b-5. See id. at 17* ("We need spend little time on the issue of fraud and deceit."). Because the defendants "'misappropriated -- stole to put it bluntly -- valuable nonpublic information entrusted to [them] in the utmost confidence,'" *id.* (quoting

*Chiarella, 445 U.S. at 245* (Burger, C.J., dissenting)), they had, the court concluded, "defrauded those employers as surely as if they took their money," *id.* [18] Because the court held that *Rule 10b-5*'s predicate fraud requirement was established through the mere theft of the confidential information, it undertook no inquiry into whether there was the statutorily required deception. [19]

18  The *Newman* court relied on Chief Justice Burger's dissenting opinion in *Chiarella*, which is often cited as the genesis for the misappropriation theory, for the proposition that the requisite fraud under *Rule 10b-5* is established when an employee defrauds his employer by stealing confidential information. *See Newman, 664 F.2d at 17*. It is true that the Chief Justice did conclude in *Chiarella* that the language of *Rule 10b-5*, with its "provisions reaching *any* person engaged in *any* fraudulent scheme," *Chiarella, 445 U.S. at 240* (Burger, C.J., dissenting) (emphasis in original), was sufficiently broad to criminalize trading on the basis of misappropriated information. However, he specifically identified the predicate fraud, consistent with the Court's prior cases, as nondisclosure, and not the misappropriation of the information itself. *See id. at 243 n.4* (noting his understanding that Court had not rejected his view that "an *absolute duty to disclose or refrain* arises from the very act of misappropriating nonpublic information" (emphasis added)). For the Chief Justice, therefore, the misappropriation of information gives rise to a duty, the breach of which, through trading without disclosure, constitutes fraud under the Rule.

[**65]

19  In truth, it is difficult to determine from the opinion in *Newman* the precise basis upon which Newman's conviction

was affirmed. Newman did not himself misappropriate any information from Morgan Stanley or Kuhn Loeb. Rather, it was Newman's co-conspirators, E. Jacque Courtois and Adrian Antoniu, employees of these two companies, who misappropriated the information. *See Newman, 664 F.2d at 15*. It appears that Newman's conviction was affirmed on the ground that he aided and abetted Courtois and Antoniu in their misappropriation of information. *Id. at 16*. At most, it seems that Newman was a tippee, whose criminal exposure prior to *Dirks* was anything but clear. *See Moss v. Morgan Stanley Inc., 719 F.2d 5, 15 (2d Cir. 1983)* (referring to Newman as a tippee), *cert. denied, 465 U.S. 1025 (1984)*.

The *Newman* court also eliminated any requirement of a fraud upon a party connected with the securities transaction. *See id. at 16* ("We hold that appellee's conduct . . . could be found to constitute a criminal violation of section 10(b) and *Rule 10b-5* despite the fact [**66] that [none of the defrauded parties] was at the time a purchaser or seller of the target company securities in any transaction with any of the defendants." (footnote omitted)). [20] Without considering the Supreme [*955] Court's limiting interpretations of *Rule 10b-5*, *Newman* read the plain language of *Rule 10b-5* to "contain[] no specific requirement that fraud be perpetrated upon the seller or buyer of securities," *id. at 17*, and found the Rule's "in connection with" requirement, "a very tenuous" requirement, to be satisfied because Newman's alleged fraud "touched" the securities transaction, *id. at 18*; *see also supra* note 17. *Newman* properly dismissed the only limitation on *Rule 10b-5*'s scope that it perceived, the purchaser/seller requirement of *Blue Chip Stamps*, as relevant only to the issue of standing in the context of implied private rights of action. *Newman, 664 F.2d at 17* ("The courts [through *Blue Chip Stamps*], not the Congress, have limited *Rule 10b-5* suits for

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

damages to the purchasers and sellers of securities."). [21] However, the court never paused to consider *any* limitation on the scope of *Rule 10b-5*, simply presuming that the Rule applies [**67] to fraud in any fiduciary relationship. [22]

20    The district court in *Newman* had specifically charged the jury that "the law is clear that Mr. Newman had no obligation or duty to the people from whom he bought the stock to disclose what he had learned, and, thus, he could not have defrauded these people as a matter of law." *Moss, 719 F.2d at 13* (quoting jury charge from Newman's criminal trial).

21    In rejecting a purchaser or seller requirement, the Second Circuit relied on its injunctive relief cases, which had read *Rule 10b-5* not to embody a purchaser/seller requirement, and noted that Newman "reasonably should have anticipated that in a criminal action the courts likewise would follow the language of the Rule." *Newman, 664 F.2d at 17*. These cases, decided before *Blue Chip Stamps*, have since been questioned. The District of Columbia Circuit squarely rejected the exception to the purchaser/seller requirement for plaintiffs seeking injunctive relief as irreconcilable with *Blue Chip Stamps*. *Cowin v. Bresler, 239 U.S. App. D.C. 188, 741 F.2d 410, 424 (D.C. Cir. 1984)* (Bork, J.) ("The relaxed standing requirement urged on us by appellant would be contrary to the rationale of section 10(b) and *Rule 10b-5* as perceived by the Supreme Court in *Blue Chip*."). This circuit recently reserved the question but suggested that any exception would be a "very limited" one that "applies in narrow circumstances." *Advanced Resources Int'l, Inc. v. Tri-Star Petroleum Co., 4 F.3d 327, 332 (4th Cir. 1993)*.

[**68]

22    Ironically, it appears that *Newman's* startling expansion of *Rule 10b-5* liability, with its elimination of the statute's requirement of deception of a party connected with the securities transaction, was unnecessary to affirm the convictions in that case. The government in *Newman*, perhaps sensing the strain that would be imposed on section 10(b)'s language by the misappropriation theory, urged the Second Circuit to construe the indictment to allege securities violations "on the theory that the defendants, by purchasing stock in [clients of the investment banking firms they worked for], defrauded the shareholders" of the client companies -- conduct recognized as potentially violative of section 10(b) in *Chiarella*. *Newman, 664 F.2d at 15 n.1*. The *Newman* court declined the government's invitation. *Id*.

In a similar vein, although not on substantively identical grounds, the government had earlier attempted to narrow the basis upon which it sought to support the defendant's conviction before the Supreme Court in *Chiarella*. *See Chiarella, 445 U.S. at 235-26; see also Chestman, 947 F.2d at 575* (Winter, J., concurring in part and dissenting in part).

[**69]    In the very next misappropriation case it decided after *Newman*, the Second Circuit, perhaps unwittingly, perhaps not, undermined the entire rationale behind the misappropriation theory. *See Moss v. Morgan Stanley Inc., 719 F.2d 5 (2d Cir. 1983), cert. denied, 465 U.S. 1025 (1984)*. Although the civil suit in *Moss* involved the same defendants and arose out of the same conduct that gave rise to the criminal convictions in *Newman*, the court held on the merits that the defendants had not violated *Rule 10b-5*. Rather than expressly repudiate *Newman*, the *Moss* court recast *Newman* as a case involving an employee's breach of his duty to his employer to "disclose

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

or abstain" from trading, *id. at 13*, even though *Newman* was explicit that the fraud was the *theft* of information, and not the failure to disclose before trading, *see Cherif, 933 F.2d at 409* ("The Court [in *Newman*] was not concerned about any fraud perpetrated on the companies whose shares were traded or on the shareholders of those companies, as in *Dirks* or *Chiarella*. Instead it was influenced by the damage inflicted on the insider trader's employer by a conniving **[**70]** employee."). So thorough was the recharacterization, that *Moss* fails even to associate *Newman* with the misappropriation theory, much less to credit that case with having first adopted it; indeed, no citation to *Newman* appears in *Moss'* subsequent analysis of a version of the misappropriation theory. *Moss, 719 F.2d at 15-16. Moss* finally disposed of *Newman* by distinguishing it on the ground that the purported duty to abstain or disclose running to an employer is not a duty that runs to the market as a whole. *See id. at 13* ("Nothing in . . . *Newman* suggests" that the asserted duty of disclosure between an employee **[*956]** and employer "should be stretched to encompass an employee's 'duty of disclosure' to the general public".) [23]

> 23    It is virtually impossible to discern the logic behind the *Moss* court's distinction of *Newman*. This is due to what appears to be a double-misreading of footnote one from the *Newman* opinion.
>
>    The plaintiff in *Moss* was a shareholder in a company called Deseret. Deseret was the target company in a friendly takeover by Warner-Lambert, a client of the investment banking firm of Morgan Stanley. Courtois worked for Morgan Stanley and provided Newman with information regarding the Deseret takeover. Moss relied on *Newman* for the proposition that because Courtois (and through his association with Courtois, Newman) owed a duty to Morgan Stanley, and to Morgan Stanley's client, Warner-Lambert, Newman also owed a separate duty of disclosure to Warner-Lambert's target, Deseret. *Moss, 719 F.2d at 13*.
>
>    According to *Moss*, footnote one of the *Newman* opinion "explicitly limited" *Newman*'s holding in a way that foreclosed Moss' proposed linking of liability. *Id.* (citing *Newman , 664 F.2d at 15 n.1*); *see also supra* note 22. This reading of the *Newman* footnote is flawed in two ways. First, the footnote in no way purported to "limit" the holding of that case. It was merely a notation by the court that the government, at the last minute, attempted to reconstrue the indictment such that Newman's criminal liability would have been predicated on a breach of duty to Morgan Stanley's and Kuhn Loeb's *clients*, instead of to Morgan Stanley and Kuhn Loeb themselves, thereby bringing Newman's charged conduct closer in line with the Court's then-new opinion in *Chiarella*:
>
> > In two instances the targets themselves were *clients* of the investment banking firms. The Government belatedly suggests that the indictment should be construed to allege securities laws violations in these two instances, on the theory that t h e d e f e n d a n t s , b y purchasing stock in the target companies [*i.e.*, in the investment banking firms' *clients*], *defrauded the shareholders of those companies*.
>
> *Moss, 719 F.2d at 13* (quoting *Newman, 664 F.2d at 15 n.1*) (first

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

emphasis added; second emphasis added by *Moss* court). Second, the *Newman* footnote does not even address whether or how Courtois and Newman could have owed a duty to Deseret, which, though a "target" company, was not a "client" of Morgan Stanley. It appears that *Moss* focused on the identification of "targets" in the second sentence and assumed the footnote was discussing parties like Deseret, which was a target, but missed the fact that the "targets" the government identified in *Newman* footnote one were, unlike Deseret, "clients" of Morgan Stanley, and therefore, at least plausibly, *were* owed a duty under *Chiarella* and *Dirks*.

[**71] The *Moss* court read section 10(b) and *Rule 10b-5*, as do we, to regulate relationships and duties among securities market participants and others involved in securities transactions. *Moss* fully embraced the Supreme Court's holdings in *Chiarella* and *Dirks* that "liability for nondisclosure of material nonpublic market information under section 10(b) is 'premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction,'" *id. at 12*, and concluded that "absent an 'insider' or 'fiduciary' relationship with the sellers of stock, a purchaser has no duty to disclose non-public market information," *id.* In light of these authorities and *Santa Fe Industries*, *Moss* held that *Rule 10b-5* liability could not be predicated on the defendants' misappropriation of confidential information. Although the plaintiff in *Moss* proceeded under a version of the misappropriation theory more akin to that articulated in Chief Justice Burger's *Chiarella* dissent than that developed in *Newman*, *see id. at 15-16*, the reasoning employed in *Moss* to foreclose liability -- that the defendants "committed no 'fraud' in purchasing [**72] shares of Deseret stock," because they "owed no duty of disclosure to plaintiff Moss," *id. at 16* -- applies equally to the misappropriation theory articulated in *Newman*. *Moss'*

observations are true under either version of the misappropriation theory:

> In effect, plaintiff's "misappropriation" theory would grant him a windfall recovery simply to discourage tortious conduct by securities purchasers. Yet, the Supreme Court has made clear that section 10(b) and *rule 10b-5* protect investors against *fraud*; they do not remedy every instance of undesirable conduct involving securities.

*Id.* (emphasis in original) (citing *Chiarella, 445 U.S. at 232*; *Santa Fe Indus., 430 U.S. at 474-77*).

