IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON


ELTON E. BRYAN

v.                                    CIVIL ACTION NO. 2:10-cv-01196

UNITED STATES OF AMERICA


RESPONSE OF THE UNITED STATES TO
PETITION FOR A WRIT OF ERROR CORAM NOBIS

        Comes now the United States of America, by Larry R. Ellis,
Assistant United States Attorney for the Southern District of West
Virginia, and hereby responds to the Petition For a Writ of Error
Coram Nobis filed in this case.

I.  INTRODUCTION

        Defendant Bryan was charged with five felony counts: two mail-
fraud schemes, one wire-fraud scheme, one securities-fraud count
and one count of making material false statements before a grand
jury.  Defendant went to trial and was convicted by a jury on all
five counts.  The Fourth Circuit affirmed the mail-fraud, wire-
fraud, and false statement convictions, but reversed defendant's
conviction on the securities-fraud count, rejecting the
prosecution's "misappropriation theory."  *United States v. Bryan*,
58 F. 3d 933, 944 (4th Cir. 1995).  The Supreme Court later
expressly abrogated that ruling, holding that the "misappropriation
theory" the prosecution had employed in this case was in fact a

viable theory of prosecution. *United States v. O'Hagan*, 521 U. S. 642, 649-50 (1997).

Defendant brings the instant petition for relief under coram nobis under the principal theory that the mail and wire-fraud charges of which he stands convicted are based on an "honest-services" theory that has now been rejected by the Supreme Court. *Skilling v. United States*, 561 U.S. ___, 130 S.Ct. 3896 (2010). His petition is meritless. It is founded on outdated precedent and on incomplete exposition of the record below. It ignores the fact - directly relevant under *Skilling* - that the two mail-fraud charges against the defendant included a valid "property fraud" theory allegation, and makes no attempt to determine whether the convictions are supported under that theory. In fact, a review of the record clearly demonstrates that the jury found defendant guilty of both of the mail fraud counts under that property-fraud theory. Therefore, any erroneous instruction under an "honest services" theory is harmless and the convictions thus survive coram nobis review under *Skilling*. The wire-fraud conviction is based on a charge and evidence that included bribery and kickback activity and thus, under the rule in *Skilling*, remains valid under 18 USC 1346. That charge may also be affirmed under a property-fraud theory.

Finally, the defendant's arguments for the dismissal of his perjury conviction rest completely on his claim that the jury was

unfairly biased in considering the charge because it heard evidence supporting the other four counts which, he argues, were improperly before the jury.  This argument cannot logically withstand the rule in *O'Hagan* holding that the "misappropriation theory" is valid, taken together with the Fourth Circuit's observation in Bryan's direct appeal that "Bryan's conduct clearly constituted criminal activity under this theory of misappropriation." 58 F. 3d 945. Thus, all of the "prejudicial evidence" supporting the conviction of the defendant on the securities fraud case was properly before the jury.  Moreover, as will be shown more fully below, each of the wire-fraud and two mail fraud counts in the case were more than amply charged and supported on theories that survive the rule in *Skilling.*  Thus, all of the evidence before the jury was properly admitted.

## II.  FACTUAL AND PROCEDURAL HISTORY

### A.  Factual Background

Defendant Elton S. Bryan was appointed commissioner of the West Virginia Lottery on April 15, 1990.  (Vol. 6, p. 29)[1].  He resigned from that position on February 5, 1993.  (Vol. 6, p. 93).

#### 1.  The Advertising Contract Scheme

In early 1991, the West Virginia Lottery began a process to award a $2.8 million advertising contract.  (Vol. 2, pp. 4-5).

---

[1]Citations to the trial transcript will be indicated by "Vol. ___, p. ___."

This undertaking was supervised by Tamara Gunnoe, one of Bryan's deputies, and began with the appointment of a bid evaluation committee, the solicitation of bids from advertising firms, and the composing of a system of numerical or quantitative review criteria to be used in judging the bids. (Vol. 2, pp. 4-8) State purchasing regulations required that contracts of this magnitude be awarded based on such formal and quantitative analysis of vendors' proposals. (Vol. 2, pp. 194-96).

Six firms responded to the solicitation and made formal presentations of their proposed advertising programs at the offices of the Lottery in Charleston, West Virginia on April 1 and 2, 1991. (Vol. 2, pp. 9-10). After the presentations, the evaluation-committee members deliberated, completed the quantitative evaluation sheets that Gunnoe had composed and submitted the sheets to her. Gunnoe tabulated the members' rankings and determined that The Arnold Agency had won the day. (Vol. 2, pp. 11-13). That agency had spent some $58,000 preparing and presenting its program.

Gunnoe related these results to Bryan who, after consulting with the Governor, told Gunnoe that, the results of the bid-evaluator process notwithstanding, the contract was to be awarded to the incumbent Fahlgren-Martin Agency of Parkersburg, West Virginia. (Vol. 2, pp. 13-19).

Bryan thereafter confiscated the evaluation sheets from Gunnoe and told her to get rid of any other evidence of the Committee's

4

work.   (Vol. 2, pp. 19-20).   He further instructed Gunnoe to falsely inform the Lottery Commission, as they met in formal session, that the committee had actually selected the Fahlgren-Martin Agency and that they had not employed any kind of quantitative or numerical rating of the bidders' presentations. (Vol. 2, pp. 21-23).

Bryan further had Gunnoe tell representatives of the state purchasing department, who were unsatisfied with the documentation supporting the recommended award, (Vol. 2, pp. 193-94) that the committee had selected the Fahlgren Agency and had not employed any kind of quantitative or numerical scoring in their evaluation of the bidders' presentations.   Bryan also denied the existence of any quantitative analysis.   (Vol. 2, p. 201).

As a result of Bryan's actions, the $2.8 million contract was awarded to Fahlgren-Martin, and the checks in payment of the advertising contract were mailed from Charleston, West Virginia, to the office of Fahlgren-Martin in Parkersburg, West Virginia.   (Vol. 2, pp. 34-42).

## 2.  The Video lottery Scheme

When Bryan began his term as Lottery Director, video lottery was available in West Virginia in one pilot location.   (Vol. 4, p. 40-41).   Bryan and others planned to expand video lottery statewide, and to have lottery terminals in bars, clubs and other establishments throughout the state.   (Vol. 3, p. 33).   Because the

5

administration believed there was substantial popular opposition to such an expansion, the plan was not to proceed until after Governor Caperton was re-elected in the fall of 1992. (Vol. 3, pp. 170-71; Vol. 4, p. 185).

Bryan was in regular contact with representatives of the few companies with the wherewithal to supply the kinds of hardware and software that would have been necessary for such an expansion. These companies showed a great interest in participating in such a new and expansive market. (Vol. 6, pp. 56-58). Early in the process, Bryan became attracted to a company named Video Lottery Consultants ("VLC"). Larry Lippon, a vice president of VLC, flew Bryan and one of Bryan's subordinates to VLC's Bozeman, Montana headquarters. VLC entertained Bryan at Lippon's country club and lobbied Bryan for the video lottery contract. (Vol. 6, pp. 58-62). VLC offered to build a facility in Bryan's home county in West Virginia in return for being awarded an exclusive ("sole-source") contract to provide video lottery machines to West Virginia. (Vol. 4, p. 52).

