## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

—————————————————————x
                                           :
WILLIAM EDWARD REBROOK,                    :      Civil Action
                                           :      No. 2:10-cv-01009
            Petitioner,                    :
                                           :
v.                                         :
                                           :
UNITED STATES OF AMERICA,                  :
                                           :
            Respondent.                    :      DATE:   April 6, 2011
                                           :
**AND**                                    :
                                           :
ELTON E. BRYAN,                            :      Civil Action
                                           :      No. 2:10-cv-01196
            Petitioner,                    :
                                           :
v.                                         :
                                           :
UNITED STATES OF AMERICA,                  :
                                           :
            Respondent.                    :
                                           :
—————————————————————x


### TRANSCRIPT OF HEARING ON PETITION
### BEFORE THE HONORABLE MARY E. STANLEY
### UNITED STATES MAGISTRATE JUDGE
### IN CHARLESTON, WEST VIRGINIA


Court Reporter:      Teresa L. Harvey, RMR, RDR, CRR


Proceedings recorded by mechanical stenography;
transcript produced by computer.

*APPEARANCES:*

**Lonnie C. Simmons**
DiTRAPANO BARRETT & DiPIERO
604 Virginia Street, East
Charleston, WV  25301
*(Counsel for Petitioner ReBrook)*


**Richard Neely**
NEELY & CALLAGHAN
159 Summers Street
Charleston, WV  25301-2134
*(Counsel for Petitioner Bryan)*


**AUSA LARRY R. ELLIS**
**AUSA PHILIP H. WRIGHT**
U.S. ATTORNEY'S OFFICE
P. O. Box 1713
Charleston, WV  25326-1713
*(Counsel for Respondent)*

1     PROCEEDINGS had before The Honorable Mary E. Stanley,

2   United States Magistrate Judge for the Southern District of

3   West Virginia, in Charleston, West Virginia, on April 6, 2011:

4         *MR. NEELY:*  If one were impressed by the Legal

5   Realism school of jurisprudence --

6         *THE COURT:*  And I'm not.

7         *MR. NEELY:*  -- well, we would not be happy to be

8   here, given the disaster that befell your tree the other night.

9         *THE COURT:*  Well, that was a little interesting on

10  Myrtle Road, that's for sure.

11    This is ReBrook v. United States, which is case

12  No. 2:10-cv-1009; and we also have Bryan v. United States,

13  which is 2:10-cv-1196.  And we have Mr. Neely and Mr. Simmons

14  for the petitioners, and Mr. Ellis and Mr. Wright for the

15  United States.

16    One matter that I wish to raise immediately is the fact

17  that I was an assistant United States attorney until

18  October 20th, 21st of 1992, but I had been informed by the

19  district judges that I had been appointed to be a United States

20  magistrate judge in very early June of 1992 and basically quit

21  having any participation in cases, was just basically

22  transferring things and writing memos.  I did not know or

23  participate in this -- in the investigation of Mr. Bryan and

24  Mr. ReBrook, as far as I can remember, and frankly, you know,

25  it was -- investigations are held under pretty tight wraps in

1    the U.S. attorney's office, and I didn't have anything to do

2    with it.    However, I feel it's important to put that on the

3    record.

4        The other matter I wanted to address first off is

5    Mr. Simmons has -- I believe has asked that the entire record

6    from each -- from his client's criminal case be incorporated

7    into the record in this case.    And have the parties -- have the

8    attorneys talked to each other about that proposal?

9            *MR. ELLIS:*  No, Your Honor.  I didn't know that.

10           *THE COURT:*  Okay.  Is there -- we don't want to

11   burden the record in these cases with materials that are not

12   needed, but it occurs to me that there will have to be

13   substantial references, and it probably ought to be in one

14   file.  I'm wondering is the joint appendix from each case a

15   sufficient document to provide the kind of material that any

16   reviewing judicial officer would need?

17           *MR. SIMMONS:*  Judge, that may very well be true.  I

18   don't have a copy of the joint appendix, so I don't know --

19   I'm assuming it has everything in there.  I just thought for

20   purposes of having a record this court, the district court, and

21   possibly the Fourth Circuit may want to have access.  So maybe

22   one of the things we can do is talk about the record when this

23   proceeding is over and see what's in there and get back to the

24   court on that.

25           *THE COURT:*  I think it would be very helpful if

1   counsel would stipulate as to what should be in the record and

2   then we can put that together in one package, with counsel's

3   stipulation, and scan it so that it's available electronically.

4        Along those lines, we have not been able to, so far,

5   obtain a copy of the brief that was filed -- perhaps the

6   opening brief and the reply brief that was filed by Mr. Bryan's

7   counsel in the Fourth Circuit.  So anybody have that?

8   Apparently not.  I mean, we've had a phone call in to the

9   clerk's office over at the Fourth Circuit but so far we haven't

10  heard back from them.   My guess is their file is in archives.

11            *MR. NEELY:*   Your Honor, we don't have a copy of it.

12  I didn't look to it.  I am sort of surprised -- one thing, I

13  have a copy of the Bryan transcript, which Mr. Ellis provided

14  to me.   I assumed that he would have also provided a copy of

15  the transcript to the court.

16            *THE COURT:*   We have the original case file.

17            *MR. NEELY:*   Okay.  You've got the original?  Because

18  I've made reference in my brief, you know, to various parts of

19  the record.   And so you have it, if you want to look at it?

20            *THE COURT:*   We have the entire case file here in

21  chambers and we're taking care to make sure it remains intact

22  and properly organized.

23            *MR. NEELY:*   I didn't -- I didn't try and get a copy

24  of the appellate briefs from Mr. Jones because I just didn't

25  think that they were particularly relevant for this -- for

1    these issues.  I mean --

2         *THE COURT:*  Well, it's more procedural matters and we

3    just like to make sure that everything is stated correctly.

4    Mr. Jones apparently has the brief on microfiche and it will

5    take him awhile to get it.  I was just wondering whether

6    anybody had a bunch of extra copies.

7         *MR. ELLIS:*  Your Honor, I'm working from memory here

8    from like six months ago, but I think I tried to find that

9    brief desperately and couldn't.  In fact, I think I may have

10   requested some of the boxes from the Fourth Circuit and

11   couldn't find it there.  I'm almost positive that's the same

12   case, for me at least, with regard to Mr. ReBrook's initial

13   brief.  Now, I have his response brief, which was *pro se*.  I

14   have that.  That's the only one I have.  And I have my own, of

15   course, but that's all I have; and I did try to get them early

16   on, I think.

17        *THE COURT:*  Does anybody have Mr. ReBrook's petition

18   for writ of certiorari?

19        *MR. NEELY:*  I think I may have it on my computer,

20   Your Honor.

21        *THE COURT:*  And that is the other interesting aspect

22   here is that Mr. Neely represented Mr. ReBrook before the

23   Supreme Court of the United States and now represents

24   Mr. Bryan, but I'm assuming that the clients have no problem

25   with your representation?

1    *MR. NEELY:*  No; actually, Your Honor, in fact,

2    Mr. Simmons and I are sort of going to share this argument and

3    do different parts of it so we don't waste the court's time.

4    We have been cooperating on this case since the very beginning.

5    *THE COURT:*  Yes, but of course ultimately, of course,

6    it is the clients who have the call, and they're both here in

7    the courtroom, and I'm assuming they have no problem?

8    *PETITIONER REBROOK:*  I would make a knowing waiver,

9    Your Honor, that I have no problems with it at all.

10    *THE COURT:*  That's Mr. ReBrook.

11    *MR. BRYAN:*  Ditto.  Same here.

12    *THE COURT:*  That's Mr. Bryan.

13    All right.  Well, given those matters, are we ready to go

14    forward?

15    *MR. SIMMONS:*  Yes, Your Honor.

16    *MR. ELLIS:*  Yes, Your Honor.

17    *THE COURT:*  All right.  And who for the petitioners

18    is going to argue first?

19    *MR. SIMMONS:*  I will, Judge.

20    *THE COURT:*  Go ahead, Mr. Simmons.

21    *MR. SIMMONS:*  Thank you.  Obviously, we're here on a

22    coram nobis.  I haven't done very many coram nobises in my

23    time, so this is a kind of new experience for me.  I think the

24    Fourth Circuit has demonstrated a willingness to provide coram

25    nobis relief under the circumstances that we have here where a

1    decision is rendered by the U.S. Supreme Court subsequent to a

2    time when a person has been convicted of a crime, has served

3    the time, and is now out of prison and the U.S. Supreme Court

4    has decided that the crime that that person was convicted of is

5    somehow unconstitutional, void for vagueness and that sort of

6    thing, and that's what we have -- that's what we have in this

7    case.

8         The standard -- there isn't a very precise standard.  It's

9    an extraordinary remedy under compelling circumstances to

10   achieve justice, so it's the only remedy available at this time

11   to Mr. ReBrook and to Mr. Bryan, because they have served their

12   sentences and they're out.  Both of these individuals still

13   suffer from prejudicial effects of having felony convictions,

14   and it turns out when you look at the coram nobis cases around

15   the country the Fourth Circuit has been particularly generous

16   in recognizing the prejudicial effects of a felony conviction.

17   And some of the other circuits aren't quite as generous, but

18   this is an area where the Fourth Circuit actually is.