Notwithstanding that the reasoning in *Moss* virtually compelled across-the-board rejection of the misappropriation theory articulated in *Newman*, the Second Circuit just one year after *Moss* reaffirmed the validity of *Newman's* misappropriation theory. *See SEC v. Materia, 745 F.2d 197, 201 (2d Cir. 1984)* (endeavoring [*957] to "delineate the contours of what may still be perceived as a novel theory of liability under the antifraud [**73] provisions"), *cert. denied, 471 U.S. 1053 (1985)*. In order to save the misappropriation theory from the reasoning of *Moss*, *Materia* held that the requirement of a duty running between parties to a transaction, established in *Chiarella* and applied in *Moss*, is a duty that applies only in the context of implied civil actions:

> Only by fashioning the private right with which we are by now so familiar, were courts forced to deal with ancillary issues such as standing, *see Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975)*, and whether a defendant

has breached a duty to a particular plaintiff, *see Moss v. Morgan Stanley, Inc., [719 F.2d 5 (2d Cir. 1983)]*. Indeed, these issues are germane only in the context of private civil litigation. In reviewing an enforcement action such as this, our concern "must be with the scope of the Rule," *Newman, [664 F.2d at 17]*, rather than the precise direction in which a duty may have been owed. For this reason, Materia's attempted reliance on *Chiarella v. United States, 445 U.S. 222, 63 L. Ed. 2d 348, 100 S. Ct. 1108 (1980)*, is misplaced. . . .

*Moss* v. *Morgan Stanley Co.*, . . . relied on by Materia, **[\*\*74]** does n o t [c o n t r a d i c t t h e misappropriation theory]. That case, arising out of the same facts as *Newman*, was a private action brought by shareholders who unwittingly sold stock to Newman and his cohorts. This court affirmed the dismissal of the action on the same limited grounds announced by the Supreme Court in *Chiarella*. The defendants owed no duty to the plaintiffs. At the risk of repetition, we stress that such analysis bears only on the type of question raised in a private suit for damages; it is not relevant to an inquiry into whether the Rule was or was not contravened.

*Materia, 745 F.2d at 202-03*. Thus, *Materia* relegated *Chiarella*, a criminal case concerned solely with the scope of liability under *Rule 10b-5, see Central Bank of Denver, 114 S. Ct. at 1445* (*Chiarella* concerned with "scope of conduct prohibited by § 10(b)"), to a

case bearing only on private civil actions. In the same way, *Materia* misread *Moss. Moss'* rejection of the misappropriation theory was based entirely on the scope of *Rule 10b-5*, as was the decision in *Chiarella*, and not on the distinction between criminal and civil actions. Nor was there any issue of standing **[\*\*75]** in *Moss*, as the plaintiff in *Moss* was an actual seller of securities. It is apparent, in sum, that the *Materia* court failed to recognize any difference between the standing limitation of *Blue Chip Stamps* and the substantive limitation on the scope of *Rule 10b-5* imposed by *Chiarella* and recognized in *Moss*, in what was either a necessary move to save the theory after *Moss* or, more likely, an unwitting error. *Compare Clark, 915 F.2d at 445* (characterizing *Materia* as concluding that duty to disclose is relevant to determine whether plaintiff has standing).

Despite the Second Circuit's seeming inability to steady the misappropriation theory on a firm doctrinal foundation, two more circuits adopted the misappropriation theory after *Materia*. The Ninth Circuit in *Clark*, although adopting the narrowest possible model of the theory, limited to the facts of that case, *see Clark, 915 F.2d at 453*, "concluded that the misappropriation theory fits comfortably within the meaning of 'fraud' in § 10(b) and *Rule 10b-5*," *id. at 449*. The Seventh Circuit adopted the theory wholesale in *Cherif*, declining to subject the theory to rigorous review on **[\*\*76]** the ground that "the more precise issues of statutory construction and legislative history have been treated exhaustively elsewhere." *Cherif , 933 F.2d at 410 n.5*. Like *Newman* and *Materia*, neither *Clark* nor *Cherif* cites, let alone discusses, the Court's decision in *Santa Fe Industries*. [24]

24   The Second Circuit regularly applies the limitation of *Santa Fe Industries* in civil actions under *Rule 10b-5*, though it has refused to recognize the implications of *Santa Fe* for criminal prosecutions under the misappropriation theory. *See,*

*e.g., Field v. Trump, 850 F.2d 938, 946-47 (2d Cir. 1988)* ("The Court held [in *Santa Fe Industries*] that Section 10(b), *as its plain language suggests,* prohibits only conduct 'involving manipulation or deception,' . . . deception being 'misrepresentation or nondisclosure' intended to deceive." (emphasis added) (citations omitted)), *cert. denied, 489 U.S. 1012 (1989); Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir. 1982)* (citing *Santa Fe Indus., 430 U.S. at 473*) ("It is well established by now that section 10(b) was not designed to regulate corporate mismanagement nor to prohibit conduct which does not involve manipulation or deception."); *Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir. 1986)* (citing *Ernst & Ernst, 425 U.S. 185, 47 L. Ed. 2d 668, 96 S. Ct. 1375; Santa Fe Indus., 430 U.S. at 479*) ("To state a claim under Section 10(b), a complaint must allege material misstatements or omissions indicating an intent to deceive or defraud in connection with the purchase or sale of a security.").

[**77]   [*958] Despite the momentum building behind the theory with its rehabilitation in *Materia,* and its adoption in *Clark* and *Cherif,* the pendulum in the Second Circuit swung decidedly against the misappropriation theory in that court's recent *en banc* decision in *United States v. Chestman, 947 F.2d 551 (2d Cir. 1991) (en banc), cert. denied, 503 U.S. 1004 (1992).* For the first time since *Moss,* the Second Circuit attempted in *Chestman* to square the misappropriation theory with the Supreme Court's holdings in *Santa Fe Industries, Chiarella,* and *Dirks,* and not surprisingly, realized that the misappropriation theory was neither necessary, defensible under precedent, susceptible in principle to limitation, nor justifiable on the strength of the broad purposes of the Act.

*Chestman* expressly recognized that the framework for securities fraud established by the Supreme Court over the past twenty-five years does not permit of the misappropriation theory as developed in the Second Circuit. Without even attempting to come to grips with *Materia's* statement that duties are irrelevant to criminal liability for securities fraud, [**78] the circuit belatedly acknowledged that to establish criminal liability under the Supreme Court's cases, "the predicate act of fraud must be traceable to a breach of duty to the purchasers or sellers of securities." *Id. at 565.* Realizing that it would have to go outside the Supreme Court's carefully crafted framework for establishing securities fraud liability in order to sustain the misappropriation theory, *Chestman* characterized the Court's framework as merely one "theory" of criminal liability under the statute, *see id. at 564 (Chiarella* and *Dirks* establish the "traditional theory of insider trader liability"), and reaffirmed the misappropriation theory as a "second general theory of *Rule 10b-5* liability," *id. at 566.*

Ironically, we could scarcely describe better the tenuousness of the misappropriation theory under *Santa Fe Industries, Chiarella,* and *Dirks,* than did the Second Circuit itself in *Chestman:*

> One point at which the misappropriation theory and the traditional theory of insider trading merge warrants brief consideration. Our first applications of the misappropriation theory, in *Newman* and *Materia,* concerned conduct [**79] that occurred before the Supreme Court's holding in *Dirks. Dirks* noted that an outsider could obtain temporary insider status by gaining access to confidential information through certain relationships with a corporation -- as, for example, an underwriter, lawyer or consultant. *463 U.S. at 655 n.14.* A temporary insider theory of prosecution might

well have covered the activities of the investment banker in *Newman* and the printer in *Materia*. In *Newman* and *Materia*, the defendants appeared to have "entered into a special confidential relationship in the conduct of the business of the enterprise and [were] given access to information solely for corporate purposes." *Dirks, 463 U.S. at 655 n.14*. In view of the overlap between *Newman* and *Materia* on the one hand and the *Dirks* concept of temporary insiders on the other, we arguably did not break ranks with the traditional theory of insider trading until our holding in *Carpenter* . In *Carpenter* none of the prongs of liability under the traditional theory applied. That is, the defendants did not owe the people with whom they traded a duty to disclose or abstain from trading -- absent resurrection [**80] of the twice-rejected parity of information theory. *Carpenter*, then, represents the first fact pattern we have considered that is clearly beyond the pale of the traditional theory of insider trading.

[*959] After *Carpenter*, the fiduciary relationship question takes on special importance. This is because a fraud-on-the-source theory of liability extends the focus of *Rule 10b-5* beyond the c o n f i n e d   s p h e r e   o f fiduciary/shareholder relations to fiduciary breaches of any sort, a particularly broad expansion of 10b-5 liability if the add-on, a "similar relationship of trust and confidence," is construed liberally.

One concern triggered by this broadened inquiry is that fiduciary duties are circumscribed with some clarity in the context of shareholder relations but lack definition in other contexts. *See generally Reed, 601 F. Supp. 685* (and authorities cited therein). Tethered to the field of shareholder relations, fiduciary obligations arise within a narrow, principled sphere. The existence of fiduciary duties in other common law settings, however, is anything but clear. Our *Rule 10b-5* precedents under the misappropriation theory, moreover, provide little guidance with respect [**81] to the question of fiduciary breach, because they involved egregious fiduciary breaches arising solely in the context of employer/employee associations. *See Carpenter, 791 F.2d at 1028* ("It is clear that defendant Winans . . . breached a duty of confidentiality to his employer"); *Newman, 664 F.2d at 17* ("we need spend little time on the issue of fraud and deceit"); *Materia, 745 F.2d at 201* (same). For these reasons we tread cautiously in extending the misappropriation theory to new relationships, lest our efforts to construe *Rule 10b-5* lose method and predictability, taking over "the whole corporate universe." *United States v. Chiarella, 588 F.2d 1358, 1377 (2d Cir. 1978)* (Meskill, J., dissenting) (quoting *Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 480, 51 L. Ed. 2d 480, 97 S. Ct. 1292 (1977))*, *rev'd, 445 U.S. 222 (1980)*.

*Chestman, 947 F.2d at 566-67*. Even the

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

*Chestman* dissenters, in promoting expansion of the misappropriation theory, were unable to identify a credible legal basis for the theory. Judge Winter, although he would have sustained the theory on the basis of the "policy rationale for prohibiting insider trading" advanced in an article by Frank Easterbrook, **[\*\*82]** candidly admitted that "any obvious relationship [between the misappropriation theory and] Section 10(b) is presently missing." *Id.* at 578 (Winter, J., concurring in part and dissenting in part). [25]

> 25 According to Judge Winter, "a court of appeals has no option but to continue the route" of applying the misappropriation theory, on the grounds that "the law is far enough down this road" and that the Insider Trading Sanctions Act of 1984, at least according to that Act's legislative history, "seems [to be] premised" on the misappropriation theory's applicability. *Chestman*, 947 F.2d at 578.

Thus is the manner in which the misappropriation theory has evolved (or devolved) and been justified.

### D.

Our rejection of the misappropriation theory certainly should not be taken as approval of the kind of conduct of which Bryan was convicted, nor should it be perceived as evidencing a view that such conduct is not properly the subject of criminal liability. Indeed, we understand the temptation to give "legal **[\*\*83]** effect to the commonsensical view that trading on the basis of improperly obtained information is fundamentally unfair," *Carpenter, 791 F.2d at 1029* (quoting *SEC v. Musella, 578 F. Supp. 425, 438 (S.D.N.Y. 1984)),* by abandoning "distinctions premised on the source of the information [in favor of] the prophylactic intent of the securities laws," *id.* But in securities law, as in all areas of the law, our perceptions of what is wise or fair are ultimately of no relevance. In the end, we, as

judges, no less than anyone else, are bound by the actual prohibitions enacted by Congress. It is adherence to this fundamental limitation on our own authority that leads us to conclude that, as ignoble as Bryan's conduct was, it simply was not conduct that is prohibited by section 10(b) of the Securities Exchange Act of 1934. Section 10(b) is a "catch-all" provision. But, as we believe Justice Powell would have said in *Chiarella* had he had the occasion, it only catches fraud *in connection with the purchase or sale of securities. See Chiarella, 445 U.S. at 234-35.*

**[\*960]** V.

Bryan finally challenges his conviction for perjury under oath before a grand jury. *See 18 U.S.C.* **[\*\*84]** *§ 1623*. This conviction relates to Bryan's responses to prosecution questions before a federal grand jury regarding the drafting of the RFP for the video lottery contract. The government contended at trial that Bryan deliberately lied in response to government questioning to cover up the fact that VLC representatives had participated in the drafting of the RFP.