Bryan learned that Governor Caperton favored awarding such a sole-source contract to VLC under those terms. Thereupon, Bryan set about to engineer a bid process that would appear to be above-board but that, in fact, was rigged so that the contract was awarded to VLC. (Vol. 4, pp. 52-56). To that end, Bryan allowed representatives of VLC access to the bid specification documents as

they were composed.   (Vol. 4, pp. 60-66).   He supervised the drafting of those bid specifications to conform to VLC's wishes. (Vol. 4, p. 82).   He refused to allow VLC's competitor, International Gaming Technologies ("IGT"), the same sort of access to and input into those documents.   (Vol. 4, pp. 12-15, 66, 79-82). Moreover, Bryan advised more than one of the lottery employees on the evaluation committee that he wanted VLC to win the contract. (Vol. 3, p. 60; Vol. 4, pp. 78-80, 112-14).

### 3.  Insider Trading and Gratuities

During the time the plan to expand video lottery was unfolding, and while Bryan enjoyed intimate contact with company representatives lobbying for that award and other lottery business (Vol. 6, pp. 56-58), Bryan repeatedly exploited his official relationships with company representatives to obtain gratuities and to obtain and appropriate to his own use confidential information relating to the value of the corporate shares of those companies. (Vol. 6, pp. 70-74). Under West Virginia law, Bryan was absolutely forbidden from accepting anything of value from such sources.   W. Va. Code § 29-22-13(2).

The contemplated video lottery contract was never awarded.   (Vol. 4, p. 33).   The service of a federal grand jury subpoena brought the process to an unforeseen halt in January of 1993.   (Vol. 6, pp. 26-27).

### 4.  False Statements to a Grand Jury

Thereafter, Bryan appeared before a federal grand jury and, under oath, denied: 1) that any such plan to expand video lottery statewide after the general election ever existed (Vol. 6, pp. 109-14); 2) that he had met with Larry Lippon in Bozeman, Montana in furtherance of that plan; and 3) that representatives of VLC had had input into the drafting of the bid-specification documents (the "RFP") for the video lottery contract.

### B.  Procedural Background

### 1.  Indictment

In June 1993, a federal grand jury returned a Superseding Indictment charging Bryan with five counts arising from the conduct described above.  Count One charged him with mail fraud in connection with the advertising contract.  That count alleged two independent theories of fraud with distinct factual bases.  (The existence of these independent theories is central to this coram nobis proceeding.)

One fraud theory was that Bryan devised a scheme to defraud The Arnold Agency of <u>property</u>: that is, the money it spent on the bidding process and the money it would have earned from the contract absent Bryan's conduct.  (Bryan's petition disregards this property fraud theory entirely.)  The other theory alleged in Count One was that Bryan devised a scheme to defraud the State of West Virginia of his honest services.

8

Count Two charged Bryan with mail fraud in connection with the video lottery contract. Like Count One, Count Two alleged two independent fraud theories. It charged that Bryan had defrauded IGT of property: that is, the money IGT spent in the bidding process and the money IGT would have earned from the video lottery contract absent Bryan's fraud. Count Two also charged Bryan with defrauding the state of his honest services.

Count Three charged Bryan with defrauding the state of his honest services by exploiting the confidential information that had been entrusted to him as an officer of the state and by unlawfully accepting gratuities from companies doing and seeking to do business with the West Virginia Lottery. In Count Four, Bryan was charged with securities fraud for trading stocks based on confidential information he had garnered through his relationships with companies seeking business in the lottery. In Count Five, he was charged with lying to the grand jury about his relationship with Larry Lippon, his participation in the plan to expand video lottery and the participation of VLC in the composition of the bid specifications for the video lottery contract.

### 2. Trial and Appeal

Trial on these charges commenced before Chief Judge Charles H. Haden II in Charleston, West Virginia, on September 14, 1993. (Vol. 1, p. 1). On September 24, 1993, the jury returned guilty verdicts on all five counts. (Vol. 7, pp. 128-32). Bryan appealed

and on June 27, 1995, the Fourth Circuit issued an opinion affirming the mail-fraud, wire-fraud and perjury counts, but reversing the conviction on Count Four based on their rejection of the "misappropriation theory." *United States v. Bryan*, 58 F.3d 933 (4th Cir. 1995). The United States Supreme Court later expressly abrogated the Fourth Circuit's ruling reversing Bryan's conviction on the securities-fraud count, holding that the "misappropriation theory," on which the government's case was founded, was in fact a viable theory of prosecution. *United States v. O'Hagan*, 521 U.S. 642, 650 (1997).

## III. ARGUMENT

### A.    Counts One and Two

The mail-fraud convictions in Counts One and Two should be sustained. They are alternatively charged as property-fraud crimes and it is clear from the record that the jury found defendant guilty under the property-fraud theory in both counts.

#### 1.    Standards of Review: Multiple Theories and Harmless-Error

##### a.    Summary

The error about which Bryan complains in the mail fraud counts is an "instructional error," and is reviewed under a harmless-error standard. Thus, to prevail here on collateral review, Bryan must show that any error had "substantial and injurious effect or influence in determining the jury's verdict." Inasmuch as the

10

record leaves no doubt that the jury here agreed that Bryan, through the mail-fraud schemes charged in Counts One and Two, had defrauded identified victims of property, he cannot prevail.

### b.    Argument

In this case, defendant Bryan was charged in both Counts One and Two with two theories of guilt under the mail-fraud statute. Both Counts alleged that he had defrauded his employer, the State of West Virginia, of his honest services and that he defrauded certain identified participants in state bid-evaluation procedures of money.

Inasmuch as Counts One and Two do not allege that Bryan solicited or received bribes or kickbacks, the "honest-services" theory charged in those counts is invalid under *Skilling v. United States*, 130 S. Ct. 2896, 2934 (2010). Thus, these convictions are subject to challenge and, under coram nobis review, must be examined to determine whether the error in the charge was harmless. *Id.* (citing *Hedgpeth v. Pulido*, 129 S. Ct. 530, 531 (2008), for the proposition that where a jury is instructed on multiple theories of guilt, one of which is improper, that jury's verdict is reviewed under a harmless-error standard.)

### I.    Standard of Review on Direct Appeal

Under the standard applicable on direct review, an instructional error is harmless where it appears that "a rational jury would have found the defendant guilty absent the error."

11

*Neder v. United States*, 527 U.S. 1, 18 (1999).  Thus, where an instruction includes both a valid and an invalid theory of guilt, any error is harmless where the prosecution can show it appears beyond a reasonable doubt that the jury found, or a rational jury would have found, the  defendant guilty under the valid theory. *Hedgpeth v. Pulido*, 129 S. Ct. 530, 532 (2008).

The mail and wire-fraud counts complained of here survive under this direct-appeal harmless-error test.