19        So those are the initial elements that we have and, of

20   course, we're talking about the *Skilling v. United States*

21   decision which declared that the statute that Congress passed

22   subsequent to the *McNally* decision where Congress tried to put

23   "honest services" wire/mail fraud back into the statute itself

24   that it was void for vagueness and the U.S. Supreme Court

25   didn't declare the statute totally invalid but recognized that

1   you can have -- if there is bribes or kickbacks, that can be

2   the basis for a wire or mail fraud conviction.  And the

3   argument in this case is both Mr. Bryan and Mr. ReBrook were

4   convicted of honest services wire and/or mail fraud and there

5   was no evidence of kickbacks or bribes.

6       From the briefing that we've seen to date, and maybe we'll

7   hear from the Government today, I have not heard the Government

8   disputing at least that aspect.  In other words, I have not

9   heard the Government make an argument that somehow the under-

10  lying theory in either case was that they received bribes or

11  kickbacks.  Now, they have other arguments, which I'll get to,

12  but I think it will be important to establish that, because

13  when you look at the coram nobis cases that have come out since

14  the *Skilling* decision - and I've been checking it quite a bit,

15  and I'm sure they have as well - there is a *U.S. v. Vicki Lopez*

16  *Lukis* case, which is 2011 U.S. District Lexis 14609.  This one

17  came out February of 2011 and it's a coram nobis case.  The

18  facts are exactly like these two cases, but in that case the

19  Government conceded there was no evidence or theory of bribes

20  or kickbacks and the district court granted the coram nobis

21  relief.  And it's a very short opinion; it's not really, you

22  know, a very detailed discussion.

23      There have been other decisions.  I think in our brief we

24  had cited the *Geddings* decisions out of, let's see, the Western

25  District of North Carolina.  Those are both Lexis cites now,

1    2010 U.S. District Lexis 64229, and there is a 2010 U.S.

2    District Lexis 63046.  The one decision was essentially asking

3    the Government, gee, we want to know what your opinion is on

4    this; and then the subsequent one was where the district court

5    actually allowed Mr. Geddings out on bail, because he was

6    actually still serving a sentence.  So that's the situation

7    where he got bail relief and he would still have, you know,

8    habeas corpus as opposed to a coram nobis, and that case isn't

9    finalized.

10       And there is also an example in -- there is a *U.S. v.*

11   *Strategic Defense International, Inc.*, which is 2010 U.S.

12   District Lexis 140249, and this one is out of Florida.  This

13   was a case where, because the Government's theory included

14   bribery and kickbacks, coram nobis was denied, and that would

15   be consistent with *Skilling*.

16       And those are the cases that we have found.  We really

17   haven't found any sort of detailed district court decision

18   that's gone through a big analysis, but I think what those

19   cases show is that coram nobis does, in fact, apply under these

20   circumstances provided that, as the petitioners, we can meet

21   the other elements of the claim and we can overcome whatever

22   defenses are asserted.  I think today the defenses asserted in

23   the ReBrook case are different than the Bryan case, and I think

24   the way we were going to do this I would certainly address the

25   defenses asserted in the ReBrook case.  A little bit of that

1    may flow over into the Bryan case, but there are certain

2    arguments that only apply to Bryan and I won't be addressing

3    that.

4         I think one of the -- one of the main arguments by the

5    Government is that Mr. ReBrook and Mr. Bryan were convicted

6    under two theories.  There was the honest services wire

7    fraud/mail fraud and there was what we're calling a property

8    theory, and you can look through the indictment, which is

9    attached, you can look through the instructions, and the

10   Government pointed out how in the instructions -- in the

11   instructions there is this language kind of at the beginning

12   that talks about "the word 'scheme or artifice' is used in the

13   mail fraud statute to mean any plan or course of action

14   intended to defraud others or to obtain money or property by

15   means of false or fraudulent pretenses, representations or

16   promises."

17        That is exactly -- what I read to you is in the

18   instructions.  That's also the language of the instructions

19   in *Mandel* -- *U.S. v. Mandel*, which is the Fourth Circuit case,

20   which I would say it's the preeminent coram nobis decision that

21   provides a lot of guidance on the procedure on how you analysis

22   it.  Obviously, *Mandel* was coram nobis really granted after

23   *McNally* was overturned by the U.S. Supreme Court, and sort of

24   the parallel we have here is *Skilling* is when the statute that

25   attempted to put honest services back into the mail fraud and

1   wire fraud statutes, so that's sort of the parallel between the

2   two.   But the fact that -- there is a decision in *Mandel* about

3   this issue about property, a property theory, and the First

4   Circuit goes into it in great detail about how the theory in

5   *Mandel* was honest services and that the jury was never required

6   to find that the State of Maryland was defrauded of any money

7   or property, so -- and then you look at the instructions in

8   *ReBrook* - I haven't seen the instructions in *Bryan*, but I'm

9   assuming it's the same - and you look at the verdict form, look

10  at the argument, you look at the two district court decisions,

11  you look at the Fourth Circuit decision, the entire discussion

12  is about honest services wire fraud.   In my -- in my brief, I

13  think it was probably in the reply brief, I quoted in each one

14  the analysis of the district court, as well as from the Fourth

15  Circuit, where the entire argument is honest services wire

16  fraud.   And I guess one way of looking at it, the way I would

17  look at it, is that if the Government truly had an alternative

18  theory for the jury, say, hey, jury, here's another way you

19  convict Mr. ReBrook of wire fraud: you have to prove that he

20  somehow defrauded the State of West Virginia out of some

21  property, I think it would be clear in the record.   It would

22  have been an easy way for the district court to say, well,

23  they've got another theory; they've got a property theory.   The

24  Fourth Circuit could have said the same thing.   But that's not

25  what happened.   The entire case was tried as an honest services

1   wire fraud case.

2        And a similar argument, and I know I covered this in my

3   brief, was made in *Mandel*, and I'm not going to read you

4   chapter and verse from *Mandel*, but the Fourth Circuit goes into

5   great detail when the Government was trying to make that type

6   of an argument and rejected it, and I would just simply rely on

7   the analysis of that issue in *Mandel*.

8        Also on this issue, in the *Bryan* decision when the Fourth

9   Circuit is analyzing the various arguments that were made and

10  there is a discussion of the *Carpenter* case and that sort of

11  thing and that the *Carpenter* case says, you know, confidential

12  information can be, quote, property -- so we all agree with

13  that, no problem with that, but in the *Bryan* decision -- and I

14  know the easiest way is to give you the cite.  It is before --

15  of course, I have Lexis.  It looks like it's going to be around

16  page 941 is what I'm looking at.  The Fourth Circuit is

17  rejecting an argument and it says:

18           "We see no reason, however, to read into

19       the mail fraud statute an independent criminal

20       violation requirement when the fraud conviction

21       is based on the deprivation of the right to

22       intangible services as opposed to the deprivation

23       of property or money, as in *Carpenter*."

24        So the Fourth Circuit itself in *Bryan* -- in the analysis

25  of the *Bryan* conviction is making the distinction, hey, in

1   *Bryan* it was deprivation of the right to tangible services as

2   opposed to the deprivation of property in *Carpenter*.   So, in

3   other words, the Fourth Circuit was not recognizing that *Bryan*

4   was a property case.   It clearly was an honest services case.

5        The procedural argument that was made with respect -- and

6   this is the one -- this is the issue that is unique to

7   Mr. ReBrook's case is essentially kind of a procedural default

8   type argument.   One of the things that we -- and I think the

9   Government acknowledged this in the brief, we really don't have

10  a lot of case law or rules like we have in, you know, habeas

11  discussions, some of these more technical aspects of what

12  things does the defendant have to do to preserve the right to

13  seek coram nobis relief.   We have some of the big things:   You

14  can't have any other relief available; and that's kind of a

15  given.   There is sort of a timeliness requirement.   You know,

16  we certainly are timely.   They haven't argued we weren't

17  timely.   And we looked at the case law.   I mean, people had

18  filed coram nobises nine years after you think they should have

19  and the courts have had no problem with it.

20       The courts haven't been particularly -- on procedure, but

21  on this issue of procedural default, I actually provided the

22  court - and this is in the reply brief - several Fourth

23  Circuit, as well as decisions from other circuits which were

24  relied upon in the Fourth Circuit which -- and you had cases

25  where the person didn't file an appeal.   Well, under that

1   argument, how in the world could that person get coram nobis

2   relief? They didn't even challenge it, and yet coram nobis

3   relief was granted, so the court didn't procedurally fault

4   them.

5       And you end up through a series of cases - it's *Shamy*,

6   *Ingber*, *Ross*, I think *Hoffman* - and you end up coming up with

7   an analysis by the Fourth Circuit that the focus really is on

8   the injustice of having someone convicted of a crime that's not

9   a crime and but they're still suffering the ill effects of

10  that. And so what the Fourth Circuit has done is has said,

11  well, we're going to address the merits of this. And the one

12  decision which I know I quoted at length in the reply brief

13  talks about how, well, we're not going to make defense lawyers

14  out there raise -- you know, look into the future into 2010 and

15  say, well, in 2010 the U.S. Supreme Court is going to say that

16  this newly-adopted statute is unconstitutional. We're not

17  going to make defense lawyers do that.