The grand jury questioning on which the perjury conviction is based proceeded as follows:

> Q. Who wrote the RFP?
>
> A. The RFP was put together by a committee of specialized people at the Lottery. . . .
>
> Q. I want you to tell me everybody on the committee who had any input into the document. . . .

[Omitted here are several questions and answers pertaining to Bryan's identification of

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

the committee members who worked on the
RFP.]

Q. Who else participated in the
RFP?

A. Tammy Gunnoe is a specialist
in the division of marketing. All of
those components are required in
this proposal and they all worked
on this document.

Q. Who else worked on the RFP?

A. I obviously had some input on
it. . . . I made recommendations
that I would like to see and they
[**85] worked from that. . . .

Q. Anyone else have input into
the drafting of the RFP, as far as
you know?

A. Well, they may have called
upon people within their sections
to provide information.

Q. As far as you know, did
anyone else have input into it?

A. No, they were the people that
I assigned to prepare it.

Q. Okay, and so we would have
to ask them if they received input
from others, right?

A. Yes, Ma'am.

Appellee's Br. at 34-35. Bryan contends
that the questioner's initial focus on "everybody
on the committee who had input into the
document" led him to believe that the entire
line of questioning was concerned only with
which employees at the Lottery worked on the
RFP. Appellant's Br. at 45.

The federal statute proscribing perjury
before a grand jury provides that

Whoever under oath . . . in any
proceeding before or ancillary to
any court or grand jury of the
United States knowingly makes
any false material declaration . . .
shall be fined . . . or imprisoned.

18 U.S.C. § 1623. In interpreting the
analogous federal perjury statute, 18 U.S.C. §
1621, the Supreme Court has stated that

the [**86] perjury statute is not
to be loosely construed, nor the
statute invoked simply because a
wily witness succeeds in derailing
the questioner -- so long as the
witness speaks the literal truth. The
burden is on the questioner to pin
the witness down to the specific
object of the questioner's inquiry.

Bronston v. United States, 409 U.S. 352,
360, 34 L. Ed. 2d 568, 93 S. Ct. 595 (1973).
The Court also stated that "precise questioning
is imperative as a predicate for the offense of
perjury." Id. at 362.

Given the Supreme Court's command to
construe the perjury statute narrowly, we are
sympathetic to Bryan's claim. The questioner's
initial focus on committee members could well
have led Bryan to believe that the question,

58 F.3d 933, *; 1995 U.S. App. LEXIS 15893, **;
Fed. Sec. L. Rep. (CCH) P98,787

"Did anyone else have input into it," only pertained to committee members. Bryan's response of "No, they were the people that I assigned to prepare it" evinces such an understanding. Nonetheless, we are satisfied that the prosecution's repeated inquiry into whether "*anyone* else" contributed to the RFP provided the jury an adequate basis upon which to conclude that Bryan understood that the focus of the questioning had changed from the committee members to anyone else who might have had [**87] input into the RFP and that he deliberately lied to the grand jury when he answered that no one else had been involved.

**[*961]** *CONCLUSION*

Bryan's convictions for mail fraud, wire fraud, and perjury are hereby affirmed, his securities fraud conviction is reversed, and the sentence imposed by the district court is vacated for such reconsideration as the district court deems appropriate.

AFFIRMED IN PART, REVERSED IN PART



Westlaw.

1994 WL 267860
1994 WL 267860 (WL)

West Publishing Company
September, 1994

**INSIDER TRADING PROSECUTIONS UNDER THE MISAPPROPRIATION THEORY: NEW YORK'S JOKE ON HEARTLAND AMERICA**

Richard Neely [FNa]

This article originally to appear at 96 W. Va. L. Rev. 873 (1994) was ordered removed from that publication. It is now published exclusively in **WESTLAW**. The opinions presented are necessarily those of the author and do not **reflect** or represent the views of West Publishing Company, its ownership, management and subsidiaries.

| I. | INTRODUCTION | 1 |
| II. | BACKGROUND OF INSIDER TRADING | 3 |
| III. | CONFOUNDING THE EX POST FACTO CLAUSE | 8 |
| IV. | CURRENT INSIDER TRADING LAW | 10 |
| V. | THE CASES THAT CAUSED EVERYONE TO WORK BACK- WARDS FROM WHAT THEY WANTED TO DO TO A REASON TO JUSTIFY DOING IT | 17 |
| VI. | NEW YORK V. WEST VIRGINIA | 21 |
| VII. | THE UNWORKABILITY OF THE 'MISAPPROPRIATION THEORY' | 24 |
| VIII. | THE NEW INSIDER TRADING PARADIGM | 29 |

I. INTRODUCTION

In November of 1993, William Edward ReBrook III was convicted in the United States District Court for the Southern District of West Virginia of the crime of "insider trading." On the day that the alleged insider trading offenses oc-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

curred, Mr. ReBrook was the lawyer for the West Virginia Lottery Commission. Mr. ReBrook was paid a yearly salary of $25,000 for his part-time work as lottery counsel, and integrated his work for the lottery with his regular private practice. According to the Government's evidence, Mr. ReBrook was privy to a secret plan devised by Governor Gaston Caperton and Lottery Director E. E. "Butch" Bryan to expand the lottery's operations after the November 1992 general election and then to award VLT, Inc.-a manufacturer of hi-tech gaming equipment-a contract in exchange for VLT's promise to build a plant in West Virginia.

The Government asserted that Mr. ReBrook's material, non- public information that the lottery would expand *and* VLT would be favored as the equipment supplier prompted Mr. ReBrook to buy 100 shares of VLT stock and to advise two friends also to buy VLT stock. The stock in question sold for $13.50 a share and the company, VLT, Inc., had over 12,000,000 shares outstanding. Thus, had the stock doubled, Mr. ReBrook would have made less than $1,400! Yet Mr. ReBrook will spend 27 months in jail, his family is condemned to penury, and he has lost his license to practice law. [FN1]

The tragedy of this case is that Mr. ReBrook was convicted of a crime that *doesn't exist!* His indictment, prosecution and conviction are monuments to Hannah Arendt's "banality of evil." [FN2] Young, ambitious United States Attorneys salivate over high profile prosecutions; newspapers make money catering to the public's blood lust-a public remarkably reminiscent of nine-year-old children watching a spider suspended on a stick writhe in agony over an open campfire; and judges welcome something more prominent publicly than another lower class, street-level drug dealer or "ho-hum" diversity accident case. So, manned by the same type of high-principled family- valuing mechanics who fired the boilers, coupled the cars, and controlled the switches for the trains that chugged relentlessly along to Auschwitz and Treblinka, the prosecutorial engine grinds resolutely on indifferent to anything but its own bureaucratic imperatives. [FN3]

## II. BACKGROUND OF INSIDER TRADING

The classic insider trading case involves an officer, employee or a controlling shareholder of a corporation who, under a fiduciary duty to the corporation and its shareholders, discovers material, [FN4] non-public [FN5] information that can allow him to make a profit. Upon learning that another company plans to buy control of his company, the officer, employee or shareholder can make a handsome profit by buying his own company's stock at the pre-merger market price and then selling it to the company seeking control at a premium. By taking information that belongs to the shareholders of the insider's own corporation, the insider has defrauded shareholders who sold him their stock at a lower price than what they would have demanded for the stock had they known what their fiduciary knew.

The mirror image of the last scenario involves the officer, employee or controlling shareholder who, upon discovering bad news about his corporation, sells before other shareholders learn the bad news. Here, the shareholders who are defrauded *bought* the insider's stock. In short, because corporate officers, employees and controlling shareholders owe a fiduciary duty to their *own* corporations either to disclose material information or to abstain from trading, buying or selling shares, trading by corporate insiders (or persons they tip) on the basis of any material, non-public information is illegal. [FN6]

Existing law is summarized in the reporter's syllabus to *Dirks v. Securities and Exchange Commission*, [FN7] as follows:

　　1. Two elements for establishing a violation of § 10b- 5 by corporate insiders are the existence of a relation-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1994 WL 267860                                                                            Page 3
1994 WL 267860 (WL)

ship affording access to inside information intended to be available only for a *corporate purpose*, and the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure. *A duty to disclose or abstain does not arise from the mere possession of nonpublic market information.* Such a duty arises rather from the existence of a fiduciary relationship. Chiarella v. United States, 445 U.S. 222. There must also be "manipulation or deception" to bring a breach of fiduciary duty in connection with a securities transaction within the ambit of Rule 10b-5. Thus, an insider is liable under the Rule for inside trading only where he fails to disclose material nonpublic information before trading on it and thus makes secret profits. [FN8]

   2. Unlike insiders who have independent fiduciary duties to both the corporation and its shareholders, the typical tippee has no such relationships. There must be a breach of the insider's fiduciary duty before the tippee inherits the duty to disclose or abstain. [FN9]

Notably, *Dirks*, a case which reversed the censure of a financial analyst who uncovered improprieties in a corporation's financial statement and conveyed that information to others who traded on the non-public information, reaffirmed a proposition made abundantly clear in the landmark case of *Chiarella v. United States*: [FN10] the breach of fiduciary duty required for an insider trading conviction must be a fiduciary duty to a *corporation*, not just some bad act or violation of a non-securities-related fiduciary duty.

If, for example, an employee of a small research laboratory learns of a new waste treatment technology developed by his company that will lower costs on existing contracts for companies like Waste Management, Inc. and Browning Ferris, Inc., the employee-who has absolutely no relationship to Waste Management or Browning Ferris-may buy Waste Management and Browning Ferris stock on the open market *before* his company discloses its new invention to the public. Although the employee of the research lab buys Waste Management or Browning Ferris stock on material, non-public information, no duty to disclose that information attaches under securities law because there is no fiduciary relationship between the trader and Waste Management's or Browning Ferris' shareholders and thus no duty either to disclose or abstain from trading.

In this last regard, the Supreme Court in *Dirks* said:

   We were explicit in *Chiarella* in saying that there can be no duty to disclose where the person who has traded on inside information 'was not [the corporation's] agent, . . . was not a fiduciary, [or] was not a person in whom the sellers [of the securities] had placed their trust and confidence. ' 445 U.S., at 232. Not to require such a fiduciary relationship, we recognized, would 'depar[t] radically from the established doctrine that duty arises from a specific relationship between two parties' and would amount to 'recognizing a general duty between all participants in market transactions to forgo actions based on material, nonpublic information.' id., at 232, 233. This requirement of a specific relationship between the shareholders and the individual trading on inside information has created analytical difficulties for the SEC and courts . . . . [FN11]

In *In re Cady, Roberts & Co.*, [FN12] the Securities and Exchange Commission held that corporate insiders who receive inside information by virtue of their positions have a duty either to disclose that information to persons with whom they deal (or the public at large) or to refrain from trading. [FN13] Because the duty to disclose does not arise from the meree possession of non-public information, [FN14] such a duty does not turn on whether the parties to the transaction

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1994 WL 267860                                                                                                Page 4
1994 WL 267860 (WL)

have equal information, [FN15] but rather arises from a fiduciary or other similar relationship of trust and confidence between the parties.

In Mr. ReBrook's case, the Government contended that Mr. ReBrook was guilty of "insider trading" because he had acquired material, non-public information in his position as lottery counsel. [FN16] In submitting the case to the jury, the district court instructed the jury that the appellant's required breach of fiduciary duty arose from section 6B-2-5 of the West Virginia Code, [FN17] the state governmental ethics act, which provides: [FN18]

(e) *Confidential Information.*-No present or former public official or employee may knowingly and improperly disclose any confidential information acquired by him or her in the course of his or her official duties nor use such information to further his or her personal interests or the interests of another person. [FN19]

The trial court adopted what commentators have called the "misappropriation theory"-an eccentric doctrine of insider trading adumbrated in one United States Supreme Court concuring opinion and one dissent, and then promoted by Judge Ralph Winter of the United States Court of Appeals for the Second Circuit and former professor [FN20] at Yale Law School.

### III. CONFOUNDING THE EX POST FACTO CLAUSE

The so-called "misappropriation theory" notwithstanding, the law of insider trading is so inchoate that vagueness and *ex post facto* [FN21] principles are clearly implicated. In *Kolender v. Lawson*, [FN22] the Supreme Court held that "the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine-the requirement that a legislature establish minimal guidelines to govern law enforcement." That inside traders are typically high-profile defendants whose prosecutions bring great notoriety to a United States attorney's office and shower promotions and accolades on everyone involved [FN23] makes even more urgent the necessity for clear, bright-line rules and a respect for time-honored vagueness principles.