### ii.  The *Brecht* Test: Harmless Error on Collateral Review

Because Bryan brings this petition under coram nobis, he is faced with procedural hurdles and more stringent limiting standards than the defendant in *Skilling* faced on direct appeal.  Coram nobis is "extraordinary relief" and should only be granted "under circumstances compelling such action to achieve justice." *United States v. Morgan*, 346 U.S. 502, 511-12 (1954).

As Chief Justice Rehnquist summarized the matter in *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993), "The principle that collateral review is different from direct review resounds throughout our habeas jurisprudence."  Thus, because of society's interest in the finality of judgments and the increased difficulty to the State in retrying a case so long after initial judgment, the Court in *Brecht* adopted a harmless-error standard for cases on collateral review different from that applied in cases on direct appeal.  Thus, in habeas cases, it is not incumbent on the

12

government to establish that any error was "harmless beyond a reasonable doubt," as would be required on direct appeal. Rather, the test is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. This means that, on collateral review, "petitioners . . . are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice." *Id.* (Emphasis added.) Thus, not only is the definition of error narrowed on collateral review, the burden of proving the prejudice shifts to the petitioner.

While it is true that *Brecht* is a state habeas case, the Court's language suggests general applicability: the "substantial and injurious effect standard" applies "in determining whether habeas relief must be granted because of constitutional error of the trial type." *Id.* at 638. Indeed, in holding the *Brecht* standard applicable in federal habeas cases, the Ninth Circuit has observed that the rule in *Brecht* is "motivated by 'considerations underlying our habeas jurisprudence,' that apply equally to collateral attacks on both federal and state convictions." *United States v. Montalvo*, 331 F.3d 1052, 1057-58 (9th Cir. 2003)(internal citation omitted). Thus, the *Brecht* standard has been regularly applied in the review of federal habeas cases. *See United States v. Dago,* 441 F.3d 1238, 1245 (10th Cir. 2006)(citing *Montalvo*, 331 F.3d 1052 at 1057-58) ("*Brecht's* harmless-error standard applies to

13

habeas cases under section 2255 . . .");  *Ross v. United States*, 289 F.3d 677, 682 (11th Cir. 2002) ("[A]pplication of the *Brecht* standard to *Richardson* error on collateral appeal is the appropriate approach.");  *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000)(noting that "for purposes of federal habeas corpus review, a constitutional error that implicates trial procedures shall be considered harmless unless it has a 'substantial and injurious effect or influence in determining the jury's verdict'"). *But see James v. United States*, No. 03-6250, 2007 WL 470569 (6th Cir. Feb. 12, 2007)(unpublished)(*Brecht* standard applies only to state habeas cases).  At least one Supreme Court decision after *Brecht* assumes the *Brecht* standard applies in all collateral proceedings.  *See United States v. Vonn*, 535 U.S. 63 (2002) (describing *Brecht* as "the variant of harmless-error review applicable on collateral attack").

    In fact, the argument for a more limiting standard of review is even stronger in coram nobis cases than in habeas cases.  *See United States v. Osser*, 864 F.2d 1056, 1060 (3d Cir. 1988), ("judicial incentive to excuse compliance with procedural prerequisites is of a lower order" in coram nobis cases because the petitioner is no longer in custody).

    Thus, in this case, it falls to Bryan to establish that any error in the trial record "had substantial and injurious effect or

influence in determining the jury's verdict" and "actually prejudiced" him.

### iii. *Mandel* Standard of Review No Longer Valid

Defendant here contends that this case is "controlled" by the rule in *United States v. Mandel*, 862 F.2d 1067 (4th Cir. 1988). But *Mandel* is distinct on its facts inasmuch as the court there was not faced with more than one theory of criminality in the mail fraud charges:

> In *Mandel*, there was one theory of the case before the jury which would alone permit conviction, that the state of Maryland and its citizens were defrauded of the honest and faithful services of Mandel. . . .

Moreover, the standard of review the court sets forth[2] in *Mandel* utterly contradicts, and is thus overruled by, the Supreme Court's harmless-error test as developed in *Neder* and *Hedgpeth*.[3]   In *Mandel*, the Court said:

> Whatever the rule may be elsewhere[4], we hold that in a case in which the jury considers alternative theories of

---

[2]Inasmuch as *Mandel* did not concern multiple theories of criminality, it may be argued that the test announced there and as quoted here is mere dictum.  Nonetheless, it is the standard that Bryan assumes to be applicable here.  In a companion coram nobis case now pending in this District, *Rebrook v. United States*, 2:93-cr-00151, the defendant relies on *United States v. Shamy*, 886 F.2d 743 (4th Cir. 1989).  This coram nobis opinion, coming on the heels of *McNally v. United States,* 483 U.S. 350 (1987), like *Mandel*, vacated mail-fraud convictions on the ground that the "indictment and instruction to the jury permitted conviction for deprivation of "faithful and loyal services.'" *Id.* 745.  The court in *Shamy* dismissed out of hand the district court's finding that the mail fraud counts in question were amply supported under a traditional property-fraud theory that was also charged in the indictment.  The *Shamy* court's terse justification for this dismissal is that:

> Not only is this fact [that the jury was instructed on an honest-services theory] uncontradicted in the record, on the direct appeal of this case, we treated the conviction as one involving a deprivation of intangible rights

*Id.*

This ruling, consistent with the above quoted language in *Mandel*, is likewise contradicted by the *Neder/Hedgpeth harmless-error* standard that the court in *Skilling* directs the lower, reviewing courts to apply.

[3]Of course, the *Mandel* rule is even farther afield from the more stringent harmless-error test adopted in *Brecht* and applicable here on collateral review.

[4]The court is referencing then-existing authority in other circuits that rightly anticipated the Supreme Court's holdings in *Neder* and *Hedgpeth* and, thus, was counter to its ruling in *Mandel*.

16

liability, we must reverse the convictions if either
theory is an improper basis for punishment.

*Mandel*, 862 F.2d at 1073.

Thus, *Mandel* stands for the proposition that review ends with
a finding that one of two alternative theories of criminality is
invalid.   The harmless-error rule as developed in *Neder* and
*Hedgpeth*, and as applied on collateral review in *Brecht*, directs
that review begins with such a finding.[5]

In fact, the type of review that is referenced here is the
same harmless-error analysis that many courts applied in the
immediate wake of *McNally v. United States*, 483 U.S. 350, 360
(1987).   *See, e.g., United States v. Doherty*, 867 F.2d 47, 57-58
(1st Cir. 1989); *Moore v. United States*, 865 F.2d 149, 153-54 (7th
Cir. 1989) (collateral review); *United States v. Asher*, 854 F.2d
1483, 1496 (3d Cir. 1988); *United States v. Perholtz*, 836 F.2d 554,

---

[5]In the pending companion coram nobis petition, *Rebrook v.
United States*, 2:93-cr-00151, the defendant argues that his
conviction ought to be reversed, even though it was clearly
supported on a charged property-fraud theory that survives
*Skilling*, because the Fourth Circuit affirmed his conviction under
an honest-services theory on direct appeal.   (*Rebrook* Reply Brief
p. 11-16.)   But, the manner in which that or this case was treated
on direct appeal is of no analytical value there or here.   The
issue of the validity of the property-fraud theory was simply not
before the court on direct appeal of either case.   It was not
objected to at trial and not brought before the court of appeals.
Thus, the harmless-error argument raised here was not and, indeed,
could not have been, ruled on by the Court on direct appeal.   In
fact, the principal legal authorities on which defendant's
arguments and the government's response depend in this case had not
been decided when the direct appeals in this case and in *United
States v. Rebrook*, 53 F.3d 961 (4th Cir. 1995), were considered.