18      The issue in the *ReBrook* case of vagueness certainly was

19  raised at the district court level, and the Fourth Circuit a

20  footnote there says, well, we think that the issue is a little

21  more -- is a little more narrowly drawn than in *Bryan*, but the

22  one footnote suggests that, well, it wouldn't have made any

23  difference. But the Fourth Circuit does make the point that

24  the issue wasn't raised at the Fourth Circuit, so I don't

25  really dispute that. But I think the Fourth Circuit case law

 1  has made it clear that there should not be a procedural default

 2  here, and the cases I cited would be ones where there clearly

 3  would be a procedural default if, in fact, that were the rule.

 4  　　　　　THE COURT:  Well, even if there were -- or even if

 5  there is a procedural default, that's not the end of the story,

 6  of course.  Under *Bousley v. United States* you certainly can

 7  approach the issue from an inquiry as to actual innocence,

 8  which of course is factual innocence, not legal insufficiency.

 9  　　　Now, do you claim factual innocence?

10  　　　　　MR. SIMMONS:  I would say this:  I understood that

11  that was part of the analysis in the Government's brief.  In

12  the cases that I cited, the court did not go through the -- is

13  it *Bousley* -- did not go through the *Bousley* analysis.  I

14  think, yeah, that's an additional argument.  I think the Fourth

15  Circuit cases -- coram nobis cases have said, hey, we're

16  interested in a just result.  We think it's compelling if a

17  person was convicted of something that turns out wasn't a

18  crime.  But under a *Bousley* analysis, is Mr. ReBrook factually

19  innocent?  Well, since under *Skilling* he didn't receive a bribe

20  or a kickback, and if you're talking about the wire and mail

21  fraud statute, yes, he is.

22  　　　And I guess maybe what I don't necessarily understand

23  totally about *Bousley* is it seems to me it would be hard to

24  separate the factual from the legal now that the U.S. Supreme

25  Court has said you can only have a conviction for honest

1   services if there is a bribe or kickback involved.  Well,

2   that's something that you have to look at in going through the

3   facts.  Since there was no bribe or kickback - and I hope I'm

4   going to hear from the Government today that they agree there

5   was no bribe or kickback - then under the case law and under

6   the coram nobis case law from the Fourth Circuit that should be

7   the end of the analysis.  That should be -- that should -- that

8   should be the basis for providing coram nobis relief.  So, in

9   other words, that would address the procedural issues and we

10  otherwise have met the standard.

11         THE COURT:  Do you agree that if -- if the record

12  conveys dual theories of prosecutions, both property and honest

13  services, that then the court needs to undertake an analysis as

14  to whether the honest services portion of the case has

15  substantial injurious effect or influence in determining

16  verdict that is the harmless error analysis?

17         MR. SIMMONS:  I think I would agree with that, yes,

18  and certainly we -- we certainly dispute -- and obviously --

19  and, Judge, it's possible -- as I reread the briefs, it's

20  possible, depending on how this thing plays out today and what

21  the court is interested in, it might be of some benefit for us

22  to address that a little closer in a little more detail, to the

23  extent that that's a big argument.  It's just when I read the

24  instructions it was just -- once I saw that that same

25  instruction was given in Mandel and it didn't have any impact

1    on the coram nobis relief, and when you look at the record as a

2    whole and you look at all the opinions, it's all honest

3    services, it just seems very difficult in 2011 to after the

4    fact say all of a sudden the Government was going on a

5    different theory or an additional theory.  It seemed to me

6    when you read the instructions that the issue of property was

7    actually incorporated into some of the -- like there is an

8    ethics rule that they cite and the lawyers -- I mean the

9    Government ethics and the lawyer ethics that talked about, you

10   know, you're supposed to keep confidential information and

11   you're not supposed to take advantage.  I mean, it seemed to

12   me it was incorporated within those sort of proscriptions on

13   both lawyers and public employees as opposed to being, hey,

14   jury, we got two ways of getting there:  We've got honest

15   services and we've got property, you know.  And I think you

16   also have -- the thing gets a little more complicated, in part,

17   because *Carpenter*, you know, is a private business and, of

18   course, here we're dealing with the theory that a public entity

19   is the State of West Virginia.  And when you look at the *Mandel*

20   analysis, that was significant as well.  So it would be -- to

21   the extent that the court is interested in us hitting that

22   issue a little more directly, it might be of benefit, and I'll

23   certainly be willing to file a brief on that.

24            *THE COURT:*  Don't you think that if Marvin Mandel's

25   coram nobis petition came before the court post-*Skilling* that

1   he would have been denied relief?

2       MR. SIMMONS:  I was thinking about that last night,

3   and the way they analyzed it, they do seem to be talking about

4   bribes and kickbacks to him, but then what I hadn't read, to be

5   honest, Judge, I hadn't gone back to read the original appeal

6   to see -- because from the coram nobis opinion, it wasn't a

7   hundred percent clear to me what he did.  I got the impression

8   that he did receive some money.  I don't know what exactly he

9   did, to see if there was something, but that very well may be

10  true.

11      THE COURT:  Well, Judge Hall's dissent has some

12  interesting facts in it, and basically it looked like he was

13  taking bribes in order to extend racing dates which, of course,

14  produced great increases in revenue to the racetrack.  It

15  sure looked to me like he would have been denied relief post-

16  *Skilling*.

17      Well, it may well be that counsel can be of assistance to

18  the court with some subsequent briefing on some of these

19  issues.  I think you'll agree with me that coram nobis is

20  essentially a collateral attack on the conviction.

21      MR. SIMMONS:  Yes.

22      THE COURT:  Okay.  And as I have read through all

23  this material, it clearly has been subject to a considerable

24  evolution in that the evaluation of the jury instructions say

25  in *Mandel* or pre-*Brecht v. Abrahamson*, and now we have the

1  harmless error requirement for the standard of review.

2      Do you believe that coram nobis actually requires an even

3  stricter or higher standard of review than, say, in a 2255

4  post-conviction cause of actual prejudice?

5          *MR. SIMMONS:*  There is no question the case law says

6  it's an extraordinary remedy, but you don't see a lot of

7  discussion about those sorts of procedural things or the

8  standard that's being applied.  It's almost if the court thinks

9  an injustice has been done, that's what they determine; that's

10 the way they conclude.  But they don't really go into -- like,

11 for example, it doesn't say what our burden is to persuade the

12 court.  So there is a lot of procedural aspects of coram nobis

13 that I think aren't very clear in the law; and you are right,

14 when you look at the -- it started out being just for very

15 technical violations and then through time it has gotten much,

16 much broader in scope.  It's still -- it's still -- you know,

17 it's a high burden on our part, and it's an extraordinary

18 remedy, but the things that it actually encompasses is much

19 broader.

20          *THE COURT:*  Well, thank you, Mr. Simmons.

21          *MR. SIMMONS:*  Thank you, Judge.

22          *THE COURT:*  Now, do counsel have an agreement as to

23 what order we're going in?  Is the Government going to respond

24 to Mr. Simmons and then Mr. Neely stand up or what?

25          *MR. ELLIS:*  We don't have any agreement, but I'm

1  willing to do whatever the court -- whatever would be most

2  convenient for the court.  It's okay with me either way.

3          *THE COURT:*  Well, I think Mr. Simmons has been mostly

4  addressing some of the more procedural aspects, and if you want

5  to respond to that, that would be fine, and I'll hear you now,

6  Mr. Ellis.

7          *MR. ELLIS:*  Your Honor, I guess to try to put it in

8  a sound bite, to try to put it in general terms to get started,

9  it seems to me that at least part of the drift of Mr. Simmons',

10  the defendant ReBrook's, argument is that there are -- that

11  the law of coram nobis is nebulous, that there aren't real

12  standards we can latch onto and, you know, it's just a matter

13  of finding whether there was an injustice.  And we certainly

14  take issue with that.  There are some very good statements of

15  standards that I think are very relevant here and could be very

16  helpful to the court in the analysis of this case, and I'll

17  begin with *Skilling* itself.

18      And in *Skilling* there is a -- and, Your Honor, what I'm

19  going to do here is kind of walk up the stairs, because I

20  think that obviously, you know, in *Skilling* we're talking

21  about a direct appeal, so we are talking about a standard of

22  review that is less restrictive than what we have here, and so

23  I'm going to be walking up the stairway here.  And we begin,

24  you know, simply on direct appeal; and in *Skilling* the court

25  is very careful at the end of the opinion to say if there are

1    two theories alleged, you know, that's instructional error

2    under *Yates*, and I think it's under *Chapman*, and other cases

3    that follow, that's subject to harmless error analysis.  I

4    believe maybe it's *Neder*, actually, that says that.

5        And then the next test, and the next step up, if you will,

6    or the next standard that I believe is most helpful to the

7    court in analyzing this case is the rule in *Neder* which says

8    is it clear beyond a reasonable doubt that -- and this is an

9    important distinction here.  Is it clear beyond a reasonable

10   doubt, not that this jury found him guilty on the alternative

11   theory, or on the good theory, but is it clear beyond a

12   reasonable doubt that a rational jury -- sort of an objective

13   case rather than subjective, if you will -- subjective but

14   objective theory, is it clear beyond a reasonable doubt that a

15   rational jury would have found the defendant guilty absent the

16   error?  That's where we are on direct review.