In this regard, Mr. ReBrook should never have been indicted because once we get past *corporate* insiders, what constitutes "insider trading" is entirely undefined. As the Court in *Kolender* stressed, in the absence of concrete guidelines, "a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." [FN24] That is precisely what happened in the ReBrook case.

In the current climate, with the general public clamoring for criminal convictions at any price, with a press whose gluttony for dollars renders it insensate to conscience, with uzi-toting drug dealers, corrupt local police and federal agents, and an urban murder rate so high that a person's likelihood of being shot in many of our cities exceeds his likelihood either of dying of cancer or of being killed in a car crash, it is *still* the role of judges and scholars to point out that the *ex post facto* clause is important and cannot be honored only in the breach. As President Roosevelt once said, looking at events in Hitler's Europe: "If the lights of liberty burn low in other nations, we must redouble our efforts to make them burn more brightly here at home." [FN25]

### IV. CURRENT INSIDER TRADING LAW

The law governing the crime of "insider trading" is based upon statute, namely the Securities Exchange Act of 1934,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN26] and rules promulgated by the Securities and Exchange Commission. [FN27] Judge Winter of the Second Circuit summarizes existing law as follows:

> The legal rules governing insider trading under Section 10(b) are based solely on administrative and judicial caselaw. This caselaw establishes that some trading on material nonpublic information is illegal and some is not. The line between the two is less than clear. Although Congress has enhanced the penalties for illegal insider trading, *see* Insider Trading Sanctions Act of 1984, Pub. L. No. 98-376, 98 Stat. 1264 [footnote omitted], it has not defined the criteria by which legal insider trading is separated from illegal trading. And, although the Securities and Exchange Commission ("SEC") seems to take a somewhat more expansive view of what is illegal than the courts . . . the SEC has, apart from Rule 14e-3, foregone the opportunity to use its rulemaking power to define what insider trading is. [FN28]

The above quote comes from Judge Winter speaking in concurrence and dissent after an *en banc* panel cut Mr. Chestman a break by reversing his Rule 10b-5 insider trading convictions. [FN29] But if Judge Winter, America's most ardent proponent of new, judicially-created, insider trading crimes, *admits* that the legal structure under which Mr. ReBrook was convicted is: (1) based upon case law; and (2) less than clear because some insider trading is legal while other insider trading is not legal, how then are the notice requirements of *Kolender* satisfied and how are unpopular, high profile targets like Mr. ReBrook protected from "standardless sweeps?"

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." [FN30] As currently drafted and interpreted, SEC Rule 10b-5 fails to provide the first essential element of due process, namely notice; market participants are left to wander in a wilderness of speculation and surmise as to whether their conduct is lawful. [FN31] Indeed, as the Supreme Court observed in *Chiarella v. United States*, "a judicial holding that certain undefined activities 'generally are prohibited' by section 10(b) would raise questions whether either criminal or civil defendants would be given fair notice that they have engaged in illegal activity." [FN32]

As adopted (and it has not been amended), Rule 10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national security exchange,
>
> > (1) to employ any device, scheme, or artifice to defraud,
>
> > (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or
>
> > (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security. [FN33]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Early application of Rule 10b-5 focused on the situation with which it was specifically designed to deal-purchases in direct transactions by the corporation or its officials without disclosure of material favorable information about the company's affairs. [FN34] However, in a series of administrative decisions beginning in the 1960s and carrying into the 1970s, the SEC greatly broadened the applicability of Rule 10b-5. Suddenly, Rule 10b-5 was transformed into a general prohibition against any trading on "inside information" in anonymous stock exchange transactions. [FN35] Subsequent decisions by the Supreme Court have cast doubt, however, on some of the doctrines developed in these decisions. [FN36] Nonetheless, the Second Circuit, led by Judge Winter, continues to create surprising law under something called the "misappropriation theory."

According to the "misappropriation theory," a person violates Rule 10b-5 when he misappropriates material, non-public information in breach of a fiduciary or *similar relationship of trust and confidence* (whatever that means) and uses that information in a securities transaction. [FN37] In contrast to the well understood traditional theory of which we all have notice, the misappropriation theory does not require that the buyer or seller of securities be defrauded. [FN38] Focusing on the language "fraud or deceit upon any person," the Second Circuit has held that the predicate act of fraud may be perpetrated on the source of the non-public information, even though the source may be unaffiliated with the buyer or seller. [FN39] Notably, the misappro-priation theory has not been affirmed by the Supreme Court.

The misappropriation theory was introduced in one concurring opinion and one dissent to *Chiarella v. United States*. [FN40] The theory requires proof of two elements-a breach by the trader of a duty owed to the owner of the non-public information, and, if the purchaser of the stock is not the trader but a "tippee," the tippee's knowledge that the tipper has breached his duty. Thus, whereas traditional Rule 10b-5 liability centers in a breach of duty to uninformed shareholders and issuers of securities, [FN41] the misappropriation theory focuses on the relationship between the non-public information and how the trader obtained the information. [FN42] In expanding traditional Rule 10b-5 liability to outsiders who obtain inside, non-public information even though neither they nor their tippees owe *any* duty to either the buyers or sellers of the stock traded, the "misappropriation theory" has been compared to the crime of embezzlement. [FN43]

All of this creative manufacture of *criminal* law is extraordinarily seductive until we recognize that some ordinary resident of heartland America like Mr. ReBrook, who was born and raised in the woods of West Virginia (where insider trading is not exactly a hot subject), is about to have his life ruined, his 13-year-old son become the scion of a convicted felon, and his wife live in penury, all because a former Yale law professor wants to play clever games in an area of the law where the *United States Constitution* expressly forbids him from doing so! Furthermore, the "misappropriation theory" is not really a "theory" because it has no defined limits, as I shall explain in a moment, the "misappropriation theory" is really nothing more than a tool for standardless sweeps.

The *reductio ad absurdum* of the "misappropriation theory" allows an insider trading conviction in the following situation: Mafia boss John Gotti, traveling in his limousine, is caught in traffic on the George Washington Parkway next to Washington's National Airport when he sees a Boeing airplane crash because a wing falls off. Appreciating that this untoward event will cause Boeing shares to plummet, John decides to sell fifty thousand shares of Boeing short (*i.e.*, borrow stock he does not own, sell it at a higher price, and then, after the news breaks, buy the stock back at a lower price and deliver it to the person who lent him the stock.) However, Old John is stuck on the George Washington Parkway and doesn't have a car phone. So, in order to make sure that his trade beats the financial wire to the stock market floor, John instructs his chauffeur to cut over onto the berm, use the car's bumper to push other drivers out of the way, and speed as fast as possible to the nearest phone. This tactic is successful: John puts in his trade before the news of the crash becomes public; John makes a killing. Is John guilty of "insider trading?"

Under the Government's theory in Mr. ReBrook's case, the answer is "yes." John breached his fiduciary duty (or sim-

ilar relationship of trust and confidence) to other motorists to drive his car in a safe and reasonable manner on the public highway, obeying all applicable traffic laws. Thus, but for John's breach of his "fiduciary duty" to other motorists, John would never have gotten to the phone in time to sell short before news of the crash hit the Dow Jones wire. Indeed, other motorists who obeyed the law didn't get to a phone quickly enough. But the big question is: Would a prosecutor indict, or a jury convict, a West Virginia University English professor who acted like John Gotti to sell Boeing short? Certainly not! Would a prosecutor indict and a jury convict John Gotti? Absolutely! Thus, *Kolender's* admonitions about "standardless sweeps." [FN44]

If all of this is so obvious to a non-specialist like me, why (the reader undoubtedly asks) is it less than apparent to the magna cum loudmouth graduates of big time law schools who clerk on the Second Circuit and scramble like rabbits through a warren in the United States Department of Justice and even (occasionally) our local United States attorney's office? The answer is that so far some poor silly sod like Mr. ReBrook has not been the target of a thoroughly-reviewed case. Rather, the facts from which the so-called "misappropriation theory" has arisen seemed to those sensitive to insider trading problems to cry out for some sort of remedy.

### V. THE CASES THAT CAUSED EVERYONE TO WORK BACKWARDS FROM WHAT They Wanted To Do to a Reason to Justify Doing It

In *Chiarella v. United States*, [FN45] the defendant was employed by a financial printer who printed corporate takeover bids. Mr. Chiarella deduced the names of the target companies from information contained in documents delivered to the printer by the acquiring companies and, without disclosing his knowledge, purchased shares in the target companies and sold the shares immediately after the takeover attempts were made public. [FN46] The Supreme Court reversed Mr. Chiarella's conviction for insider trading, holding that insider trading liability is premised upon a duty to disclose or abstain from trading (such as that of a corporate insider to shareholders of his corporation) arising from a relationship of trust and confidence between parties to a transaction. Mr. Chiarella had no affirmative duty to disclose the information as to the plans of the acquiring companies and was not a corporate insider, having received no confidential information *from the target companies*. [FN47] No duty arose from Mr. Chiarella's relationship with the sellers of the target companies' securities, the court held, because Mr. Chiarella had no prior dealings with them, was not their agent, was not a fiduciary, and was not a person in whom the sellers had placed their trust and confidence. [FN48]

In *Chiarella*, the Court explicitly held that "a duty to disclose under section 10(b) *does not arise* from the mere possession of non-public market information." [FN49] However, the Court left open the question of whether Mr. Chiarella could have been convicted for breaching his duty to the acquiring corporation because that issue had not been raised below. [FN50] *Chiarella*, indeed, appears to be the type of case where there *should* be a remedy, and it was from *Chiarella* that Justices Stevens' and Brennan's concurrence and Chief Justice Burger's dissent birthed the "misappropriation theory."

The most egregious case, it should be noted, is *United States v. Carpenter*, [FN51] where an evenly divided court affirmed the Second Circuit's affirmance of an insider trading conviction of defendants who had conspired to trade on early knowledge of the contents of the *Wall Street Journal's* "Heard on the Street" column. The trial court had found that the column affected the market price of the stocks that it reviewed, yet even in *Carpenter*, where the conspiracy was: (1) aimed *directly* at the securities market; (2) the corporation whose information was misappropriated was the *preeminent* financial newspaper in the *world; and*, (3) the defendants actually made over $690,000 in insider profits, there were *still* only four votes on the Supreme Court to sustain the conviction!

In *Carpenter*, Justice Byron White, writing the sole opinion, glossed over the misappropriation theory by stating

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1994 WL 267860                                                                                           Page 8
1994 WL 267860 (WL)

tersely that the vote was four to four to affirm. None of the reports-even the usually thorough *Lawyers Edition*-sets forth how the various justices voted on this issue. I called Justice White and asked whether the vote was confidential or simply had not been reported. [FN52] That, according to Justice White, the vote was confidential tells me that the Justices somehow intuited that a court-generated "misappropriation theory" is a slippery slope (even though Mr. Carpenter was *definitely* a bad guy!).

Notably, *Carpenter* is the closest that the United States Supreme Court has come to abandoning the requirement that there be a fiduciary relationship between the inside trader (or his tipper) and the stockholders, present or future, of the corporation in whose stock the insider (or a tippee) trades. It is generally accepted that an authoritative judicial gloss placed on a criminal statute will give sufficient notice to allow enforcement to withstand vagueness challenges, [FN53] but it does not seem to me that a four-to-four decision so obscure that even the actual vote is secret constitutes an authoritative judicial gloss.

If one returns to the Second Circuit (whose law is hardly the raw material for West Virginia cocktail party conversation, even at bar meetings), the strongest case for the government is *United States v. Libera*, [FN54] where Judge Winter (writing for a three-judge panel and citing himself in either concurrence or dissent for authority) held that a stockbroker and lawyer who knowingly traded on stolen information about the content of forthcoming *Business Week* articles violated the insider trading laws. In *Libera*, an employee of R.R. Daniel & Sons Co., which printed *Business Week* for McGraw Hill, obtained copies of *Business Week* before the public release time. The defendants, using the misappropriated copies of *Business Week*, made substantial profits trading in the stocks recommended in the magazine's "Inside Wall Street" column. In *Libera*, the violation of fiduciary duty was: (1) the duty owed by Daniel to McGraw Hill to keep *Business Week* confidential; and, (2) the duty owed by Daniel's employees to Daniel not to violate corporate policy and disclose *Business Week* early.