17

558-59 (D.C. Cir. 1987). For example, in *Moore v. United States*, the Seventh Circuit refused to vacate, post-*McNally*, a conviction premised on a fraud charge and jury instructions that in turn referred repeatedly to "intangible rights." *Moore*, 865 F.2d at 153. Although the jury received instructions that included a scheme to defraud the public of intangible rights, the court explained that the "jury could not have found a scheme to defraud the [public] of its tangible rights separate from a criminal scheme to obtain money or property." *Id.* at 154.

Something of the same logic can be seen at work in cases inside the Fourth Circuit such as *United States v. Alexander*, 748 F.2d 185, 189 (4th Cir. 1984), *Brooks v. Leeke*, No. 89-7611, 1990 WL 2332 (4th Cir. Jan. 16, 1990) (unpublished) (denying relief under 28 U.S.C. § 2254) and *Boatwright v. United States*, 779 F. Supp. 383 (D. Md. 1991) (denying relief under coram nobis). These cases allow exceptions to the rule in *Mandel* where there is a "high degree of probability" that the jury convicted under a valid theory.[6] But even these concessions are too limited. The standard

_____

[6] In fact, *Boatwright v. United States*, 779 F.Supp. 383 (D. Md. 1991), is almost identical to this case. In *Boatwright*, as here, the defendant was charged with separate theories of mail fraud - an "honest services" theory and a property theory. After the *McNally* and *Mandel* decisions, *Boatwright* made collateral attack on his conviction under coram nobis, arguing that the presence of the honest services theory in the indictment rendered his conviction void. The court disagreed, finding ample evidence in the record to show a "high degree of probability" that the jury convicted under the alternative property-fraud theory in the indictment, irrespective of whether they convicted under the invalid "honest-

applied in *Mandel* has simply been overruled and is of no relevance here.

Here the burden is on the defendant to show that any intentional error had a "substantial and injurious effect or influence" on the jury's verdict.  As will be demonstrated below, the trial record simply does not allow such a conclusion.

### 2.  Count One:

#### a.  The Charge and the Theory

Count One of the Indictment against Bryan charged him with scheming:

> to defraud a certain advertising agency, that is, The Arnold Agency, of money expended in preparing and presenting proposals for an advertising campaign in pursuit of a certain contract, and to further defraud that agency of the award of that certain contract with the State of West Virginia.

(Ind. p. 5, ¶ 5(b)).

It is true that the property-fraud charge, quoted above, was charged in parallel with "honest-services" fraud language in this count.[7]  But the sole means of fraud charged in the count was that

_____

services" theory or not.  The court states, "[t]he facts of this case almost compel the conclusion that the jury found the *Boatwrights* guilty of depriving the Church of its money, regardless of whether the jury also found that [they] violated their duty of loyalty to the Church."  *Id*. At 384.  The assurance of the jury's agreement on the property-fraud theories is even stronger in this case, given the near complete overlap of the two theories charged in each of Counts One and Two.

[7]Thus, this case is, from the outset, factually distinguished from the *Mandel* case where "there was only one theory of the case before the jury."  *Mandel*, 862 F.2d at 1074.

Bryan, through his dishonest manipulation of a State bid procedure, cheated The Arnold Agency out of money.

Indeed, the Indictment details the execution of the fraud scheme in eleven paragraphs (8-18) that fully describe how and why Bryan went about subverting the bid-evaluation process for the award of the advertising contract. (Ind. pp. 6-11). No other means or theory of fraud was alleged in the count.

The government's approach at trial was no less singular and direct. In its opening statement, the government told the jury that Count One of the Indictment was a property-fraud case:

> As Judge Haden told you, count one in the indictment is a mail fraud count. And simply what it charges is bid-rigging.

(Vol. 1, p. 122).

> What the defendant is charged with in count one is fixing that contract and in fixing that contract he defrauded the Arnold Agency of the money they spent in preparing their proposal. He also defrauded the company of the money they would have made on that contract, and he also defrauded the State of West Virginia of his honest services.

(Vol. 1, p. 126).

It is hard to imagine a statement of the government's theory of fraud that would more directly identify the "honest-services" fraud charge with the execution of a property fraud scheme: "in fixing that contract . . . he defrauded the State of West Virginia of his honest services." That is, the honest-services fraud charged in Count One **is** the defrauding of The Arnold Agency

20

of money through the dishonest manipulation of a State bidding procedure.  As the United States put it to the jury in closing argument:

> Who suffered because of these frauds?  The Arnold Agency? Obviously.  IGT?  Obviously.  The State of West Virginia and the Lottery Commission?  What business will now want to submit a bid to any state agency now that they know how business is done in West Virginia?

(Vol. 7, pp. 60-61).

Thus, the harm or loss of "honest-services" to the State of West Virginia, according to the language of the Indictment and as posited in the trial, was specifically and solely the tangible harm caused The Arnold Agency.  Thus, under the charge in Count One, if The Arnold Agency is not cheated out of money, there is no "honest-services" harm to the State.

No other manner or means of fraud is charged or argued and no evidence was offered at trial to support any other theory or means of fraud in this count.  Thus, the jury's guilty verdict on Count One must have been based on its finding that Bryan had defrauded The Arnold Agency out of money.  There was simply no other basis offered to them for a guilty verdict.

As the Supreme Court directed in *Skilling*, such an assurance is all that is necessary to affirm so called "honest-services" mail-fraud convictions where more than one theory is charged.  That is, this Court may not - as the defendant here  urges - simply locate "honest-services" language in a mail-fraud count and

thereupon reverse convictions.  Rather, this Court must determine whether the defendant has met his burden to prove that any error in the instructions "had substantial and injurious effect or influence in determining the jury's verdict."

Indeed, in *Skilling*, the Supreme Court, after rejecting one of multiple theories of criminality charged, specifically directed the lower reviewing court to "take a fresh look at the parties' harmless-error arguments," 130 S. Ct. at 2934 n.46, and noted the government's argument that "[A]ny juror who voted for conviction based on [the honest-services theory] also would have found [Skilling] guilty of conspiring to commit securities fraud." *Skilling*, 130 S. Ct. at 2934.

Here such a review is simple - there was no theory other than the direct property fraud under which the jury could have found Bryan guilty of the mail fraud charged in Count One.  The only means of fraud alleged, argued or proved was the cheating of The Arnold Agency out of money it spent and money it would otherwise have earned, by subverting a bid process.  That is, Bryan was charged with defrauding the State of his honest services precisely and exclusively by defrauding The Arnold Agency out of money.

### b.    The Evidence: What Bryan Did

Count One is a garden-variety, *malum in se* fraud scheme, complete with ulterior motives, orchestrated deceit, and direct, out-of-pocket losses to the victim.