17       On coram nobis, the review is even more limited.  And the

18   court has already cited to *Brecht*, and the harmless error

19   standard on collateral review, according to *Brecht*, is not for

20   the Government to prove that the error was harmless beyond a

21   reasonable doubt, as it would have been on direct appeal and in

22   *Neder* and *Hedgpeth*, but the defendant must show that the error

23   has substantial injurious effect and influence in determining

24   the jury's verdict.

25       There are two sort of footnotes I want to add to that that

1    actually -- actually, one of them is not in my briefing and I

2    can cite the case. I have a copy of it here. There is a case,

3    I believe it's out of Florida, and I believe the cite to it is

4    *Spellissy*. I think I have it. Yes, I do. It's 2010 WL

5    5463107. It's out of the Middle District of Florida, and it is

6    a case that applies the *Brecht* standard of review on federal

7    coram nobis. If there was any -- there is a little bit of a

8    split, I guess, on whether *Brecht* is merely limited to state

9    habeas or whether it's more generally applicable to collateral

10   review. In this case, we've taken the position it's generally

11   applicable to collateral review, including federal coram nobis.

12        There is also a case, and this is not a Fourth Circuit

13   case, but there is also a case and this is -- this is actually

14   a 2241 case and not a coram nobis case. This is *Trenkler v.*

15   *United States* out of the First Circuit, 2008, 536 F.3d 85, and

16   at page 99, and it stands for the proposition that a defendant

17   who has been convicted under the legally invalid honest

18   services theory should not be eligible for 2241 relief unless

19   he can show that he was actually innocent. And this is -- the

20   thing about *Trenkler* that distinguishes it from the cases I

21   argued in the *ReBrook* case is in *ReBrook* I was arguing actual

22   innocence under a theory of procedural default under *Bousley*.

23   *Trenkler* seems to apply an actual innocence standard on coram

24   nobis - period - that is, procedural default or no.

25        Under a -- where there is a -- where there are multiple

1  theories charged, 2241 relief - the guy's still in jail - is

2  denied unless a defendant can show he was actually innocent

3  under any legally valid theory of mail or wire fraud, whether

4  or not specifically charged in the indictment or submitted to

5  the jury.

6       *THE COURT:*  In other words, if there is evidence to

7  believe it's a bad person, then no coram nobis relief - or 2241

8  relief?

9       *MR. ELLIS:*  Well, what they actually say is any valid

10  theory of mail or wire fraud.

11       Mr. Simmons talked some about the liberality of the

12  Fourth Circuit in coram nobis cases, and there is truth in

13  that, certainly.  There are ways -- and in some cases the

14  Fourth Circuit has been more apt or willing to grant coram

15  nobis relief.  But as the court pointed out in questioning

16  Mr. Simmons, those cases seemed to be counter to *Bousley*.

17  Those cases seemed to be counter to *Bousley* and to the other

18  cases I've just cited here and, you know, the question -- I

19  believe the question was raised, you know, well, you know, what

20  do these cases have to say about *Bousley*?  And two answers to

21  that.  First of all, some of them don't have anything to say

22  about *Bousley* because *Bousley* came later.  Secondly, it doesn't

23  matter what they say about *Bousley*, it matters what *Bousley*

24  says about them, because *Bousley* is a Supreme Court case and,

25  of course, would trump anything the Fourth Circuit said on that

1   point.

2       I believe that that covers the Government's position

3   regarding standards of review here.  We believe that *Bousley*

4   dictates that Mr. ReBrook must show actual factual innocence.

5   We believe that the record as it exists is more than ample to

6   show that there was a valid property theory submitted.  We

7   think that in ReBrook's case, because of one of the flukiest

8   things I have seen since I've been practicing law, where we

9   have -- we have -- it goes up to the Fourth Circuit, the

10  securities fraud conviction is reversed, the mail fraud theory

11  is upheld, and then things evolve and it turns out that the

12  Fourth Circuit was wrong about reversing the securities fraud

13  and wrong about upholding the honest services prong now, not

14  the property, but upholding the -- I mean, it's just a complete

15  reversal.  But what that gives us in this case is a complete

16  assurance that this jury was convinced of the property fraud

17  theory.

18      If you look at the instructions in the ReBrook case, and

19  Mr. Simmons, I'm going to quote to a part of the record here

20  that I did not brief.  And I have the joint appendix and I'll

21  give you that.

22          *MR. SIMMONS:*  I appreciate that.

23          *MR. ELLIS:*  But if you look at the instructions that

24  the district court gave in the ReBrook case regarding

25  Count Two, that being the securities fraud scheme, he says --

1  and I'm reading from page 586, and I'll provide this to the

2  court:

3         "The particular scheme to defraud and deceive

4      as alleged by the Government in this case..."

5      And I don't want to mislead the court here; I'm talking

6  now about the securities fraud case, which is not before you.

7         "...is something -- a species of fraud that

8      is called insider trading.  An insider is one who

9      comes into possession of material, nonpublic

10      information about a stock or a security by virtue

11      of a personal or business relationship which

12      imposes a duty of trust and confidence..."

13      Which, of course, was -- that duty did devolve on

14  Mr. ReBrook and was alleged in the indictment.

15         "When a person has such inside information,

16      the law forbids that person from buying or selling

17      the security in question or recommending to others

18      that they buy or sell the security."

19      Well, that's exactly what the proof showed and that the

20  jury bought.

21         "And this position of trust or confidence

22      prevents him from disclosing insider information.

23      Such a person, an insider, must refrain from

24      trading on it or causing others to trade on it

25      until the information has been made publicly

1    available to all investors."

2    Well, okay.  That instruction as it was given related to

3    Count Two, but it is, except for the mail, a perfect -- a

4    perfect instruction on the *Carpenter* theory of mail fraud.  And

5    because the jury convicted under the securities fraud, it's not

6    whether there is a reasonable doubt.  We know for certain that

7    they bought these elements.  Just because of this really odd,

8    weird set of circumstances here -- they bought the securities

9    fraud theory, and the securities fraud theory is the property

10   theory in Count One.

11            *THE COURT:*  I just have a question.  After *O'Hagan*,

12   would it have been possible for the Government to do something

13   to reinstate the conviction?  Or did you --

14            *MR. ELLIS:*  That's a good question.

15            *THE COURT:*  Or would you have had to have actually

16   petitioned for cert after the misappropriation theory was

17   refused in the Fourth Circuit?

18            *MR. ELLIS:*  I think -- and Mr. Wright will know

19   better than me, the Fourth Circuit clerk here, but let me try.

20   I think that, you know, we are given a window of time to appeal

21   the court's reversal of the honest services conviction of

22   Mr. ReBrook, and I think once that's done, it's done.  I

23   remember --

24            *THE COURT:*  You mean the security -- the insider

25   trading?

1          *MR. ELLIS:*  I'm sorry.  Yes, yes, yes.  And I don't

2    think we can go beyond that.  I don't think that once we get

3    *Skilling* that we have the equivalent of a Government coram

4    nobis to go back in.  I think that's -- is that right?

5          *THE COURT:*  That's what I assumed, that you would

6    have had to petition for cert.

7          *MR. ELLIS:*  In a timely way.

8          *THE COURT:*  Right.

9          *MR. ELLIS:*  And as I recall, the calculus at that

10   time was that that reversal didn't affect the sentence and the

11   Justice Department just didn't want to -- and that's where we

12   are.

13         *THE COURT:*  All right.  Now, let's kind of go over

14   what you've said here.  You believe Mr. ReBrook has

15   procedurally defaulted the issue and therefore he has to go

16   under *Bousley*.  You, I take it, concede that Mr. Bryan has

17   preserved his issue on appeal throughout and therefore he has

18   not procedurally defaulted?

19         *MR. ELLIS:*  That's right.

20         *THE COURT:*  Okay.  So then, as to Mr. Bryan, it is a

21   question of not whether he's actually innocent but whether the

22   instructions and the evidence as to the alternative theory, if

23   there was one, is subject to the substantial and injurious

24   effect or influence of the honest services evidence and

25   instruction on it.

1          *MR. ELLIS:*  Yes, Your Honor.  Can I have just a

2   moment?

3          *THE COURT:*  Yeah.  I may not have phrased that very

4   well.

5          *MR. ELLIS:*  Yes, I believe the court has stated it

6   correctly; inasmuch as Mr. Bryan has not procedurally

7   defaulted, he is reviewed under the standard in *Brecht*, which

8   is substantial and injurious effect.  Now --

9          *THE COURT:*  Now, do you assert that coram nobis

10  review has a higher standard of review than harmless error?

11         *MR. ELLIS:*  That it has a higher standard of review

12  than harmless error?  Yes, under *Brecht*, that if -- I think

13  that the *Brecht* case, at the very least, heightens the sort of

14  harmless error review that would be applicable on direct

15  appeal.  So  I guess you could call them both harmless error,

16  but they are different standards.  The harmless error standard

17  on direct appeal is *Neder* and *Hedgpeth*, and it's, you know, can

18  we say beyond a reasonable doubt that a jury -- a reasonable

19  jury would have convicted upon a valid theory under these

20  facts?