However, *Libera* is very different from Mr. ReBrook's case, and was decided *after* Mr. ReBrook bought his stock in VLT. In *Libera* there was an elaborate scheme to misappropriate information directly related to the securities markets. *Libera*, then, should not be allowed to stand for what Judge Winter argued should be the correct law in his dissent two years earlier in *United States v. Chestman*, [FN55] namely that BAD ACT + SECURITIES PURCHASE = CRIMINAL INSIDER TRADING.

Ironically, Judge Winter laid out in *Chestman* what the law as articulated by the Supreme Court of the United States is and what Mr. ReBrook (here in the West Virginia woods where he was not privy to the most recent insider trading bulletins issued hourly by the Bar Association of the City of New York, the world's largest banks, and everyone's favorite M&A mavins) would have thought the law was *before Libera* when Mr. ReBrook bought his stock: "one, the predicate act of fraud must *be traceable to a breach of duty to the purchasers or sellers of securities* [emphasis added, footnote omitted], two, a fiduciary duty does not run to the purchasers or sellers solely as a result of one's possession of material, non-public information." [FN56] If, then, even Judge Winter admits that the Supreme Court has never gone further than this rule (except to affirm by an evenly divided court using a *secret* vote the Second Circuit's decision in *United States v. Carpenter*), [FN57] am I making too big a deal about the standardless sweep that destroyed Mr. ReBrook's life?

## VI. NEW YORK V. WEST VIRGINIA

As judges drop a political enemy through the trap door to snap his neck, they are fond of saying "everyone is presumed to know the law," even though the law is extraordinarily obscure. In civil cases, where the *Constitution's ex post facto* clause does not apply, [FN58] new forms of liability are often created after the fact, but courts attempt to disguise their willingness to confound legitimate expectations by applying some multi-part test [FN59] (an entirely result oriented

exercise) one part of which is usually whether the new rule is "clearly adumbrated" by prior holdings. [FN60]

Undoubtedly, it is the position of the zealous prosecutors who destroyed Mr. ReBrook that the "misappropriation theory" was somehow "clearly adumbrated" by the concurrence and dissent in *Chiarella*, and by Judge Winter's concurring and dissenting opinion in *Chestman*. Well . . . that's about as true in West Virginia as the supposition that the 1968 Farmington mine disaster clearly "adumbrated" to the average New York lawyer that he better not smoke in a coal mine! There are very few lawyers in West Virginia so stupid as to light a cigarette in a coal mine, and probably very few lawyers in New York so stupid as not to understand at least the rudiments of the insider trading rules. But West Virginia lawyers don't know about insider trading and New York lawyers don't know about mining coal.

"The void-for-vagueness doctrine requires that penal statutes define crimes so that ordinary people can understand the conduct prohibited and so that arbitrary and discriminatory enforcement is not encouraged." [FN61] In the adumbrating business, there is a big difference between New York City, where the Second Circuit sits, and West Virginia. Stocks, bonds, mergers, acquisitions, tender offers, insurance, underwriting new issues, law-related services, accounting, financial publishing and corporate administration are bedrock industries in the Second Circuit. In all of these undertakings, insider trading always lurks as a major hazard-not only in terms of serious criminal sanctions for the individual trader but also in terms of mammoth civil liability for major institutions. Whenever a deal goes sour, those who lose money look around for someone to sue; "insider trading" is a favorite theory of civil recovery. [FN62]

Consequently, insider trading is something that people in and around New York talk about a great deal, and it is a subject for which there are extraordinarily competent, well organized and well funded training programs. Just as my thirteen-year-old son John first ran a continuous miner, put in roof bolts, and passed his federal mine health and safety test to go underground in a coal mine when he was eleven years old, people who work in and around the greatest financial center in the world learn about insider trading at an early age. [FN63] But to believe that anyone in West Virginia (a state that has seen only *two* insider trading prosecutions, both within sixty days of one another, since the dinosaurs drank from the Kanawha River) understands anything about insider trading past the bare rudiments taught in the heartland law schools and publicized in local newspapers confounds what everyone knows about this part of the world.

Finally, it must be remembered that both cases that clearly "adumbrate" the "misappropriation theory"-namely, *Carpenter* and *Libera*-dealt with activities that were at the very *heart* of the securities markets. In *Carpenter*, the defendant manipulated the "Heard on the Street" column of the *Wall Street Journal*. In *Libera*, the defendants traded on early knowledge of stocks recommended by *Business Week*. Unquestionably, this type of "insider trading" *ought* to be prohibited because it threatens the integrity of our securities markets. Investors *expect* the SEC to protect them from journalists who use their positions as supposedly neutral evaluators to make profits. The problem is that Judge Winter and those who have acceded to the "misappropriation theory" have used the equivalent of an eight inch gun to kill a piss ant. The "misappropriation theory" is too broad to be useful.

Often I wish that when a court finds a really bad actor like Mr. Carpenter or Mr. Libera, the judges would just quietly drop him through the trap door without creating a monumental jurisprudential parody to justify context-specific execution. After all, the Chinese and Argentineans simply "disappear" the guy without a lot of jurisprudential masturbation. I myself am personally more insulted by grandiose (and ironic) jurisprudential constructs like the "misappropriation theory" than I am by your average Third World dictator who simply says, as he places the noose around some political enemy's neck, "I really don't like you!" At least the dictator does not end up killing a bunch of his friends or even a bunch of strangers he has never met. The same cannot be said of those judges (who when all is said and done have no more principles than the dictator) who start out with somebody they really want to get and then work backwards to some new and creative theory that will allow them to get him.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1994 WL 267860
1994 WL 267860 (WL)

## VII. THE UNWORKABILITY OF THE "MISAPPROPRIATION THEORY"

The big problem with the "misappropriation theory," all considerations of fair notice aside, is that it doesn't work in the sense of providing a bright-line, understandable rule. Either Congress or the Securities and Exchange Commission could produce a new rule that would cover all persons connected in any way with the financial media and anyone who is involved in the printing, distribution or preparation of confidential financial information. That, then, would mean that traditional corporate fiduciaries, employees of any financial information ser- vice-newspaper, magazine, newsletter, television broadcast, radio program, etc.-and persons involved in the handling of confidential financial information cannot trade on material, non- public information. That is an understandable expansion of traditional insider trading that basically covers *all* of the hard reported cases (including *Chiarella* where, although the conviction was reversed, the Supreme Court was plainly not happy about it).

In the real world everyone believes that he or she is trading on "material non-public" information; if traders didn't think that they knew something more than the market they would stick to bonds and blue chip stocks. [FN64] The analogy between the misappropriation theory and embezzlement is at first seductive, but, the question is, where does its logic stop? Is John Gotti in my earlier hypothetical example guilty because he "took" or "misappropriated" more road than he was entitled to as a law abiding driver?

What about the person who overhears a conversation in a French restaurant in New York where two merger and acquisition specialists (who are not officers or agents of the acquiring or target corporations) are chewing over a corporate takeover. If the eavesdropper buys stock in the target company, has he "misappropriated" or embezzled a conversation to which he was not supposed to be privy? If the answer to that question is "no," then what about the guy who buys a portable CIA-type listening device with the microphone disguised as a Montblanc fountain pen and sits in high-priced New York restaurants getting wind of bankers, brokers and underwriters discussing corporate buy-outs over lunch? If the guy with the microphone is guilty, would a person not using a microphone but who had preternatural hearing be guilty of a 10b-5 violation?

People tend to invest in the industries they know and understand. In 1980 when I first became Chief Justice of West Virginia, I decided to expedite the preparation of trial transcripts and thus the whole appeal process by bringing in computer-assisted transcription. I carefully studied the subject and found two companies that were developing that technology. I then initiated experiments using both systems. As it turned out, both systems were failures, and we abandoned the project after a six-month trial, but what if the systems had worked? If through my efforts to reduce state costs I had learned that computerized transcription was just around the corner on a massive scale, could I have bought stock in the California company pioneering one type of system? At what point is the line passed where I have "misappropriated" information from the State? What if before buying stock I had issued a press release, but nobody had bothered to print it?

As I have been fairly intemperate in my disparagement of the "misappropriation theory," let me prove my point thoroughly. Assume that the ABC Corporation has a chairman of the board, a president and a special assistant to the president. ABC is a publicly-traded corporation and its stock is listed on the New York Stock Exchange. Let us further assume that the chairman of the board and the president of ABC decide that ABC will buy $250 million worth of equipment from the XYZ Corporation. Having made that decision, let us now assume that the management of ABC buys 10% of the stock of the XYZ corporation on the open market in the name of the ABC Corporation. Thereafter, ABC announces that it will award XYZ the $250 million contract, the stock of XYZ soars, and ABC makes a huge profit on its stock purchase.

To the non-specialist this would appear to be insider trading, yet under *no* theory of insider trading could the management of ABC be guilty of a Rule 10b-5 violation. [FN65] ABC, its officers, and its employees owed absolutely no fidu-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ciary duty to the shareholders of XYZ; the only duty that officers and employees owed was to the shareholders of ABC and, because the entire stock trade was made in ABC's corporate name, no violation of fiduciary duty occurred. This, then, is an example of when trading on material, non-public information is entirely legal.

Now let us carry our hypothetical one step further. Let us assume that the corporate charter of ABC prohibits the ABC corporation from owning the stock of any other corporation; therefore, management is forbidden to buy XYZ stock in the name of ABC, Inc. In that event, if the assistant to the president of ABC buys stock in XYZ for his own account, there is also no Rule 10b-5 violation because the management of ABC owed no duty whatsoever to any person associated with XYZ. But, under the misappropriation theory, would there now be criminal liability for insider trading because management used information that belonged to the shareholders of ABC, even though ABC's shareholders were so numerous that they could not possibly have been contacted in such a way that they could have made profits themselves before the word was on the wire? [FN66]

If everything the government asserted were true, Mr. ReBrook's case still presents only the fact pattern of the last hypothetical. In Mr. ReBrook's case, instead of being the assistant to the president of ABC, Mr. ReBrook was counsel to the West Virginia lottery director. Instead of XYZ, we have a vendor of computerized gaming equipment (VLT, Inc.) and, just as in our second hypothetical, Mr. ReBrook owed no duty whatsoever to the shareholders, either present or future, of VLT. Mr. ReBrook, however, did owe a fiduciary duty to the citizens of West Virginia, and violation of that duty is a state misdemeanor. But Mr. ReBrook violated no fiduciary duty *protected by the securities law* because under the *West Virginia Constitution*, the State of West Virginia is not allowed to own stock in any corporation. [FN67] Thus, Mr. ReBrook was in the position of the assistant to the president in the second hypothetical example above who *could not* have bought stock in the XYZ Corporation for the benefit of his shareholders because the corporate charter of the ABC Corporation prohibited it.

## VIII. THE NEW INSIDER TRADING PARADIGM

Having manufactured decisional law like a fiend for over twenty years myself and having justified the process in books and articles, [FN68] I would be disingenuous to repair to that old saw that courts don't make law. Nonetheless, even I-perhaps one of America's greatest offenders in the judicial legislation business-am mighty respectful of the *ex post facto* clause in criminal cases, the vagueness doctrine that emerges from the *ex post facto* clause, and the concepts of civil liberties these principles uphold.

Given the widespread dissatisfaction (at least among academicians and judges) with Congress' and the SEC's failure to update insider trading rules, it is inevitable that interested parties will come to the courts (as everyone else who is dissatisfied with the political process comes to the courts) for a little relief in the form of lawmaking. On the civil side (where the *ex post facto* clause does not apply), lawmaking is a routine exercise and the law of *civil* liability for insider trading is constantly evolving. [FN69] Criminal liability, on the other hand, is an entirely different matter. It can be argued, of course, that the original landmark insider trading case, namely *In re Cady, Roberts*, [FN70] was an *ex post facto* -type case. But it should be remembered that in *In re Cady, Roberts* there was hardly *any* sanction, and what little sanction there was emerged from the SEC's acceptance of an offer of settlement. [FN71] Mr. Gintel, the inside trader in *Cady*, was suspended from the New York Stock Exchange for twenty days! *No* action was taken against Cady, Roberts, and although the New York Stock Exchange itself fined Mr. Gintel $3,000, the overall penalty was such a joke that one SEC commissioner dissented.