In the spring of 1991 the West Virginia Lottery was conducting a bid-evaluation procedure for the award of a $2.8 million advertising contract. (Vol. 2, pp. 4-7). Procedures and policies governing the awarding of such contracts required that the bids and advertising programs be judged through a process of quantitative analysis. (Vol. 2., pp. 193-94, 203-04). The Lottery was in the process of that evaluation and had, under the supervision of Tammy Gunnoe, one of Bryan's underlings, (Vol. 2, p. 4) appointed a committee and designed quantitative rating sheets for the panel to use in comparing the advertising programs under consideration. (Vol. 2, pp. 5-7). The ad agencies bidding for the contract made presentations before the evaluation committee in Charleston on April 1 and 2, and a few days later the results of the committee's judgements were tallied, showing The Arnold Agency to have won the day. (Vol. 2, p. 13.)

Thereafter, Bryan, knowing that The Arnold Agency had won the contract under the evaluation, contacted Gunnoe and instructed her to award the contract to the incumbent Fahlgren-Martin advertising agency, rather than The Arnold Agency. (Vol. 2, p. 18). Days later Bryan confiscated from Gunnoe the ratings sheets that the evaluation committee had used in the process that showed The Arnold Agency as winner. (Vol. 2, p. 19). Bryan instructed Gunnoe to destroy any notes from the process that she had not surrendered to him and to make sure that the panel members, likewise, destroyed

any other evidence of the evaluation process. (Vol. 2, pp. 19-20). Bryan further instructed Gunnoe to falsely state to the Lottery Commission, as they met in formal session to consider the award, that the Fahlgren-Martin agency and not The Arnold Agency had won the contract through the evaluation process. (Vol. 2., pp. 21-24, 78-79). When members of the commission inquired about evaluation sheets used on the process, Bryan never acknowledged that the sheets - that Gunnoe had surrendered to him and that showed The Arnold Agency won the contract - were actually in his possession. (Vol. 2., pp. 24-26).

When the State purchasing department reviewed the award of this contract, they asked for any evidence that the contract had been awarded through a quantitative or "numerical" analysis. Agents of that department asked for the evaluation sheets that Bryan had confiscated from Gunnoe, but Bryan did not surrender these documents or even acknowledge that they existed. (Vol. 2, pp. 28-29, 200-201). In response to Bryan's instruction to "give them something," Gunnoe prepared and had committee members prepare false documents indicating that Fahlgren-Martin had won the contract through the evaluation process. (Vol. 2, pp. 30-31). These documents were never actually submitted to the purchasing department. (Vol. 2, pp. 31-32) However, Gunnoe, at Bryan's direction, did write a memo falsely declaring Fahlgren-Martin the winner of the evaluation. She believed that memo would have been

sent to purchasing with other documents justifying the award of the contract.  (Vol. 2, pp. 33-34).

At the end of the day, the $2.8 million contract was actually awarded to and carried out by Fahlgren-Martin[8] and the checks in payment of the contract were mailed from Charleston to that agency's offices in Parkersburg.  (Vol. 2, pp. 41-42).

The Arnold Agency spent approximately $58,000 in preparing their ad program to be pitched to the lottery in the evaluation process. (Vol. 1, p. 168).  Had they been awarded the contract, they would have also received the $2.8 million in revenue from the State over the life of that contact.  Thus, Bryan's scheme and deceitful manipulation of the evaluation process cost The Arnold Agency over $2.8 million.

    **3.  Count Two**

        **a.    The Charge and the Theory**

Count Two of the Indictment also charged, and was argued, proved and instructed to the jury as a property-fraud scheme.  As in Count One, the Indictment and instructions included an "honest-services" theory, but that theory again perfectly overlapped with

---

[8]Harold Curtiss, the state purchasing department's representative who was reviewing this award, testified that if he had learned that a quantitative analysis had been done in this instance and had resulted in another agency winning this bid, he would not have approved the contract.  However, ignorant of that fact, he approved the contract, despite the perceived lack of a quantitative analysis, believing that to be less harmful to future lottery revenue.  (Vol. 2, p. 204).

and was completely dependent upon the proof of the alternatively charged property fraud.  That is, again in Count Two, defendant Bryan was charged with defrauding the State of his honest services precisely and exclusively by subverting a state bid process and thereby defrauding an unknowing bidder of property.  (Ind. pp. 13-22).

The prosecution charged, argued[9] and proved that Bryan slanted a video lottery bid process in favor of VLC by tailoring the state

---

[9]In opening statement, the government told the jury that the honest-services theory in Count Two was directly dependent upon the alternatively charged property fraud scheme:

> When the defendant schemed to fix this contract, fix the bidding process so that VLC would be awarded a monopoly in the State of West Virginia, he, again, defrauded the companies of the efforts they put in of [sic] this bid process.  He defrauded those companies that might have been the winner in this process.  But most importantly, ladies and gentlemen, he defrauded the citizens of the State of West Virginia of his honesty when he used the United States mails to violate the law.

(Vol. 1, p. 136).

In closing argument, the government re-emphasized that the harm to the State - the breach of honest-services - derived from the property fraud against the victim bidder, IGT:

> Who suffered because of these frauds?  The Arnold Agency?  Obviously.  IGT?  Obviously.  The State of West Virginia and the Lottery Commission?  What business will now want to submit a bid to any state agency now that they know how business is done in West Virginia?

(Vol. 7, pp. 60-61).

Thus, the theory, as articulated, was that the State of West Virginia was harmed solely and exclusively through Bryan's property fraud against IGT.

26

bid documents to VLC's specifications and instructing several of the evaluation-committee members, who were his subordinates, to award the contract to VLC. Thus, the other participant in the bid process, International Gaming Technologies (IGT), was defrauded of the money it spent in preparing its bid proposal and of the money it might have made had the process been fairly executed.

Inasmuch as the contract that is the subject of Count Two was never actually awarded (Vol. 4, p. 33), the evidence of IGT's monetary losses are not so readily quantified as those of The Arnold Agency in Count One. However, the record does show that IGT, the victim-bidder, expended substantial resources in pursuit of the contract (Vol. 4, pp. 3-6, 10-15, 22, 66, 101; Vol. 6, pp. 198-99, 203), and submitted a voluminous, complex, written proposal in support of its bid. (Vol. 3, p. 57). And it is clear that the contract would have resulted in substantial revenue to the winning bidder (Vol. 3, p. 212; Vol. 4, p. 19). Of course, it is not essential that the government provide any proof of actual loss to support a mail fraud scheme. *United States v. Barber*, 668 F.2d 778, 784 (4th Cir. 1982) ("Since the gravamen of the offense is a 'scheme to defraud,' it is unnecessary that the Government allege or prove that the victim of the scheme was actually defrauded or suffered a loss.") (citing *United States v. George*, 477 F.2d 508, 512 (7th Cir. 1973), *cert. denied,* 414 U.S. 827 (1973)). Rather, the prosecution must show that the aim or intent of the scheme was

to defraud another of property.[10]  Of course intent to defraud is rarely subject to direct proof and thus may properly be inferred from the totality of the circumstances.  *United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001).  Thus, where real harm to a victim would flow as a "natural and probable result of a scheme," fraudulent intent may be inferred.  *United States v. Cochran*, 109 F.3d 660, 668 (10th Cir. 1997).  In this case, it was not Bryan's primary goal to cheat either The Arnold Agency or IGT.  Rather, his direct intent was to award contracts the victim agencies sought to other agencies through corrupt means.  Thus, the "necessary result" of the defendant's scheme was to injure others - here The Arnold Agency and IGT.  In such cases, the fraudulent intent may be inferred from the scheme itself.  *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994).