21      I think -- I think that both convictions survive under

22  that standard, but given that we are on collateral attack and

23  not on direct appeal, that standard is further limited by

24  *Brecht*, which says -- and I don't know if you would -- and I

25  don't know if you would call *Brecht* -- continue to call it a

1    harmless error standard or not.  I guess you do.  But it's a

2    different harmless error standard than that which would apply

3    on direct appeal.  And the court stated it correctly that it's

4    the substantial and injurious effect test.

5        And the other -- the only other footnote there, of

6    course, is this *Trenkler* case, and we don't know where that's

7    going to go.  We don't know if that is, you know, going to be

8    a developing trend.  I think it's probably fair at this point

9    in response to the court's question to say that there is

10   thought and expression in the law that is very understandable

11   that nothing should be easier for a coram nobis defendant than

12   it is for a habeas defendant, because the stakes are lower.

13   I believe that thought and that language is probably best

14   capsulated in *Osser*, but it may be elsewhere as well.  But

15   trying to give the best answer I can, yes, there is a harmless

16   error standard.  At the very least, it is *Brecht*; it may be

17   *Trenkler*; and, yes, I believe that the standards are higher

18   for a coram nobis defendant than they would be for a habeas

19   defendant.  At least as strict, but there are policy reasons

20   why it should be stricter.  I hope I've answered the court's

21   question.

22            *THE COURT:*  Now, there's some additional language

23   from *O'Neal v. McAninch*, 513 U.S. 432, 1995.

24            *MR. ELLIS:*  I'm sorry; 432, Your Honor?

25            *THE COURT:*  Yes, 513 U.S. 432, which says that an

1  alternative way to express the harmless error standard is to

2  ask if the record is so evenly balanced that a conscientious

3  judge is in grave doubt as to whether the error had a

4  substantial effect.

5       Does that standard of review apply in the coram nobis?

6       MR. ELLIS:  I think not.  I think -- I really think

7  that that idea -- that idea, to me, as the court expressed it

8  there in that quote, does not completely jive with the thought

9  that has evolved out of *Hedgpeth*.  In other words, what the

10 court is supposed to do on coram nobis review is not, you know,

11 sort of weigh and balance and say which is more likely: Did

12 they more likely do this, or did they more likely do that?  I

13 think the court is supposed to just look at what was before the

14 jury and say, hmmm, would this jury have convicted on a valid

15 theory?  And I think that's the end of the story.  I think the

16 analysis ends there.  And I think if that is the question, the

17 answer is easy.

18      THE COURT:  Now, Mr. Simmons wants to know what your

19 position is on bribes or kickbacks.  Now, it wasn't clear to me

20 whether he was limiting that to Mr. ReBrook or whether it also

21 went to Mr. Bryan.  Mr. Simmons?

22      MR. ELLIS:  I'll be happy to answer that.

23      THE COURT:  Mr. Simmons, did you want to clarify

24 that?

25      MR. SIMMONS:  Judge, I suppose while he is answering

1  the question he might as well answer it for both.

2         *THE COURT:*  Okay.  Thank you.

3         *MR. ELLIS:*  I'll try to do that, Your Honor, and I

4  can give you a straight answer as to ReBrook:  No.  I'm always

5  happy to be in a position to do that.

6         With regard to Mr. Bryan, it's a little more complicated.

7  In the briefing we talked some about the gratuities, and they

8  relate to Count Three, the gratuities that Mr. Bryan received

9  there.  There is some authority for the idea that gratuities

10  may constitute kickbacks and therefore be actionable and

11  survive *Skilling*.  At this juncture -- and, you know, Your

12  Honor, I've looked at this over some time now.  At this

13  juncture, I believe that the better theory for upholding

14  Count Three is that it can be upheld under a *Carpenter* theory.

15  And, you know, I want to -- you know, I want to leave it just

16  like that with the court.  There is some support for the idea

17  that gratuities might constitute kickbacks.  At this point, it

18  is not the Government's position that that is the better means

19  for sustaining that count.  I have an argument for sustaining

20  that count, but that probably goes afield from what the court

21  is looking at right now.

22         *THE COURT:*  Well, thank you.  That was helpful.

23         Now, as far as -- Mr. Simmons, did you want to respond as

24  far as standards of review or procedural default?

25         *MR. SIMMONS:*  Judge, I was taking a lot of notes

1   there.  Maybe when we're finished we can -- I think a lot of

2   issues are raised that strike me as things that we probably

3   ought to brief, but I don't really have anything substantively

4   to add.  I think we have both argued our positions in the

5   briefs as well.

6            *THE COURT:*  All right.  Well, if you want, we can

7   take a few minutes at the end of this argument for counsel to

8   review their notes and to decide what it is, if anything,

9   additional that they want to say or write.

10       So it sounds to me like we're now ready for a discussion

11  of the evidence.  Is that correct, Mr. Neely?  Is that what

12  you're rising to do?

13           *MR. NEELY:*  Yes.  Yes, Your Honor.  I want to address

14  the fact that these men are absolutely, totally and completely

15  innocent.  Factually, procedurally, legally, they are innocent.

16  And they have been very, very badly hurt by this whole

17  experience.  These are upper middle class people.  These are

18  not drug dealing gangbangers who go in and out of various

19  facilities.  And these are not people who live, you know, close

20  to the edge all the time, like a lot of lying, cheating,

21  thieving brokers or dealers or dealmakers.  These people were

22  honest government workers trying to make West Virginia a better

23  place.

24       Now, government brings to mind Hart Crane's great line

25  from a poem called Lachrymae Christi, which is:  "There is the

1    world dimensional for those untwisted by the love of things

2    irreconcilable."

3         Government inherently has things irreconcilable.  Members

4    of the Legislature have got to make policy about the interests

5    of people who contribute to their political campaigns.  Judges

6    who run for office in West Virginia have got to decide cases

7    that affect people who may very well be campaign contributors.

8    People have got to, in the judiciary at least, look at cases

9    and try and arrive at the right decision, often circumventing a

10   lot of procedural niceties that are going to cause some axe

11   murderer to be released onto an unsuspecting world where he

12   will undoubtedly do it again.  And I speak here from personal

13   experience.

14        What concerns me in this case is that these folks are

15   being prosecuted under an area of law that is extremely vague

16   and indeterminate.  Now, that's what the *McNally* case and the

17   *Skilling* case are really about.  The *McNally* and the *Skilling*

18   cases are about the problem of trying to narrow something that

19   is almost limitless in its possibilities for prosecution, and

20   I quoted in my brief the example that Judge Easterbrook gave,

21   who is equally concerned, that "A" invites "B" to a party; "B"

22   gets dressed up, rents a tuxedo, drives his car to the place

23   where the party is to be held, and it turns out to be a vacant

24   lot.  "B" is the victim of a practical joke.  Judge Easterbrook

25   points out that conceivably you could prosecute "A," the

1  perpetrator of the joke for mail fraud.  The invitation was

2  delivered through the mail; "B" spent money and was deprived of

3  property and he relied to his detriment, and so this was a

4  scheme or artifice to defraud.  It isn't even a state

5  misdemeanor.

6      The mail fraud statute is itself a very, very slippery

7  piece of judicial equipment.  Now, it may be that out there in

8  the urban areas you have folks who come up with highly

9  imaginative schemes to do people real damage.  Maybe that's why

10  the courts have been as careless as they've been on setting the

11  real standard of scheme or artifice to defraud.  But both

12  *McNally* and *Skilling* are attempts to narrow something that is

13  otherwise indeterminate.

14      The same thing, I would point out, is true of the insider

15  trading prosecution.  Now, I don't pretend to be a federal

16  criminal lawyer, but I am a securities lawyer, and most of the

17  insider trading law under misappropriation theory has been

18  developed by Judge Ralph Winter on the Second Circuit who has

19  developed it as *ex post facto* law.  All of these new rules

20  applied to people in criminal prosecutions, and they had no

21  advance knowledge.

22      Now, there are a lot of us who are really seriously

23  concerned about the generation of judges making *ex post facto*

24  law, particularly -- particularly in the face of the

25  constitutional prohibition against *ex post facto* law.  Now,

1   this may be, as you know, far afield.  You seem to look a

2   little bit either bored or incredulous, but it's important to

3   see that in this context:  A lot was going on in this case that

4   doesn't immediately spring off the page.  For example, not only

5   was I outraged at this prosecution, but the editors of the

6   West Virginia Law Review were equally outraged at the

7   prosecution.  I wrote an article, which is attached to the

8   petition, called "Insider Trading Under the Misappropriation

9   Theory:  New York's Joke on Heartland America," in which I

10  raised all of these issues of indeterminacy and of the fact

11  that they were using *ex post facto* law to prosecute two people

12  who hadn't really done anything wrong.  That article was set up

13  and typed by the West Virginia University Law Review and was

14  sent before the publication of the Law Review; and it, by the

15  way, had been reviewed by Professor Maxey, who is -- or was at

16  the time, unfortunately, she is dead now, but she was at the

17  time WVU's expert on securities law and certain types of

18  corporate law.  So it was a peer review article that the Law

19  Review editor sent to every judge of the Fourth Circuit in

20  advance of the publication.  That article was ordered removed

21  from the West Virginia Law Review by the President of the

22  University.  And I know that because the dean, the dean at the

23  time - who I believe was Dean Foster - mistakenly sent me on my

24  fax number at the Supreme Court the letter that she had sent

25  back to the President of the University saying, "I followed

1   your instructions and ordered the Law Review to remove this

2   article."  And if you go into the West Virginia Law Review, you

3   will see that the pagination omits this article, and there is a

4   note that this article was removed because of an editorial

5   dispute.  There wasn't any editorial dispute.  The article was

6   removed at the insistence of the President of the University,

7   and I'm sure that the prosecutorial authorities in these cases

8   had something to do with that.