Unless courts can figure out a way to give an ambiguous criminal statute an authoritative judicial gloss *in advance*, it is not for the federal courts to try to develop the appropriate "new paradigm" for criminal insider trading. This is particu-

larly true in light of the fact that there is a perfectly competent (if overworked) administrative agency that has the power to promulgate administrative rules delineating in a precise way what is and is not illegal. Although the court-generated "misappropriation theory" is neither coherent nor workable, the rules that need to be made to assure investor confidence in the market emerge clearly from the cases in which everyone has wanted prosecution so desperately that they played fast and loose with the *U. S. Constitution's ex post facto* clause. The *Cady, Roberts* rule that insiders cannot trade on material, non-public information in the stock of their own companies pretty well covers the most obvious cases. The SEC should then add to Rule 10b-5 that no person connected with the preparation of confidential papers (financial printers, messengers, delivery services, etc.) [FN72] and no person employed or associated with a financial news service (newspaper, television station, newsletter, etc.) may trade on material, non-public information.

This approach parallels what the SEC has already done in adopting Rule 14e-3 in 1980. Rule 14e-3(a), for example, provides:

If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:

(1) The offering person,

(2) The issuer of the securities sought or to be sought by such tender offer, or

(3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise. [FN73]

Thus, the SEC knows how to make a narrow rule designed to correct a specific problem. [FN74] The new Rule 14e-3 makes it a violation if a person trades on the basis of material, non-public information concerning a pending tender offer that he knows or has reason to believe has been acquired "directly or indirectly" from an insider of the offeror or issuer, or someone working on his or her behalf. Thus, the new Rule 14e-3(a) creates a duty in those traders who fall within its ambit to abstain or disclose, without regard to whether the trader owes a pre-existing fiduciary duty to respect the confidentiality of the information. [FN75] Rule 14e-3, then, actually covers my French restaurant eavesdropping hypotheticals. That is because possession of any concrete information about a tender offer necessarily implies an inside trade and not superior skill, judgment or deep knowledge of an industry!

In the specific context of tender offers it makes a great deal of sense to have a blanket prohibition of trading by outsiders whenever there is an information disparity, just as it makes sense to prohibit financial printers and other handlers of confidential documents and financial journalists from profiting from the non-public information to which they are privy. But expanding the insider trading rules beyond these specific cases (unless problems can be incisively isolated) simply invites "standardless sweeps" or moves the whole law of insider trading towards the unworkable rule that insider trading occurs whenever there is any informational disparity among participants. [FN76] (*Dirks*, expressly rejected any-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

thing approaching that type of rule on the grounds that it was *utterly* unworkable).

The objection can be made, of course, that there are bad situations out there that will not be covered by these rules. The retort is that if Congress or the SEC can target those situations *in advance* and give traders clear prospective notice that they will be prosecuted for what they are doing, then prosecutions can withstand *ex post facto* and vagueness scrutiny. But concurring opinions, dissenting opinions, and the erratic decisions of random three-judge panels simply do not pass constitutional muster. There are lots of bad folks that we would all like to do away with or sanction more severely than existing law allows. I am often sorely tempted to modify the law so that vandalizing juveniles can be given a good public spanking; I would like to see out-of-state armed felons hanged; and I would like to take anyone who violates existing firearms statutes, flog them severely, and then exile them beyond the seas for the rest of their natural lives. What restrains me and, indeed, all of us from inaugurating some of these attractive law changes I have just "adumbrated" against those whom we find threatening is the little matter of the *ex post facto* clause and our proper respect for the limits of judicial lawmaking in criminal cases.

[FNa] A.B. 1964, Darmouth College; LL.B. 1967, Yale Law School; justice (and former chief justice) West Virginia Supreme Court of Appeals. The author thanks Christopher R. McDowell, a lead editor of the West Virginia Law Review, for his invalueable contributions to the form, scholarship and ultimate substance of this article. Mr. McDowell's work went well beyond that normally associated with a law editor.

[FN1]. In the Rebrook trial itself, there were problems with both materiality and certainty. It is surpassingly unlikely that a contract to provide equipment to the state of West Virginia would have materially affected the price of VLT's stock; furthermore, it is obvious that given the number of players whose assent was necessary before either (1) video lottery could be expanded, or (2) a contract could be awarded to any vender-*i.e.*, the lottery director, lottery commission, the governor of West Virginia, the West Virginia legislature, and the West Virginia Supreme Court of Appeals, all of whom have nibbed at one point or another in this issue-that anything approaching an agreement-in-principle had been reached.

[FN2]. HANNAH ARENDT, EICHMANN IN JERUSALEM: A REPORT ON THE BANALITY OF EVIL 13 (1963).

[FN3]. This seemingly inconsequential prosecution of a minor political actor is noteworthy because it is emblematic of an untoward turn that the criminal law lately has taken. The crime rate in America is rising so rapidly and America has grown so savage, that the public, the judges and even the media have become entirely impatient with any "due process" obstacles (like the fact that a law confounds *ex post facto* principles). Dwindling state and local revenues cause money to be transferred from traditional government services like police protection to pay for "entitlements," which prompts terrified civilians to look to the federal government for protection with little inclination to engage in oversight. What the public and the press today think of as "technicalities" were once, in a more optimistic era, thought of as "constitutional rights."

[FN4]. The word "material" in this context has been defined in the following ways: An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. Basic Indus. v. Levinson, 485 U.S. 224, 231-33 (1987). Where, on the other hand, the event is contingent or speculative in nature, it is difficult to ascertain whether the "reasonable investor" would have considered the omitted information significant at the time. Merger negotiations, because of the ever-present possibility that the contemplated transaction will not be effectuated, fall into the latter category. The Second Circuit has said that materiality "will depend at any given time upon a balancing of both the indicated prob-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968), quoted with approval in *TSC Industries, 485 U.S. at 238.*

[FN5]. Non-public information is that which is not normally available to most investors in the marketplace. *In re Investors Management Co., 44 S.E.C. 633, 643 (1971) ("Information is nonpublic when it has not been disseminated in a manner making it available to investors generally."). Further, as the SEC has stated, "[i]n order to effect a meaningful public disclosure of corporate information, it must be disseminated in a manner calculated to reach the securities market place in general through recognized channels of distribution, and public investors must be allocated a reasonable waiting period to react to the information." Faberage, Inc., Exchange Act Release No. 10,174, FED. SEC. L. REP. (CCH) P79, 378, at 83, 105 (May 25, 1973). It is possible that information is sufficiently publicly available even though it was not really available to all investors,* e.g., through some form of nationwide media. *See Elkind v. Ligett & Myers Inc., 635 F.2d 155, 166 (2d Cir. 1980) (knowledge legitimately in the hand of a significant number of investment analysts is apparently seen as functionally equivalent of public knowledge). Information has become public when it is in the public domain or when the market has internalized it,* i.e., stock price movements are not linked any more to issuer-related factors but are correlated again with the general market movements.

[FN6]. Section 20A(a) of the Exchange Act, 15 U.S.C. § 78t- 1(a) (1988) provides for civil liability if the fiduciary duty is breached; however, this section does not define insider trading.

[FN7]. 463 U.S. 646 (1983).

[FN8]. *Id.* at 646 (emphasis added).

[FN9]. *Id.* at 647.

[FN10]. 445 U.S. 222 (1980). In *Chiarella* the defendant was employed by a financial printer who printed corporate takeover bids. Chiarella deduced the names of the target companies from information contained in documents delivered to the printer by the acquiring companies and, without disclosing his knowledge, purchased stock in the target companies and sold the shares immediately after the takeover attempts were made public. The Supreme Court reversed Chiarella's conviction for insider trading, holding that insider trading liability is premised upon a duty to disclose (such as that of a corporate insider to shareholders of his corporation) arising from a relationship of trust and confidence between parties to a transaction. Chiarella had no affirmative duty to disclose the information as to the plans of the acquiring companies and he was not a corporate insider, having received no confidential information *from the target companies.* No duty arose from Chiarella's relationship with the sellers of the target companies' securities because Chiarella had no prior dealings with them, was not their agent, was not a fiduciary, and was not a person in whom the sellers had placed their trust and confidence. The Court explicitly held that a duty to disclose under section 10(b) *does not arise* from the mere possession of non-public market information. However, the Court left open the question of whether Chiarella could have been convicted for breaching his duty to the acquiring corporation because that issue had not been raised below. 463 U.S. at 654-55. In Mr. ReBrook's case, it is undisputed that Mr. ReBrook owed no fiduciary duty to VLT, Inc. or to any of its present or future stockholders.

[FN11]. 40 S.E.C. 907 (1961).

[FN12]. *Id.* at 911.

[FN13]. Chiarella, 445 U.S. at 228.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1994 WL 267860                                                                    Page 15
1994 WL 267860 (WL)

[FN14]. *See* United States v. Chestman, 947 F.2d 551, 560 (2d Cir. 1990).

[FN15]. *See* the court file and record in United States v. ReBrook, Criminal No. 2:93-00151, United States District Court for the Southern District of West Virginia, Charleston Division, Haden, C.J. presiding.

    In support of its case, the Government introduced a February 1992 surreptitiously-recorded conversation between Mr. ReBrook and Mr. Bernard Folio in which Mr. ReBrook revealed to Mr. Folio the plan to expand the Lottery. In his defense, Mr. ReBrook highlighted the following comment made by him to Mr. Folio (quoted by the Government in the indictment):

   Well, you can keep this under your-*it's no secret, because every machine operator in West Virginia knows this, so I'm not talking out of school, but it's not something that you want to make public statements about.* [emphasis added].

   Caperton is going to allow the lottery commission, as soon as the general election is over, to go full speed ahead with the video lottery, full speed ahead.

    Ironically, this conversation took place in February 1992-five months *before* the governor, according to the Government's evidence, developed his plan to expand the lottery and give VLT a contract for the equipment.

    Mr. ReBrook testified that his "belief" that there was a "plan" was based upon public statements, formal meetings between employees of the lottery and amusement machine operators, newspaper articles and his political instincts. In other words, Mr. ReBrook's position was that every *material* piece of information of which Mr. ReBrook was apprised was public. Unfortunately for Mr. ReBrook, the trial court, basing its ruling on some theory of hearsay, excluded from evidence 147 published newspaper articles that reported public meetings where plans to expand video lottery were discussed over a three year period *before* Mr. ReBrook purchased the VLT stock. Mr. ReBrook did not seek to introduce the stories for the truth of the matter asserted; therefore, the trial court ruling that the stories were inadmissible hearsay was wrong. Newspaper articles are self- authenticating. FED. R. EVID. 902(6). Indeed, the Second Circuit considers newspaper stories so central to a defendant's defense that the information on which he traded was public, that such articles are routinely admitted into evidence without further discussion. *See, e.g.,* United States v. Teicher, 987 F.2d 112, 117 (2d Cir. 1993).

[FN17]. W. VA. CODE § 6B-2-5 (1989).

[FN18]. Violation of W. VA. CODE § 6B-2-5 (1989) is a state misdemeanor punishable by six months in jail and a fine not to exceed $1000. W. VA. CODE § 6B-2-10(a) (1989).

[FN19]. W. VA. CODE § 6B-2-5(e) (1989).

[FN20]. The problem with big time law professors is that they usually have been extraordinarily clever children. This cleverness, then, allows them to get jobs where they need never practice real law for real people. Thus there is often no opportunity to cultivate intelligence. "Cleverness is a false presumption . . . . It is like being a natural skater, you are so busy doing tricks to impress that you do not see where the thin ice is and before you know, poof! You are in deep, ice-cold water, frozen like a dead herring. Intelligence is a harder gift. For this you must work, you must practice it, challenge it, and maybe toward the end of your life you will master it. Cleverness is the shadow, whereas intelligence is the substance." BRYCE COURTENAY, THE POWER OF ONE 277 (1989).

[FN21]. U.S. CONST. art. I, § 9. Congress shall pass "[n]o bill of attainder or ex post facto law . . . ."

[FN22]. 461 U.S. 353 (1983).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN23]. The most obscene form of corruption is not the penny ante bribery of two-bit politicians on the take. Rather, the most obscene form of corruption is a form that is entirely legal-namely self-dealing by a bureaucracy for its own aggrandizement as an institution. Bureaucratic self-dealing involves every bit as much indifference to duty and to the most elementary obligations of honesty and humane conduct as regular bribery, but because bureaucratic self-dealing is so difficult to prove it has never been made illegal. The corrupt bureaucratic self-dealer (*i.e.,* thief) can always trot out the defense "I was only doing my job," or better yet, "I was simply following orders!" For greater elaboration on courts' obligations to ferret out this type of corruption, *see RICHARD NEELY, HOW COURTS GOVERN AMERICA 79-114 (1981).*

[FN24]. *Kolender,* 461 U.S. at 358 (quoting in part, *Smith v. Goguen,* 415 U.S. 566, 574-75 (1974)).