Thus, the "honest-services" language in Count Two and in the charge to the jury simply cannot be seen as "substantially injurious" to Bryan.  Here the jury simply could not have convicted

_____

[10]The defendant, in his petition, argues that the mail fraud schemes charged did not result in any money flowing directly to him.  Although evidence of motive is always relevant in any criminal case, proof of a mail-fraud scheme does not require a showing that the defendant received or even that he intended to receive money through the scheme.  Rather, the proof element is satisfied by showing that the aim or intent of the scheme was to defraud another of property.  *McNally v. United States*, 483 U.S. 350, 355 (1987).  Bryan likewise notes that some of Bryan's schemes did not involve violations of state law.  Again, "That the mail fraud statute contains no predicate violation requirement is seemingly confirmed by *Carpenter v. United States*, 484 U.S. 19 (1987)."  *Bryan,* 58 F.3d at 941.

Bryan if it had not decided that he, through the scheme charged, defrauded the victim bidder out of property. No other theory of guilt was offered the jury in the Indictment, argument, or evidence.

### b. The Evidence

Bryan and others contemplated the expansion of video lottery[11] statewide after the election in 1992. (Vol. 3, pp. 33-35). The expansion, as planned, would have involved contracting with a manufacturer for the supply and maintenance of video lottery machines or "terminals." Such a contract would have been let or awarded through a regulated state bidding procedure. (Vol. 3, pp. 48-56). Bryan began a relationship with an agent of VLC, one of the companies interested in the contract. (Vol. 3, p. 38). Bryan traveled to VLC's headquarters in Bozeman, Montana, and talked with representatives there about the proposal of VLC locating a manufacturing facility in Bryan's home county if they were given an exclusive contract to supply the machines throughout West Virginia. (Vol. 3, pp. 35-39; Vol. 4, pp. 42-50).

Bryan organized and appointed a committee for the purpose of considering the bid proposals from companies vying for this equipment contract. Four out of five appointees on that committee were Bryan's underlings at the lottery. (Vol. 3, p. 58). From the

---

[11]Until statewide expansion, the operation of video lottery terminals in West Virginia was limited to a single racetrack location (Vol. 3, p. 32; Vol. 4, pp. 40-41).

outset, Bryan instructed the lottery employees on this committee that he wanted VLC to be awarded the contract (Vol. 3, p. 60; Vol. 4, pp. 78-80, 112-14).[12]

William Woodford, one of the evaluation-committee members, testified as follows:

> Q.   And would I be correct in saying that he gave you a straight order when you became involved in the evaluation committee?
>
> A.   At that point in time, yes.
>
> Q.   What was that order?
>
> A.   That he wanted VLC to win.
>
> Q.   Did that put you under more pressure?
>
> A.   Yes.

(Vol. 4, p. 80).

The committee members, who were beholden to Bryan for their jobs, felt pressured by Bryan's demand and the process was, thus, no longer fair and objective, but skewed in favor of VLC. (Vol. 3, p. 61; Vol. 4, pp. 112-14). In fact, agents of VLC were included in the process of drafting the state bid specifications for the contract (Vol. 4, pp. 60-66) and agents from IGT were not consulted until after those specifications had been finalized. (Vol. 4, pp. 12-15, 66, 79-80, 81-82).

---

[12]After instructing his employees to award the bid to VLC, Bryan personally bought stock in VLC. (Vol. 6, p. 72.)

30

Thus, the bid process executed for the award of the video lottery machines was a sham.  The inevitable award of the contract to VLC was a foregone conclusion.  (Vol. 3, pp. 65-68).  IGT was thereby defrauded of the money and resources it had expended in pursuing the award of the contract and of any money it might have received had they been awarded the contract through a fair process.

### 3.    Counts One and Two: Jury Instructions

The record also makes clear that the jury was properly instructed on the property-fraud theory charged in Counts One and Two of the Indictment.

In instructing the jury, the trial court defined a "scheme and artifice" as used in the mail fraud statute as "any plan or course of action intended to deceive others and to obtain by false or fraudulently [sic] pretenses money or property from the person or organization so deceived." (Vol. 7, p. 103).  The court explained that "honest-services" might be included in that definition: "The terms 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." (*Id.* at 103-04).

Later in the instructions, in the context of the securities fraud charge, the court defined "fraud" as,

> a general term which embraces all efforts and means that individuals devise to obtain money or property of others . . .

and explained that honest-services fraud is only a subset of that larger definition,

> . . . [o]r, as I've already described in relation to the other charges, a plan to defraud someone or some entity of honest services due them or it.
>
> A scheme to defraud, therefore, is any plan or design by which a person seeks to obtain money or property, tangible or intangible, of another.

(Vol. 7, p. 111).

Thus, again in the instructions, the property theory of the mail fraud charges was fully and fairly articulated. Under these instructions, the jury was not compelled to rest its verdict on the "honest services" theory. Rather, the instructions made clear to them that "honest services" fraud was only a subset of the larger universe of fraud that is defined primarily and principally as property fraud.

## B.    Count Three

The wire fraud charge alleged in Count Three of the Indictment is unaffected by *Skilling*. This count charges Bryan with a wire-fraud scheme arising from Bryan's misuse of his official position for his own profit. That is, through the unlawful receipt of gratuities from agents of companies doing and seeking to do business with the West Virginia Lottery and through his personal exploitation and appropriation of confidential information about such companies gained through his relations with company agents. Thus, it falls within the "hard core" of honest-services cases that

32

18 U.S.C. § 1346 encompasses, *Skilling*, 130 S. Ct. at 2933-34, and may also be upheld under *Carpenter v. United States*, 484 U.S. 19 (1987).

> **1.  An Honest-Services Fraud Scheme to Unlawfully Obtain Gratuities is Unaffected by the Rule in *Skilling***

In *Skilling*, the Supreme Court restricted the use of the honest-services fraud theory to cases involving bribery and kickback schemes.  130 S. Ct. 2896, 2905 (2010) (interpreting 18 U.S.C. § 1346).  The Court stated that such an interpretation would forestall "arbitrary" prosecutions or unforseeable theories of criminality since the mail fraud statute's prohibitions on bribes and kickbacks is so fairly and clearly defined, drawing:

> content not only from the pre-*McNally* case law, but also from federal statutes proscribing and defining similar cases.  See, *e.g.*, 18 U.S.C. §§ 201(b), 666(a)(2); 41 U.S.C. § 52(2) ("**The term 'kickback' means any** money, fee, commission, credit, gift, **gratuity**, thing of value, or compensation of any kind which is provided, directly or indirectly . . . for the purpose of improperly obtaining favorable treatment.