9        Now, let me get to Mr. Bryan's case.  Mr. Bryan's case was

10  predicated on the securities fraud theory, the misappropriation

11  theory, and honest services.  There was no instruction, there

12  was no argument, there was nothing on property.  It was all

13  honest services.  Judge Haden's -- Judge Haden's instruction

14  specifically said "honest services."  And it's in the brief,

15  but I'll quote it here just so you know that this is the only

16  theory under which he was convicted.

17       "In both statutes I've spoken of a scheme or

18       artifice.  The word 'scheme and artifice' as used

19       in the mail fraud and wire fraud statutes includes

20       any plan or course of action intended to deceive

21       others and to obtain by false or fraudulent

22       pretenses money or property from the person or

23       organization so deceived.  For the purposes of

24       both mail fraud and wire fraud statutes, the term

25       'scheme or artifice to defraud' includes a scheme

1          or artifice to deprive another of the untangible

2          right of honest services."

3      If you look at the closing argument by Mr. Ellis and by

4  Mr. Miller, they only spoke about honest services.  There was

5  no mention of any kind of property defrauding.  There was no

6  mention of any -- anything else other than honest services; so

7  there is no question that what Mr. Bryan was convicted of was

8  deprivation of honest services.

9      It's a slam dunk.  If it wasn't a crime, what's the issue

10 of innocence?  If it wasn't a crime, then you're obviously

11 innocent, you know.  You can't just -- I don't care what the

12 standard of review is, you can't just look at the guy and say,

13 "You're a no-good son of a bitch, so you're convicted, and we

14 don't care whether it's a crime or not."  That's essentially

15 what Mr. Ellis is arguing.  Mr. Ellis is arguing that you have

16 to look at the guy, and if he's a bad guy, then drop -- pull

17 the trapdoor and let him drop down, you know, into the pit.

18 That's not right.

19     Factually, government does not fall into neat boxes.  When

20 Mr. Bryan -- and Mr. Bryan tried to testify to all of this.  If

21 you look -- if you look at the interruptions of Mr. Bryan and

22 the court's ruling you will see fabulous hostility on the part

23 of the court.  There were objections made that no reasonable

24 judge would have sustained.  Also, no reasonable judge would

25 have allowed the prosecution to keep the defendant from getting

1  his side of the story out in some kind of an articulate

2  fashion.   This was a rigged deal, Your Honor, as far as I'm

3  concerned.   And I've read the record carefully, and I watched

4  the trials when they were going on, and I was sufficiently

5  concerned at the time to take a lot of time and effort to write

6  a West Virginia University Law Review article.

7       These -- if you now look, there is one problem with

8  Mr. Bryan's case.   Mr. Bryan was also convicted of making a

9  false statement before the grand jury.   There were seven

10 volumes of transcript in this case of which, I think Mr. Ellis

11 will agree, 6.9 volumes were devoted to evidence about wire

12 fraud and mail fraud and insider trading, and virtually no

13 evidence directly aimed at improper testimony before the grand

14 jury.   The lying before the grand jury, or the perjury count,

15 was a throwaway count.   It's one of those counts that you put

16 into an indictment to put pressure on the defendant to make a

17 deal, you know.   If you can possibly throw in lying to the FBI

18 or lying to the grand jury, whatever it is, it's a very

19 traditional sort of count to have in an indictment.

20      Even the Fourth Circuit in its opinion was reluctant to

21 affirm the perjury conviction.   What the Fourth Circuit said

22 was: those questions that they're relying on weren't very well

23 framed.   What they were trying to get Mr. Bryan to say was that

24 the company that got the lottery contract -- the company that

25 got the lottery contract had something to do with the drafting

1    of the RFP, the Request for Proposal.

2            *THE COURT:*  I've read your materials.  I'm very

3    familiar with your argument.

4            *MR. NEELY:*  Okay.  So you know about that argument?

5            *THE COURT:*  Yes, I do.

6            *MR. NEELY:*  Okay.  Well, my real -- the gist of this

7    is that Rule 402 provides that relevant evidence should be

8    admitted; irrelevant evidence should be kept out.  There were

9    6.9 volumes of irrelevant evidence and prejudicial evidence in

10   this case, and no matter whether you use a harmless error,

11   harmless beyond a reasonable doubt, no matter what standard of

12   review you use, unless the standard of review is "let's screw

13   the guy just because we don't like him," but if the standard

14   of review is harmless beyond a reasonable doubt, or harmless,

15   or probably harmless, or might be harmless, or could in our

16   wildest dreams be harmless -- even under a "could in our

17   wildest dreams be harmless," when you put in 6.9 volumes of 7

18   volumes of transcript of irrelevant, highly prejudicial

19   evidence, you can't say that that perjury conviction wasn't

20   based upon the irrelevant, prejudicial, biased evidence that

21   was put in against Mr. Bryan.

22       Now, just finally factually, if you look at what these

23   folks said they did, they made a close-call decision whether to

24   give one advertising agency or another advertising agency a

25   government contract.  The bids were very similar; the programs

1    were very similar; but the Fahlgren Martin Agency had a track
2    record of actually doing a good job for the lottery and every
3    month proceeds from the lottery was going up.  So Mr. Bryan
4    decides, well, you know, let's -- if it ain't broke, let's
5    don't fix -- you know, don't fix it.
6          The second thing was that they were accused of somehow
7    using inside information to buy stock in a company thinking
8    that it might get some sort of a contract.  In the end, I'm not
9    so sure that they got the contract.  I can't remember.  But if
10   you look at the *O'Hagan* case, the *O'Hagan* case was actually
11   mischaracterized and was probably prosecuted and tried by
12   people out of one of those square states in the west - it
13   didn't come out of New York - who didn't know what they were
14   doing.  The *O'Hagan* case is a classic insider trading case.
15   Here is what happened in the *O'Hagan* case:  O'Hagan was a
16   lawyer in a law firm.  The law firm represented company "Y."
17   Company "Y" was planning on acquiring company "X."  All right.
18   O'Hagan was not involved in the merger or acquisition, but he
19   was a partner in the firm.  He went out and bought stock in
20   company "X."  Now, that's classic insider trading.  Anytime --
21   and because as a lawyer in the firm that was representing the
22   client, he was in exactly the same position as the president of
23   company "Y."  Right?  He was an insider.  He was a corporate
24   insider.  He had corporate inside information.  The rule is
25   Black Letter Law, and it has been since the 1960's.  Right?  If

1  you're a corporate insider, you either disclose inside

2  information or you refrain from trading.  There wasn't anything

3  novel about the *O'Hagan* case.  The novelty was simply in the

4  clowns who were sitting there writing about how this is somehow

5  the misappropriation theory.  This isn't the misappropriation

6  theory such as it would have been under *Carpenter* or any --

7  under some of the cases that Ralph Winter wrote in the Second

8  Circuit.  This was just classic insider trading.  So the notion

9  that somehow *O'Hagan* brings all these things back into being

10 relevant and actionable is nonsense.  Right?

11       Because there wasn't anywhere close -- these people

12 weren't insiders.  They weren't working for a company that they

13 had an obligation to disclose or to refrain from trading,

14 because there weren't any stockholders.  If they disclosed,

15 there wasn't anybody to benefit from it.  Who would have

16 benefited from hey, VLC is going to get a corporate contract,

17 possibly.  Who is going to make money?  Nobody.  No citizens of

18 West Virginia standing around:  Who is going to get this

19 contract or that contract?  There are no stockholders.  There

20 is nobody being injured.

21       Finally, I would point out everybody trades on information

22 that he learns in his own industry.  My son is a surgeon.  He

23 called me about a year ago and said, "There is a machine down

24 here at CAMC that is the wave of the future.  It's called the

25 da Vinci machine.  It is the slickest thing since sliced bread.

1  It does surgery better than any human can actually do it.  It
2  is more precise.  You got to buy some of this."
3      So I looked at it.  It's -- I can't remember -- the
4  machine is the da Vinci machine; I can't remember the name of
5  the company, something surgical.  Anyway, the stock was at a
6  hundred seventy-five dollars a share.  I thought that's kind of
7  pricey, but I bought a couple hundred shares based upon the
8  information that I received from my son.  Right?  And the stock
9  went to -- it's now $324 a share.  I got out long before that,
10  but you trade on information that you get -- that you get
11  because you're involved in an industry.  I mean, I have clients
12  who are oil and gas producers, so if somebody wanted to sell me
13  a bunch of land from the Marcellus shale area and didn't know
14  what it was worth, I'd buy it.  You know about these things.
15      These folks weren't out -- they only bought a couple
16  hundred shares.  It wasn't as if they were *O'Hagan* making
17  $10 million.  These people were buying nothing.  Right?  They
18  weren't doing anything wrong.  Nothing that they did even
19  amounted to a state misdemeanor.  Nothing.  These people are
20  absolutely, completely, and totally innocent.
21      And, by the way, just to give you an example of how hard
22  it is on these people and how much they suffer, Mr. ReBrook's
23  son is a West Point first lieutenant who was shot up in Iraq
24  and invalided out of the Army.  He had three miserable years at
25  George Washington High School because people would make

1    comments and be snide and generally - people you wouldn't

2    expect - reprehensible.