[FN25]. THE VOICE OF FDR: EXCERPTS OF HIS SPEECHES DURING THE PRESIDENTIAL YEARS (1932-1945), (DECCA Records, 1953).

[FN26]. 15 U.S.C. §§ 78ff, 78j(b) (1934).

[FN27]. The Commission gets its power to promulgate rules from section 10(b) of 15 U.S.C. § 78a (1988). Section 10(b) makes it unlawful for any person to use the mails or facilities of interstate commerce:
> To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. It should be noted that section 10(b) by its terms does not make anything unlawful unless the Commission has adopted a rule prohibiting it.

[FN28]. United States v. Chestman, 947 F.2d 551, 572 (2d Cir. 1991) (Winter, J., concurring in part and dissenting in part).

[FN29]. Chestman, a stockbroker, had been convicted of Rule 10b-5 violations because he traded on information received from the husband of the daughter of the sister of a corporation's controlling stockholder. The controlling stockholder had told his sister about an impending tender offer and the sister had told her daughter, who in turn told her husband. An *en banc* panel of the Second Circuit held that no fiduciary relationship or similar relationship of trust and confidence existed between husband and wife and husband and wife's family so as to impose Rule 10b-5 liability on husband's stockbroker with respect to information received from the husband regarding transactions contemplated by his wife's family members. However, Mr. Chestman's conviction for Rule 14e-3 insider trading was affirmed because the trade in question had to do with a tender offer for which there is a specific, narrow rule. Rule 14e-3 is discussed in the last section of this Article. *See* infra part VIII.

[FN30]. *Kolender,* 461 U.S. at 357.

[FN31]. The courts have not been specific as to which clause of the Rule imposes this duty to disclose or refrain from trading, but have relied, in the words of one court, simply upon the assertion that, "the rule is clear," Speed v. Transamerica Corp., 99 F. Supp. 808, 828 (D. Del. 1951), or have asserted, as did the Second Circuit, that "we fail to see that it makes any difference which clause of the Rule 10b-5 is relied on . . . ." List v. Fashion Park Inc., 340 F.2d 457, 462 (2d Cir. 1965).

[FN32]. 445 U.S. at 235 n.20.

[FN33]. 17 C.F.R. § 240.10b-5 (1993).

[FN34]. *See, e.g.,* Ward La France Truck Corp., 13 S.E.C. 373 (1943); Speed v. Transamerica Corp., 99 F. Supp. 808 (D.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Del. 1951).

Milton Freeman has explained the origin of Rule 10b-5 and the problem it was designed to tackle:

It was one day in the year 1943, I believe. I was sitting in my office in the S.E.C. building in Philadelphia and I received a call from Jim Treanor who was then the Director of the Trading and Exchange Division. He said, "I have just been on the phone with Paul Rowen," who was then the S.E.C. Regional Administrator in Boston, "and he has told me about the president of some company in Boston who is going around buying up the stock of his company from his own shareholders at $4.00 a share, and he has been telling them that the company is doing very badly, whereas, in fact the earnings are going to be quadrupled and will be $2.00 a share from this coming year. Is there anything we can do about it?" So he came upstairs and I called in my secretary and I looked at Section 10(b) and I looked at Section 17, and I put them together, and the only discussion we had there was where "in connection with the purchase of sale" should be, and we decided it should be at the end.

We called the Commission and we got on the calendar, and I don't remember whether we got there that morning or after lunch. We passed a piece of paper around to all the commissioners. All the commissioners read the rule and they tossed it on the table, indicating approval. Nobody said anything except Sumner Pike who said, "Well," he said, "we are against fraud, aren't we?" That is how it happened.

Louis is absolutely right that I never thought that twenty-odd years later it would be the biggest thing that ever happened. It was intended to give the Commission power to deal with this problem. It had no relation in the Commission's contemplation to private proceedings. How it got into private proceedings was by the ingenuity of members of the private Bar starting with the *Kardon case. It has been developed by the private lawyers, the members of the Bar, with the assistance or, if you don't like it, connivance of the federal judiciary, who thought this was a very fine fundamental idea and that it should be extended* . . . .

*Conference on Codification of the Federal Securities Laws*, 22 BUS. LAW. 793, 922-23 (1967).

Mr. Freeman was off by a year: Rule 10b-5 was adopted in 1942. The May 1942 promulgating release for Rule 10b-5 states that it "closes a loophole in the protection against fraud administered by the Commission by prohibiting individuals or companies from buying securities if they engage in fraud in their purchase." SEC Exchange Act Release No. 3230 (May 21, 1942).

[FN35]. The three most significant decisions were *In re Cady Roberts & Co., 40 S.E.C. 907 (1961); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968); and Investors Management Co., 44 S.E.C. 633 (1971).*

[FN36]. Chiarella v. United States, 445 U.S. 222 (1980); Dirks v. SEC, 463 U.S. 646 (1982).

[FN37]. *Chestman*, 947 F.2d at 566.

[FN38]. *Id.*

[FN39]. *Id.*

[FN40]. Chiarella, 445 U.S. 222, 238-39 (Stevens, J., and Brennan, J., concurring) and at 243-45 (Burger, C.J., dissenting).

[FN41]. S.E.C. v. Downe, 92 Civ. 4092, U.S. Dist. Ct., S.D.N.Y., January 26, 1993.

[FN42]. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN43]. United States v. Libera, 989 F.2d 569 (2d Cir. 1993). See Patrick Coughlin, *Insider Trading-The Misappropriation Theory*, A.L.I.-A.B.A. POSTGRADUATE COURSE IN FEDERAL SECURITIES LAW, (1993) (available on WESTLAW, C859 ALI-ABA 583).

[FN44]. The problem of petty state misdemeanors being converted into serious federal felonies because of the political proclivities of prosecutors is not unique to SEC Rule 10b-5 violations. Here is Judge Easterbrook of the Seventh Circuit talking about a similar problem with the mail fraud statute:

> A mails B an invitation to a surprise party for their mutual friend C. B drives his car to the place named in the invitation. But there is no party; the address is a vacant lot; B is the butt of a joke. The invitation came by post; the cost of gasoline means that B is out of pocket. The prosecutor said [at oral argument] that this indeed violates Sec. 1314, but that his office pledges to use prosecutorial discretion wisely. Many people will find this position unnerving (what if the prosecutor's policy changes, or A is politically unpopular and the prosecutor is looking for a way to nail him?) . . . [T]he idea that practical jokes are federal felonies would make a joke of the Supreme Court's assurance that sec. 1314 does not cover the waterfront of deceit.

United States v. Walters, 997 F.2d 1219, 1224 (7th Cir. 1993); *ssee also* Geraldine Szott Moohr, *Mail Fraud and the Intangible Rights Doctrine: Someone to Watch Over Us*, 31 HARV. J. ON LEGIS. 153 (1994).

[FN45]. 445 U.S. 222 (1980).

[FN46]. *Id.* at 224.

[FN47]. *Id.* at 232.

[FN48]. *Id.*

[FN49]. *Id.* at 235 (emphasis added).

[FN50]. *Id.* at 236.

[FN51]. 484 U.S. 19 (1987).

[FN52]. Telephone Interview with Justice Byron White (February 1994).

[FN53]. *See, e.g.*, Rose v. Locke, 423 U.S. 48 (1975); Wainwright v. Stone, 414 U.S. 21 (1973); Grayned v. City of Rockford, 408 U.S. 104 (1972); Gooding v. Wilson, 405 U.S. 518 (1972); Paulos v. New Hampshire, 345 U.S. 395 (1953); Terminiello v. Chicago, 337 U.S. 1 (1949). *But see* United States v. Reese, 92 U.S. 214 (1875) (explaining that for the Court to "introduce words of limitation" into an overbroad criminal statute in order to make it constitutional "would, to some extent, substitute the judicial for the legislative department . . . . To limit this statute . . . would be to make a new law, not to enforce an old one. This is no part of our duty"). *Id.* at 221.

Even if a statute is unconstitutionally vague standing alone, courts often reject vagueness challenges if external factors appear to have "cured" the problem. Frequently, judicial gloss applied by a state supreme court or by a federal administrative agency provide enough definiteness to remedy a statute's vagueness. Michael S. Kelley, *""Something Beyond": The Unconstitutional Vagueness of RICO's Pattern Requirement*, 40 CATH. U. L. REV. 331, 377 (1991). However, although judicial gloss by the highest court of a state and by a federal agency may "cure" an otherwise vague statute, this policy cannot be extended to federal appellate courts because they are not the final interpreters of their respective bodies of law. In the federal sphere, until the Supreme Court gives a *definitive interpretation* to a statute, the defendant cannot be sure what a particular statute means. *See, e.g.*, McNally v. United States, 483 U.S. 350 (1987)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1994 WL 267860                                                                                                    Page 19
1994 WL 267860 (WL)

(repudiating "intangible rights doctrine" in mail fraud cases, though this theory was "settled law . . . in every circuit that had considered the issue"). (Congress, in an eleventh hour amendment to an unrelated amendment-ridden, election-year, drug abuse act, amended the mail fraud statute in 1988 to restore the intangible rights doctrine. Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7603, 102 Stat. 4181, 4508).

[FN54]. 989 F.2d 596 (2d Cir. 1993).

[FN55]. 947 F.2d 551 (2d Cir. 1990).

[FN56]. *Id.*

[FN57]. 445 U.S. 222 (1980).

[FN58]. Calder v. Bull, 3 U.S. (3 Dall.) 386 (1798).

[FN59]. *See, e.g.*, Bradly v. Appalachian Power Co., 256 S.E.2d 879 (W. Va. 1979).

[FN60]. Until 1258, under the English common law as developed by Henry II and Lord Chancellor Bracton, litigants could apply to the lord chancellor for a writ authorizing a royal court to decide any dispute, and the decision to grant a new writ was what we would call today the creation of a new cause of action. As is the case today, however, the ability of common law courts to correct new and imaginative wrongs done by well-heeled, entrenched interests was a bone of contention between the royal government speaking occasionally for the national interest and insular, baronial interests defending the prerogatives of the feudal propertied classes.

Thus it came to pass that during the troubles of the reign of Henry III, when rebellious barons (most prominently Simon de Montfort) captured the King and his adolescent son, Edward (later King Edward I), they proceeded to establish an illegitimate parliament at Oxford (only nominally and unwillingly presided over by the prisoner King Henry) and there caused to be enacted the infamous 1258 Provisions of Oxford. The purpose of the Provisions of Oxford was to limit the lawmaking flexibility of courts by freezing the number of available writs, forbidding the creation of new writs, and thereby preventing intrusion by judicial officers of the national government into the affairs of the paramount local landowners.

After the escape of Prince Edward, the Prince's ultimate victory in his father's name over the rebellious barons, the re stablishment of legitimate government, and the ultimate accession of the strong and talented Edward I to the throne in place of the weak and ineffectual Henry III, a duly constituted parliament enacted the 1285 Statute of Westminster II, which repealed many of the limitations the Provisions of Oxford had imposed on common law courts to make new law.

During the twenty-seven years that the Provisions of Oxford had been on the statute books of England, it had become apparent  that the efforts of the Provisions of Oxford to limit the lawmaking flexibility of courts was utterly impractical. Accordingly, under the Statute of Westminster II, 13 E. I, Stat. 1, Cap 24 [1285] the lord chancellor's pre-1258 powers were largely restored, but with the exception that the creation of new writs was not to be unbounded, but was authorized only in *consimilis casus* (similar situations), *i.e.*, when the problem the new writ was designed to solve was similar to problems that existing writs were solving. It was, then, under this authority that writs for "trespass" were converted into writs for "trespass on the case" (in other words, trespass in a similar case) and the modern law of negligence was born. *See* FREDRIC W. MAITLAND, CONSTITUTIONAL HISTORY OF ENGLAND (H. Fisher ed., 1968). The Provisions of Oxford are not included in the official compilations of statutes, but can be found in WILLIAM STUBBS, SELECTED CHARTERS AND OTHER ILLUSTRATIONS OF ENGLISH CONSTITUTIONAL HISTORY FROM THE EARLIEST TIMES TO THE REIGN OF EDWARD THE FIRST 378-84 (9th ed. 1985) (translation 384-87).