*Skilling,* 130 S. Ct. at 2933-34. (Emphasis added).  Thus, gratuities are kickbacks, and honest-services mail-fraud charges that include bribes and kickbacks remain viable under 18 U.S.C. § 1346.

Count Three of Bryan's Indictment charges and focuses directly and exclusively on his enrichment of himself.  Thus, the Count charges that Bryan's purpose in the scheme was to enrich himself

and others through "the unlawful personal exploitation and transfer of confidential information" relating to the value of certain corporate stock, and "the unlawful acceptance of gifts, gratuities, and other things of value . . . from companies contracting or seeking to contract with the West Virginia Lottery." (Ind. p. 26, ¶ 4(a) and (b)).

Thus, Count Three charge is not concerned with more abstract or nebulous schemes involving "undisclosed self-dealing" or conflicts of interest that *Skilling* and *Black*, 130 S. Ct. 2963 (2010), hold to be outside the range of the statute. Rather, the scheme charged here consists of old-fashioned, plain-vanilla venality. Here Bryan is charged with the unlawful exploitation of his official relationships with venders. Particularly with milking confidential information and gratuities out of companies that were seeking favorable treatment in their dealings with the West Virginia Lottery.[13]

In holding that cases involving such wrongdoing are in fact actionable under 18 U.S.C. § 1346, the Supreme Court in *Skilling* observed that "it has always been 'as plain as a pikestaff' that

_____

[13]While it is not necessary that a mail fraud scheme of any kind have a violation of state law as its predicate, it is nonetheless relevant here that Bryan, as Director of the West Virginia Lottery, was strictly forbidden from receiving anything of value from any entity doing or seeking to do business with the Lottery. W. Va. Code § 29-22-13(2). Thus, Bryan's near daily acceptance of dinners out was not simply an accepted part of his job, but a direct violation of the statute that governed his office.

bribes and kickbacks constitute honest-services fraud." *Skilling*, 130 S. Ct. at 2933, (citing *Williams v. United States*, 341 U.S. 97, (1951)).  It is just as plain that the crime charged here in Count Three is that kind of scheme.

The evidence at trial clearly established that Bryan's unlawful receipt of gratuities was regular and consistent throughout his three-year tenure as Lottery Director.  James Moran, who began as a representative of Scientific Games and later became a representative for GTech, had an office in the same building as Bryan.  (Vol. 5, p. 22).[14]  Moran testified that over the three-year period he was lobbying Bryan, he bought things for Bryan – meals, golf, flowers, drinks – "more than a hundred" times.  (Vol. 5, pp. 16, 26).  Both companies – Scientific Games and GTech – were doing business with the West Virginia Lottery at the time.[15]  (Vol. 5, pp. 15, 20).  Records Moran authenticated showed, for example, that Moran bought Bryan's dinner twelve times in November 1991, thirteen times in July of 1992, and nine times in October 1992.  (Vol. 7, p. 62).  Moran testified that his expenditures on Bryan over the life of the scheme totaled "a few thousand dollars."  (Vol. 5, p. 17).

---

[14]A copy of Volume 5 of the trial transcript, recovered from the recorder's back-up disks, is attached to this filing.

[15]In fact, GTech actually expanded its business with the West Virginia Lottery during Bryan's tenure, opening a new "Travel" lottery game in late 1992 that had grossed over $14 million before the trial in this case.  (Vol. 5, pp. 20-21).

**2.    Count Three is Unaffected by *Skilling* Because it Involves the Exploitation of Confidential Information that, Under *Carpenter,* Constitutes Property Within the Meaning of the Mail Fraud Statute**

Count Three also charges Bryan with the "unlawful personal exploitation of . . . confidential information" relating to the value of the stock shares of certain corporations that were doing and/or seeking to do business within the West Virginia Lottery. In upholding the jury verdict on that count, the Fourth Circuit observed that, not only had the government presented sufficient evidence to support the "honest-services" theory, but:

> The jury was presented with ample evidence that Bryan . . . traded on confidential information. *Cf. Carpenter*, 484 U.S. at 26 (confidential information is "property," the deprivation of which can constitute wire fraud).

Bryan, 58 F.3d at 943.

The citation to *Carpenter v. United States, 484 U.S. 19 (1987)* is telling. There the Supreme Court unanimously affirmed a mail-fraud conviction based on a defendant's exploitation of confidential information he had obtained in his capacity as an employer of the victim corporation. The *Carpenter* court unanimously held that such information constitutes property within the meaning of the mail fraud statute and the fact that it may be intangible is of no moment in the analysis of the validity of the charge.

> It is irrelevant that petitioners might not have . . . caused the Journal monetary loss . . . Winans violated his fiduciary obligation to protect his employer's

36

confidential information by exploiting that information
for his personal benefit.

*Id.* at 20.  The Fourth Circuit's citation of *Carpenter* here in
affirming the wire-fraud count must be read as its understanding
that the count is viable and justified under a *Carpenter* "property"
theory in addition to and without dependence upon any "honest-
services" theory.

### C.    Count Five

#### 1.    Waiver

Defendant does not contend that he preserved the "prejudicial
spillover" argument at trial or on direct appeal.  There is no
indication in the Fourth Circuit opinion on direct appeal that the
argument was made.  Before he can prevail on an argument for the
first time on collateral attack, he must show "both 'cause and
actual prejudice'" on the one hand, *Murray v. Carrier,* 477 U.S.
478, 503 (1986); *Wainright v. Sykes*, 433 U.S. 72, 87 (1977), or
that he is "actually innocent" on the other.  *Murray* at 496.

He cannot show cause for any such default.  The Supreme Court
has ruled that a petitioner may have "cause" for such a default
where the claim in question is "so novel that its legal basis is
not reasonably available to counsel . . . ." *Reed v. Ross*, 468
U.S. 1 (1984).  Inasmuch as the "prejudicial spillover" doctrine
has been recognized in this circuit since no later than 1967,
*United States v. Wilkins*, 385 F.2d 465 (4th Cir. 1967) *cert.*
*denied*, 390 U.S. 951 (1968), it is impossible for the defendant to

maintain that it was "novel" or unavailable to him at the time of his direct appeal in 1995.

Thus, to overcome his procedural default, Bryan must show that he is "actually innocent" of the perjury charge. That is, he must show that "'in light of all the evidence,'" "it is more likely than not that no reasonable juror would have convicted him," *Schlup v. Delo*, 513 U.S. 298 (1995). In this case, it is impossible for the defendant to show that no reasonable juror would have convicted him on this charge. In fact, the record shows that a reasonable jury did exactly that.

### 2. The Jury Was Property Instructed on the Elements of Each Offense

In this case, the jury was properly instructed on the elements of each separate offense charged and told to consider each offense separately. (Vol. 7, pp. 96-117). The law presumes, generally, that jurors are capable of following and do, in fact, follow, their instructions in reaching their verdict. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Thus, evidence admitted in support of counts that were acquitted on or later reversed is not generally not held to infect the remaining counts. See *United States v. Sarin*, 10 F.3d 224, 225-26 (4th Cir. 1993).