3         Mr. Bryan is up there in a small community in Philippi.

4    He is 76 years old, Your Honor, and he has to always bear the

5    shame of being a federal felon.  All right.

6         Mr. ReBrook's son will have to go through life as the son

7    of a federal felon, and that always comes up where people

8    whisper about it, people say in the field club -- or the

9    country club.  These are real serious consequences imposed on

10   people who were trying to make West Virginia -- trying to raise

11   money for West Virginia, trying to follow the instructions of

12   the Governor of West Virginia.  One of the reasons that

13   Mr. Bryan tried to give the contract to this VLC, the company

14   involved, was that they had offered to build a factory in

15   Barbour County, Barbour County being one of the welfare

16   capitols of the world.  Barbour County and Tyler County are

17   among the poorest counties in the state.  There are few worse.

18   But anytime you can make government work, you try and do it.

19   If you can bring in 25 or 30 union high-paying jobs, why not?

20        So my position on this case is that 402 -- Rule 402

21   absolutely says that the evidence that was put in in support

22   of the perjury conviction was irrelevant and prejudicial and

23   should not have been admitted.  All right.  Six-point-nine

24   volumes of transcript out of seven volumes.

25              *THE COURT:*  You said perjury.  You meant honest

1    services?

2            *MR. NEELY:*  No.  Perjury.  There are three

3    convictions with Mr. Bryan.

4            *THE COURT:*  Right.

5            *MR. NEELY:*  One was overturned by the Fourth

6    Circuit.  That was the insider trading.  The second was

7    mail-fraud/wire-fraud.  I guess that's two counts.  And the

8    third was lying to the grand jury.  It's the lying to the

9    grand jury count that if it had been argued separately, if he

10   had only been prosecuted for lying to the grand jury, he would

11   have gotten off.  Right?  Because if the State -- if the

12   Government had really been asking did VLC, the company that was

13   manufacturing -- did they -- did they have something to do with

14   the proposal?  Right?  If they'd asked the question that way,

15   he would have answered it.  The Fourth Circuit said so.  The

16   only reason they affirmed it was because they didn't want to

17   fool around trying to make some distinction and screw the law

18   up as to what the standard of review was, et cetera.  But you

19   can tell from the written opinion of the Fourth Circuit that

20   they thought the evidence for the perjury count was very, very

21   weak.  Well, if the Fourth Circuit themselves believes that the

22   evidence for the perjury count is real weak, and now we find

23   out that the whole trial, 6.9 volumes out of 7, were devoted to

24   prosecuting this guy for two crimes that didn't exist, how can

25   you say that that isn't prejudicial?  How can you say that

1  that -- but for all of that evidence, he would never have been

2  convicted of perjury?

3          *THE COURT:*  Thank you, Mr. Neely.

4      And the Government's response?  Basically the evidence.

5          *MR. ELLIS:*  Yes, Your Honor.  I'll try to respond to

6  I think three ideas.  The first idea is the response to the

7  sufficiency of the evidence, I believe; the second is a

8  response to the argument about the securities fraud charge and

9  then the third has to do with the perjury case.  The allegation

10 that this case was never put before the jury as a property

11 fraud is just wrong.  It was clearly in the indictment.  The

12 language charging the property theory in the indictment I

13 would venture to say is stronger than most property fraud

14 language that's included in indictments in alternative

15 theories and have been upheld in alternative theory cases.

16     We mentioned the property theory in both opening statement

17 and in closing argument.  I'm not going to quote that.  It's in

18 the brief.  I don't want to belabor that.  But we never hid the

19 ball on the property theory.  Your Honor, restitution was

20 ordered.  The victims in both of these frauds were ordered

21 money restitution.  I mean, that's in the record.  I don't

22 believe there was even an objection to it at the time, but

23 Count One and Count Two, money damages were awarded.  And that

24 relates to Mr. Bryan.

25     And, again, with regard to the sufficiency of the

1    evidence, you know, I can't honestly say to you right now that

2    I have a standard for sufficiency of the evidence under a coram

3    nobis review, but it's got to be very restricted.  I mean, on

4    Rule 29, as Your Honor well knows, the standard is very liberal

5    to the Government.  Post-trial, it's even more liberal, you

6    know.  The evidence is considered in the light most favorable

7    to the Government; you know, could any reasonable jury have

8    returned a verdict on this?  There's nothing in the record that

9    suggests that this jury was anything other than reasonable,

10   and they didn't have any trouble returning verdicts on this

11   evidence.  There is no reason to question their analysis in

12   weighing and sifting of the evidence.

13         With regard to the -- with regard to the -- and the last

14   two portions of my argument really go together.  With regard

15   to the perjury, the false statement count, as I follow it,

16   Mr. Neely's argument is that all of the evidence that came in

17   under the securities fraud theory that we used, the

18   misappropriation theory, none of that should have come in

19   because that theory was invalid and, therefore, all of that

20   evidence was out there and the mail fraud evidence and the

21   securities fraud evidence shouldn't have been before the jury

22   at all.

23         And what is so obvious is that *O'Hagan* absolutely,

24   unquestionably, speaks to this case.  There is no question

25   legally -- there can be no question legally as to whether or

1   not the *O'Hagan* case speaks to the *Bryan* case, and I'll tell

2   you why.  It says it in the opinion.  There is no ambiguity in

3   the Supreme Court's opinion about whether what they are doing

4   in *O'Hagan* relates to the *Bryan* case, because they say

5   specifically -- they name this case.  They say that the rule

6   that was applied by the Fourth Circuit in *Bryan* is abrogated.

7   And if you look at the *Bryan* case on Westlaw, there is a red

8   flag there for that reason.  So the fact of the matter is that

9   the Supreme Court has said that the Government's theory, the

10  misappropriation theory for the securities fraud case, was

11  valid.

12       Now, when you take that -- when you take that -- when you

13  take that in together with what the Fourth Circuit said about

14  it in their opinion, you know, they said, oh, you know, if we

15  apply the misappropriation theory, clearly Bryan is guilty of

16  it under these facts; we just reject it.  So you have the

17  Fourth Circuit saying he's guilty of it, if it's valid; and

18  then you have the Supreme Court coming along and saying, it's

19  valid.  So not to reinstate that count, Your Honor, but simply

20  to say that all of the evidence in the trial that related to

21  that count is before the jury under a proper, legally viable

22  theory.  There is no prejudice there.

23       The idea -- and I believe this was in both briefs -- the

24  idea that because the Fourth Circuit reversed the

25  misappropriation theory that it wasn't illegal for a while

1  until the Supreme Court corrected the Fourth Circuit?  That's

2  just -- that's not right.  The fact of the matter is, and the

3  proper legal analysis is, it was always against the law; the

4  Fourth Circuit was just wrong about it for a little while.

5        So all the evidence that came in on those counts -- on

6  that count is properly before the jury.  There is no unfair

7  prejudice.  There is no unfair loading up of the evidence.

8  If -- if -- if Mr. Bryan wanted to prevail on an argument on

9  this, I don't think he could do it this way, but he certainly

10 would have had to make the objection at trial.  He certainly

11 would have had to argue it on appeal.  He couldn't argue this

12 now if this case was on direct appeal, because he didn't make

13 it below.  Much further, he can't make it now on coram nobis

14 where the standards and the scope are higher and more limited.

15       That's all, Your Honor.

16            *MR. NEELY:*  Your Honor, I just want to point one

17 thing out.  What the indictment says, and what the opening

18 statement says, are not important when the instruction points

19 out honest services and the entire closing argument focused on

20 honest services.  There was not one mention in the closing

21 argument by either the Government or Mr. Bryan's counsel of any

22 kind of a property theory.  So we know, just as sure as God

23 made little green apples, that when the jury convicted, they

24 convicted on the basis of the honest services part -- count in

25 the indictment; that it was the honest services that the judge

1  focused on, the Government focused on, the defense focused on,

2  and unless this is the strangest jury since time out of mind,

3  that's what the jury focused on.

4          *THE COURT:*   Thank you.   Did you have something

5  further, Mr. Simmons?

6          *MR. SIMMONS:*   Judge, I've been going through my notes

7  and it occurred to me, I sort of have outlined -- certainly, I

8  will defer to the court, but I've identified some things that

9  it seems to me that it would -- I hope it would benefit the

10 court if we would brief, because it seems we have had a lot of

11 discussion about it.   The first part will be what I would just

12 call the standard, and between the court and the Government and

13 myself, *Brecht*, *Bousley*, *Trenkler*, *Spelling*, *O'Neal* and *Neder*,

14 so *Brecht*, *Bousley*, *Trenkler, Spelling*, *O'Neal* and *Neder* have

15 all been cited, and, of course, I cited the cases in my own

16 brief.   It seems to me that that would be of some benefit,

17 because depending on which standard applies, it seems it

18 impacts the way you analyze the coram nobis petition; so it

19 seems to me that that would be one area to brief.