[FN61]. Kolender v. Lawson, 461 U.S. 353 (1983).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN62]. *See, e.g.*, Garcia v. Cordova, 930 F.2d 826 (10th Cir. 1991); Greenfield v. Heublein, Inc. 742 F.2d 751 (3d Cir. 1984); Reiss v. Pan Am. World Airways, Inc., 711 F.2d 11 (2d Cir. 1983); Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976 (S.D.N.Y. 1989).

[FN63]. When I was at the Yale Law School, Judge Winter was a professor. "Insider trading" was a major topic of discussion at Yale even in 1967; the great majority of Yale graduates were headed for prestigious New York law firms (I spent time at Nixon, Mudge, Rose, Guthrie & Alexander), and we studied the law of insider trading the way a West Virginia University law student studies workers' compensation and mineral law. I remember having had three semester courses in business and securities law, three courses in federal taxation, plus two courses in labor law and one course each in administrative law and bankruptcy law. I never had a course in domestic law or knew personally anyone who took such a course, although rumor had it that Yale offered one. Yale offered no course in workers' compensation!

[FN64]. Once not long ago I was at a bar meeting and talked with Sterl Shinaberry, one of West Virginia's leading plaintiffs' lawyers and a person who had litigated long and mightily against Johns Manville Corporation in the asbestos cases. At that time Johns Manville was about to emerge from bankruptcy protection and Sterl told me that from his detailed knowledge of Manville based on volumes of discovery and years of regular contact, he thought that Manville would come back *very* strong and that the stock was substantially undervalued. Upon that information-which I could not evaluate personally-I went out and bought a few hundred shares for my son. Was this material, non-public information? I hoped so, but it obviously wasn't because I took a good bath in Manville and have been hunting Sterl at bar meetings ever since!

However, under the misappropriation theory the government could probably get an indictment, and if I were unable to hire a specialist in federal criminal law for $250,000-about the minimum that a truly excellent practitioner of federal criminal law would charge for a case of this sort in a low-cost-of-living place like West Virginia-the government (which can afford to spend millions on a *single* prosecution) could probably get a conviction if the judge were as politically antagonistic as the prosecutor.

The argument would go something like this: Mr. Shinaberry acquired all of his information about Johns Manville in pursuit of lawsuits on behalf of clients to whom he owed a fiduciary or "similar" duty.    "Tipping" a friend at a bar meeting concerning material, non-public information that he acquired through private discovery (discovery documents are no longer routinely filed in federal courts) before a public disclosure to his own clients can be construed as a breach of his fiduciary or "similar" duty to his clients. Consequently, under the government's misappropriation theory every cocktail party bull session that leads anyone to buy stock is potentially a platform for an insider trading prosecution.

[FN65]. *See* Stafin v. Greenberg, 672 F.2d 1196 (3d Cir. 1982). The *Stafin court cites with approval* Victor Brudney, Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws, *93 HARV. L. REV. 322 (1979) for the proposition that "a duty to disclose depends upon a special relationship between the buyer and seller." 672 F.2d at 1203 n.7. Thus, the insider's duty must be* to the seller *of the stock, and in our hypothetical example, there is no duty between ABC and the sellers of XYZ's stock.*

[FN66]. *See* Windon Third Oil & Gas v. Federal Deposit Ins. 805 F.2d 342 (10th Cir. 1986) where the court said: "Although *Chiarella* involved the issue of insider liability, the Court there unequivocally rejected the proposition that all participants in market transactions are under a general duty to disclose material, nonpublic information. 'Formulation of such a broad duty . . . departs radically from a specific relationship between two parties . . . .' " 805 F.2d at 347. The court in *Windon* articulated the traditional position that trading on non-public information is not actionable unless there is a duty to disclose such information that is owed either to the buyers or sellers of the securities involved. In this regard the court in *Windon* said:

The failure to disclose material information is actionable only 'when [one] is under a duty to do so. And the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

duty to disclose arises when one party is entitled to know *because* of a fiduciary or other similar relation of trust and confidence between them.' *Chiarella v. United States*, 445 U.S. 222, 228, 100 S. Ct. 1108, 1114, 63 L. Ed. 2d 348 (1980) (citation omitted). A duty arises from the relationship between the parties not merely because one party has an ability to acquire information. Id. at 231, n. 14, 100 S. Ct. at 1116, n.14. Without a duty to disclose, silence cannot be made fraudulent.

  805 F.2d at 347.

[FN67]. "[N]or shall the State ever hereafter become a joint owner, or stockholder in any company or association in the State or elsewhere, formed for any purpose whatever." W. VA. CONST. ART. 10, § 6.

[FN68]. *See, e.g.*, RICHARD NEELY, THE PRODUCT LIABILITY MESS: HOW BUSINESS CAN BE RESCUED FROM THE POLITICS OF STATE COURTS (1988); RICHARD NEELY, HOW COURTS GOVERN AMERICA (1981); Richard Neely, *The Primary Caretaker Parent Rule: Child Custody and the Dynamics of Greed*, 3 YALE L. & POL'Y REV. 168 (1984); Richard Neely, *Obsolete Statutes, Structural Due Process, and the Power of Courts to Demand a Second Legislative Look*, 131 U. PA. L. REV. 271 (1982).

[FN69]. Rule 10b-5 is worded as a prohibition; there are no express provisions anywhere in the securities laws prescribing any civil liability for its violation. Starting in 1946, however, courts began applying common law tort rules to 10b-5 violations, *i.e., that a person who violates a legislative enactment is liable in damages if he invades an interest of another person that the legislation was intended to protect. Kardon v. National Gypsum Co., 69 F. Supp. 512 (E.D. Pa. 1946). In 1971, the validity of a private right of action for 10b-5 violations was recognized by the Supreme Court, without discussion, in a footnote to Superintendent of Ins. v. Bankers Life & Casualty Co., 404 U.S. 6 (1971). The Court simply noted that "a private right of action is implied under [section] 10(b)." Id. at 13 n.9. A second plausible basis for the private right of action has been found in § 29(b) of the Exchange Act, which declares void any contract in violation of the Act or its rules. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 735 (1975). Yet a third theory justifying Rule 10b-5 civil liability is the statutory implication theory. See J.I. Case Co. v. Borak, 377 U.S. 426, 431-32 (1964). The essence of the statutory implication theory is that the underlying bases of the Exchange Act plus a general grant of jurisdiction to the courts are sufficient to create an implied private right of action. Despite the scant legislative and administrative history of section 10(b) and Rule 10b-5, the Supreme Court has favored an approach that emphasizes congressional intent. This theory states that when Congress substantially revised the securities laws in 1975, most federal courts permitted suit under section 10(b) and Rule 10b-5 regardless of the availability of other express remedies; thus, Congress' decision to leave Section 10(b) intact suggests that Congress ratified the cumulative nature of the section 10(b) action. This argument brings judicial activism full circle. Because of Congressional inaction, the courts broadly interpret a statute to "get" a bad guy.     Then, when the same gridlocked legislative body that was unable to take action in the first place, fails to take action to correct the latest judicial interpretation, the legislative body is deemed to have acceded to the judicial doctrine as if it had actually passed a law saying so.*
  In *Blue Chip Stamps*, the Court noted that flexible judicial interpretation of the Rule 10b-5 private right of action has caused the rule to become "a judicial oak which has grown from little more than a legislative acorn." 421 U.S. at 737. Today, the existence of this implied private right of recovery is not only unquestioned, but also has become, by judicial interpretation and construction, the most widely invoked provision of the securities laws in civil suits for damages.

[FN70]. 40 S.E.C. 907 (1961).

[FN71]. This, of course, is why such a landmark case is merely an SEC opinion rather than a Second Circuit opinion or a Supreme Court opinion. The deal obviously was that the SEC could make a little law, but the perpetrators would not suf-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1994 WL 267860                                                                          Page 22
1994 WL 267860 (WL)

fer any significant penalty.

[FN72]. This rule would handle the case that caused the misappropriation theory to be adopted in the Seventh Circuit, namely S.E.C. v. Cherif, 933 F.2d 403 (7th Cir. 1991). In *Cherif*, the principal defendant, Danny O. Cherif, fraudulently obtained a magnetic identification card that allowed him entry to the premises of his former employer, First National Bank of Chicago. Mr. Cherif would unlawfully enter the bank, where he would seek out and read documents (whose location he knew because of his previous position as an employee) likely to disclose corporate buy-out plans that were not yet public. Mr. Cherif made large profits over a two year period trading on his purloined information. *See also* United States v. Cherif, 943 F.2d 692 (7th Cir. 1991).

[FN73]. 17 C.F.R. § 240.14e-3(a) (1993). Note that the rule is written in such a way that people who simply hear a rumor, without being appraised of the rumor's source, or who see market activity that leads them to believe a tender offer is afoot can still trade without risking prosecution.

[FN74]. SEC Rule 14e-3 handles quite nicely the problem that caused the Ninth Circuit to adopt the misappropriation theory in S.E.C. v. Clark, 915 F.2d 439 (9th Cir. 1990). In *Clark*, the principal defendant, Mr. Clark, had been the president of a Wisconsin corporation that sold medical supplies. This Wisconsin company was bought by a British company, which then made the old Wisconsin company its wholly owned subsidiary with Mr. Clark as the subsidiary's president. The British parent liked Mr. Clark's subsidiary so well that it decided hat it would acquire other medical supply companies, so it placed Mr. Clark on an "acquisitions team" to find companies that could be bought profitably. While involved in this acquisition work for the parent, Mr. Clark learned of the parent's intent to acquire a surgical glove manufacturer, so Mr. Clark bought thousands of shares of the target company through a brokerage account set up in a misspelled version of his wife's maiden name. (No lack of notice that insider trading restrictions applied in this case!) As the court relates the facts, "Easter [another employee who worked with acquisitions] figuring that Clark knew all about the AHP project, told him that SN planned to offer roughly $35 for each share of AHP's stock." *Id.* at 441. When Mr. Clark bought the target's stock, the price was only $17 a share. Mr. Clark's purchase of the target company's stock on the basis of his material, non-public information concerning a tender offer placed Mr. Clark squarely within the prohibitions of Rule 14e-3. Thus, the *Clark* case could have been properly decided under Rule 14e-3.

[FN75]. *Chestman*, 947 F.2d at 557.

[FN76]. Indeed, this comes close to the rule for which Justices Blackmun and Marshall argued in their dissent to *Chiarella*, 445 U.S. 222, 245-52, but that theory has found no other support.
1994 WL 267860 (WL)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT

3

**LexisNexis®** *Total Research System*

Switch Client

*My Lexis™* | Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Counsel Selector

FOCUS™ Terms  cite(96 W. Va. L. Rev. 873)          Search Within  Original Results (1 - 1)     Go     Advanced...

Source: Legal > Secondary Legal > Law Reviews & Journals > US Law Reviews and Journals, Combined [i]
Terms: **cite(96 W. Va. L. Rev. 873)**  (Edit Search | Suggest Terms for My Search)

*96 W. Va. L. Rev. 873*

Copyright (c) 1994 West Virginia Law Review
West Virginia Law Review

Summer, 1994

**96 W. Va. L. Rev. 873**

**LENGTH:** 91 words

West Virginia Law Review

**SUMMARY:**
... Those pages originally designated for the article will not be reassigned. ...

**TEXT:**
An article by Justice Richard Neely, West Virginia Supreme Court of Appeals, entitled, Insider Trading Prosecutions Under the Misappropriation Theory: New York's Joke on Heartland America, was originally scheduled for publication in this issue. Justice Neely decided not to publish this article due to a dispute over its editing, a dispute that did not involve the Executive Board of Volume 96. Those pages originally designated for the article will not be reassigned. Pagination for the remainder of the issue will begin with page 905.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
   Securities Law > Liability > Securities Exchange Act of 1934 Actions > Insider Trading > Misappropriation Theory

Source: Legal > Secondary Legal > Law Reviews & Journals > US Law Reviews and Journals, Combined [i]
Terms: **cite(96 W. Va. L. Rev. 873)**  (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Monday, October 4, 2010 - 12:26 PM EDT

**LexisNexis®**   About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2010 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.