38

**3.    The Perjury Count Should be Affirmed Because the Trial Evidence was all Properly Admitted**

In arguing for the dismissal of his perjury conviction (Count Five), defendant contends that the jury was unfairly biased in its consideration of the perjury count because it was exposed to the evidence admitted in support of the wire-fraud, securities-fraud and two mail-fraud counts. He argues that those fraud counts charged crimes that "did not exist," and that the jury, therefore, should never have heard the evidence in support of them that showed him to be "corrupt, self-dealing and generally unsavory." (Pet. p. 18.) In fact, all of the evidence in the case was properly before the jury. As argued above, the mail-fraud schemes charged in Counts One and Two charge alternative property-fraud theories. All of the evidence admitted under those counts was relevant to the property-fraud theories, and it is clear that the jury agreed on property-fraud theories. Likewise, the wire-fraud charge in Count Three was properly before the jury because it alleged bribery/kickback-related activity and the unlawful exploitation of confidential information. Moreover, all of the evidence relating to the video lottery scheme - which is the factual basis for Counts Two and Three - was also properly before the jury under the securities-fraud charge alleged in Count Four.

      **4.  The Evidence Relating to the Video Lottery Scheme was Properly Admitted in Support of the Securities Fraud Charge in Count Four**

Defendant's argument that the jury was biased by evidence it should not have heard depends in large part on the "reversal" of the securities-fraud charge in Count Four.  He argues that, since the Fourth Circuit reversed the conviction on that count, the crime charged therein "did not exist" and, therefore, the jury should not have had the evidence supporting that charge before it.  But, two years after the Fourth Circuit's reversal of Count Four, the Supreme Court unequivocally ruled that the securities-fraud scheme charged here is, in fact, a crime.  *United States v. O'Hagan*, 521 U.S. 642, 649-50 (1997).  Thus, there was no error in allowing this charge and the evidence in support of it to go to the jury.

In fact, the Fourth Circuit went to some length in its opinion to explain that the evidence the government submitted in support of the securities-fraud count was sufficient to prove every element of that offense under the "misappropriation theory" that *O'Hagan* ruled to be viable.  *Bryan*, 58 F.3d at 945 ("Bryan's conduct clearly constituted criminal activity under this theory of misappropriation").

The evidence relating to the securities fraud charge was properly before the jury.  Therefore, the defendant here cannot sustain a claim that he was unfairly prejudiced by it. Indeed, it is more than clear that the jury's guilty verdict on that count was

justified in light of the ample evidence and should have been sustained by the Fourth Circuit on direct appeal.  The fact that the court erroneously reversed it is an unmerited windfall for the defendant.

### 5.  The Securities-Fraud Charge: The Evidence

Since it is now established that any evidence supporting the securities-fraud charge was rightly admitted and considered by the jury, it becomes relevant here to outline that evidence in rebuttal of the defendant's claim that he was prejudiced by the admission of evidence of "crimes that did not exist."

First, inasmuch as proof of the securities-fraud charge requires a showing of breach of duty, all evidence tending to establish that defendant owed his employer a duty of confidentiality is relevant.  Second, since the charge alleged that Bryan breached that duty by misappropriating confidential information relating to the value or speculated value of the shares of corporations doing business with the West Virginia Lottery, all evidence relating to what that confidential information actually was and how the defendant learned of it is, likewise, relevant to the charge.  Third, any and all evidence relating to the actual transactions charged in Count Four is, of course, relevant, as well.

The securities-fraud charge in the Indictment consists almost entirely of and incorporates almost[16] all of the mail-fraud scheme charged in Count Two of the Indictment. Moreover, the securities-fraud charge is a near[17] complete overlap with the wire-fraud charge alleged in Count Three.[18] Thus, the evidence relevant to proving Count Four, the securities-fraud count, also established Counts Two and Three. The only evidence admitted that may not have been relevant under the securities-fraud count was that relating strictly to the advertising contract fraud scheme charged in Count One which, as argued above,[19] was properly before the jury on an alternative "property-fraud" theory.

---

[16]The paragraph relating to an attempt to conceal the mail-fraud scheme and the paragraph alleging the mailings in Count Two are not incorporated.

[17]The securities-fraud charge does not include the allegations relating to Bryan's receipt of gratuities from venders doing business with the Lottery.

[18]Indeed, in its opinion deciding the direct appeal of this case, the Fourth Circuit noted the near-perfect overlap between proof of securities-fraud under the "misappropriation theory" as charged here and proof of a mail or wire-fraud scheme. Pointing to *Carpenter*, the court observed that "Those who trade on purloined information . . . are still almost certain to be subject to criminal liability for federal mail or wire fraud." *Bryan*, 58 F.3d at 953.

[19]All of the evidence relating to Counts Two and Three was also properly before the jury on alternative "property-fraud" or "bribes and kickbacks" theories that survive or are unaffected by the rule in *Skilling*, as argued above.

42

## IV.  CONCLUSION

These seventeen-year-old verdicts should be left intact.  It is more than clear that the defendant in this case was charged with and proven guilty of conduct violative of the mail and wire-fraud statutes even as they have been limited under *Skilling*.  It is also clear that the jury must have agreed that defendant was guilty of property fraud in the two mail-fraud counts or they would not have convicted defendant at all.  Likewise, the wire-fraud count here is unaffected by *Skilling* inasmuch as it charges "bribery and kickback" related conduct and, further, charges and rests on proof of the wrongful exploitation of confidential information that constitutes "property" within the meaning of the wire-fraud statute.

Moreover, the record now makes clear that the misappropriation theory pursued by the United States in the securities-fraud charge (Count Four) was in fact legally viable and the evidence in the case was more than ample to support the jury's guilty verdict on that charge.  Therefore, defendant's argument that he was prejudiced in the perjury count because the jury heard evidence of "crimes that did not exist" is utterly baseless.

These convictions – each one of them – rest on legal and factual bases substantial enough to survive post-*Skilling* review even under the direct-appeal standard of review.  How much more

should they survive given the more restricted standard of review
and the shifting of the burden of proof applicable cases here.

Respectfully submitted

R. BOOTH GOODWIN II
UNITED STATES ATTORNEY


By:
    s/Larry R. Ellis
    LARRY R. ELLIS
    WV Bar No.  1122
    Assistant U.S. Attorney
    P.O. Box 1713
    Charleston, WV  25326
    Telephone:  (304) 345-2200
    Fax:  (304) 347-5706
    E-mail: larry.ellis@usdoj.gov

44

<u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing "Response of the United States to Petition for a Writ of Error Coram Nobis" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this the 7th day of January, 2010, to:

```
                    Richard Neely
                    NEELY & CALLAGHAN
                    159 Summers Street
                    Charleston, WV 25301




                By: s/Larry R. Ellis
                    LARRY R. ELLIS
                    WV Bar No.  1122
                    Assistant U.S. Attorney
                    P.O. Box 1713
                    Charleston, WV  25326
                    Telephone:  (304) 345-2200
                    Fax:  (304) 347-5706
                    E-mail: larry.ellis@usdoj.gov
```