20     One issue that's come up that really didn't hit me before,

21 because I didn't realize that the Government was really wanting

22 to do this, but a very specific issue would be:   Can the

23 Government rely on the security fraud convictions in both cases

24 which were set aside by the Fourth Circuit to deny coram nobis

25 relief?   It is an unusual circumstance, I agree.   I don't

1  disagree with that.  So that seems to me -- I never anticipated

2  that they were really going there, but I think that's worth

3  briefing.

4      And it seems like the next two questions that I have are

5  related.  The first one would be at the trial -- both trials,

6  did the Government actually proceed on a property theory?  And

7  related to that analysis would be, even if the Government

8  didn't proceed on a property theory, can coram nobis relief be

9  denied?  It seemed like one of the standards that was being

10 discussed about, well, it isn't necessarily the jury back then,

11 it's a rational jury, so, in other words, can we sort of after

12 the fact say, well, you know, if the Government had gone on the

13 property theory these folks would have been convicted, even if

14 that wasn't the theory at trial?  So those two seem to be

15 related.

16     And the final note I have, because I thought it was a very

17 good question, the one you threw at me, is -- and this may be

18 more academic and a side issue, but it may have an impact on

19 the way we argue the case, is:  Would *Mandel* survive the

20 *Skilling* decision?  You know, what if *Skilling* had been the law

21 at the time of *Mandel*?

22     And I think some of these things are interrelated.  So

23 those are the ones I had in my note, Judge.  These are things

24 that I certainly think I would like to brief for the court just

25 to make sure we kind of flesh this thing out a little more

1  thoroughly.

2          *MR. NEELY:*  Your Honor, may I make a quick motion --

3  oral motion?  Mr. Bryan is 76 years old and suffers from a

4  fairly serious heart condition.  Could I move that the court

5  try and expedite this decision, because it would be very nice

6  if it happened, you know -- I'm not being ironic, but happened

7  within his lifetime.

8          *THE COURT:*  I will do the very best I can.  I take

9  these cases very seriously and I know this is going to be an

10  awful lot of work and a long document.

11      The way -- just stating the issues presented by these

12  cases has been an exercise in substantially difficult legal

13  research, and I believe that the attorneys have opinions or

14  positions that are pretty consistent with what the court has

15  come up with, so that the first issue is, because it's habeas

16  corpus, basically, that the court is required to determine if

17  there is procedural default because that has an effect on

18  subsequent standards of review.  And Mr. Bryan is not subject

19  to procedural default, other than on the perjury count, and

20  Mr. ReBrook is subject to procedural default.  So if you take

21  Mr. ReBrook's case, you -- it appears to me he can't show cause

22  and actual prejudice so, therefore, you're kicked into actual

23  innocence and *Bousley*.  And so *Bousley* says that actual

24  innocence means factual innocence, not legal insufficiency, and

25  includes uncharged conduct.  So clearly right here we have the

1  interjection of the securities violation evidence, which I

2  think Mr. Simmons has pointed out; it's not uncharged conduct,

3  it was charged conduct which got reversed, of course, and then

4  never reinstated, though abrogated.  So that's the way I see

5  Mr. ReBrook's case going.

6      Now, as to Mr. Bryan, and assuming that there are

7  alternative theories of the prosecution, then -- and while the

8  United States has not completely thrown out the suggestion of

9  bribes or kickbacks as to Mr. Bryan, they're getting close to

10  it.  So if we have alternative theories, then we go to -- and,

11  of course, based on *Skilling*, we have honest services theory

12  being invalid and constituting error.  Then there has to be

13  the analysis of whether that the error had a substantial and

14  injurious effect or influence in determining the verdict.

15  That's the *Hedgpeth, Brecht, Neder*.  But that assumes that

16  coram nobis has basically the same standard of review as you

17  would have on any other kind of collateral attack.

18      Then the *Mandel* decision sets forth criteria for coram

19  nobis.  I don't think there is much argument -- I haven't heard

20  any argument that these petitioners don't meet those criteria.

21  I think just the inability to bear arms probably is sufficient

22  prejudice; and they have discharged their sentences and all the

23  other criteria.

24      So that's basically where I am.  If there is procedural

25  default and you've got to do the actual innocence, then that

1   would include the perjury.  If there is not procedural default,

2   then it's the harmless error, which according to *O'Neal* can be

3   alternatively stated as so evenly balanced that a conscientious

4   judge is in grave doubt.  As opposed to a quickwitted judge or

5   a dimwitted judge - a conscientious judge.  That's what I try

6   to be.

7        Now, it seems to me that it certainly benefits the

8   petitioners if we basically say that coram nobis review is

9   going to be at the same level as any other collateral attack,

10  plus the four criteria.  I don't see that as making a material

11  difference in the outcome of this case, and so I don't see the

12  need to go that far and start erecting ever higher barriers.

13  Somehow walls don't seem to work anyway.  So that's where I am.

14       And the attorneys need to work out what of the underlying

15  criminal cases need to be put into the record of this case.

16  It certainly seems the joint appendix is the logical place to

17  start.  The question then becomes whether anything else needs

18  to be added.

19       And I don't think it's going to make a significant

20  difference if we have the briefs -- the Fourth Circuit briefs

21  that I asked about or the petitions for a writ of certiorari,

22  but the fact is I would like in the proposed findings and

23  recommendation to be able to quote them exactly, and so that's

24  why I asked for those.

25       If anybody thinks that I shouldn't be working on this

 1  case, please tell me before I do any more work on it, so, you

 2  know --

 3          MR. ELLIS:  Your Honor, the Government has no problem

 4  with you staying on the case.  In fact, what you said about the

 5  investigation, I was there at the time, too, and that comports

 6  with my memory as well.

 7          THE COURT:  It's mostly the petitioners who have --

 8          MR. SIMMONS:  No objection.

 9          MR. NEELY:  We have known of your background from the

10  very beginning and we have no -- no reason to object to your

11  sitting on the case.

12          THE COURT:  I guess I can't get out of it, then.

13          (Laughter.)

14          MR. NEELY:  We could change our opinion, if that

15  would help.

16          THE COURT:  All right.  Well, if anybody has a

17  chainsaw, I'm in the market for one of those, as you may have

18  heard.

19      Is there anything further to be brought before the court

20  at this time?

21          MR. SIMMONS:  Do you want a briefing schedule?

22          THE COURT:  Yeah, I do, and I'm just wondering how

23  much time you think you need.

24          MR. SIMMONS:  Judge, I think I could do our brief in

25  two weeks.

1      MR. ELLIS:  Judge, I would like to have two weeks to

2  respond.

3      THE COURT:  All right.  Now, let's see.

4      MR. NEELY:  But --

5      THE COURT:  Hold on just a minute.

6      MR. NEELY:  Would it be convenient, Judge, if

7  Mr. Simmons and I did a joint brief, since the issue is common

8  to both cases?

9      THE COURT:  Sure.

10     MR. NEELY:  Okay.

11     THE COURT:  Let's see.  Here we are on the 6th, so

12  Mr. Simmons, how about Friday, the 22nd?

13     MR. SIMMONS:  Yes, that will be fine, Judge.

14     THE COURT:  Now, so that would mean for the

15  Government it is Monday, May 16th.

16     MR. ELLIS:  Thank you, Your Honor.

17     THE COURT:  And for the petitioners' reply it would

18  be Thursday, May 26th.

19     MR. NEELY:  Thursday, May 26th?

20     THE COURT:  Right.  Now, if somebody feels an

21  overpowering urge to have another round of oral argument, I

22  suppose we could do it sometime like June 1st or 2nd, but my

23  guess is that we probably won't need that.

24     Anything else?

25     MR. NEELY:  You say the 1st or the 2nd would be good

```
 1   for oral argument?
 2              THE COURT:  Uh-huh, if you have to have it.
 3              MR. NEELY:  Should -- would you like to -- let's
 4   reserve one of those days, if it works for everybody, now.
 5   Does it work for you, Judge?
 6              THE COURT:  Yes; it has to be the 2nd.
 7              MR. NEELY:  The 2nd.  Okay.  We'll just put down the
 8   date's reserved.
 9              THE COURT:  June 2nd, 10 a.m.
10        Is that open, Tabitha?
11              COURTROOM DEPUTY CLERK:  Yes, ma'am.
12              THE COURT:  And we'll just put that it's tentative.
13   Anything else?
14              MR. SIMMONS:  No, Judge.
15              MR. ELLIS:  No, Your Honor.
16              THE COURT:  Thank you very much.
17              MR. SIMMONS:  Thank you, Judge.
18              MR. NEELY:  Thank you, Your Honor.
19           (Proceeding adjourned at 10:41 a.m., April 6, 2011.)
20
21
22
23
24
25
```

CERTIFICATION:

     I, Teresa L. Harvey, Registered Diplomate Reporter,
certify that the foregoing is a correct transcript from the
record of proceedings in the matters of William Edward
ReBrook, III, Petitioner v. United States of America,
Respondent, Civil Action No. 2:10-cv-01009 and Elton E. Bryan,
Petitioner v. United States of America, Respondent, Civil
Action No. 2:10-cv-01196, as reported on April 6, 2011.


s/ Teresa L. Harvey, RDR, CRR            April 20, 2011