IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

ELTON E. BRYAN,

      Petitioner,

v.                                        Case No. 2:10-cv-01196

UNITED STATES OF AMERICA,

      Respondent.


**PROPOSED FINDINGS AND RECOMMENDATION**

Introduction

Currently pending before the Court is a Petition for a Writ of Error Coram Nobis, filed October 6, 2010.  (ECF No. 112.) Petitioner asserts that his prior convictions for mail fraud, wire fraud and perjury must be set aside because the Supreme Court in Skilling v. United States, 103 S. Ct. 2896 (2010), declared that fraudulent deprivations of "the intangible right of honest services," are properly confined to cover only bribery and kickback schemes.  Because Petitioner's misconduct entailed neither bribe nor kickback, he argues that it does not fall within the proscription set forth in 18 U.S.C. § 1346.  The United States has responded (ECF No. 124), and Petitioner has replied (ECF No. 126). On April 6, 2011, the Court conducted a hearing on the Petition. Thereafter, the court permitted additional briefing on the standards of review that govern this coram nobis proceeding.

Petitioner filed a brief (ECF No. 131), the United States responded (ECF No. 134), and Petitioner replied (ECF No. 135).

Procedural Background

On April 23, 1993, a federal grand jury returned a five-count indictment against Petitioner charging him with (1) mail fraud involving an advertising contract in violation of 18 U.S.C. §§ 1341 and 1346; (2) mail fraud involving a video lottery contract in violation of 18 U.S.C. § 1341 and 1346; (3) wire fraud/insider trading in violation of 18 U.S.C. § 1343; (4) insider trading in violation of 15 U.S.C. § 78j(b) and 78ff; and (5) perjury before a grand jury in violation of 18 U.S.C. § 1623.  United States v. Bryan, No. 2:93-cr-00089 (S.D. W. Va. # 1).[1]  Following a jury trial conducted September 14-24, 1993, the jury convicted Petitioner on all five counts.  (## 54, 73-78.)  Petitioner filed a post-trial motion for judgment of acquittal, which was denied. (# 62.)  On February 7, 1994, the Honorable Charles H. Haden, II, United States District Judge for the Southern District of West Virginia, sentenced Petitioner to serve fifty-one months in prison on each count, with the sentences to run concurrently, followed by a three year term of supervised release.  He was ordered to pay a

---

[1]   The docket sheet of the criminal case is not an electronic file.  In this Proposed Findings and Recommendation, references to the documents in the criminal case will be designated "# ___;" references to documents in the instant case will be designated "ECF No. ___."  There is one exception. Trial testimony on Tuesday, September 21, 1993, is not part of the original criminal court file.  The court located this transcript and directed that it be docketed in the criminal case.  As a result, it is referenced by its ECF Number in the criminal case, "ECF Number 119 (criminal)."

special assessment of $250.00, and $120,000.00 in restitution ($60,000 to the Arnold Agency and $60,000 to International Gaming Technology). (# 63.)[2] Judge Haden declined to impose a fine. (# 79, pp. 27-28.) Petitioner has discharged his sentence and paid all fines and restitution. (# 91.)

Petitioner filed a notice of appeal. (# 66.) The United States Court of Appeals for the Fourth Circuit affirmed most of the convictions, but reversed the conviction for securities fraud under the misappropriation theory. United States v. Bryan, 58 F.3d 933 (4th Cir. 1995). Judge Haden determined that the reversal of the securities fraud count had no impact on the appropriate guideline calculations previously used for sentencing nor on the judgment of restitution imposed by the court, though he did order the return of a $50.00 special assessment. (# 100, pp. 2-3.) In United States v. O'Hagan, 521 U.S. 642, 649-650 (1997), the Supreme Court expressly abrogated Bryan, and held the misappropriation theory under 15 U.S.C. § 10(b) is viable. However, the United States took no further action against Petitioner related to the securities fraud charge.

Factual Background

The facts underlying Petitioner's offense conduct, as found by

---

[2]   Judge Haden stated that "a full award of restitution would be inappropriate based solely on the allegations of losses by the victims as set forth in the presentence investigation report. Civil litigation pending in Kanawha County Circuit Court further addresses the issue of restitution." (# 63, p. 5.)

the Fourth Circuit on Petitioner's direct appeal, are that Petitioner, Elton "Butch" Bryan, became Director of the West Virginia Lottery Commission ("Lottery Commission") in 1990, when he was appointed by then governor Gaston Caperton.  The Fourth Circuit found as follows:

> As Lottery Director, Bryan was charged with negotiating and securing contracts on behalf of the Lottery. In January 1991, with its existing advertising contract due to expire that summer, the Lottery began the selection process for its award of a $2.8 million advertising contract. Although the Lottery previously had relied on subcontractors to secure the Lottery's advertising services, it was decided in 1991 that the Lottery would contract with the new advertising agency directly and that the forthcoming contract would be awarded through an open bidding process.
>
> Bryan assigned responsibility for the selection process to Tamara Gunnoe, the Lottery's Deputy Director of Marketing. Gunnoe in turn formed a seven-member evaluation committee, which included five Lottery employees and two advertising consultants, to review presentations made by agencies bidding on the contract. In early April 1991, six agencies made presentations before the evaluation committee in formal one-hour sessions. The committee members scored each presentation on a numerical evaluation sheet designed to rate the merits of the presentations. Among the companies bidding for the $2.8 million contract was the Fahlgren Martin Agency, the agency that had provided the Lottery's advertising services under the expiring contract. Tabulation of the scoresheets, however, revealed that the Arnold Agency had received the committee's highest rating.
>
> After completing the evaluation process, Gunnoe met with Bryan to brief him on the results. She informed Bryan that the Arnold Agency had received the committee's highest rating and that the committee had decided to recommend that the Arnold Agency be awarded the contract. Gunnoe also presented Bryan with a sheet summarizing the results the committee had reached. Bryan advised Ms. Gunnoe that he would have to give the matter further consideration before making any decisions.
>
> After meeting with Gunnoe, Bryan discussed the matter of

the advertising contract with Governor Caperton. Caperton and Bryan decided to award the contract to the Fahlgren Martin Agency, notwithstanding the committee's recommendation of the Arnold Agency. Bryan informed Gunnoe of this decision and directed her to surrender to Edward ReBrook, legal counsel for the Lottery, all of the evaluation committee's forms documenting that the Arnold Agency had received the committee's highest evaluation.

Neither Bryan nor the Governor, however, had unilateral power to award the advertising contract. Rather, the seven-member West Virginia Lottery Commission (the Commission) had to approve the contract before it could officially be awarded. Hearings before the Commission to consider the contract had already been scheduled for April 24, 1991.

Fully aware of the Commission's authority and fully aware that hearings had already been scheduled, Bryan, without the Commission's knowledge or approval, sent letters on April 16 notifying those agencies bidding for the contract that Fahlgren Martin had been awarded the advertising contract. Although he had already notified the interested parties that Fahlgren Martin had been selected, Bryan nonetheless decided to seek the approval of the Commission at the April 24 hearing and to represent to the Commission at the hearing that the selection process was still open.

Deputy Director Gunnoe appeared before the formal session of the Commission on April 24 to testify about the evaluation committee's findings and recommendations. At Bryan's direction, Gunnoe falsely testified to the Commission that the evaluation committee had decided to recommend the Fahlgren Martin Agency for the contract, that the committee had not used a numerical scoring procedure in evaluating the bid proposals, and that there existed no numerical scoresheets reflecting the committee's evaluations. To support her falsified testimony, Gunnoe presented to the Commission altered versions of her notes of the evaluation committee's meetings and characterized those notes as reflective of the committee's deliberations. The Commission voted to adopt the evaluation committee's "recommendation" of Fahlgren Martin on May 29, 1991.

Bryan's scheme to have Fahlgren Martin awarded the contract hit a snag in June 1991, when Harold Curtiss of the Department of Administration's Purchasing Division found Bryan's contract proposal recommending Fahlgren Martin to be deficient. In particular, Curtiss questioned

the absence of any quantitative data to support the
Commission's recommendation. When Curtiss inquired of the
Lottery whether a quantitative analysis had been used in
the evaluation process, he was falsely advised that the
committee had not used a quantitative analysis. Fearing
that Curtiss might persist in challenging the Lottery's
contract proposal, Bryan instructed Gunnoe to have some
of the evaluation committee's members prepare memoranda
falsely evidencing their support for Fahlgren Martin.
Bryan and Gunnoe later met with Curtiss and his
supervisor and continued in their misrepresentation that
the only quantitative data to support the recommendation
were Gunnoe's altered notes, which had earlier been
provided to the Commission.

As a result of Bryan's and Gunnoe's misrepresentations,
the Purchasing Division ultimately approved the proposed
$2.8 million advertising contract, which was signed by
the Lottery and Fahlgren Martin on August 6, 1991. The
Lottery immediately thereafter began sending checks
through the mail pursuant to the terms of the contract.
The mailing of these checks, in conjunction with Bryan's
conduct in manipulating the award of the advertising
contract, served as the basis for Bryan's first mail
fraud conviction.

At about the time Bryan was completing the advertising
contract, he began to investigate the possible expansion
of video lottery gaming throughout West Virginia. "Video
lottery" is the gaming trade name for those lottery games
played by individuals on interactive electronic
terminals. The state-run video lottery industry in West
Virginia was in its infancy in the summer of 1991, with
the only authorized video lottery machines located at
Mountaineer Park, a horse-racing track in Chester, West
Virginia.

In July 1991, high-level members of Governor Caperton's
administration, including Bryan, decided to launch a
statewide expansion of video lottery gaming. The plan
called for the installment of approximately 5,000
machines in race tracks, bars, restaurants, and other
locations throughout the state. Due to the perceived
political unpopularity of expanding video lottery,
however, it was decided in the summer of 1991 that the
implementation of a statewide video lottery system would
not take place until after Governor Caperton's
anticipated re-election in November 1992.

Several video lottery manufacturing companies began
lobbying for a piece of the anticipated video gaming

6

business in July 1991, after they became aware of the proposed expansion of video lottery in West Virginia. One company in particular, Video Lottery Consultants (VLC) of Bozeman, Montana, aggressively sought to maximize its share of the potential West Virginia video lottery market. VLC ultimately gained favor with Governor Caperton in the summer of 1992, when it promised to locate a manufacturing plant in West Virginia in exchange for a statewide monopoly on the sale of video lottery machines. Governor Caperton developed a strong interest in the proposal and ultimately decided that VLC would be granted a "single source" contract, under which VLC would be the exclusive supplier of video lottery gaming terminals in West Virginia.

After Governor Caperton decided upon VLC, Bryan sought to ensure that VLC would receive a single source contract and that West Virginia would receive a manufacturing facility, as per the agreement. In much the same way he rigged the award of the $2.8 million advertising contract, Bryan undertook to ensure that the Lottery Commission would award a single source video lottery contract to VLC. From August 1992 through November 1992, Bryan and William Woodford, the Deputy Director of the Lottery, held a series of meetings with VLC officials to finalize the agreement reached by Governor Caperton and VLC executives earlier that summer.

In August, Bryan and Woodford flew to VLC's headquarters in Bozeman to hammer out details with VLC executives. After returning from Bozeman, Bryan directed Woodford to draft a Request for Proposals (RFP) calling for a single source provider of video lottery technology. At the same time, administration officials assured VLC executives that the RFP would also specifically call for a type of electronic network that only VLC could supply.

Later that same month, a VLC agent flew to West Virginia to inspect several locations in Barbour County, West Virginia, that Bryan had suggested as possible sites for VLC's proposed manufacturing facility. Bryan and Woodford met with VLC representatives again in September, this time in Charleston, West Virginia. Woodford's notes from this meeting were used to draft the RFP for a single source contract that would be submitted to the Lottery Commission. In October 1992, Woodford supplied VLC representatives with an advanced copy of the unpublished RFP.

Governor Caperton was re-elected in the general election of  November 1992, at which time the Caperton

7

administration immediately began to implement the previously undisclosed plan to expand video lottery. The Lottery Commission voted in favor of the expansion on November 30, 1992, and ordered the formation of a subcommittee to investigate the best way to proceed with the expansion. Despite the Commission's decision to form an investigatory subcommittee, Bryan directed Woodford, without the Commission's knowledge or approval, to proceed with the issuance of the RFP that had already been drafted prior to the Commission's vote of approval for the expansion plan. Two bid packages were submitted in response to the RFP: one by VLC and one by International Game Technology (IGT), a rival of VLC. Although Woodford formed a committee to evaluate these bid packages, Bryan had specifically informed Woodford that he wanted VLC to be awarded the contract. Shortly thereafter, Woodford submitted the committee's report, with VLC's bid receiving the highest evaluation.

Bryan scheduled a meeting for January 20, 1993, to announce that VLC had been awarded the video lottery contract. Bryan cancelled that meeting, however, after he received a federal grand jury subpoena on January 19, 1993, calling for records pertaining to video lottery. The video lottery contract was never awarded. Bryan's handling of the video lottery contract gave rise to his second conviction for mail fraud.

Bryan's convictions for wire and securities fraud were based upon his trading in the shares of companies doing business with the West Virginia Lottery. In 1991 and 1992, Bryan purchased shares of IGT and GTech, both of which were bidding for valuable contracts before the Lottery, and in September 1992, soon after the decision had been made to select VLC as the exclusive supplier of terminals in the statewide expansion of video lottery, Bryan purchased 300 shares of VLC stock. Bryan made all of these trades on the basis of nonpublic, confidential information entrusted to him in his capacity as Lottery Director.

Bryan, 58 F.3d at 937-39.

## Arguments of the Parties

Petitioner asks the court to set aside his convictions for mail fraud and wire fraud in light of Skilling. (ECF No. 112, p. 2.) Petitioner relies primarily on United States v. Mandel, 862

8

F.2d 1067 (4th Cir. 1988).  In that case, former Maryland Governor Marvin Mandel was convicted of mail fraud under a loss of honest services theory.  After Governor Mandel finished serving his sentence, the Supreme Court issued its decision in McNally v. United States, 483 U.S. 350 (1987), holding that the mail fraud statute does not protect against schemes to defraud persons of their intangible rights such as the right to honest government. (ECF No. 112, p. 9.)  Because there was only one theory in the case against Mandel, that the State of Maryland and its citizens were defrauded of his honest and faithful services, the Fourth Circuit granted coram nobis relief, setting aside the convictions and ordering the repayment of any fines paid.  (ECF No. 112, p. 10.) Petitioner asserts that based on Mandel, the mail and wire fraud claims against him should be dismissed because both were founded on an honest services theory only.

    A year after McNally, Congress amended Title 18, Chapter 63, relating to fraud offenses, by adding Section 1346, which reads: "For the purposes of this chapter, the term 'scheme and artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346. Petitioner points out that it was this provision that the Court in Skilling found to be unconstitutionally vague. (ECF No. 112, p. 9 n.7.)

    Petitioner argues that with his convictions for mail and wire

fraud invalidated under <u>Skilling</u> and with the reversal of his conviction for securities fraud by the Fourth Circuit, his "perjury conviction cannot stand." (ECF No. 112, p. 10.) He contends that when the Fourth Circuit sustained the perjury conviction, language in the decision expressed "misgivings concerning whether the required showings for perjury had been made." (ECF No. 112, p. 10.)

Petitioner asserts that the "conflation of the perjury prosecution with the two invalid prosecutions is NOT harmless error." (ECF No. 112, p. 12.) He contends that the prosecution for perjury was an afterthought founded on evidence of other crimes that are no longer valid.

> Had Mr. Bryan been tried correctly, then the <u>only</u> thing the jury would have decided would have been whether Mr. Bryan was guilty of perjury. But in the actual prosecution, the perjury allegation was simply a garbage, kitchen-sink part of the indictment (designed, presumably to enhance the likelihood of a plea) that was not the primary focus of the trial. In a proper trial, however, it would have been the <u>entire</u> focus of the trial. Therefore, can this Court honestly say that without the mountain of evidence tending to show that Mr. Bryan was corrupt, self-dealing and generally unsavory, the jury would have convicted him on the flimsy evidence that the Fourth Circuit itself had a hard time swallowing? The answer is obviously "no."

(ECF No. 112, p. 18) (footnotes omitted).

Petitioner seeks an order reversing his convictions for mail and wire fraud and perjury, return of $120,000 in restitution and $200.00 in fees not already returned after his securities fraud conviction was overturned, all with interest. (ECF No. 112, pp.

19-20.)

> In response, the United States argues that Petitioner
>
> ignores the fact - directly relevant under Skilling -
> that the two mail-fraud charges against the defendant
> included a valid "property fraud" theory allegation, and
> makes no attempt to determine whether the convictions are
> supported under that theory.  In fact, a review of the
> record clearly demonstrates that the jury found defendant
> guilty of both mail fraud counts under that property
> fraud theory.

(ECF No. 124, p. 2.)  Thus, according to the United States, any erroneous instruction under an "honest services" theory is harmless and the mail fraud convictions thus survive coram nobis review under Skilling.

The United States asserts that the wire fraud conviction is based on a charge and evidence that included bribery and kickback activity and thus, under the rule in Skilling, remains valid under 18 U.S.C. § 1346.  The United States contends that the wire fraud charge may also be affirmed under the property fraud theory.  (ECF No. 124, p. 2.)

Regarding dismissal of the perjury conviction, the United States argues that there is no indication in the Fourth Circuit opinion on direct appeal that Petitioner preserved the "prejudicial spillover" argument at trial or on direct appeal.  Petitioner cannot show cause or actual prejudice to excuse this waiver or that he is actually innocent.  (ECF No. 124, p. 37.)  The United States further points out that the argument cannot withstand the rule in O'Hagan holding that the "misappropriation theory" is valid, taken

11

together with the Fourth Circuit's observation in Petitioner's
direct appeal that "'Bryan's conduct clearly constituted criminal
activity under this theory of misappropriation.'" (ECF No. 124, p.
3 (quoting <u>Bryan</u>, 58 F.2d at 945.))  Finally, the United States
argues that each of the wire fraud and two mail fraud counts in the
case were more than amply charged and supported on theories that
survive the rule in <u>Skilling</u>.  (ECF No. 124, p. 3.)

    In reply, Petitioner asserts that the only theory for his
convictions was the deprivation of honest services.  He argues that
"[n]owhere in the closing argument does [the United States] call
the jury's attention to the giving of the advertising contract to
the Falgren [sic] agency as the act of defrauding **property**; rather
[the United States'] entire focus was upon the giving of the
contract of Falgren [sic] as an instance of deprivation of honest
services!"  (ECF No. 126, p. 9.)  Petitioner contends that there
was no argument by the United States at trial that the gravamen of
Petitioner's deprivation of honest services was his acceptance of
<u>de minimus</u> hospitality.  (ECF No. 126, p. 11.)  He argues that the
proper rule is set forth in <u>Mandel</u>.  (ECF No. 126, p. 12.)
Petitioner avers that to a high degree of probability, the jury
found mail and wire fraud based on deprivation of honest services.
(ECF No. 126, p. 13.)

    As for the perjury conviction, Petitioner disputes the United
States' assertion that he waived any challenge to the perjury

conviction because he did not raise it on direct appeal as a "parody of Federal criminal jurisprudence." (ECF No. 126, p. 16.) "On appeal in the original case, Butch argued that he was innocent of perjury: If his argument was innocence, how stupid would he had looked if he had then said that the big error was evidentiary?" (ECF No. 126, p. 16.)

In his supplemental brief, Petitioner points out that there has been no procedural default in this case and that the error committed below was not harmless. According to Petitioner, because the deprivation of honest services theory was the only theory specifically instructed, the only theory argued by the United States and the only theory rebutted by the defense, "it is hard to say that the 'honest services' theory didn't have a 'substantial and injurious effect or influence in determining the jury's verdict.'" (ECF No. 131, p. 12.)

The Petitioner further asserts that the United States may not base a perjury indictment and conviction upon answers that it elicits from a witness solely for the purpose of charging that those answers were false and perjurious. Petitioner asserts that the evidence of perjury is flimsy at best and that under the standard expressed in O'Neal v. McAninich, 513 U.S. 432, 435 (1995), coram nobis relief is appropriate as to the perjury claim as well. (ECF No. 131, pp. 14-15.)

The Petitioner argues that

> [a]ll of the evidence about mail fraud, wire fraud, and
> insider trading was (1) highly prejudicial and (2) in
> hindsight, with the decisions in <u>Bryan</u> by the Fourth
> Circuit and <u>Skilling</u> by the U.S. Supreme Court, entirely
> irrelevant.  Therefore, it is possible to say that,
> without all of the inadmissible, prejudicial evidence
> tending to show that the Petitioner is generally a bad
> person, that Petitioner would have been convicted of
> perjury?  The evidence of perjury is flimsy at best by
> the Fourth Circuit's own admission.  If this Honorable
> Court has any doubt, then under the standard of <u>O'Neal</u>,
> the writ of coram nob[i]s must be granted on perjury as
> well.

(ECF No. 131, p. 15.)

In response, the United States argues that the honest services theories in Counts One and Two are derived from and completely dependent upon the property fraud theories alternatively charged in each count.  According to the United States, Petitioner

> is charged with defrauding the state of his honest
> services solely and exclusively by defrauding others -
> the Arnold Agency in Count One and IGT in Count Two - of
> property.  Count One charges that Bryan defrauded the
> Arnold Agency out of the money it spent pursuing an
> advertising contract with the Lottery through a bid
> process.  If Bryan's subversion of this bid process is
> removed from the Count, nothing beside remains.
>
> * * *
>
> Likewise, Count Two charges that Bryan defrauded the
> State of his honest services by subverting a state bid
> process and thereby cheating an unknowing bidder - IGT -
> out of the money it spent in preparing and presenting its
> bid.  As in Count One, if the subversion of this bid
> process through which IGT was defrauded of money is
> removed from the charge, there simply is no charge at
> all.
>
> Thus, the reviewer may rest confidently on the conclusion
> that the jury's guilty verdicts on Counts One and Two are
> based on its findings that Bryan had schemed to defraud
> the Arnold Agency and IGT of money.

<div align="center">14</div>

(ECF No. 134, pp. 4-5.)

Regarding Count Three, in which Petitioner was convicted of defrauding the State of his honest services through exploitation of confidential information relating to stock prices, the United States argues that this Count, like Counts One and Two, is nothing more than a typical property fraud scheme with honest services language thrown in. "There is no doubt that confidential information constitutes property and that the exploitation of that confidential information for personal gain may constitute a crime under either of the mail or wire fraud statutes." (ECF No. 134, pp. 8-9.) The United States asserts that the only other fraudulent activity alleged in this count is Petitioner's alleged receipt of gratuities, which is peripheral to the main thrust of the charge. (ECF No. 134, p. 9.)

Regarding Count Four, related to the securities fraud count that was vacated by the Fourth Circuit, the United States argues that Petitioner was justly convicted. The United States points to the Fourth Circuit's express agreement that the evidence was sufficient to convict Petition under the misappropriation theory, a theory now validated by the Supreme Court in O'Hagan. While the United States concedes that this court is not now in a position to reinstate the legally valid conviction of Petitioner on Count Four, the rule in O'Hagan further undermines any argument by Petitioner that this record supports any claim of "fundamental error" or cries

15

out for correction.  (ECF No. 134, p. 14.)

Finally, the United States argues that Petitioner has waived any prejudicial spillover argument as to Count Five, the perjury count, and therefore, must prove that he is actually innocent of that charge and all other charges that were available for prosecution, including the charges in Counts One through Four in order to obtain relief under coram nobis.  (ECF No. 134, pp. 14-17.)

In reply, Petitioner references the arguments made in the companion case of ReBrook v. United States, 2:10-cv-01009, United States District Court for the Southern District of West Virginia, related to law of the case in response to the United States' arguments about Count Four.  (ECF No. 121, p. 4; ECF No. 135, p. 2.)

As to Count Five, Petitioner argues that the only way the United States can avoid granting coram nobis relief with regard to the perjury conviction under the "prejudicial spillover" doctrine is to resurrect the lower court conviction for insider trading.

> The problem for the Government, however, is that the Fourth Circuit's decision ended Petitioner's jeopardy on this securities fraud claim.  Once a person has been acquitted of a criminal charge by an appellate court because the appellate court concludes the theory asserted by the United States was invalid, that person cannot be subjected to any further prosecution or punishment on that same charge under double jeopardy principles, even when a subsequent appellate decision determines another case that the noncriminal conduct may be criminal.

(ECF No. 135, p. 4.)

16

<u>Facts</u>

A.   The Charges.

On April 23, 1993, a five-count indictment was filed against Petitioner alleging mail fraud (two counts), wire fraud, securities fraud and perjury.  (# 1.)  Superceding indictments were filed on May 13, 1993, and June 17, 1993.  (## 6, 31.)

Count One alleging mail fraud involving the advertising contract alleged that Petitioner violated 18 U.S.C. §§ 1341 and 1346.  Count One alleged that Petitioner did knowingly devise a scheme and artifice (the "scheme"):

> a.  To defraud the State of West Virginia, the West Virginia Lottery Commissioners, the Purchasing Division of the Department of Administration of the State of West Virginia and the citizens of the State of West Virginia of his loyal, honest, and faithful services as an employee, that is, Lottery Director, of the State of West Virginia; and

> b. To defraud a certain advertising agency, that is, the Arnold Agency, of the money expended in preparing and presenting proposals for an advertising campaign in pursuit of a certain contract, and to further defraud that agency of the award of that certain contract with the State of West Virginia.

(# 31, p. 5.)

Count Two also alleged mail fraud, this time involving the video lottery contract, in violation of 18 U.S.C. § 1341 and 1346. Count Two alleged that Petitioner did knowingly devise a scheme:

> a.  To defraud the State of West Virginia, the West Virginia Lottery, and the citizens of the State of West Virginia of his loyal, honest and faithful services as an employee, that is, Lottery Director, of the West Virginia Lottery; and

17

b.  To defraud certain gaming equipment companies of the
money expended in preparing and presenting proposals in
pursuit of a state-wide video lottery contract, and to
further defraud those companies of the award and of the
income from that certain contract, to be let by and on
behalf of the West Virginia Lottery.

(# 31, p. 15.)

Count Three alleged wire fraud/insider trading in violation of

18 U.S.C. § 1343.  Count Three describes the scheme as follows:

[f]rom approximately July, 1991 until January 19, 1993,
at or near Charleston, ... West Virginia, ... and
elsewhere, defendant ... and others ... did devise a
scheme and artifice (hereinafter referred to as "the
scheme") to defraud the State of West Virginia, the West
Virginia Lottery, and the citizens of the State of West
Virginia of his loyal, honest and faithful services as an
employee, that is, Lottery Director, or the State of West
Virginia.

(# 31, p. 25.)  The alleged purpose of the scheme is described as

follows:

a.  The unlawful personal exploitation and transfer of
confidential information by defendant ... relating to the
value and potential future value of certain publicly-
traded stocks, to which information defendant ... was
privy by virtue of his position as Lottery Director;

b.  The unlawful acceptance of gifts, gratuities and
other things of value by defendant ... and others from
companies contracting or seeking to contract with the
West Virginia Lottery to supply gaming equipment or
materials for use in the operation of the lottery; and

c.  The concealment by defendant ... of all of the above
from the citizens of the State of West Virginia.

(# 31, p. 26.)

Count Four alleged insider trading in violation of 15 U.S.C.

§ 78j(b) and 78ff, and Petitioner's conviction on this count was

18

ultimately reversed by the Fourth Circuit as noted above.

Count Five alleged perjury before a grand jury in violation of 18 U.S.C. § 1623. The United States cited alleged material declarations by Petitioner to the grand jury that Petitioner "knew and believed, were false ...." (# 31, p. 40.) In particular, the United States alleged that Petitioner testified falsely before the grand jury in four areas. First, "from at least July of 1991 defendant ... was aware that there was a plan in existence to allow the spread of video lottery throughout the State of West Virginia after the general election in November of 1992 which plan defendant ... had helped implement." (# 31, p. 35.) Second, that Petitioner failed to reveal that VLC employees had "input into the drafting of the RFP and discussed during the course of the meeting [on September 1, 1992] various provisions, including the single source provision which was in fact included in the RFP later issued by the State of West Virginia." (31, p. 37.) Third and fourth, Petitioner failed to  reveal to the Grand Jury

> a. That he had met with Larry Lippon in Bozeman, Montana, on or about August 9 and 10, 1992, both at Larry Lippon's home and at VLC headquarters, at which time Larry Lippon proposed, on behalf of VLC, that VLC be granted a monopoly to provide all video-lottery machines throughout the State of West Virginia in return [for] VLC locating a factory in West Virginia; and

> b. That he had met with Larry Lippon on or about October 15, 1992, in Huntington, West Virginia, during which meeting Larry Lippon offered defendant ... a job.

(# 31, p. 39.)

B.  Trial Brief.

The United States filed a trial brief.  (# 39.)

In its trial brief, the United States stated that

> as one of two alternative fraud theories [footnote
> omitted] [it is alleged] that BRYAN defrauded the State
> and the citizens of the State of his honest services
> inasmuch as he intervened in and overturned a bid
> evaluation process which he had sponsored and endorsed,
> then subverted the legal processes of government by
> ordering state employees under his supervision to lie to
> the Lottery Commissioners, ... regarding the activity of
> the evaluation committee and the results of their
> deliberation.

(# 39, p. 12.)   In the footnote, the United States stated that

"Count One also alleges a standard 'money and property' fraud

theory in charging that BRYAN also defrauded the Arnold Agency and

others out of money and property by subverting the bid evaluation

process."  (# 39, p. 12 n.6.)

Regarding Count Two, the United States wrote that Count Two

charged that BRYAN deceitfully manipulated "a state bid process,

deprived the State of his honest services and several companies of

money expended in pursuit of a contract with the Lottery and the

income from that contract."  (# 39, p. 15.)

With respect to Count Three, the United States wrote that

> [t]he purpose of the scheme charged in Count Three,
> contrary to the first two counts, is to personally enrich
> BRYAN and several of his associates.  That enrichment was
> achieved through the exploitation of confidential, non-
> public information and the acceptance of gratuities which
> came to BRYAN in the course of his duties as Lottery
> Director.

(# 39, p. 16.)

C.   Trial.

   1.  Opening Statement.

In its opening statement, the United States stated that

count one in the indictment is a mail fraud count.  And
simply what it charged the defendant of is bid rigging
in connection with the award of an advertising contract with
the West Virginia Lottery and using the United States
mails in connection with that. *** What the defendant is
charged with in count one is fixing that contract and in
fixing that contract he defrauded the Arnold Agency of
the money they spent in preparing their proposal.  He
also defrauded that company of the money that they would
have made on that contract, and he also defrauded the
State of West Virginia of his honest services.  When he
used the mails, he violated federal law.

(# 73, pp. 122, 126.)

Regarding Count Two, the United States stated that

[w]hen the defendant schemed to fix this contract, fix
the bidding process so that VLC would be awarded a
monopoly in the State of West Virginia, he, again,
defrauded the companies of the efforts that they put
[into] this bid process.  He defrauded those companies
that were not able to bid.  He defrauded the companies
that might have been the winner in this process.  But
most importantly, ladies and gentlemen, he defrauded the
citizens of the State of West Virginia of his honesty
when he used the United States mails to violate the law.

(# 73, p. 136.)

Count Three was described by the United States as follows:

     Count three of the indictment ... also charges the
defendant with engaging in a scheme to defraud the
citizens of West Virginia of his honesty, but it differs
from the first two counts in a couple of ways.  First of
all, it involves a wire transfer.  I don't know how many
of you are familiar with wire transfers, but it's a
common mechanism used to transfer money and other things
from one location to another.

     The second difference is that while the first two

21

counts of the indictment allege that the defendant's
scheme was to benefit some company or a bidder, his
efforts in connection with count three were to benefit
himself directly and his friends.

(# 73, p. 136.)

The United States described Count Four as insider trading.

Petitioner

knew in September of 1992 that VLC was going to be the
winner.  When he used that information to buy stock in
VLC, knowing that the award of this contract would be a
financial shot in the arm for the company, he bought
stock in that company and that, ladies and gentlemen,
violated federal law that prohibits insider trading and
that is buy the stock based on information that you come
into by virtue of trust or a fiduciary capacity ....

(# 73, p. 139.)

The final count charged Petitioner with perjury.  The United

States stated that Petitioner lied to the grand jury in the

questions and answers he gave before a federal grand jury in

Charleston on January 21, 1993:

Despite the fact that on August 9, 1992, the defendant
traveled to Bozeman, Montana with Bill Woodford, despite
the fact that he met with VLC officials on September 1 of
1992 in the hotel room here in the Marriott and discussed
the input of the RFP, when he was asked those questions
about who had input and what his contacts were with Larry
Lippon, he never mentioned those things.  He never
mentioned the meeting at the Marriott, what he talked
about, who had input into the RFP.  He never mentioned
when he's asked about contacts with Larry Lippon.  He
never mentioned going to Bozeman, Montana on August 9th,
1992, and spending four days there.  He never mentioned
traveling to Huntington, West Virginia, on October 15th
of 1992 and meeting with Larry Lippon, having dinner with
him, paid for by Mr. Lippon, and the next day bragged to
lottery employees that he had been offered a job as chief
executive officer of VLC.  When asked about the job
offers or any other offer, the defendant replied

22

"absolutely not".
(# 73, pp. 138-39.)

    2.  Evidence at trial - United States.

      a.  Linda Arnold.

Ms. Arnold of the Arnold Agency testified that in January of 1991, she received a solicitation from the State of West Virginia regarding a bid on a 2.8 million dollar advertising contract with the West Virginia Lottery. (# 73, pp. 165-66.) Ms. Arnold's firm spent months preparing a bid and presentation, which was ultimately presented to the Lottery Commission. (# 73, pp. 167-68.) In preparing the bid, Ms. Arnold testified that the Arnold Agency spent $58,000.00 on the 1991 presentation to the evaluation committee. Ms. Arnold was present when the presentations were made and recalls scores being kept. (# 73, p. 168.) She felt that the Arnold Agency had done really well and had received signals to that effect from the Lottery Commissioners. Ms. Arnold was later notified by letter that the contract had been awarded to another agency. (# 73, p. 169.)

On cross examination, Ms. Arnold conceded that the Arnold Agency would not actually receive all 2.8 million dollars because that amount included account monies expended for media buying. (# 73, p. 171.) Tammy Gunnoe wrote the letter informing the Arnold Agency that another firm had been chosen. (# 73, p. 171.)

      b.  Tammy Gunnoe.

23

Ms. Gunnoe testified that she worked for the Lottery
Commission as the director of marketing. (# 74, p. 3.) In the
spring of 1991, Ms. Gunnoe organized a bid process for an
advertising contract for the West Virginia Lottery for
approximately 2.8 million dollars. Petitioner gave Ms. Gunnoe
permission to organize and execute the bid process, including the
appointment of a committee, and gave Ms. Gunnoe assurances that the
committee's recommendation would be used in evaluating the bid to
be awarded. (# 74, pp. 5-6.) Information packets were
disseminated to the committee members, and they included rating
sheets to be completed by the committee members. (# 74, p. 7.) Six
agencies made presentations to the evaluation committee considering
the bid proposals. (# 74, p. 10.) On a summary sheet, Ms. Gunnoe
totaled the points from the committee members' individual rating
sheets of each agency, and the Arnold Agency received the most
points. (# 74, pp. 12-13.) Ms. Gunnoe took the summary sheet and
the rating sheets into Petitioner's office and gave them to him.
(# 74, p. 13.) Petitioner returned the rating sheets and asked for
an overall review or summary of what each agency had presented.
Petitioner told Ms. Gunnoe that "he would get back to me. He
wasn't going to make a decision immediately and that he did need to
run this by the Governor." (# 74, p. 14.)

    After the presentations, Ms. Gunnoe received a call from
Petitioner in which he stated that the contract had been awarded to

Fahlgren Martin.   When asked if Petitioner had talked to the Governor or run it by him, Petitioner responded that he had.   (# 74, p. 18.)   About a week later, Petitioner called Ms. Gunnoe into his office.   Ed ReBrook, counsel for the Lottery Commission, was present as well.   Petitioner told Ms. Gunnoe that "the evaluation was going to be very confrontational and he asked that I give the [rating] sheets and any other documents that the people had ... to Ed."  (# 74, p. 18.)   Petitioner told Ms. Gunnoe to make sure and get rid of everything related to the evaluation process or to give it to Mr. ReBrook.  (# 74, p. 20.)

Petitioner instructed Ms. Gunnoe in April of 1991 to tell the Lottery Commission that Fahlgren Martin "had been chosen by the committee to receive the contract."  (# 74, pp. 21-22, 24.)   Ms. Gunnoe told the Lottery Commission that "it was a recommendation from the evaluation committee that Fahlgren Martin receive the contract," but Ms. Gunnoe testified that this statement was untrue. (# 74, p. 24.)   Commissioners raised questions about the ratings process and numerical scoring.   One Commissioner asked who received the highest score.   Ms. Gunnoe did not respond immediately and looked at Petitioner and Mr. ReBrook, but got no response from them initially.  (# 74, p. 25.)   Ms. Gunnoe told the Commissioner that she had no rating sheets.  (# 74, p. 25.)   Petitioner eventually

> did speak up and he did state to the commission that it
> was a subjective review, there were video tapes, and I do
> believe he further stated that this is the first time I
> had done a review and so the possible lack of sheets or

> rating system was to be excused and that there were video
> tapes available for the commission to review if they
> should choose to do so.

(# 74, p. 26.)  Petitioner never told the Commission that rating

sheets had been used or that he had collected them.  (# 74, p. 26.)

Ms. Gunnoe attended a meeting of the purchasing department and

Petitioner and others at which the purchasing department was

seeking further documentation on the Fahlgren Martin contract.

Beforehand, Ms. Gunnoe had provided a memorandum, prepared at

Petitioner's direction, stating (incorrectly) that it was the

consensus of the evaluation committee that Fahlgren Martin should

receive the contract.  (# 74, p. 34.)  The purchasing department

representatives sought further information about how the evaluation

process was done, including whether a rating-type evaluation was

done.  (# 74, p. 28.)  They specifically asked for numerical

scoring.   No one at the meeting provided information about

numerical scoring or that forms had been collected by Petitioner.

(# 74, p. 29.)  Thereafter, Ms. Gunnoe met with Petitioner in his

office and

> I told him that from the conversation with purchasing it
> was clear that they wanted, one - they had asked for
> documentation from me as the chairperson of the committee
> and, two, they did want supporting documentation from the
> committee to show that Fahlgren was the award or should
> be awarded the contract.

(# 74, p. 30.)  Ms. Gunnoe testified that Petitioner stated that

the contract "was beginning to become a pain" and that Ms. Gunnoe

should give the purchasing division the video tapes.  (# 74, p.

30.)

After the meeting with the purchasing department, Ms. Gunnoe asked members of the evaluation committee to prepare documents recommending Fahlgren Martin.  These documents were never given to the purchasing department because, in the meantime, the contract was approved.  (# 74, pp. 31-32.)

On cross examination, Ms. Gunnoe testified that up until 1991, there had not been a competitive presentation process to obtain the advertising contract, which had, up until then, been handled through Scientific Games.  (# 74, p. 44.)  She suggested that Petitioner have an evaluation committee because she was informed that one was necessary.  However, had the contract still been under Scientific Games, it was Ms. Gunnoe's understanding that it could have been renewed with Scientific Games.  Ms. Gunnoe testified that Petitioner was not required to have competitive bidding at all.  (# 74, pp. 45-46.)  Ms. Gunnoe understood that the evaluation committee was to make a recommendation to the director "and whether or not he had [the] final decision, I do not know." (# 74, p. 46.) Ms. Gunnoe understood that ultimately Petitioner would make a recommendation to the Lottery Commission about who should be awarded the contract.  (# 74, p. 46.)

When asked if any of the evaluation committee members refused to write that they recommended Fahlgren Martin because that is not who they recommended, Ms. Gunnoe testified that "[n]obody gave me

27

... fits over it.   There were several comments made by various people." (# 74, p. 65.)

Ms. Gunnoe admitted that she had a conflict with one individual from Fahlgren Martin and that she asked that this individual be removed.  (# 74, pp. 60-61.)  Regarding the VLT[3] contract, Ms. Gunnoe testified that she was on the committee that chose VLT and that Petitioner never made any effort to influence her one way or the other.  (# 74, p. 67.)

On redirect examination, Ms. Gunnoe testified that Petitioner knew about her disagreements with Fahlgren Martin, including before the evaluation committee recommended the Arnold Agency.  (# 74, p. 71.)  When asked if Petitioner assured her the results of the committee's evaluation would be the basis for the award of the contract, Ms. Gunnoe answered "yes."  (# 74, p. 73.)  Ms. Gunnoe believed this because she "had talked to the director prior to it going out for bid and we had discussed the fact, you know, there would be an evaluation committee.  I mean I thought that was the whole reason for having the bid process."  (# 74, p. 74.) Petitioner never told Ms. Gunnoe he was not going to abide by this. (# 74, p. 74.)

On recross examination, Ms. Gunnoe was asked whether Petitioner thought her dispute with Fahlgren Martin might have

---

[3]   Throughout the trial, the terms "VLTC," "VLT" and "VLC" were used interchangeably, and the undersigned has done so herein as well.

influenced her judgment, to which she responded in the negative.
(# 74, p. 85.)

c.  Marjorie Bair.

Ms. Bair testified that she worked at the Lottery in public
relations and as secretary to the marketing director, Tammy Gunnoe.
She served on the evaluation committee related to the selection of
an advertising agency for the 2.8 million dollar contract in 1991.
(# 74, p. 88.)  Ms. Bair prepared the rating sheets that were
completed by the evaluation committee.  (# 74, p. 89.)  Ms. Bair
was present for the evaluations from the advertising agencies in
April of 1991.  (# 74, p. 91.)  She received the rating sheets
after they were completed, and the Arnold Agency was ranked in
first place with a comfortable margin.  (# 74, p. 93.) Ms. Bair
turned over the completed sheets to Ms. Gunnoe, who ultimately told
her that the Arnold Agency had won "by a comfortable margin."  (#
74, p. 93.)  Ms. Bair testified that several days later, Ms. Gunnoe
came into the office "extremely upset" and told Ms. Bair that
Petitioner "had called her the night before at home and had told
her that we would be awarding the contract to Fahlgren Martin."  (#
74, p. 95.)  Ms. Gunnoe then directed Ms. Bair to get rid of
anything relating to the evaluation process.  (# 74, p. 99.)

Ms. Bair testified that Ms. Gunnoe appeared before the Lottery
Commission and thereafter, came to Ms. Bair and was upset and
embarrassed because "she had to stand there and look rather inept

actually as a marketing director that there had not been an evaluation of the whole process." (# 74, p. 99.)[4]

On cross examination, Ms. Bair confirmed that she was in attendance at the Lottery Commission meeting at which Ms. Gunnoe told commissioners that Fahlgren Martin was to be awarded the contract because that was the recommendation of the evaluation committee. Ms. Bair admitted that she had an opportunity to speak out at this meeting, but did not. (# 74, p. 105.) She also never went to the Petitioner and objected to what was happening. (# 74, p. 105.)

Ms. Bair testified that Ms. Gunnoe had "discomfort" in her relationship with Fahlgren Martin because Fahlgren Martin did not always respect Ms. Gunnoe's position as marketing director. (# 74, pp. 107-08.)

Ms. Bair looked through the rating sheets that she received, but did not tabulate them. She gave those that she received to Ms. Gunnoe. She did not receive all of the rating sheets. (# 74, p. 123.)

Ms. Bair prepared a letter advising Fahlgren Martin that they had received the contract and sent it out before the Lottery Commission approved Fahlgren Martin, but Ms. Gunnoe never complained to her about sending it out prematurely. (# 74, p, 136.) Ms. Bair did not know at the time she sent out the letter

---

[4]  Page 97 of the transcript is missing.

that the Lottery Commission had not yet voted on the advertising contract.  (# 74, p. 136.)

On redirect, Ms. Bair was asked if she did not report problems related to the bidding process because she felt the problem or falsehoods might go well beyond the Lottery, to which Ms. Bair responded in the affirmative.  (# 74, pp. 141-42.)  When asked if Petitioner was always a "nice guy" to Ms. Bair, she responded in the negative.  (# 74, p. 142.)

d.   Scott Sigman.

Mr. Sigman testified that he was currently enrolled in law school and was a contract employee with the West Virginia Lottery employed to do their nightly drawings.  (# 74, p. 143.)  Ms. Gunnoe asked Mr. Sigman to serve on the evaluation committee, but at the time he was working at another job and could not.  (# 74, p. 144.)  Ms. Gunnoe told Mr. Sigman that she had a conversation with Petitioner, and Petitioner told Ms. Gunnoe that regardless of the scores that the committee had come up with, the contract would be awarded to Fahlgren Martin.  Ms. Gunnoe was very upset when she relayed this statement to Mr. Sigman.  (# 74, p. 144.)  Ms. Gunnoe also told Mr. Sigman that she was very upset about having to appear before the Lottery Commission because she was instructed by Petitioner to misrepresent to them what had actually happened in the evaluation process.  (# 74, p. 145.)

On cross examination, Mr. Sigman conceded that Ms. Gunnoe's

31

statement were not direct quotes.  (# 74, p. 146.)

       e.  Gregory Michael Ross.

Mr. Ross worked at the West Virginia Lottery as the advertising and promotions manager.  Tammy Gunnoe was his immediate supervisor.  (# 74, p. 147.)  Mr. Ross sat on the evaluation committee. (# 74, p. 148.)  He attended all six presentations and videotaped them.  (# 74, p. 149.)  Under his individual scoring, the Arnold Agency won.  (# 74, p. 151.)  After he completed the scoring sheets, he gave them to Ms. Bair and, thereafter, he heard from Ms. Gunnoe that the Arnold Agency had won.  (# 74, pp. 151-52.) Within a week and a half, Ms. Gunnoe called him again and told him that Petitioner had decided that Fahlgren Martin would win the contract.  (# 174, p. 152.)

Mr. Ross attended the Lottery Commission meeting in April of 1991, and had a conversation with Ms. Gunnoe about her presentation.  Ms. Gunnoe said that "she had been directed to go in and present to the commission that Fahlgren Martin had won the contract, even though that was untrue." (# 74, p. 152.)  After the commission meeting, Ms. Gunnoe and Mr. Ross met in Ms. Gunnoe's office, along with Ann Scott, and Ms. Gunnoe told them that she had never had to do anything like that before and never wanted to ever again.  (# 74, p. 153.)

Mr. Ross, at Ms. Gunnoe's request, prepared a document stating that Fahlgren Martin should win the contract.  He was told by Ms.

Gunnoe this was necessary to get through purchasing.   (# 74, p. 154.)

On cross examination, Mr. Ross testified that once awarded, he considered the Fahlgren Martin contract a successful one.   (# 74, p. 157.)

After the presentations were made to the evaluation committee, the evaluation committee met, with the exception of two members, Messrs. Steve Scott and Rex Repass.   Both voted to give Fahlgren Martin the highest scores.   (# 74, p. 162.)   Mr. Ross was told by Ms. Gunnoe that the vote between Fahlgren Martin and the Arnold Agency was "pretty close."   (# 74, p. 163.)

Mr. Ross was present at the Lottery Commission meeting where Ms. Gunnoe told the Commissioners that Fahlgren Martin had won.   (# 74, p. 165.)

When asked if Petitioner had the ultimate decision making authority on the contract, Mr. Ross responded in the negative.   He believed the evaluation committee's recommendation would be followed.   (# 74, pp. 167-68.)

Regarding any conflict between Ms. Gunnoe and Fahlgren Martin personnel, Mr. Ross testified that in a lot of instances, "what they presented us, we did have problems with, not only Tammy but myself.   We did not feel that it fit into our plan as we were developing it as far as our strategy to what we had coming up." (# 74, p. 169.)

Mr. Ross drafted a memorandum at Ms. Gunnoe's request stating that Fahlgren Martin was to be awarded the contract.  (# 74, pp. 170-71.)  Petitioner did not ask Mr. Ross to draft this memorandum, and Mr. Ross never had a conversation with Petitioner about it.  At the Lottery Commission meeting in April of 1991, Mr. Ross never said anything about the evaluation process and who had really won. (# 74, p. 171.)

On redirect, Mr. Ross testified that he did not protest about the events related to the bid process because he liked his job and did not want to question Petitioner's authority.  (# 74, p. 172.)

> f.   Ann Scott.

Ms. Scott worked for the State Lottery Commission as a product development manager. Ms. Gunnoe was her immediate supervisor.  (# 74, p. 174.)   Ms. Scott was on the evaluation committee that recommended the Arnold Agency.  Ms. Scott saw six presentations and attended a meeting of the committee after the presentations.  (# 74, p. 175.)   The Arnold Agency had won overall and according to Ms. Scott's scoring.  (# 74, p. 176.)   Thereafter, Ms. Gunnoe told Ms. Scott that the contract would be awarded to Fahlgren Martin. (# 74, p. 178.)   Ms. Gunnoe also told Ms. Scott that, at the direction of Petitioner, "she was to present to the commission that Fahlgren had won the evaluation consensus of the committee and that she was going to have to tell that to the commissioners even though she knew that wasn't true."  (# 74, pp. 178-79.)   After the

34

meeting, Ms. Gunnoe told Ms. Scott that several of the commissioners had questions about the evaluation process and concerns about the lack of criteria for the evaluation and ratings. Ms. Gunnoe was very upset. (# 74, p. 179.) Ms. Scott prepared written documentation at Ms. Gunnoe's request that she approved Fahlgren Martin for the contract. (# 74, p. 180.)

On cross examination, Ms. Scott confirmed that Ms. Gunnoe is her immediate supervisor and that Ms. Scott is protected by civil service. (# 74, p. 180.) Ms. Scott had never participated in an evaluation process for an advertising agency before. (# 74, p. 182.) The day after the presentations, the evaluation committee met, but two individuals, Mr. Repass and Mr. Scott were absent. (# 74, p. 185.) Ms. Scott gave her evaluation to Ms. Gunnoe. She never saw the results completed by other members of the committee. Her knowledge that the Arnold Agency won is based upon what Ms. Gunnoe told her. (# 74, pp. 188-89.) In June of 1991, at the request of Ms. Gunnoe, she prepared a memorandum stating that Fahlgren Martin had won the contract. (# 74, p. 189.) This request by Ms. Gunnoe was at Petitioner's direction, but Ms. Scott was not present when Petitioner gave that direction to Ms. Gunnoe. Ms. Scott did not ask Petitioner if he had asked Ms. Gunnoe to direct preparation of the memorandum. (# 74, p. 189.)

g.  Harold Curtiss.

Mr. Curtiss worked in the purchasing division of the West

35

Virginia Department of Administration as the assistant director of
purchasing. (# 74, p. 191.)   In the spring of 1991, he was asked
for a consultation with Ms. Gunnoe and others on formulating an RFP
for a marketing contract.  (# 74, p. 192.)   He later received a
requisition for contract agreement.   Mr. Curtiss did not feel
comfortable with it and contacted Bob Wilhelm at the Lottery.  (#
74, p. 193.)   Mr. Curtiss told Mr. Wilhelm that he felt "the
documentation that was provided to make an award on this contract
was inadequate and I was not going to proceed at this time."  (#
74, p. 194.)   Mr. Curtiss told Mr. Wilhelm that he needed a
quantitative analysis and an evaluation of some sort to find out
how the Lottery arrived at their decision.  (# 74, p. 194.)   Mr.
Curtiss wrote a memorandum stating that the lack of written
documentation and the fact that the Lottery Commission met in a
closed session gave the appearance it was a done deal to begin with
when the incumbent vendor is recommended for the award.
Thereafter, he received some documentation from the Lottery.  (#
74, p. 196.)   Mr. Curtiss was not completely satisfied with this
information.  (# 74, p. 198.)

In July of 1991, Mr. Curtiss attended a meeting in
Petitioner's office at the Lottery's headquarters.   The meeting
also was attended by Ms. Gunnoe, Mr. Wilhelm and Reggie McClure.
(# 74, p. 199.)   Mr. Curtiss asked for the evaluation that was
performed and prepared by the evaluation committee, specifically

36

the quantitative evaluation. (# 74, p. 200.) Mr. Curtiss did not receive a quantitative analysis. Petitioner told Mr. Curtiss that they had videos of the oral presentations. (# 74, p. 201.) The bid ultimately was awarded to Fahlgren Martin, but Mr. Curtiss testified that if he had known a quantitative analysis had been done that rated another agency higher than Fahlgren Martin, he would not have approved the contract. (# 74, p. 204.)

On cross examination, Mr. Curtiss admitted that there was no written requirement that there be a quantitative analysis. (# 74, p. 225.) Mr. Curtiss testified that it was not unusual for contracts to fall short and for those shortfalls to be overlooked and the contracts approved despite the shortfalls. (# 74, pp. 227-28.) Mr. Curtiss's office determined it was appropriate to approve the advertising contract to avoid a lapse in the contract. (# 74, p. 228.)

h.   Rhys G. Evans.

Mr. Evans was employed by the West Virginia Lottery as a lottery accounts supervisor. His immediate supervisor was Ms. Gunnoe. (# 75, pp. 3-4.) Mr. Evans was a member of the evaluation committee who was chosen to select an advertising agency for the Lottery. Six agencies made presentations, which he attended. Thereafter, he attended an informal meeting of the committee, but not all of the evaluators were present. Mr. Evans had completed scoring sheets. (# 75, pp. 4-5.) Mr. Evans also had a summary

37

sheet on which he recorded each agency and their score in each area.  (# 75, p. 6.)  The Arnold Agency had the highest score of 45.  The Fahlgren Agency had a score of 31 and ranked sixth.  (# 75, p. 8.)  Mr. Evans kept this summary sheet and turned in the scoring sheets to Ms. Bair.  (# 75, p. 8.)  Mr. Evans eventually learned that the Arnold Agency earned the highest score in the evaluation process.  (# 75, p. 8.)  Four or five days after he turned in his scoring sheets, Ms. Gunnoe told him that the contract would go to Fahlgren Martin.  (# 75, p. 9.)  Ms. Gunnoe was very upset and angry when she communicated this to Mr. Evans.  Ms. Gunnoe told Mr. Evans to turn over any other notes he had related to the evaluation process.  Mr. Evans kept the summary sheet he had prepared and did not turn it over to Ms. Gunnoe.  (# 75, p. 10.)

On cross examination, Mr. Evans testified that he primarily worked directly with lottery retailers.  (# 75, p. 13.)  He had no experience in the advertising field before being asked to serve on the evaluation committee.  The evaluation committee met before the presentations and it was made very clear to the committee that they were to meet and conduct a fair and impartial evaluation.  (# 75, p. 13.)  Mr. Evans was aware that Ms. Gunnoe was not very happy with Fahlgren Martin.  Mr. Evans perceived the evaluation committee as a move by Ms. Gunnoe to get rid of the Fahlgren Agency as the advertising agency for the Lottery.  (# 75, p. 14.)  Mr. Evans stated that he compared notes with Ms. Bair and she rated the

Arnold Agency the highest, but admitted that before the grand jury, he had testified that Ms. Bair rated the Arnold Agency second.  (# 75, pp. 15, 17.)

       i.  Robert Wilhelm.

Mr. Wilhelm testified that he was deputy director of finance and administration of the West Virginia Lottery.   Mr. Wilhelm testified that Ms. Gunnoe was very upset after Petitioner told Ms. Gunnoe she had to keep Fahlgren Martin as the current advertising agency, even though the Arnold Agency ranked first in the evaluation process.  Mr. Wilhelm agreed to talk to Petitioner.  (# 75, p. 24.)  Petitioner told Mr. Wilhelm not to worry about it, that he did not see any need for a change.  (# 75, pp. 24-25.)

Mr. Wilhelm attended the Lottery Commission meeting on April 24, 1991, when the advertising contract was discussed.  Ms. Gunnoe stated to the Commission that Fahlgren Martin was rated highest, and Mr. Wilhelm knew this to be untrue, but did not correct Ms. Gunnoe.  (# 75, p. 25.)  Ms. Gunnoe was questioned extensively by Commissioners Jim Foster and Sam Kusic about the process she used and how she came up with this recommendation.  Ms. Gunnoe did not tell them there were numerical scoring sheets.  (# 75, p. 26.)

Mr. Wilhelm handled the contract with Fahlgren Martin and worked with Mr. Curtiss in purchasing.  Mr. Curtiss called Mr. Wilhelm and told him he had not provided enough paperwork.  Mr. Curtiss told Mr. Wilhelm that purchasing needed "some kind of basis

for how the decision was reached, some kind of an evaluation basis, you know, more than just these are the people that won the contract." (# 75, p. 28.) Mr. Wilhelm testified that he contacted Ms. Gunnoe, who gave him a "dummied up memo because it wasn't the actual things that they used because it said that Fahlgren had won the evaluation." (# 75, p. 28.) He forwarded this and other documents on to purchasing. (# 75, pp. 28-29.) Purchasing continued to indicate that there were problems with the contract, and Mr. Wilhelm informed Petitioner. Petitioner indicated a meeting would be necessary. Petitioner, Mr. Wilhelm and others met with Mr. Curtiss and urged them to approve the contract. Mr. Wilhelm did not speak up at this meeting about the Arnold Agency being the highest rated agency for fear of losing his job. (# 75, pp. 30-31.)

Mr. Wilhelm testified that in 1990 the Lottery started a video lottery research project at Mountaineer Park, shortly after Petitioner became director of the Lottery. Mr. Wilhelm and Petitioner discussed expansion of the video lottery statewide. In 1991, there was a poll indicating the public was not in favor of video lottery. As a result, the idea of expanding video lottery was put on hold. (# 75, p. 35.)

In the fall of 1992, Mr. Wilhelm testified that there was a change in the approach to video lottery. For at least two years, Mr. Wilhelm and Petitioner spoke of having an inhouse system and

multiple companies hooked into it.  However, in September of 1992, Petitioner decided that was not the best way to go and that instead, there should be a sole source system; i.e., one company doing everything for the Lottery.

Mr. Wilhelm confirmed that in August of 1992, Petitioner and Bill Woodford traveled to Bozeman, Montana.  (# 75, pp. 34-37.)  In October of 1992, Mr. Wilhelm drove Petitioner to Huntington, West Virginia for a meeting with Larry Lippon, the president of VLC.  (# 75, p. 38.)

In the fall of 1992, Mr. Wilhelm participated in an RFP regarding video lottery.  (# 75, p. 48.)  In November of 1992, Petitioner requested that Mr. Wilhelm retrieve an RFP for design, development and installation of a computer supported video lottery system that had already gone to purchasing.  Mr. Wilhelm contacted Mr. Curtiss in purchasing and obtained the purchasing bulletins. (# 75, pp. 50-52.)

A new RFP was issued in December with different dates.  (# 75, p. 53.)  Like the first RFP, it sought proposals for companies to provide a sole source computer supported video lottery system.  (# 75, p. 54.)  Two companies responded to this RFP, IGT and VLC.  (# 75, p. 57.)

Mr. Wilhelm was a member of the evaluation committee that considered these bids.  Members of the committee included Bill Woodford, Ms. Gunnoe, John Melton (assistant secretary of tax and

revenue) and Pam Lopez, the Lottery's on-line and communications manager.  (# 75, p. 58.)  The evaluation committee was to review the proposals and formulate a recommendation to give to Petitioner who in turn would take it to the Commission for approval.  (# 75, p. 59.)  Prior to the evaluation process, Petitioner told Mr. Wilhelm and others that "he wanted – - that we wanted VLC.  That he wanted VLC to win this thing."  (# 75, p. 60.)  The committee met and during this process, Petitioner made comments in private to Mr. Wilhelm that were in favor of VLC, while making public comments to the effect that both companies were good companies.  (# 75, p. 63.)

The committee chose VLC, but Mr. Wilhelm could not say that VLC was the best company because he had lost objectivity due to Petitioner's comments.  (# 75, pp. 65-66.)

On cross examination, Mr. Wilhelm explained that from the Lottery's inception, the advertising contract had always been a subcontract to the contract the Lottery had with Scientific Games. Fahlgren Martin had had the advertising contract for a number of years before 1991.  (# 75, p. 74.)

Mr. Wilhelm testified that Petitioner asked him to help Ms. Gunnoe in dealing with the purchasing department and the approval of the Fahlgren Martin contract.  (# 75, p. 75.)  Mr. Wilhelm recalled making a comment about the competence of Ms. Gunnoe's ability to handle the job.  He testified that he was "concerned that maybe she missed some steps in the process, you know, not

42

having all the right things together, and I probably did say something to [Petitioner] about that." (# 75, p. 76.) Mr. Wilhelm testified that he had a conversation with Petitioner around the time the contract was awarded to Fahlgren Martin in which Petitioner said that "he felt there was no reason to change, that things were going good, sales were good, we're not having any problems, why would we need to change." (# 75, p. 77.)

Mr. Wilhelm testified that Ms. Gunnoe told the Commissioners that the evaluation committee had recommended Fahlgren Martin and that there were various things available for them to examine such as videotapes of the presentations. (# 75, p. 79.) The contract was not approved at this first meeting of the Commissioners because Mr. Kusic wanted to take a look at the tapes. (# 75, p. 80.)

Regarding the RFP, Mr. Wilhelm's committee recommended to the Commission that VLT be awarded the contract. (# 75, pp. 94-95.) Mr. Wilhelm testified that irrespective of Petitioner's preference that VLT be awarded the contract, Mr. Wilhelm felt that VLT could do the job. The Commission never approved the contract with VLT. (# 75, p. 95.)

     j. James E. Foster.

Mr. Foster served as a Lottery Commissioner from July of 1985, through July of 1991. (# 75, pp. 104-05.) Mr. Foster attended a meeting in 1991, where Ms. Gunnoe made a presentation about awarding the advertising contract to Fahlgren Martin. Petitioner

43

was present at this meeting.  (# 75, pp. 107-08.)  Mr. Foster
questioned Ms. Gunnoe about the evaluation documentation and the
evaluation process.  (# 75, p. 108.)  Ms. Gunnoe "was hesitant and
gave [Mr. Foster] the impression that the evaluation had not been
carried  out  according  to  the  proper  procedures  and  the
documentation."  (# 75, p. 109.)  Mr. Foster had been involved in
the awarding of other contracts by the Lottery and instructed Ms.
Gunnoe that a numerical quantitative analysis of each applicant
should have been completed.  (# 75, p. 109.)  Mr. Foster told Ms.
Gunnoe that was what he wanted to see regarding this contract, and
Ms. Gunnoe told him it was not available.  Mr. Foster let Ms.
Gunnoe know that the proper procedures had not been followed and
that he was uncomfortable with the situation.  (# 75, p. 110.)
Petitioner's only comment was that the process was done according
to the way it should have been done.  Petitioner did not state
there were numerical scorings.  (# 75, p. 111.)  The Commission did
not vote on the contract at this meeting.  (# 75, p. 113.)

On cross examination, when asked what role the Petitioner, as
director of the Lottery, played in awarding contracts, Mr. Foster
testified  that  Petitioner  did  not  participate  in  awarding
contracts.  (# 75, p. 115.)  Mr. Foster testified that substantial
contracts with the Lottery require evaluation and supporting
evaluation.  (# 75, p. 116.)  Mr. Foster admitted that at the May,
1991, meeting of the Lottery Commission, in addition to the

44

Fahlgren Martin contract, the Scientific Games on-line contract was approved without evaluation forms and reports. Mr. Foster testified that this contract was a significant contract, but that unlike the advertising contract, this particular contract with Scientific Games was also "an extension of the present contract." (# 75, pp. 117-18.) Mr. Foster did not recall being told at the April, 1991, meeting that there were video tapes of the advertising presentations available. (# 75, p. 120.) At the May, 1991, meeting, Mr. Foster abstained from voting on the advertising contract because of his objections about the method of evaluation. (# 75, pp. 121-22.)

k.   Samuel N. Kusic.

Mr. Kusic served as a Lottery Commissioner from 1985 through February 5, 1993. (# 75, pp. 125-26.) Mr. Kusic attended the April, 1991 Lottery Commission meeting wherein Ms. Gunnoe advised the Commissioners that the evaluation committee had evaluated several bids and recommended Fahlgren Martin. (# 75, pp. 126-27.) Mr. Kusic questioned Ms. Gunnoe about whether there were evaluation sheets and numerical information relating to the rating of the advertising agencies. Ms. Gunnoe responded that there were no evaluations prepared or done on this contract. (# 75, p. 127.) The questioning became heated and Petitioner intervened, stating that Ms. Gunnoe was "new at this." (# 75, p. 128.) Mr. Kusic had no reason to believe otherwise. Mr. Kusic asked for any

45

documentation the evaluation committee had written down, and Ms. Gunnoe provided hand written notes that did not contain numerical scores. (# 75, p. 128.) At the May, 1991, meeting of the Commission, the advertising contract and several other contracts were up for vote. Mr. Kusic voted against awarding the advertising contract to Fahlgren Martin. (# 75, p. 129.)

Mr. Kusic attended a Lottery Commission meeting on August 24, 1992, and at this meeting he was appointed to a committee to look at the video lottery project at Mountaineer Park. (# 75, p. 130.) The committee never met, but Anthony Giambrone, another Lottery Commissioner and member of the committee, presented a report to the Lottery Commission on this issue. Mr. Kusic did not know whether Mr. Giambrone had prepared the report. (# 75, p. 131.) At the meeting, Mr. Kusic saw the report and commented that the committee had not met. Mr. Giambrone told Mr. Kusic to take a look at the report to see if he agreed with it. (# 75, p. 132.)

Mr. Kusic attended a Lottery Commission meeting at the end of November of 1992, at which a motion was made unexpectedly by Commissioner Fred Haddad to proceed with statewide expansion of video lottery. The motion passed. (# 75, pp. 133-34.) The Lottery Commission appointed a subcommittee, of which Mr. Kusic was a member, to study the issue of whether a single source or multiple source contract should be awarded. (# 75, pp. 134-35.) Petitioner told Mr. Kusic nothing would happen with the subcommittee before

46

January.  (# 75, p. 136.) Before the subcommittee could meet and
without Mr. Kusic's knowledge, an RFP went out for a single source
contract.  Mr. Kusic was "infuriated because the motion which I had
heard did not authorize the director to issue an RFP."  (# 75, p.
138.) Mr. Kusic testified that an emergency meeting of the Lottery
Commission was called.  Mr. Kusic expressed concern at the meeting
that "the RFP had been issued and that the thing that really
irritated me the most was that the RFP was issued for a single
source vendor and I had just been appointed to a committee on
November 30th to make that determination."  (# 75, p. 138.)
Petitioner attended the meeting and told the Commissioners not to
worry, that if the committee met and recommended otherwise, the RFP
could be changed. Mr. Kusic moved that the RFP be recalled, but the
motion failed.  (# 75, p. 139.)

Mr. Kusic attended a Lottery Commission meeting on January 20,
1993, at which meeting he believed the issue of the sole source
contract would be addressed.  At the end of the meeting Mr. Kusic
raised two issues.  First, he provided copies of an advertisement
for Mountaineer Park that showed a video lottery machine with the
initials VLC or VLTS, but he knew that Bally had the machines at
Mountaineer Park.  Mr. Kusic found it strange that Mountaineer Park
was advertising machines for which the Lottery Commission had not
even awarded a contract.  (# 75, pp. 141-42.)

Second, Mr. Kusic also stated at the meeting that it was his

47

understanding that VLC was paying for or financing renovations at the Charles Town racetrack.  (# 75, p. 142.)  Petitioner's response was that he would check out the advertisement.  Shortly thereafter in February 1993, Mr. Kusic was fired from the Lottery Commission by Governor Caperton.  (# 75, p. 143.)

On cross examination, Mr. Kusic was asked if the Lottery Commission had the power and authority to control renovations made at the Charles Town racetrack since it did not own the racetrack.  Mr. Kusic responded that the Lottery did not have such authority unless it related to the Lottery.  Mr. Kusic conceded that Mountaineer Park, not the Lottery, put the ad in the newspaper picturing VLC machines.  (# 75, p. 146.)

Mr. Kusic admitted that at a Lottery Commission meeting on November 16, 1992, Mr. Haddad announced that at the November 30, 1992, meeting he was going to move for the implementation of statewide video lottery.  (# 75, p. 153.)  Mr. Kusic further testified that Mr. Haddad had made such statements in the past and not done so.  (# 75, p. 154.)

Mr. Kusic was unaware of any rules or regulations created by the Commission for the evaluation of certain kinds of contracts.  (# 75, p. 158.)

Mr. Kusic reviewed the video tapes of the presentations made by the advertising agencies.  (# 75, p. 161.)  Mr. Kusic voted against awarding the contract to Fahlgren Martin.  (# 75, p. 162.)

l.   Robert Babcock, Jr.

Mr. Babcock was employed as the vice-president of government relations at VLT.  Mr. Babcock testified that VLT has a wholly owned subsidiary known as VLC.  (# 75, pp. 163-64.)  Mr. Babcock first met Petitioner in 1989 or 1990 when Mr. Babcock was the lottery director in Vermont.  In early 1991, shortly after he came to VLC, Mr. Babcock came to West Virginia to meet with Petitioner.  Mr. Babcock's job involves lobbying legislatures and working with state government officials and lottery directors in securing passage of bills pertaining to his company securing online contracts.  (# 75, p. 165.)

At his first meeting with Petitioner in February of 1991, Mr. Babcock testified that Petitioner was very much in favor of video lottery expansion.  (# 75, p. 166.)  Mr. Babcock met with Governor Caperton in July of 1991.  (# 75, p. 168.)  Mr. Babcock was aware of a poll conducted in May or June of 1991 that indicated a negative public reaction to video lottery.  (# 75, pp. 169-70.)  At the meeting, the Governor indicated to him that he was not going to proceed with the statewide video lottery program until after the election in November of 1992.  After this meeting, Mr. Babcock had discussions with Petitioner about expansion of video lottery.  (# 75, p. 171.)

Upon learning this information, VLC began to strategize as to how it could meet with track officials and begin to expand video

lottery in West Virginia.    (# 75, pp. 171-72.)   VLC met with officials from the Charles Town Race Track and in the fall of 1992, entered into an agreement with them to provide video lottery terminals and for VLC to perform renovations at the track.  (# 75, pp. 172-73.)  Mr. Babcock had discussions with Petitioner about this.  (# 75, p. 173.)

On July 17, 1992, Mr. Babcock met with Governor Caperton about tying in the expansion of video lottery in West Virginia with the location of a plant in West Virginia.  (# 75, p. 176.)  The offer, which was in written form at the request of the Governor, was that VLC would provide a central communications system and all the terminals for a video lottery program and locate a manufacturing plant in West Virginia.  (# 75, pp. 176-77.)  When Mr. Babcock spoke with Petitioner about this written agreement, Petitioner had two changes.   First, he wanted the coin operators to become involved, so that the coin operators would buy the terminals from VLC and share in the net revenue from those machines.  Second, the proposal must be subject to competitive bid.  (# 75, p. 178.)

Mr. Babcock testified that in August of 1992, Petitioner traveled to Bozeman, Montana with Bill Woodford where they met with Larry Lippon and other VLC company officials.  (# 75, pp. 179-80.)

Mr. Babcock traveled to West Virginia at the end of August, 1992 to look at potential site locations for VLC's West Virginia manufacturing plant.  (# 75, p. 182.)  On the second day of his

50

visit, September 1, 1992, Mr. Babcock attended a meeting at the
Marriott with Petitioner, Mr. Woodford and Jack Boyle of VLC to
discuss the parameters of the RFP. (# 75, pp. 183-84.)  Mr. Babcock
testified that this discussion was helpful in preparing VLC's bid.
(# 75, p. 186.)

On September 23, 1992, Mr. Babcock testified that he received
a call from Petitioner asking him what was going on because VLC's
stock was "down to 9." (# 75, p. 188.)  Petitioner inquired of Mr.
Babcock if it was going to drop further and when he should buy.
Mr. Babcock did not know whether Petitioner purchased stock in VLC.
(# 75, p. 188.)

Regarding the RFP, Mr. Babcock testified that VLC received it
in December of 1992.  VLC had received a draft, but Mr. Babcock did
not know how VLC got it.  Mr. Babcock testified that it would have
been of benefit to VLC to have the draft of the RFP, particularly
if it was the only company to receive the draft. (# 75, p. 189.)

Mr. Babcock testified that in November of 1992, Petitioner
called Mr. Babcock and asked him to come to West Virginia for a
meeting.  The meeting took place around November 20, 1992.  Mr.
Babcock, Mr. Woodford, Petitioner and Dan Bower, chairman of the
board of VLT, attended the meeting.  (# 75, p. 191.)  VLC
ultimately proposed two sites in their RFP response, Glenville and
Belington, but VLC "zeroed in on Glenville." (# 75, p. 192.)  In
order to prepare the RFP, VLC discussed the terms of the lease in

51

Glenville.  (# 75, p. 193.)  Petitioner was upset that VLC had not chosen Belington as its manufacturing site and that VLC had not told him directly about this decision.  (# 75, pp. 190, 192.)

Mr. Babcock testified that VLC was obligated to spend 1.2 million dollars at Charles Town Race Track.  (# 75, pp. 193-94.) Mr. Babcock attended a Lottery Commission meeting on January 20, 1992, at which Mr. Kusic asked questions about VLC and an ad in the newspaper and goings on at the Charles Town Race Track involving VLT.  Mr. Babcock did not respond to or comment on any of these questions.  Both he and Petitioner were aware during this meeting of the agreement with Charles Town Racetrack.  Petitioner also did not respond to these questions.  (# 75, p. 197.)

On cross examination, Mr. Babcock testified that after the RFP was issued, he considered the bidding process a serious thing and did not feel that VLC "had a lock on the contract."  (# 75, p. 202.)

When asked if Petitioner ever conditioned the award of a contract on the location of the manufacturing plant in Belington, Mr. Babcock testified that Petitioner did not.  (# 75, p. 207.)

Mr. Babcock testified on cross examination that he did not believe, based on statutory language, that a bidding process was necessary, but that Petitioner indicated that the Lottery Commission had to receive bids.  (# 75, p. 209.)

Regarding the Charles Town Race Track, Mr. Babcock testified

52

that the Lottery Commission did not own the track and that the renovations to the track were solely at the risk of VLC. There was no agreement with the Lottery Commission that upon making these improvements at the Charles Town Race Track, VLC would receive something in return. (# 75, p. 210.)

At the meeting at the Marriott in September of 1992, there was never any commitment or deal that VLC would get the contract. (# 75, p. 210.)

m.   Kerry Reppert.

Mr. Reppert was employed by International Games Technology ("IGT") as a sales manager. In early 1991, Mr. Reppert met with Petitioner about expanding video lottery in West Virginia and the use of a central computer system that would monitor this video lottery system. (# 76, pp. 4-5.) The plan Mr. Reppert and Petitioner discussed involved the Lottery administering the program with multiple vendors. (# 76, p. 5.) Mr. Reppert's expectation from these conversations was that IGT would participate in the expansion of video lottery in West Virginia. (# 76, p. 19.)

At the end of 1992, IGT's involvement with the Lottery changed. Mr. Reppert testified that "[i]t changed from an opportunity perhaps to a slow down of that opportunity where we were just kind of waiting to hear something more." (# 76, pp. 10-11.) In July of 1992, IGT was then told that video lottery would expand very quickly in West Virginia. On November 4, 1992, Mr.

Reppert met with Petitioner, who told him the RFP was ready to go. Neither Mr. Reppert nor other representatives of IGT had any input into the content of the RFP and were not given a copy of it at this meeting.   Mr. Reppert first saw a copy of the RFP when it was released.  (# 76, p. 12.)  There was a "major change" in that the RFP now called for a monopolized sole source vendor as opposed to multiple vendors.  In addition, the timing required to respond to it all was very short and over a holiday period.  (# 76, pp. 13, 15.)  And third, "there was a pricing issue of the equipment that the private sector would be buying.  Having that placed in the bid was very unusual."  (# 76, p. 13.)  The use of a sole source vendor was a change from Petitioner's position when Mr. Reppert met with Petitioner in 1991.  (# 76, p. 13.)

Mr. Reppert testified that it would have been helpful if he had had an advance copy of the RFP, had input into the RFP or if a bidder's conference, a practice customary in the industry, had been held prior to issuance of the RFP.  (# 76, p. 15.)

Mr. Reppert testified that there was a blackout period in this particular bidding process where bidders are not allowed to contact the state in any way.  No one from IGT contacted the Lottery until they requested a public meeting and no one from the Lottery contacted IGT during this time period.  IGT subsequently submitted a bid and made a presentation to the evaluation committee.  (# 76, pp. 16-17.)

54

Mr. Reppert reviewed VLC's bid, which revealed that IGT's bid was substantially less.  The difference between the two bids was approximately $1,000 per machine, so for 8,000 machines, the total difference was $8,000,000.00.  (# 76, p. 18.)

On cross examination, Mr. Reppert admitted that he would not have been opposed to a sole source approach.  (# 76, p. pp. 22-23.) Mr. Reppert was asked whether it was true that the Lottery would not actually be buying the machines, and, as a result, the difference in dollars would not make a difference to the State.  In response, he agreed and stated "[t]hat was what was surprising that the state wasn't ... involved or concerned about it but yet they should be because they were representing the private sector and putting the price of the equipment in a bid that the private sector would pay for ...."  (# 76, p. 27.)

When questioned about the request for a meeting during the blackout period, Mr. Reppert stated that there was some discussion and that IGT also made a presentation to the evaluation committee. (# 76, p. 30.)

On redirect, Mr. Reppert was asked why it was unusual for a company to bid full retail price for a contract of this nature, as VLC did.  Mr. Reppert testified that "in a bidding war ... [y]ou're expected to provide the very cheapest price of the product ... to win the bid.  If you're a thousand dollars higher per machine, that's substantial."  (# 76, p. 35.)

n.   William Woodford.

Mr. Woodford worked at the Lottery as chief of security and computer services. Petitioner was Mr. Woodford's supervisor. (# 76, p. 38.)   Petitioner gave Mr. Woodford research assignments related to video lottery. (# 76, pp. 41-42.)  Mr. Woodford visited VLC's headquarters in Bozeman, Montana in August of 1992, to inspect their manufacturing facility.   (# 76, p. 43.)   While on this trip, Mr. Woodford also visited Pierre, South Dakota with Petitioner and others.   (# 76, p. 43.)   When Mr. Woodford and Petitioner first arrived in South Dakota, they were met by two of VLC's lobbyists, Steve Haid and Bill Perry, both of whom live in Charleston, West Virginia. (# 76, p. 44.)   Mr. Lippon and Mr. Babcock were also present. (# 76, p. 45.)  During the visit, in a meeting attended by Petitioner and Mr. Woodford, Mr. Lippon proposed that VLC locate a manufacturing plant in West Virginia. This proposal was contingent upon VLC selling terminals exclusively in West Virginia.   (# 76, p. 48.)   Petitioner later asked Mr. Woodford to write a confidential summary of VLC's proposal. (# 76, pp. 50, 55.)  Mr. Woodford's summary provided a brief history of VLC, listed VLC's proposal and then described a possible way to get the manufacturing plant in West Virginia, i.e., through a sole source contract with VLC. (# 76, p. 52.)  Mr. Woodford agreed that his summary was the way to award the contract to VLC with the least resistance.   (# 76, p. 55.)   Mr. Woodford's next assignment from

56

Petitioner was to examine video lottery RFPs from other jurisdictions. (# 76, pp. 56-57.)   While working on these assignments, Mr. Woodford had phone conversations with Jeff Boyle of VLC about video lottery in West Virginia. (# 76, pp. 57-59.)

Mr. Woodford's next assignment from Petitioner was to begin preparation of an RFP. (# 76, p. 59.)   On September 1, 1992, he attended a meeting at the Marriott with Petitioner, Mr. Babcock and Mr. Boyle.   There were no representatives from IGT present.   The purpose of the meeting was to discuss video lottery issues and the RFP in general terms. (# 76, p. 60.)   Mr. Woodford took his notes dealing with the RFP and read them aloud at the meeting. (# 76, p. 61.)   Mr. Woodford took notes at this meeting, and the notes reflect that VLC had indicated that with a sole source contract there would be a monopoly situation and, as a result, there needed to be a method in place to keep the pricing competitive.   They suggested tying the price to similar terminals in competitive markets. (# 76, p. 64.)   Some of VLC's suggestions were included in the RFP, suggestions which Mr. Woodford viewed as "unbiased." (# 76, p. 67.)   During this meeting, Petitioner stated that the release date would be sometime shortly after the election. (# 76, p. 70.)

Mr. Woodford met with Mr. Reppert of IGT in November of 1992, after the RFP had been written, but he did not use these notes specifically. (# 76, p. 66.)   He did not go over the notes with

Scientific Games either, which was also in a position to bid on the contract. (# 76, p. 66.)

Mr. Woodford testified that the sole source provision arose originally from VLC's proposal. From the time Mr. Woodford was employed by the Lottery until he visited Bozeman, Montana with Petitioner, it was his understanding that there would be multiple manufacturers. (# 76, p. 76.) There was a fairly long period of time when it was unclear whether the Lottery would proceed under sole or multiple source, but Petitioner eventually indicated his preference for sole source. (# 76, pp. 77-78.) Thereafter, Mr. Woodford proceeded to draft a video lottery sole source RFP. (# 76, p. 78.)

Petitioner initially indicated to Mr. Woodford his preference for VLC. Mr. Woodford was on the evaluation committee that would recommend which company should receive the sole source contract. Once Mr. Woodford became involved with the evaluation committee, Petitioner gave Mr. Woodford a straight order that he wanted VLC to win. (# 76, pp. 78, 80.)

Mr. Woodford gave a copy of the RFP draft to Mr. Boyle at his request and asked him not to make any copies of it. Knowing Petitioner's preference for VLC, Mr. Woodford was concerned about VLC's ability to respond to the RFP in such a short time period given problems the company was having in Australia. (# 76, pp. 79-81.) Mr. Boyle returned the draft with notes in the margins

58

related to terms in the RFP.  Mr. Woodford made some of the suggested changes.  (# 76, p. 82.)

Mr. Reppert of IGT asked for a copy of the RFP in November, but Mr. Woodford did not give the draft copy to anyone else.  (# 76, p. 80.)

Mr. Woodford purchased VLTS stock on September 28, 1992.  (# 76, p. 85.)  Mr. Woodford purchased the stock after Petitioner made a positive statement about the company's stock price.  (# 76, p. 86.)  Mr. Woodford sold the stock on October 16, 1992, after he met with Mr. Curtiss of purchasing and dates were set up to release the video lottery RFP.  Mr. Woodford told Petitioner that he felt uncomfortable holding stock in a company that was bidding for the video lottery contract.  (# 76, p. 87.)

Mr. Woodford finished the RFP in late October, 1992, and delivered it to purchasing on November 2, 1992, the day before the election on November 3, 1992.  (# 76, p. 88.)  On November 2, 1992, Mr. Curtiss informed Mr. Woodford that he needed a written copy of the summary of the video lottery proposal, but Mr. Woodford had expected this request would come after the election.  (# 76, p. 89.)  Mr. Woodford faxed Mr. Curtiss a copy of the summary and prepared a memorandum to Petitioner expressing his concerns about the publicity that might result from taking the RFP to purchasing prior to the election.  (# 76, p. 90.)

Petitioner told Mr. Woodford to stop the bidding process.  (#

76, pp. 92-93.)   State purchasing bulletins had already been printed and Mr. Curtiss told Mr. Woodford that the bulletins would have to be reprinted at the Lottery's expense.  (# 76, pp. 93-94.) Mr. Woodford retrieved the original bulletins and put them in the Lottery warehouse.  (# 76, p. 95.)

Mr. Woodford attended a Lottery Commission meeting in December of 1992, at which a subcommittee was appointed to further study video lottery. (# 76, p. 97.)  After the meeting, Mr. Woodford told Petitioner he was under the impression from the Lottery Commission meeting that the Lottery would not proceed with video lottery for a while.  Petitioner told Mr. Woodford that they would proceed with video lottery procurement.  Mr. Woodford contacted Mr. Curtiss and asked him to give him dates of when an RFP would be released and required to be done.   (# 76, p. 98.)   Mr. Woodford informed Petitioner of the quickly approaching purchase dates and, as a result, a new RFP was delivered to Mr. Curtiss.  (# 76, p. 100.)

Mr. Woodford served on the evaluation committee for the RFP proposals.  Mr. Wilhelm, Ms. Gunnoe, Pam Lopez and John Melton served on the committee as well.  All were selected by Petitioner. Two responses to the RFP, from IGT and VLT, were received on December 30, 1992. (# 76, p. 101.)  The evaluation committee chose VLT using a points rating system.  (# 76, p. 111.)  Mr. Woodford had conversations with Petitioner during the evaluation process. At one point, Mr. Woodford told Petitioner that it was close and

that he even expected VLT to win. Petitioner told Mr. Woodford "that's fine." (# 76, p. 112.) Mr. Woodford's preference was for VLT to win because it was known as a leader throughout the industry, and Petitioner told Mr. Woodford he wanted VLT to win. (# 76, pp. 112-13.) Mr. Woodford testified that he incorrectly told the grand jury that he did everything in his power to see that VLT won the contract. (# 76, p. 113.)

On cross examination, Mr. Woodford testified that the RFP he drafted was a generic RFP relatively common in the industry. (# 76, p. 118.)

Mr. Woodford testified that while he was not initially subject to civil service protection, by August of 1992, he was subject to such protection and, as a result, Petitioner was not able to fire him without good cause. The influence Mr. Woodford felt from Petitioner was out of respect and a desire to please his boss, not out of fear of losing his job. (# 76, p. 119.)

Regarding Mr. Woodford's decision to provide a copy of the draft RFP to Mr. Boyle, Mr. Woodford testified that no one directed him to do this, and he told no one that he did it. (# 76, pp. 126-27.)

Mr. Woodford testified that the evaluation committee actively evaluated the two RFP bids and reviewed them in detail. (# 76, pp. 131-32.) VLC received the highest score, and Mr. Woodford believed that VLC could do the job. (# 76, p. 132.) Mr. Woodford prepared

61

a report indicating the committee's recommendation, though it was never presented to the Lottery Commission. (# 76, p. 133.)

On redirect, Mr. Woodford testified that he goes back a long way with Petitioner and that it was difficult to testify against Petitioner. Mr. Woodford conceded that he made several appearances before the grand jury because he did not tell the whole truth at first out of a sense of loyalty to Petitioner. (# 76, pp. 134-35.) Mr. Woodford agreed that while he testified that the RFP he drafted was "generic," there is no other sole source video lottery system in the country. (# 76, p. 138.)

Mr. Woodford testified that he gave the draft RFP to Mr. Boyle because he was concerned about VLT's ability to respond. He explained that he was worried about that because he was aware, based on conversations with Petitioner, that Petitioner and the Governor wanted VLT to win. (# 76, p. 141.)

o.  Anthony Giambrone.

Mr. Giambrone served on the Lottery Commission beginning in 1989. (# 76, p. 146.) Mr. Giambrone attended a Lottery Commission meeting on August 24, 1992, at which he was asked by Petitioner to make a motion to form a subcommittee to study video lottery at Mountaineer Park. (# 76, pp. 149-51.) Mr. Giambrone, along with Commissioners Lawrence Pack and Samuel Kusic were placed on the subcommittee. (# 76, p. 151.)

Mr. Giambrone attended a Lottery Commission meeting on

September 18, 1992, and the minutes reveal that Mr. Giambrone commented "on the Mountaineer Park experience and the changing technology." (# 76, pp. 151-52.) Mr. ReBrook gave Mr. Giambrone the statement to read at the meeting. At that time, the subcommittee that was formed on August 22, 1992, had never met. (# 76, p. 153.)

Mr. Giambrone attended a Lottery Commission meeting on October 26, 1992, and asked Petitioner certain questions, which questions were given to Mr. Giambrone by Mr. ReBrook. (# 76, pp. 153-55.) The subcommittee had not met as of this meeting. (# 76, p. 155.)

Mr. Giambrone attended a Lottery Commission meeting on November 30, 1992, and the minutes reflect that he submitted a subcommittee report, given to him by Mr. ReBrook, even though the subcommittee had never met. (# 76, pp. 155-56.) The report stated that the "'subcommittee after studying carefully the Mountaineer Park video lottery experience, proposes to allow video lottery game machines in only Class-A liquor and beer establishments.'" (# 76, p. 157.) Mr. Giambrone testified that the subcommittee had not studied anything and had no input whatsoever into this report. (# 76, p. 157.) At the time of this meeting, Mr. Giambrone had no knowledge that an RFP for statewide video lottery expansion had been sent to purchasing in the first part of November 1992, and then retrieved. (# 76, p. 158.)

On cross examination, Mr. Giambrone testified that the

63

subcommittee appointed to study video lottery at Mountaineer Park never met formally, but talked about having a meeting.  (# 76, p. 160.)  Mr. Giambrone never told any members of the Commission that the subcommittee had never met.  (# 76, p. 160.)  Both Messrs. Pack and Kusic also never stated at the Commission meeting that they had not met or investigated Mountaineer Park.  (# 76, p. 161.)  Mr. Giambrone conceded that it was his responsibility as chairman of the subcommittee to get the committee together for a meeting.  (# 76, p. 162.)

On redirect, when asked what the real purpose of the subcommittee's report was, Mr. Giambrone responded that it was "[w]indow dressing."  (# 76, p. 162.)

p.   John Perdue.

Mr. Perdue was employed as senior executive assistant to Governor Caperton.  Mr. Perdue was on a leave of absence working on the Governor's campaign during the election in November of 1992, but returned to the office on November 5, 1992.  On November 5, 1992, he attended a meeting, along with Petitioner, Jim Paige, Lloyd Jackson and Tom Heywood about implementing video lottery in West Virginia.  (# 76, pp. 166-67.)  At the meeting, Petitioner stated that the Lottery was ready to implement video lottery and had an RFP ready to go.  At the conclusion of the meeting, Mr. Perdue heard the Governor direct Petitioner to retrieve the RFP that was in finance and administration and go back to the Lottery

64

Commission with it.  (# 76, p. 168.)

On cross examination, Mr. Perdue testified that the Governor called the meeting after the November election.  (# 76, p. 169.) Mr. Perdue understood that the reason for retrieval of the RFP was to allow it to go before the Lottery Commission.  (# 76, p. 171.)

q.  Brian Tone.

Agent Tone was employed by the FBI.  Agent Tone served a subpoena on Petitioner to appear before a grand jury on January 21, 1993.  (# 76, p. 182.)  Agent Tone interviewed Petitioner on three occasions subsequent to serving the subpoena.  When asked about contacts with agents or employees of VLC, Petitioner told Agent Tone that his contacts were limited to official settings with VLC officials as well as other gaming company officials, such as conventions.  Thereafter, Agent Tone learned of Petitioner's August 1992, meeting with VLC officials from a newspaper article and asked Petitioner about it.  (# 76, p. 183.)

Agent Tone asked Petitioner if he knew of the outcome of the evaluation committee that studied video lottery and if he had learned of their decision as to which company they had recommended, IGT or VLC.  Petitioner responded that until Agent Tone had advised him that VLC had been chosen, he was unaware that VLC had won.  (# 76, p. 184.)

Petitioner admitted to Agent Tone that contrary to his grand jury testimony, the expansion of video lottery was linked to the

65

1992 election.  (# 76, p. 185.)

Petitioner admitted to Agent Tone that he had purchased stock in GTech, IGT and VLC and that he had purchased the VLC stock on September 23, 1992.  He spoke to Mr. Woodford and Mr. ReBrook about the VLC stock.  (# 76, p. 186.)  Agent Tone reviewed a newspaper article about Petitioner traveling to Bozeman, Montana.  (# 76, p. 186.)

On cross examination, Agent Tone testified that he conducted interviews of Petitioner on February 1, 3 and 8, 1993.  Agent Tone prepared a memorandum of these meetings, which was based on his notes and memory of the meetings.  Agent Tone agreed that the memorandum does not contain the exact statements of Petitioner.  (# 76, p. 189.)  Petitioner admitted he had traveled to Bozeman, Montana after Agent Tone asked him about it.  (# 76, p. 191.)

r.  Lawrence A. Pack.

Mr. Pack was a Lottery Commissioner appointed in mid-1991.  (# 76, p. 196.)  Mr. Pack characterized the Commission's role as policy and oversight oriented.  (# 76, p. 198.)  Mr. Pack attended a meeting on August 24, 1992, at which he was appointed to a subcommittee, along with Messrs. Giambrone and Kusic, to review video lottery activities at Mountaineer Park.  The subcommittee never met.  (# 76, p. 199.)  At a meeting on November 30, 1992, Mr. Pack testified that a subcommittee report on the topic was presented, but that he had no input into this report.  The report

contained a general recommendation that video lottery at
Mountaineer Park was successful, a statement with which Mr. Pack
agreed. (# 76, p. 200.) At this meeting, Mr. Pack sat beside Mr.
Haddad, who intended to make a two-part motion about video lottery.
The motion first stated that video lottery had been successful and
should be expanded. The second part authorized the director to
prepare and issue an RFP to obtain a private contractor to
implement the video lottery. Mr. Pack testified that Mr. Haddad
did not agree with the second portion of the motion related to the
RFP because he believed the Lottery was not yet ready to authorize
issuance of the RFP. As a result, Mr. Pack witnessed Mr. Haddad
scratching out the second part of the motion. (# 76, p. 202.) Mr.
Haddad made the motion without the inclusion of the second part of
the original motion. (# 76, pp. 202-03.)  The motion passed, but
Mr. Pack did not vote on it. (# 76, p. 203.)

On November 30, 1992, at Mr. Haddad's suggestion, a
subcommittee was appointed to determine how video lottery should be
implemented statewide.  Mr. Pack believed that the subcommittee
would work to determine how to implement video lottery and work
with the Commission staff to that end and then report back. (# 76,
p. 204.)

Sometime in the next week, Mr. Pack testified that he learned
from the newspaper that an RFP had been issued by the Commission
staff.  Mr. Pack was surprised and did not believe the

67

Commissioners had authorized the Commission staff to take such action. (# 76, pp. 204-05.)

Mr. Pack had no knowledge of an RFP that had been delivered earlier in November of 1992. (# 76, p. 205.)

Mr. Pack attended a meeting on December 7, 1992, where Petitioner was asked about the RFP. Petitioner stated to the Commission that it was his understanding that he had the authority to issue the RFP. (# 76, p. 206.)

Mr. Pack attended a Commission meeting on January 20, 1993. At this meeting, Mr. Kusic raised the issue of VLC financing improvements at the Charles Town Racetrack and an advertisement for Mountaineer Park that contained a VLC logo on it. (# 76, pp. 207-08.)

At the January 20, 1993, meeting, Mr. Pack did not know that Petitioner owned VLC stock. Mr. Pack would have found this information to be important prior to the time the Commission voted on awarding the sole source contract for video lottery. (# 76, pp. 209-10.)

On cross examination, Mr. Pack testified that he supported the report made by Mr. Giambrone on video lottery at Mountaineer Park. Mr. Pack testified that the Commissioners received financial statements and had had numerous discussions with individuals at Mountaineer Park related to video lottery during this time period and, as a result, did not feel it was necessary for the

68

subcommittee to meet.  (# 76, p. 211.)  However, Mr. Pack stated
that if a subcommittee was appointed, "we probably should have
met."  (# 76, p. 211.)

Mr. Pack testified that at a meeting on December 7, 1992, the
Commission voted on whether to withdraw the RFP, but the vote was
not successful.  (# 76, pp. 214-15.)

s.  James Moran.

Mr. Moran was employed with GTech Corporation ("GTech") as the
site director for the State of West Virginia.  GTech had an online
contract with the West Virginia Lottery to provide services to the
Lottery (including a central site computer and the terminals at
which players buy lottery tickets) and to provide maintenance and
collect money for the Lottery.  Prior to working at GTech, Mr.
Moran worked at Scientific Games.  (ECF No. 119 (criminal), p. 15.)
Mr. Moran purchased meals, lunches, dinners and rounds of golf for
Petitioner paid for by GTech.  (ECF No. 119 (criminal), p. 16.)
While working at Scientific Games and GTech over a three year
period, Mr. Moran estimated that he made one hundred purchases for
Petitioner.  (ECF No. 119 (criminal), p. 17.)

On September 23, 1992, Mr. Moran was in Petitioner's office
and recalled Petitioner calling VLC headquarters and Mr. Babcock
after VLC's stock plummeted.  (ECF No. 119 (criminal), p. 17.)
Petitioner then received a call from Larry Lippon of VLC.
Petitioner told Mr. Moran that the stock drop was due to trouble in

Australia that had cleared up and "everything should be okay." (ECF No. 119 (criminal), p. 18.)   Government Exhibit 25, showing Petitioner's purchase of 300 shares of VLT stock on September 23, 1992, was admitted.

Mr. Moran identified Exhibit 49, dated August 20, 1992, a letter from Petitioner to GTech, which referred to a contract expansion involving a new game.  (ECF No. 119 (criminal), p. 20.) Since December 1992, the game had grossed 14 million dollars. Judge Haden admitted Exhibit 48 into evidence, confirmation of Petitioner's purchase of GTech stock on August 17, 1992.  (ECF No. 119 (criminal), p. 21.)

On cross examination, Mr. Moran explained that before working for GTech, he worked for Scientific Games in the Lottery building. (ECF No. 119 (criminal), p. 22.)  Mr. Moran testified that he and Petitioner talked about stocks "a lot" and that in the mornings, he would go to Petitioner's office and watch television with Petitioner to see how different stocks were trading, including VLC, GTech and IGT.  (ECF No. 119 (criminal), p. 23.)  They watched the VLC stock over several days, but only learned the reason for the drop after the phone call with Mr. Lippon, "but it may have been something in the paper."  (ECF No. 119 (criminal), p. 25.)  After the phone call Petitioner received from Mr. Lippon, Mr. Moran purchased one hundred shares of VLC stock.  (ECF No. 119 (criminal), p. 25.)

t.   Robert Wilhelm.

The United States recalled Mr. Wilhelm.  Mr. Wilhelm testified that on a trip back from Huntington in mid-October 1992, Petitioner told him that VLT had offered him a job.  (ECF No. 119 (criminal), p. 30.)

u.   C. Donald Robertson.

Mr. Robertson was semi-retired and testified that he made a stock purchase on September 24, 1992, of VLT stock.  (ECF No. 119 (criminal), p. 31.)  Mr. Robertson made this purchase after reading about the expansion of video lottery in West Virginia and based on a conversation with Mr. ReBrook.  (ECF No. 119 (criminal), p. 33.)

On cross examination, Mr. Robertson testified that he knew Petitioner and saw him occasionally.   He did not obtain any information directly from Petitioner about the VLT stock.  (ECF No. 119 (criminal), p. 34.)

v.   James Kay Thomas.

Judge Haden struck this witnesses's testimony.  (ECF No. 119 (criminal), p. 51.)

w.   Brian Tone.

The United States recalled Agent Tone, who testified about phone records and Petitioner's phone calls to and from VLC.  (ECF No. 119 (criminal), pp. 40-45.)

3.   Petitioner's Motion for Acquittal.

The Petitioner moved for acquittal on the ground that Count

71

One of the superceding indictment relied upon the honest government theory, which is "an unconstitutionally vague concept." (ECF No. 119 (criminal), p. 47.) Judge Haden denied the motion. (ECF No. 119 (criminal), p. 48.)

Regarding Count Two, Petitioner argued that there was no showing of any benefit or gain to Petitioner as to the alleged mail fraud involving the video lottery contract. Petitioner also renewed his argument related to honest services. Judge Haden denied the motion. (ECF No. 119 (criminal), p. 49.)

Regarding Count Three, Petitioner argued that the purchase of VLC stock was based on public information. (ECF No. 119 (criminal), pp. 49-50.) Judge Haden decided to strike paragraph 10 from the superceding indictment related to the purchase of VLC stock. (ECF No. 119 (criminal), p. 51.)

As to Count Four, Petitioner renewed the motion he made as to Count Three, that information was public rather than private. Judge Haden denied the motion. (ECF No. 119 (criminal), p. 52.)

Finally, as to the perjury count, Petitioner asserted that with respect to the question of who wrote the RFP, there was never a reference to anyone outside of the committee. (ECF No. 119 (criminal), p. 52.) Judge Haden noted that the questions were not a "model of clarity," but denied the motion. (ECF No. 119 (criminal), p. 53.)

　　　　4.  Evidence at trial - Petitioner.

a.   Stephen Scott.

The Petitioner called Mr. Scott, who was employed by Scientific Games as the general manager.  Mr. Scott testified that Ms. Gunnoe asked him in 1991 to participate on an evaluation committee to choose an advertising agency for the Lottery.  (ECF No. 119 (criminal), p. 54.)

Before the evaluations began, Ms. Gunnoe told Mr. Scott that she believed it was time for a change.  (ECF No. 119 (criminal), p. 55.)  Mr. Scott did not recall filling out a form of any kind during the presentations.  He took notes and wrote a summary at the end.  (ECF No. 119 (criminal), p. 55.)  Mr. Scott never attended a meeting at the conclusion of the presentations and was not advised that there was going to be a meeting.  At the end of the presentations, he returned to his office and completed a written summary that included his recommendation that Fahlgren Martin be awarded the advertising contract.  Mr. Scott gave this summary to Ms. Gunnoe's secretary.  (ECF No. 119 (criminal), p. 56.)  Mr. Scott later was asked to prepare a second recommendation, which also recommended Fahlgren Martin.  (ECF No. 119 (criminal), p. 57.)

On cross examination, Mr. Scott confirmed that he did not recall receiving numerical scoring sheets.  (ECF No. 119 (criminal), p. 58.)  Mr. Scott testified that he told Ms. Gunnoe how to conduct and score an evaluation and that her process was based on the information provided by him.  When shown an evaluation

73

sheet, he testified that it was highly possible he was given an evaluation form. Mr. Scott testified that Ms. Gunnoe never attempted to poison him against anyone, and Mr. Scott never saw any bias on the part of anyone on the committee. (ECF No. 119 (criminal), pp. 59-60.) Mr. Scott rated Fahlgren Martin first, but he also rated the Arnold Agency very high. (ECF No. 119 (criminal), p. 60.)

On redirect, Mr. Scott testified that he could not say that he saw any evaluation sheets during the evaluation process. (ECF No. 119 (criminal), p. 60.) Mr. Scott further testified that it was his understanding that the committee's purpose was to make a recommendation only. (ECF No. 119 (criminal), pp. 60-61.)

b.   Thomas Crooks.

Mr. Crooks was the senior vice president and general manager of the Parkersburg office of Fahlgren Martin. Fahlgren Martin held the advertising contract for the Lottery since its inception in 1985. (ECF No. 119 (criminal), p. 61.) Originally the contract was with Scientific Games, but in 1991, the process changed, and the contract was with the Lottery directly. Mr. Crooks testified that Fahlgren Martin had conflicts with Ms. Gunnoe that were of a creative nature. (ECF No. 119 (criminal), p. 62.) Mr. Crooks had no conversations with Petitioner prior to 1991 and the presentation for the advertising contract. (ECF No. 119 (criminal), p. 63.) Mr. Crooks testified that he had no deal or other prearrangement of

any sort where he was promised the advertising contract by the Lottery. (ECF No. 119 (criminal), p. 64.)

On cross examination, Mr. Crooks admitted that if he testified on behalf of Petitioner and Petitioner is found not guilty, that would be of great assistance to Fahlgren Martin. (ECF No. 119 (criminal), p. 66.) No one at Fahlgren Martin complained about Ms. Gunnoe until after the criminal investigation started. (ECF No. 119 (criminal), p. 67.)

c.  Kelly Farrell.

Ms. Farrell was an account manager at Fahlgren Martin. Ms. Farrell described the relationship between Ms. Gunnoe and the employees at Fahlgren Martin as strained. (ECF No. 119 (criminal), p. 69.) Ms. Farrell had no contact with Petitioner, at any time following the presentation to the evaluation committee and before the bid was ultimately awarded, concerning problems with Ms. Gunnoe. (ECF No. 119 (criminal), p. 71.)

d.  Jack Buckalew.

Mr. Buckalew was a former superintendent of the State Police. Mr. Buckalew accompanied Petitioner to Louisiana to evaluate the Louisiana lottery. (ECF No. 119 (criminal), p. 73.)

e.  Joseph Horvath.

Mr. Horvath, a certified accountant and auditor with Ernst and Young, testified that he conducted an audit of the Lottery in 1990, 1991 and 1992, which revealed that the "financial position of the

75

West Virginia Lottery ... for each of the three years [was] in
conformity with generally accepted accounting principles." (ECF
No. 119 (criminal), p. 76.)

On cross examination, Mr. Horvath testified that at the time
of his audits, he was unaware of the charges in this case. (ECF
No. 119 (criminal), p. 76.)

f. Douglas K. Wagner.

Mr. Wagner testified that he was president of Charles Town
Races, Inc. (# 77, p. 6.) Sometime in 1991, he learned of the
possibility of statewide expansion of video lottery. At the time,
the track was badly in need of an additional revenue source. (#
77, pp. 9-10.) Charles Town Race Track took bids from three
different sources, including GTech and VLC in the summer of 1992,
and visited the various facilities of these companies. (# 77, pp.
12-13.) Petitioner was not involved in this evaluation process.
(# 77, p. 13.) Mr. Wagner and the general manager recommended that
the Board of Directors choose VLC because they felt their equipment
was superior. (# 77, p. 14.) The Charles Town Race Track signed
a letter of intent with VLC, the gist of which was that VLC would
put up 1.25 million dollars to renovate the track and would be
repaid this money out of commissions from the video lottery
terminals once they were in operation. (# 77, p. 15.) Petitioner
played no role in reaching this letter of intent. (# 77, p. 15.)
Mr. Wagner spoke with Petitioner and told him they were choosing

between GTech and VLC.  Mr. Wagner "constantly kept [Petitioner] informed of what we were doing so that everyone in the state would know." (# 77, p. 17.)

Mr. Wagner became aware that a sole source RFP had been issued on the same day it came out.  He was surprised it was sole source. VLC and Charles Town Race Track reached a second agreement after the RFP was issued.  (# 77, pp. 18-19.)

On cross examination, Mr. Wagner admitted that he got Petitioner's blessing on the agreement with VLC, but that Petitioner also indicated that VLC's expenditure of 1.25 million at the track was none of his business.  (# 77, pp. 21-22.)

At one point, Mr. Wagner was prepared to make another expenditure related to video lottery machines (for barstools), and he called Petitioner to ask him his opinion.  (# 77, p. 22.)  Mr. Wagner testified that Petitioner told him something to the effect: "[t]his train is on the track.  This train is picking up speed.  If I were you, I would already have spent that money ...." (# 77, p. 24.)

Mr. Wagner testified that on the day the video lottery contract was to be announced, he called Petitioner, who told him "[w]e're dead in the water.  Those SOB's stopped us ...." (# 77, pp. 26-27.)

g.  Elton E. Bryan.

Petitioner was appointed by Governor Caperton as Director of

the West Virginia Lottery on April 15, 1990.  (# 77, p. 29.)
Petitioner's deputy director, Ms. Gunnoe, recommended that in 1991,
at the conclusion of the Fahlgren Martin contract, which was part
of the contract with Scientific Games, the advertising contract be
separated from the instant ticket contract with Scientific Games.
Petitioner was aware at that time of conflicts between Ms. Gunnoe
and Fahlgren Martin employees.  (# 77, p. 35.)  In preparation for
the 1991 advertising contract bid, he directed the advertising
department, headed by Ms. Gunnoe, to proceed with an RFP.
Petitioner became aware that an evaluation committee had been
formed and that the administrative side of his staff had prepared
the RFP, which he signed.  (# 77, p. 37.)  Petitioner never
represented to any members of the evaluation committee that they
had control of or that their decision would be final as to who
would be awarded the advertising contract.  Instead, the evaluation
committee was to provide an advisory type evaluation.  (# 77, p.
38.)

     Petitioner had no pressure from anyone to make a decision in
favor of Fahlgren Martin.  Petitioner learned that Ms. Gunnoe was
upset about the evaluation process.  (# 77, p. 39.)  Petitioner
told Ms. Gunnoe that he was in favor of awarding the contract to
Fahlgren Martin because they were having such great success and had
consistently increased the Lottery's sales.  (# 77, pp. 39, 44-45.)
Petitioner then went to Mr. Wilhelm and told him to meet with Ms.

Gunnoe and make sure that proper procedures were followed in
preparing reports for the Commission.  (# 77, p. 41.)

Petitioner met with Mr. Wilhelm and Mr. Curtiss and Ron Riley
from purchasing.    They had a discussion about the RFP and
procedures.    The matter had not yet been presented to the
Commission.  (# 77, p. 42.)

At the Lottery Commission meeting in July, Ms. Gunnoe
presented the proposal for approval of the advertising contract to
the Commission.    Petitioner did not ask Ms. Gunnoe to make this
presentation.    Petitioner never told Ms. Gunnoe to fabricate or
misrepresent anything with respect to the awarding of the
advertising contract.    (# 77, p. 43.)    At the meeting,
Commissioners Kusic and Foster asked questions about the
advertising contract.  Petitioner recalls telling the Commissioners
that video tapes of the presentations were available for their
review.  Petitioner recalled that the Commission voted to approve
the advertising contract.  (# 77, p. 47.)

When asked if he directed anyone to provide any information to
purchasing after they made a request about the advertising
contract, Petitioner testified that he did not direct Ms. Gunnoe to
prepare memoranda, nor did he ever see any memoranda from various
individuals on the evaluation committee after the request from
purchasing.    Petitioner does recall that in the earlier meeting
with purchasing, Ms. Gunnoe told Mr. Curtiss and Mr. Riley that she

79

had evaluation committee notes, and they told her purchasing needed those and she should type those up and turn them into purchasing. According to Petitioner, Messrs. Curtiss and Riley told Ms. Gunnoe that with the typed notes and the video tapes, they would have sufficient information to award the contract. (# 77, p. 48.)

Petitioner testified that Ms. Gunnoe never brought him evaluation sheets that showed any scoring of the evaluations. (# 77, p. 48.) Petitioner also testified that he never asked Ms. Gunnoe to destroy or preserve the evaluation sheets, as he "did not even know that they existed." (# 77, p. 49.)

Regarding video lottery, Petitioner testified that it was no secret that the Lottery Commission was going to go statewide with video lottery. (# 77, pp. 52-53.) Petitioner testified that the issue was publicized in the news and on television. During this time period, Petitioner had contact with the Governor about video lottery and kept him abreast of the progress in this area. (# 77, p. 53.) Initially, there was no specific date for the implementation of statewide video lottery, and, as a result, he developed a program and informed his staff that he wanted to be ready whenever the call came. Petitioner did not perceive that he had the authority to initiate the statewide video lottery process. (# 77, p. 54.)

Petitioner went to Bozeman, Montana in August of 1992, to visit VLC at the request of Governor Caperton because the Governor

had received a proposal from officials at VLC concerning the possibility of locating a plant in West Virginia.  (# 77, p. 57.) Governor Caperton asked Petitioner to find out "what VLC was all about and what kind of operation they had and so forth." (# 77, p. 57.)  While in Montana, Petitioner flew to South Dakota to see a computer driven video lottery system.  (# 77, p. 61.)  During the visit, VLC put forth a proposal for the operation of a statewide video lottery system in West Virginia that included VLC locating a plant in West Virginia.  When asked if he had the authority to agree to anything proposed by VLC, Petitioner testified that he was not there for that purpose.  (# 77, p. 62.)

Petitioner testified that VLC officials believed that the state code precluded them from having to go through the bidding process, and Petitioner "told them under no circumstances would I be a part of any video lottery system coming to West Virginia that did not provide a bidding process." (# 77, p. 63.)  Petitioner was also concerned about job loss, and, as a result, insisted that the vending machine operators be part of the system.  VLC disagreed. (# 77, p. 63.)

Upon his return, Petitioner asked Mr. Woodford to prepare a summary of VLC's perception about what video lottery should be about in West Virginia.  (# 77, pp. 64-65.)  Petitioner had a full discussion with Governor Caperton about VLC's proposal.  (# 77, p. 65.)

81

Around the first of September, 1992, Petitioner attended a meeting at the Marriott with VLC.  VLC requested the meeting.  (# 77, p. 67.)  Petitioner took Mr. Woodford to the meeting with him. Petitioner testified that there were no agreements or deals made of any sort that VLC would have the exclusive contract for the furnishing of machines in the statewide video lottery.  (# 77, p. 69.)

On September 23, 1992, Petitioner purchased VLC stock after he saw on CNBC that the price of the stock had dropped from thirty or thirty five dollars to fifteen dollars, and they had stopped trading.  (# 77, p. 70.)  Petitioner called both Mr. Babcock and Mr. Lippon of VLC.  (# 77, pp. 70-71.)  Several other individuals came and went from Petitioner's office that day, including Mr. Moran, Mr. ReBrook and Mr. Woodford.   These individuals had discussions about the VLC stock.  (# 77, p. 72.)  Petitioner denied communicating with Mr. ReBrook, Mr. Moran or Mr. Woodford about the VLC stock and why it dropped dramatically.   (# 77, p. 73.) Petitioner purchased the VLC stock because he thought it was an excellent company and he thought the stock would recover.  (# 77, p. 73.)  Petitioner's purchase of VLC stock was not based in any way upon the prospect of VLC having a sole source contract to furnish video lottery in West Virginia.  (# 77, p. 75.)

In an October 1992, meeting with the Governor, the Governor told Petitioner to prepare an RFP.   (# 77, pp. 66, 77.)

82

Petitioner's staff delivered the RFP to the purchasing department, but later, based on instructions from the Governor, Petitioner instructed his staff to retrieve it.  (# 77, p. 78.) From November when the RFP was retrieved until the first of December, video lottery was in a hold position because the Governor wanted members of the legislature and members of the Lottery Commission to have an opportunity to meet and talk about video lottery.  (# 77, pp. 78-79.)

In early December, Petitioner testified that a second RFP was submitted to purchasing.  The only change to this RFP was the date by which certain phases of the proposal had to be completed.  Both the first and second RFP contained single source provisions.  (# 77, p. 79.)  The decision to require a single source proposal was based on analysis and study by Petitioner's staff.  (# 77, p. 81.) Petitioner testified that the Commission's involvement in this process was "very limited," but that in November and December of 1992, a subcommittee was appointed to review the Mountaineer Park experience.  The subcommittee did "very little," but did travel to Rhode Island to examine that state's implementation of video lottery.  (# 77, pp. 82, 83-84.)  The subcommittee and ultimately the Commission approved the sole source contract concept.  (# 77, p. 84.)

Petitioner presented a speech to the legislature at the request of the Governor in an attempt to inform the legislature of

the Lottery's contemplated actions.  Petitioner prepared a speech, took it to the Governor along with two other speeches, one prepared by Mr. Babcock and the other prepared by Mr. ReBrook.  (# 77, p. 86.)  Petitioner and the Governor took parts from the three speeches and incorporated them into one.  (# 77, p. 87.)

Petitioner was never given anything by the Fahlgren Martin Agency favoring their company for the advertising contract.  (# 77, p. 87.)

Petitioner was never given anything by VLC for proposing that the Lottery adopt a sole source arrangement, nor was he given anything for recommending or favoring VLC as the vendor for the sole source contract.  (# 77, pp. 87-88.)

Petitioner favored VLC over IGT because VLC had the best "market share of the product or the highest play" and VLC had a validation system which could control several hundred machines, as opposed to IGT, which had a validation system that could only handle "sixty on a pad."  (# 77, pp. 88-89.)

Regarding activities at Charles Town Race Track, Petitioner testified that he was aware of activity going on there, but the Lottery had no supervisory responsibility over the track.  (# 77, pp. 89-90.)  Petitioner never encouraged Mr. Wagner to select VLC as a machine vendor because they were going to get a statewide contract.  (# 77, pp. 90-91.)

Petitioner attended a Lottery Commission meeting on January 19

84

or 20, 1993, and there was a discussion about video lottery and the fact that the Lottery was not yet ready to move forward. (# 77, p. 91.)  Following the meeting, the Governor called Petitioner.  (# 77, p. 92.)

On cross examination, Petitioner testified that he told people who asked, that the evaluation committee chosen to evaluate the advertising agencies would make a recommendation to the Lottery Commission.  (# 77, p. 94.)

Petitioner conceded that five individuals testified under oath that the evaluation committee used numerical scoring and chose the Arnold Agency, but Petitioner testified that the five witnesses were lying and that there never was a grading system of any sort. (# 77, pp. 96-97.)

Petitioner conceded that Ms. Gunnoe had conflicts with Fahlgren Martin, but Petitioner appointed her to the evaluation committee because it was within her job responsibilities. Petitioner denied that Ms. Gunnoe's complaints with Fahlgren Martin were related to money, and instead testified that they were creative.  However, Petitioner agreed that he approved Lottery advertising in Smoot Fahlgren's son's publication, "Wally's and Wimpy's World," from which Fahlgren Martin received a commission. (# 77, pp. 98-99.)

Petitioner denied that he told Ms. Gunnoe she had to go with Fahlgren Martin even though the Arnold Agency won the evaluation.

85

(# 77, p. 100.)

Petitioner denied that Mr. Curtiss from purchasing asked him specifically for numerical scores, and that when the question came up about whether there was any information available as to the process which was used, Petitioner responded that he had video tapes of the presentations and Ms. Gunnoe said she had notes from that proceeding.  According to Petitioner, Mr. Curtiss would have accepted Ms. Gunnoe's notes if she could get them in shape.  (# 77, pp. 100-01.)

Petitioner had dinner with Smoot Fahlgren on February 6, 1991, and February 25, 1991, and met with him on March 4, 1991, and June 3, 1991.  (# 77, pp. 102-03.)  Petitioner agreed that the first RFP on the advertising contract was issued in January of 1991, and the presentations were made in April of 1991.  Petitioner conceded it was possible he had met with one of the principals of Fahlgren Martin during the blackout period for the advertising contract.  (# 77, p. 106.)

Regarding video lottery, Petitioner agreed that in February of 1991, he may have told various video lottery companies that video lottery statewide in West Virginia was sixty to ninety days away from implementation.  (# 77, p. 108.)  In the summer of 1991, Petitioner became aware of a poll that did not favor statewide expansion of video lottery. (# 77, p. 109.)  Petitioner did not recall a conversation with Mr. Babcock following a meeting Mr.

Babcock had with the Governor on June 16, 1991, at which Mr. Babcock told Petitioner that video lottery was being put on hold until after the general election because of this poll. (# 77, p. 110.)  Petitioner testified that the general election of 1992, had absolutely nothing to do with the expansion of video lottery statewide in West Virginia. (# 77, pp. 114-15.)  When confronted with his admission to Agent Tone that he testified falsely to the grand jury on this issue, Petitioner testified that he did not recall that he admitted to Agent Tone that he testified falsely before the grand jury.  "It was a general consensus and it was in the press and the press was asking questions, is the election of 1992 a factor.  In my mind, it was not a factor because I was not calling the shots." (# 77, p. 118.)

Petitioner was aware of a meeting between Mr. Babcock of VLC and the Governor on July 17, 1992, out of which a summary proposal was prepared by VLC and provided to Petitioner. (# 77, pp. 119-20.)  On August 9, 1992, Petitioner traveled to Bozeman, Montana and there were discussions about this proposal. (# 77, p. 123.)  Petitioner denied that Mr. Lippon said VLC would build a factory or locate a factory in West Virginia if the Lottery would give VLC a monopoly or sole source contract.  Petitioner testified that Mr. Lippon stated that he wanted to build a plant in West Virginia and did not attach any conditions and that the proposal he prepared containing such conditions was "his preparation, not anything that

87

we did." (# 77, pp. 124-25.)

Petitioner was asked during his grand jury testimony about his contacts with VLC and never mentioned his trip to Bozeman, Montana. (# 77, p. 134.) Petitioner testified that this was an oversight that he addressed with Agent Tone. (# 77, p. 136.)

Petitioner's request that the chairman of the Lottery Commission establish a subcommittee to study video lottery at Mountaineer Park was for the purpose of getting the ball rolling toward video lottery expansion. (# 77, p. 140.) Petitioner conceded it was "window dressing." (# 77, p. 141.)

Petitioner testified that he attended a meeting at the Marriott with representatives of VLC on September 1, 1992. Petitioner waited for an hour before Mr. Haid showed up for the meeting and when he did and indicated he was there to make a presentation, Petitioner left. (# 77, p. 153.) The United States confirmed Petitioner's testimony that at the meeting at the Marriott with VLC representatives, they talked about video lottery "and the discussions around video lottery would have incorporated the RFP somewhat." (# 77, p. 154.) Petitioner testified that he did not recall never mentioning to the grand jury that the RFP was discussed at the meeting at the Marriott. (# 77, p. 155.) Petitioner was asked if, when questioned by Agent Tone, he ever mentioned the meeting at the Marriott; Petitioner testified that he did not remember. (# 77, p. 155.)

88

The United States asked Petitioner if he had a meeting on September 3, 1992, with Mr. Curtiss and Chuck Polan regarding video lottery and giving them a heads up about the RFP.  Petitioner did not dispute this.  When asked if he had a meeting with Bill Perry and Steve Haid, VLC lobbyists, right after the meeting with Messrs. Curtiss and Polan, Petitioner could not recall, but stated that it was possible.  (# 77, p. 156.)  The United States asked Petitioner if he had a phone call that evening with Mr. Babcock, and he stated that he did not recall.  (# 77, p. 158.)

When asked on cross examination if his testimony was that the conversations with Mr. Lippon and Mr. Babcock had nothing to do with his purchase of VLC stock, Petitioner testified that "my conversation with Mr. Babcock reflected he didn't know anything about the stock.  And at that time that I bought stock, I don't think I had talked to Larry Lippon ....  I'm not sure about that." (# 77, p. 160.)

In fact, on the morning of his stock purchase, Petitioner called the VLC offices, he called Mr. Babcock's office in Virginia, a call came from Mr. Lippon's hotel in Las Vegas to the Petitioner's private number, Petitioner made another call from the Lottery to VLC offices, and another call came from Mr. Lippon's hotel in Las Vegas to the Petitioner's private number.  After these series of calls, the last one of which was at 12:00 p.m., Petitioner called his stock broker at 1:04 p.m. (# 77, pp. 161-62.)

89

At 2:11 p.m., Petitioner received, on his private line, another
call from the hotel in Las Vegas where Mr. Lippon was staying. (#
77, p. 163.)

Petitioner recalled talking to Mr. Lippon only once, and could
not recall the time. He testified that Mr. Lippon told him about
the problem with the VLC stock related to the Victoria Gaming
Commission in Australia. (# 77, p. 163.) Petitioner testified
that he did not recall Mr. Lippon telling him that the VLC stock
had bottomed out and that the problem in Australia would blow over.
(# 77, p. 164.)

When asked if he knew at the time he bought VLC stock that VLC
was going to be one of the primary competitors in the video lottery
expansion, Petitioner testified that he "knew at the time I bought
the stock that [neither] the State of West Virginia, nor the
Lottery was under contract to VLC." (# 77, p. 164.)

In October and December of 1991, Petitioner bought shares of
IGT stock. Petitioner admitted that IGT was likely to be involved
in expansion of video lottery in West Virginia, had wined and dined
Petitioner and was interested in doing business in West Virginia.
(# 77, pp. 165-66.)

In August of 1992, Petitioner admitted that GTech was also
doing business in West Virginia and there was some discussion in
the summer of 1992 about expansion of an online travel game for
GTech. (# 77, p. 167.) Petitioner sent a letter to the president

90

of GTech indicating an interest in proceeding with the contract for the online game.  Three days before Petitioner sent this letter, he admitted purchasing 300 shares of GTech stock.  (# 77, p. 168.)

On cross examination Petitioner was asked if he told a number of people who worked in the Lottery office and Mr. Moran that on October 16, 1992, Mr. Lippon had offered him a job.  In response, Petitioner testified that he did not remember.  (# 77, p. 177.) Petitioner did not recall riding back from Huntington to Charleston with Mr. Wilhelm and telling him about the job offer and asking him to keep quiet about it.  (# 77, p. 178.)

Regarding the October 26, 1992, Lottery Commission meeting, Petitioner did not know whether Mr. Giambrone had been given questions by Petitioner or Mr. ReBrook.  (# 77, p. 179.)

Petitioner admitted that on election day, he had dinner with Dan Bower, the president of VLC, and Mr. Bower paid for the dinner. (# 77, p. 180.)

Petitioner testified on direct examination that the Commissioners are the final decision makers.  (# 11, p. 181.) However, Petitioner admitted that he issued the sole source RFP in November of 1992, without the Commissioner's knowledge because he handled every other proposal this way.  (# 11, p. 182.)  In November 1992, Petitioner had an RFP drafted with a sole source provision to go out in early November, 1992, when there had been no Commission meeting to approve it.  Petitioner contended that the

91

Commission approval was not necessary.  Petitioner admitted there was a meeting of the Commission on November 4, 1992, and he never mentioned the RFP, the fact that it had a sole source provision in it or that there were thousands of copies of it sitting in the purchasing division printed and ready to go.  (#77, p. 183.)

Petitioner met with Governor Caperton on November 5, 1992, one day after the general election.  Petitioner testified that this meeting included a discussion about how to proceed with video lottery, not when to proceed.  (# 77, p. 184.)  Petitioner did not deny that at that time, a decision was made to run the video lottery decision through the Lottery Commission.  Petitioner testified "[t]he decision was always to run it through the Lottery Commission." (# 11, p. 184.)  Petitioner considered it a foregone conclusion that the Lottery Commission would approve video lottery. (# 11, p. 185.)

Petitioner denied that he prepared the motion made by Mr. Haddad.  He discovered later that the motion had two parts to it, one part dealing with statewide expansion of video lottery and the second part dealing with the issuance of an RFP.  Petitioner was on vacation and found out later that Mr. Haddad had not made the second motion for approval of an RFP.  (# 11, p. 187.)  Petitioner did not recall Mr. Woodford asking him what they were going to do with the RFP.  (# 11, p. 188.)

Petitioner agreed that at the Commission meeting on November

92

30, 1992, a subcommittee was appointed to study how video lottery should be moved forward from that point and to look at sole versus multiple source.  Petitioner admitted that during this meeting, he knew he had a sole source RFP "ready to roll."  (# 77, p. 188.)  Based on the motion made by Mr. Haddad which included the language "as soon as possible," Petitioner believed that he did not need Commission approval to issue the RFP.  (# 11, p. 189.)  When Petitioner returned from vacation, a question arose and he was advised that Mr. Haddad had withdrawn the section referring to the RFP.  "Once that I understood that he had done that, I came back and called the Lottery Commission meeting and I apologized to the commissioner for not understanding what he had done with his motion."  (# 77, p. 189.)  Petitioner called a special meeting to allow the Lottery Commission to "vent their frustration with me over advancing the thing without their approval and the change that he had made in his motion."  (# 77, p. 189.)

Petitioner met with VLC representatives on November 17, 1992, in Washington, D.C., including Mr. Bower and Mr. Babcock.  The purpose of the meeting was to find out if a pollster would do a public survey at VLC's expense to determine how best to break the news of video lottery to the public.  The Governor sent Petitioner.  (# 77, p. 192.)  When asked if it was not important to him that he had gone to Washington D.C. to visit a pollster with the people who were getting ready to bid on a sole source contract, Petitioner

93

testified that "[i]t did not occur to me." (# 77, p. 192.) Petitioner spent the night in a hotel room paid for by VLC. (# 77, p. 193.)

The second RFP was sent out on December 4, 1992, and gave the bidders until December 15, 1992, to ask questions of clarification and until December 30, 1992, to submit their bids. (# 77, pp. 193-94.) Petitioner denied that this short time frame, over a holiday period, prevented companies from bidding. (# 77, p. 194.) Petitioner denied that the provisions of the RFP, combining the sale of the machines and the central system excluded all but three manufacturers, IGT, GTech and VLC, and stated that he believed Scientific Games was also bidding. (# 77, pp. 194-95.) Petitioner agreed that the second RFP also had a dial up provision, as opposed to an online provision. Petitioner denied that this prevented GTech from bidding. (# 77, p. 195.)

Petitioner admitted receiving phone calls from IGT's counsel in January of 1993 complaining of favoritism towards VLC, and Petitioner wrote a memorandum to the file summarizing the conversation. (# 77, p. 196.) Petitioner later met with counsel for IGT, Tom Goodwin, and counsel for VLC, Tom Graff, and assured them both that everything was fair and above board with respect to the bidding process. (# 77, p. 198.) Petitioner denied that he invited Mr. Graff for a drink after the meeting, which was during the black out period. (# 77, p. 198.)

94

Petitioner further admitted that records reflect during the black out period, there were fourteen calls from the Lottery to VLC, nine calls from VLC directly to Petitioner and four phone calls to Petitioner's home or hotel room.  (# 77, p. 200.)

Petitioner denied that the speech he gave to the West Virginia legislature was written by VLC, but rather, was a combination of three speeches.  (# 77, p. 204.)  Petitioner later admitted that the sum and substance of the speech he gave to the legislature was the speech prepared by VLC with some minor changes.  (# 77, p. 209.)

The evaluation committee chosen to evaluate the sole source video lottery companies met from January 4, 1993, through January 15 or 19, 1993, but by January 15, 1993, a decision had been made. Petitioner denied that he told Mr. Wilhelm and Mr. Woodford who was to win the evaluation process, but admitted that prior to beginning the evaluation, Mr. Woodford asked him who he thought the best company was and Petitioner responded that it was VLC.  (# 77, p. 211.)  Petitioner testified that when asked by Mr. Woodford if he wanted to know the results of the evaluation committee, he responded that he did not want to know until it was reported to the Commission.  (# 77, p. 212.)

When Petitioner went before the Lottery Commission on January 20, 1993, Petitioner's expectation was that the contract would be awarded if everything was in order and Petitioner told the

95

Commissioners that there were a number of reasons why it was not awarded that day, including that the State Police had not yet finished the investigations.  Petitioner admitted that the meeting had been called on January 20, 1993, to announce the contract, but that he did not even give the State Police the materials they needed until the Friday before the meeting and told them there was "no hurry."  (# 77, p. 213.)  Petitioner also told the Commissioners there had not been enough time for a response to Mr. Kusic's request regarding contacts with the companies.  (# 77, p. 214.)  When asked if the reason for not announcing the awarding of the contract was because of a grand jury subpoena, Petitioner stated it was on his mind, but that the Governor directed that he stop the proceedings.  (# 77, pp. 225-26.)

Petitioner denied that he called Mr. Graff, counsel for VLC, and told him that he wanted to meet with him in person, not on the phone or in Petitioner's office.  Petitioner further denied that he met with Mr. Graff in his car on January 20, 1993.  (# 77, pp. 226-27.)  Petitioner did not recall telling Mr. Graff that the reason the contract was not awarded was because the grand jury subpoena had been issued.  (# 77, p. 227.)

Petitioner did not recall calling Keith Wagner a day or so later and telling him that "those SOB's stopped it."  (# 77, p. 227.)  Petitioner testified that Mr. Tone served the subpoena on the 18th of January and things were a bit hectic.  (# 77, p. 227.)

Petitioner agreed that there were other issues raised at the January 20, 1993, Lottery Commission meeting, including Mr. Kusic's question about the newspaper advertisement for Mountaineer Park that had a VLC logo on one of the machines. Petitioner also recalled Mr. Kusic saying that he had some information that led him to believe that VLC had some sort of deal with the race track in Charles Town. (# 77, p. 228.) Petitioner knew about the arrangement between VLC and Charles Town Racetrack, but never mentioned it at the meeting because he did not know specifically what the deal was and he believed he had no obligation to report to the Commission about something over which he had no control. (# 77, p. 230.)

Petitioner agreed that the records reflect there are no telephone calls on January 19, 1993, from the Lottery to VLC, but there are five one minute faxes. (# 77, p. 231.) Petitioner denied faxing the grand jury subpoena to VLC. (# 77, p. 232.)

On redirect, Petitioner testified that he looked into the advertisement done by Mountaineer Racetrack that contained the VLC machine, and he asked for an investigation to take place related to the Charles Town Racetrack situation involving VLC, although he had never seen any documents. (# 77, pp. 237-38.)

> h.   John Lepp, Caton Hill, Robert Hatfield, Ira Dadisman.

Petitioner called four character witness. All of them testified that Petitioner had a good reputation in the community.

97

(# 78, pp. 14-20.)

     5.   Evidence at trial - Rebuttal Witness.

       a.   Thomas Graff.

Mr. Graff was called as a rebuttal witness by the United States.   Mr. Graff attended a meeting at the Lottery office on January 20, 1993.   At the meeting, he expected that a contract would be awarded.   (# 78, p. 22.)   About thirty minutes to an hour after Mr. Graff left the Lottery office, Petitioner called Mr. Graff and told him he would like to talk to him in person.   Mr. Graff suggested that they drive to a house he was building.   (# 78, p. 23.)   Mr. Graff had a discussion with Petitioner about why the contract was not awarded.   Petitioner told Mr. Graff that both he and the Lottery Commission had been subpoenaed by the grand jury and that the awarding of the bid had been put on hold.   Petitioner told Mr. Graff he did not think anyone had done anything wrong.   (# 77, p. 24.)

     6.   Rule 29 Motion.

Prior to closing arguments, Petitioner's counsel renewed the motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.   In the motion, the Petitioner argues that with respect to Counts One and Two,

> count one is the mail fraud charge dealing with two things.   One, that the defendant through a scheme or artifice attempted to deprive the state of his loyal, honest, faithful services and as a part of that or in the alternative that he tried to deprive the Arnold Agency of something.

I have previously pointed out that the loyal, honest, faithful services aspect of it is a relatively vague concept or a vague concept in law. The defendant had no way, and I pointed this out earlier and I'm enhancing my motion earlier, had no opportunity or no way to conform his conduct to law if the law is constantly changing with respect to the definition of what loyal, honest and faithful services may be.

*** 

The government, I believe, at law has a duty to define – – not the government in this case per se but government in general has a duty to define the conduct which is unlawful. They do that through statutes, rules and regulations. There is nothing in this particular case relative to count one, the award of the advertising agency contract. In fact, the government's evidence is that – – from Mr. Curtiss, I believe, it was  – that there were no such rules, regulations, or statutes which required a specific manner of handling the advertising bid for an advertising contract.

You can't have or I don't believe you can have a crime in a vacuum. The crime has to be connected to some sort of fraud. In this particular instance, there is nothing that was specifying a certain kind of conduct and, therefore, there is no fraud. [N]o crime.

***

In addition to that, Your Honor, there has been no showing that he had any duty to the Arnold Agency. They accepted the same risk in entering into the bidding process as any vendor did. They knew going in that they could have been the unsuccessful bidder and that they could lose whatever effort that they put into that bid.

***

There is also no evidence relative to count one to the gain to the defendant – – to any pecuniary or other type of gain to the defendant, nor is there any loss to the state particularized or proven in the evidence of this case relative to the State of West Virginia.

There is no evidence from other companies ... of what the other companies that were bidding in that process spent.

The government alleged that those companies lost something in a pecuniary manner. There has been no evidence offered in this case of any expenditure relative to that effort relative to those other companies.

99

(# 78, pp. 27-35.)

In response, counsel for the United States argued that he did not "believe the defense counsel raises any argument with respect to the honest theory. The motion that he raised before the Court appears to be an argument he can make on many of those counts." (# 78, p. 36.)   The United States addressed Petitioner's arguments related to Count Three.  (# 78, p. 37.)

Judge Haden denied Petitioner's motion.  (# 78, p. 38.)

        7.   Closing Arguments.

In its closing argument, the United States asserted that "[t]here is no doubt that the scores on these forms indicated Arnold to be the winner." (# 78, p. 54.)  The forms indicating as much were destroyed at the direction of Petitioner.  (# 78, p. 54.) The United States argued:

> What happened after these forms were destroyed?  The West
> Virginia Lottery Commission ... was defrauded.  They were
> defrauded out of this defendant's honest services.  He
> owes them a duty of honesty.  He works for them in a
> sense, and he has a duty to be honest with them.  It just
> doesn't work if he doesn't.  It's just a sham if he's not
> honest.

(# 78, p. 56.)

The United States continued:

> Let's talk about count two.  What happened there?
> The defendant put the fix in on another bid process.  He
> put the heat on Bill Woodford, his guy.  He told Woodford
> he wanted VLC to win this contract.  He told Bob Wilhelm,
> the other senior guy, he wanted VLC to win.

* * *

100

Ladies and gentlemen, what's wrong here?  This – on
the outside this bid process appeared to be a legitimate
bonafide state bid process.  On the inside there is a
little secret track running all down there.  In other
words, it is something other than what it appears to be.
That is fraud.

Who suffered because of these frauds?  The Arnold
Agency? Obviously.  IGT? Obviously.  The State of West
Virginia and the Lottery Commission?

(# 78, p. 60.)

Regarding Count Three, the United States concluded by stating

that

[t]his count charges the defendant again with defrauding
the state of his honest services by violating two
specific legal duties placed on him by state law.  First
of all, as the lottery director, he is strictly and
absolutely forbidden to receive any gratuity.
                              ***
What else does he do? He takes confidential
information that comes to him in the course of his duties
as state lottery director and used it to play the stock
market.  When it appears to him that IGT will be a player
in the expansion of video lottery, he buys IGT stock.
Just before he personally extends a multimillion dollar
on-line contract with the state lottery to GTech, he buys
GTech stock.  And after he knows that he's going to fix
this contract for the award of video lottery to VLC, he
buys VLC stock.  Every time he bought the stock, he used
his broker and he caused an interstate wire transfer
transmission.  That fact is also in stipulation.  And in
buying those stocks, he furthered his scheme to enrich
himself in violation of West Virginia law.

(# 78, pp. 61, 63.)

Finally, regarding Count Five, perjury, the United States

pointed out that "William Woodford testified that the defendant

told him things were on hold until the election."  (# 78, p. 64.)

Likewise, Mr. "Babcock testified that the Governor had told him of

101

the plan to hold this thing off until after the election and he discussed that plan with the defendant and the defendant concurred." (# 78, p. 65.) "The fact that the expansion of video lottery was tied to the 1992 election is also corroborated by the testimony of Agent Brian Tone." (# 78, p. 66.) The United States further argued that Petitioner "lied about the fact that VLC had input in the drafting of this RFP." (# 78, p. 66.) Petitioner "[l]ied about his meeting with Larry Lippon. He met with Lippon in Montana, he met with Lippon in Huntington. Never admitted that until Agent Tone confronted him with the facts." (# 78, p. 67.)

8.   Jury Instructions.

With respect to Counts One and Two, the court instructed the jury that the United States must prove three elements beyond a reasonable doubt:

> First, the government has to prove to you that the defendant knowingly devised or knowingly participated in a scheme or artifice to defraud as is set forth in counts one and two of the indictment.
> Secondly, that he did what he did with the intent to defraud.
> And, third, that in advancing or furthering or carrying out this scheme to defraud, the defendant either used the mails or caused the mails to be used.

(# 78, p. 97.)

In instructing on the "scheme and artifice to defraud definition," Judge Haden stated that

> [i]t may be properly charged under the mail fraud statute that a scheme violates or that it has one of its – – as one of its goals the violation of particular duties imposed by state law as is alleged in some instances in

102

> this indictment.  It is not necessary that the scheme be
> one which violates some particular state statute or
> regulation or that it has as its goal something which is
> a crime in and of itself.  Rather for the purpose of the
> mail fraud statute, any scheme involving deception that
> employs the mails in its execution that is contrary to
> public policy and conflicts with accepted standards of
> moral uprightness, fundamental honesty, fair play and
> right, may constitute a, quote, "scheme and artifice to
> defraud."

(# 78, pp. 98-99.)

    Judge Haden explained that "Count number three of the

indictment charges the defendant with the crime of wire fraud.  And

the concepts in the crime of wire fraud are almost identical to mail

fraud  -- very little difference except you use wires and signals

instead of the mails in order to further or carry out the scheme."

(# 78, p. 100.)

    Judge Haden stated that

> the wire fraud statute is found in a companion statute.
> The mail fraud statute is Section 1341, the wire fraud
> statute is Section 1343.  It provides in pertinent part,
> quote, "Whoever having devised or intending to devise any
> scheme or artifice to defraud or for obtaining money or
> property by means of false or fraudulent pretenses,
> representations, or promises, transmits or causes to be
> transmitted by a means of a wire, radio, or television
> communication  in interstate or foreign commerce any
> writing, sign, signals, pictures, or sounds for the
> purpose of executing such scheme or artifice, shall be
> guilty of an offense against the United States," end
> quote.
>
> Again, to prove this crime the government has to prove
> that the defendant knowingly devised or knowingly
> participated in a scheme or artifice to defraud as
> detailed in count number three of the indictment.
>
> Secondly, the government has to prove that the defendant
> did what he did with the intent to defraud.

And, third, that in advancing or furthering or carrying out the scheme to defraud, the defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing signal or sound of some kind by means of a wire radio or television communication in interstate commerce.

(# 78, pp. 100-01.)

Judge Haden concluded that

[i]n both statutes I have spoken of "scheme" or "artifice". The word "scheme" or "artifice" as used in the mail fraud and the wire fraud statutes includes any plan or course of action intended to deceive others and to obtain by false or fraudulent pretenses money or property from the person or organization so deceived. For the purposes of both the mail fraud and the wire fraud statutes, the terms "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

(# 78, pp. 103-04.)

For Count Four, Judge Haden instructed that for insider trading/securities fraud, the United States must prove beyond a reasonable doubt:

First, that the defendant must have used a device, scheme, or artifice to misappropriate non-public information.

Secondly, that that information must have been material.

Third, that the information must have been non-public when the defendant purchased the stock or recommend to others to purchase the stock.

Fourth, that the information must have been used in violation of a duty of trust and confidence.

And, fifth, that the defendant must have used or disclosed the information to buy stock knowingly and willfully.

104

(# 78, p. 110.)

Finally, regarding Count Five alleging perjury, the court explained that to prove this charge, the United States must prove the following elements beyond a reasonable doubt:

> First, the government has to prove to you that the defendant gave testimony under oath before a federal grand jury.
>
> Secondly, the government has to prove to you that the defendant made a false material statement or statements as detailed in the indictment during the course of that testimony.
>
> And, third, that the defendant knew the statements were false when he gave that testimony.

(# 78, pp. 113-14.)

       9.   Verdict.

The jury found Petitioner guilty on all counts.   As to particular counts, the jury was asked to identify which mailings or wire transfers they found Petitioner had made.   Regarding the perjury count, the jury found Petitioner guilty of the charges related to paragraphs seven and eight of the superceding indictment. These paragraphs related to questioning about who had input in the RFP and Petitioner's lying about VLC's input.   (# 54.)

      10.   Post Trial Relief.

         a.   Motion for Judgment of Acquittal.

Petitioner filed this motion, which was denied on December 10, 1993.   (## 56, 61, and 62.)

         b.   Appeal to the Fourth Circuit.

105

On appeal to the United States Court of Appeals for the Fourth Circuit, Petitioner challenged his convictions on several grounds. Regarding the two mail fraud convictions, he argued that there was no evidence that he violated any law or regulation.  The Fourth Circuit rejected this argument, having recently addressed an essentially identical argument in <u>Mandel</u>, 591 F.2d 1347.  The Fourth Circuit observed that "[t]he government secured these convictions on the theory that Bryan defrauded the people of the State of West Virginia by depriving them of the right to the 'honest services' of their government officials."  <u>Bryan</u>, 58 F.3d at 939.

The court concluded

> [w]e see no reason, however, to read into the mail fraud statute an independent criminal violation requirement when the fraud conviction is based on the deprivation of the right to intangible services as opposed to the deprivation of property or money, as in <u>Carpenter</u>.  We therefore reject Bryan's contention that the government was required to prove that he violated a criminal statute independent of the mail fraud statute in order to establish a violation of 18 U.S.C. §§ 1341, 1346.

<u>Id.</u> at 941.

The Fourth Circuit further determined that Petitioner made an alternative argument as to Counts One and Two:

> that if § 1346 does not define a "deprivation of the right to honest services" by reference to a statute or regulation, then he "had no reasonable way to know, at the time of his actions, that his conduct in dealing with his staff, the Lottery Commission, and the Purchasing Department would be deemed by the government to be unlawful." Appellant's Reply Br. at 9.  To the extent that this amounts to an argument that section 1346 should be declared void for vagueness, we are unpersuaded.

106

Id.

     Regarding the wire fraud conviction (Count Three), the Fourth

Circuit acknowledged that Petitioner

> challenges his conviction for violating the federal wire
> fraud statute, 18 U.S.C. §§ 1343, 1346, which was based
> upon his trading in the stock of companies that stood to
> gain from the decisions of the West Virginia Lottery
> Commission. Bryan contends that the government's case
> against him was flawed because it included no evidence of
> benefit or gain accruing to him, and "no proof of actual
> or constructive fraud."

Id. at 943.

     The court rejected this argument, reasoning that

> [o]nce again, Bryan's sufficiency challenge reflects a
> misunderstanding of the elements of the crime charged.
> The gravamen of the offense of wire fraud is simply the
> execution of a "'scheme to defraud,'" and "the fraud need
> not succeed" for a defendant to be convicted of wire
> fraud. Bryan's claim that the jury was presented with
> insufficient "proof of actual or constructive fraud"
> likewise fails. The jury was presented with ample
> evidence that Bryan was engaged in a scheme to defraud
> the citizens of West Virginia of their right to his
> honest services, and that he traded on confidential
> information. Cf. Carpenter, 484 U.S. at 26, 108 S.Ct. at
> 320-21 (confidential information is "property," the
> deprivation of which can constitute wire fraud).

Id. (citations omitted).

     The Fourth Circuit overturned the conviction for securities

fraud under the misappropriation theory.  Id. at 944.  The Fourth

Circuit held that

> criminal liability under section 10(b) [of the Securities
> Exchange Act of 1934] cannot be predicated upon the mere
> misappropriation of information in breach of a fiduciary
> duty owed to one who is neither a purchaser nor seller of
> securities, or in any other way connected with, or
> financially interested in, an actual or proposed purchase

or sale of securities, even when such a breach is
followed by the purchase or sale of securities.

Id. at 952.

Finally, as to his conviction for perjury under oath before a

grand jury, the Fourth Circuit found that

> [g]iven the Supreme Court's command to construe the
> perjury statute narrowly, we are sympathetic to Bryan's
> claim. The questioner's initial focus on committee
> members could well have led Bryan to believe that the
> question, "Did anyone else have input into it," only
> pertained to committee members. Bryan's response of "No,
> they were the people that I assigned to prepare it"
> evinces such an understanding. Nonetheless, we are
> satisfied that the prosecution's repeated inquiry into
> whether "anyone else" contributed to the RFP provided the
> jury an adequate basis upon which to conclude that Bryan
> understood that the focus of the questioning had changed
> from the committee members to anyone else who might have
> had input into the RFP and that he deliberately lied to
> the grand jury when he answered that no one else had been
> involved.

Id. at 960.

Thereafter, Judge Haden determined that the reversal of Count

Four had no impact on the appropriate guideline calculations

previously used for sentencing nor on the judgment of restitution

imposed by the court.  Judge Haden explained that in

> [a]pplying the Sentencing Guidelines, [he] grouped the
> mail and wire fraud counts and, because this grouping
> produced the highest offense level, Counts One, Two and
> Three were thus employed to determine the base offense
> level.  The reversed insider trading count was not used
> by this judge to determine the offense level for the
> grouped counts.

(# 90, p. 2.) Judge Haden ordered that Petitioner be reimbursed

$50.00 for the special assessment imposed as a result of his

108

conviction on Count Four.  (# 100, pp. 2-3.)

<u>The Writ of Error Coram Nobis and Standard of Review</u>

The writ of error coram nobis derives from British common law. Judgments before the king's bench that were erroneous in matters of fact could be reversed through use of the writ, which, translated, means "before us."  3 WILLIAM BLACKSTONE, COMMENTARIES, *406 n.5.  At common law, the writ was issued out of chancery; however, "the procedure by motion in the case is now the accepted American practice." <u>United States v. Morgan</u>, 346 U.S. 502, 506 n.4 (1954).

In American legal proceedings, the writ is not specifically authorized by statute, but instead derives from the all-writs provision of the Judicial Code.  <u>Id.</u> at 506.  That provision, 28 U.S.C. § 1651(a), provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  While its validity had at one point become unclear, use of the writ in criminal cases was endorsed by the Supreme Court in <u>Morgan</u>; Justice Minton tartly noted in his dissent in that decision that the majority had "resurrecte[d]" the writ "from ... limbo." <u>Morgan</u>, 346 U.S. at 513 (Minton, J., dissenting).  However, in its rejuvenation of the writ, the majority cautioned that "[c]ontinuation of litigation after final judgment and exhaustion or waiver of any statutory right of review should be allowed through this extraordinary remedy

only under circumstances compelling such action to achieve justice," id. at 511, and that "coram nobis [only] included errors 'of the most fundamental character'" id. at 512 (quoting United States v. Mayer, 235 U.S. 55, 69 (1914)).  More recently, it has been described as "an extraordinary tool to correct a legal or factual error."  United States v. Denedo, 129 S. Ct. 2213, 2221 (2009).

"[T]he precise contours of coram nobis have not been 'well defined.'"  2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 41.2[b], at 2143 (6th ed. 2011) (quoting Denedo, 129 S. Ct. at 2220); see also Trenkler v. United States, 536 F.3d 85, 88 (1st Cir. 2008) (describing the writ as "poorly understood terrain").[5]  In the Fourth Circuit, four criteria apparently must be met before relief under the writ is appropriate: "(1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character."  United States v. Mandel, 862 F.2d 1067, 1077 (4th Cir 1988) (Hall, J., dissenting) (citing Hirabayashi v. United States, 828 F.2d 591, 604 (9th Cir. 1987)).

---

[5]  At the hearing on this matter, the United States asserted that Trenkler "seems to apply an actual innocence standard on coram nobis - period - that is, procedural default or no." (ECF No. 130, p. 23.)  The United States did not develop this argument in further briefing and, as a result, the undersigned declines to address it here.

However, other lower courts use varying standards for determining when a grant of the writ is appropriate. See, e.g., United States v. Kwan, 407 F.3d 1005, 1011 (9th Cir. 2005) (same); United States v. Novak, No. 98-1444, 1999 WL 357846, at *2 (2d Cir. May 26, 1999) ("To obtain coram nobis relief, [the petitioner] must show (1) that he is suffering continuing legal consequences from his conviction, (2) that cause exists for his failure to seek appropriate earlier relief, and (3) that he will be prejudiced by a denial of the relief sought because his convictions were unjust."); United States v. Bruno, 903 F.2d 393, 396 (5th Cir. 1990) (grant of coram nobis relief conditioned upon petitioner's "establish[ing] both that he is suffering civil disabilities as a consequence of the criminal conviction and that the error involved in his conviction is 'of the most fundamental character'--that is, error that has resulted in a complete miscarriage of justice"); United States v. Barber, 881 F.2d 345, 348 (7th Cir. 1989) (petitioner seeking writ of error coram nobis must establish that "(1) the claim could not have been raised on direct appeal; (2) the claimed error is a defect of a type that sap[s] the proceeding of any validity; (3) the conviction produced lingering and still extant collateral civil disabilities; and (4) the error is of a type that would have justified relief during the term of imprisonment") (internal quotation omitted).

Before Petitioner's conviction can be attacked collaterally in this coram nobis proceeding, he must overcome the significant

111

procedural hurdle of showing that he raised the issue he now wishes to challenge on direct appeal.  The Third Circuit noted in <u>United States v. Osser</u>, 864 F.2d 1056, 1059 (3d Cir. 1988) that

> [t]he interest in finality of judgments is a weighty one that may not be casually disregarded.  Where sentences have been served, the finality concept is of an overriding nature, more so than in other forms of collateral review such as habeas corpus, where a continuance of confinement could be manifestly unjust .... In a coram nobis case, [in contrast to habeas corpus under 28 U.S.C. § 2255], where sentence has been served and nothing remains but some financial detriment, judicial incentive to excuse compliance with procedural prerequisites is of a lower order.

The court concluded that the "issue that Osser brings at this late date should have been included in his direct appeal; to now excuse his failure to exhaust direct appellate procedures would disproportionately harm the prosecution." <u>Id.</u> at 1062; <u>see also</u> <u>Mandel</u>, 862 F.2d at 1077 (Hall, J., dissenting) ("Thus, while it is clear that coram nobis and habeas corpus are roughly 'similar' proceedings, it is even more clear that the burden on a coram nobis petitioner is, and properly should be, greater than that placed on a habeas petitioner.") (citations omitted).

Where procedural default has occurred, the "cause and actual prejudice" standard may be applied to overcome the default. <u>United States v. Frady</u>, 456 U.S. 152, 167 (1982) (citing <u>Davis v. United States</u>, 411 U.S. 233 (1973); <u>Francis v. Henderson</u>, 425 U.S. 536 (1976); <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977)).  "Under this standard, to obtain collateral relief based on trial errors to

which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." Frady, 456 U.S. at 168. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986).  A showing that the factual or legal basis for a claim was not reasonably available to counsel can constitute cause.  Id.  (citing Reed v. Ross, 468 U.S. 1, 16 (1984)).

In the alternative, a petitioner who has procedurally defaulted can show that he is actually innocent.  Murray, 477 U.S. at 496.  Actual innocence "means factual innocence, not mere legal insufficiency."  Bousley v. United States, 523 U.S. 614, 623 (1998).  To prevail under an actual innocence theory, a petitioner must show in light of "all the evidence," that "it is more likely than not that no reasonable juror would have convicted him ...." Schlup v. Delo, 513 U.S. 298, 327, 329 (1995).  An actual innocence examination encompasses both charged counts, as well as counts that the government may have forgone.  Bousley, 523 U.S. at 624.

As discussed further below, in this case involving alternative theories of guilt, whether or not this extraordinary remedy should be granted in light of the holding in Skilling is subject to a

113

harmless error analysis:

> In Hedgpeth v. Pulido, 555 U.S. 57 [61], 129 S. Ct. 530[, 532], 172 L.Ed.2d 388 (2008) (per curiam), the Supreme Court recently confirmed that an alternative-theory error—i.e., where a jury rendering a general verdict was instructed on alternative theories of guilt and may have relied on an invalid theory—is subject to harmless-error analysis "so long as the error at issue does not categorically 'vitiat[e] all the jury's findings.'"

United States v. Skilling, 638 F.3d 480, 481 (5th Cir. 2011);

United States v. Hornsby, ___ F.3d ___, No. 08-5267, 2012 WL 207065, at *5 (4th Cir. Jan. 25, 2012) (acknowledging Skilling and Hedgpeth and need for harmless error analysis). Therefore, in instances where there has not been procedural default or the procedural default has been excused, the court must determine whether the error cited by the petitioner "had a substantial and injurious effect" or influence on the jury's verdict. Hedgpeth, 555 U.S. at 58 (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

### The Impact of Skilling on 18 U.S.C. § 1346

Petitioner filed his petition for a writ of error coram nobis because of the recent decision of the Supreme Court in Skilling v. United States, 130 S. Ct. 2896, 2904 (2010), wherein the Court found § 1346, which proscribes fraudulent deprivations of "the intangible right of honest services" as "properly confined to cover only bribery and kickback schemes." Because the alleged misconduct of the defendant, the former chief executive officer of Enron Corporation, involved no bribe or kickback, the Court found that it

114

did not fall within the Court's confinement of § 1346's proscription.  Id.

In Skilling, the Court considered at length the historical development of the modern day mail and wire fraud provisions that proscribe deprivation, not only of money or property but of intangible rights.  Id. at 2926.  "In 1987, this Court, in McNally v. United States, [483 U.S. 350, 356 (1987)], stopped the development of the intangible-rights doctrine in its tracks."  Id. at 2927.  In McNally, the Court limited the statute "in scope to the protection of property rights," and stated that "[i]f Congress desires to go further ... it must speak more clearly than it has."  McNally, 483 U.S. at 360.  The following year, Congress enacted a new statute, 18 U.S.C. § 1346, that included honest services.  Skilling, 130 S. Ct. at 2927.  Skilling asserted that § 1346 was unconstitutionally vague, but the Court rejected this argument and instead, determined that

> § 1346 should be construed rather than invalidated.
> First, we look to the doctrine developed in pre- McNally
> cases in an endeavor to ascertain the meaning of the
> phrase "the intangible right of honest services."
> Second, to preserve what Congress certainly intended the
> statute to cover, we pare that body of precedent down to
> its core: In the main, the pre-McNally cases involved
> fraudulent schemes to deprive another of honest services
> through bribes or kickbacks supplied by a third party who
> had not been deceived. Confined to these paramount
> applications, § 1346 presents no vagueness problem.

Id. at 2928.  Thus, the Court concluded that "[i]nterpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague."  Id. at 2933.

In <u>Skilling</u>, the Court found that

> [b]ecause the indictment alleged three objects of the conspiracy - honest-services wire fraud, money-or-property wire fraud, and securities fraud - Skilling's conviction is flawed.  See <u>Yates v. United States</u>, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957) (constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory).  This determination however, does not necessarily require reversal of the conspiracy conviction; we recently confirmed in <u>Hedgpeth v. Pulido</u>, 555 U.S. ____, 129 S.Ct. 530, 172 L.Ed.2d 388 (2008) (<u>per</u> <u>curium</u>), that errors of the Yates variety are subject to harmless-error analysis. *** We leave this dispute for resolution on remand.

<u>Id.</u> at 2934.

In <u>Hedgpeth</u>, the jury was instructed on two alternative theories of guilt, one of which was invalid under California law. The Court found that such error was not a structural error requiring that a conviction based on a general verdict be set aside on collateral review without regard to whether the flaw in the jury instructions prejudiced the defendants; rather, it was subject to the harmless error standard of review.  <u>Hedgpeth</u>, 555 U.S. at 61-62.  Harmless error review means that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."  Fed. R. Crim. P. 52(a).  A reviewing court should ask whether the jury instructions "'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Hedgpeth</u>, 555 U.S. at 58 (quoting <u>Brecht</u>, 507 U.S. at 623).

<div align="center"><u>Issues Presented</u></div>

1.  <u>Procedure Default</u>: Was the "honest services" jury instruction

<div align="center">116</div>

issue preserved at trial and on direct appeal?

2.a.  Cause and Actual Prejudice: If not, has Petitioner shown "cause and actual prejudice" as set forth in United States v. Frady, 456 U.S. 152, 167 (1982), sufficient to excuse the default?

2.b.  Actual Innocence: If Petitioner cannot show cause and actual prejudice, may his claim still be reviewed because the alleged error "probably resulted in the conviction of one who is actually innocent"?  Bousley v. United States, 523 U.S. 614, 623 (1998) (In light of all the evidence, is it more likely than not that no reasonable juror would have convicted him?).

2.b.1.  Was Petitioner convicted of offenses as to which the evidence and the jury instructions presented alternative theories, i.e., property loss and deprivation of the intangible right of honest services?

2.b.2.  If so, and assuming the deprivation of honest services theory was invalid and constituted error, did the error have a "'substantial and injurious effect or influence in determining the verdict?'"  Hedgpeth v. Pulido, 555 U.S. 57, 61 (2008) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)); Skilling v. United States, 130 S. Ct. 2896, 2934 (2010) (where alternative theories are alleged and the jury returns a general verdict that may rest on a legally invalid theory, such error is subject to a harmless error analysis).

Analysis

117

1.    **Counts One and Two.**

    a.    **Petitioner is not in procedural default as to his convictions on Counts One and Two.**

In the Fourth Circuit's decision in <u>Bryan</u> dealing with the mail fraud statute (Counts One and Two), the court stated

> [i]n what we take to be an alternative argument, Bryan argues that if section 1346 does not define a "deprivation of the right to honest services" by reference to a statute or regulation, then he "had no reasonable way to know, at the time of his actions, that his conduct in dealing with his staff, the Lottery Commission, and the Purchasing Department would be deemed by the government to be unlawful." Appellant's Reply Br. at 9.  To the extent that this amounts to an argument that section 1346 should be declared void for vagueness, we are unpersuaded.

<u>Bryan</u>, 58 F.3d at 941.

At the hearing on the Petition, the United States conceded that Petitioner preserved the honest services issue on appeal and has not procedurally defaulted as to his convictions related to honest services.  (ECF No. 130, p. 28.)

The undersigned proposes that the presiding District Judge find that Petitioner sufficiently challenged his convictions for mail fraud (Counts One and Two) at trial and on appeal, such that he is not precluded from collaterally attacking them in this coram nobis proceeding.

    b.    **Where a Petitioner was convicted of offenses as to which the evidence and jury instructions presented alternative theories, including an invalid theory, a harmless error analysis is appropriate.**

In <u>Skilling</u>, the indictment against Jeffrey Skilling alleged

118

three objects of the conspiracy - honest services wire fraud, money-or-property wire fraud, and securities fraud.  The Court in Skilling determined that honest services wire fraud under § 1346 covered only bribery and kickback schemes.  As a result, "Skilling's conviction [was] flawed."  Skilling, 130 S. Ct. at 2934 (citing Yates v. United States, 354 U.S. 298 (1957) (constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory)).  However, the Court in Skilling directed that "[t]his determination ... does not necessarily require reversal of the conspiracy conviction [because such errors] are subject to harmless-error analysis."  Skilling, 130 S. Ct. at 2934 (citing Hedgpeth, 555 U.S. at 61).

In Hedgpeth, the Court, in a per curiam decision, ruled that instructing a jury on multiple theories of guilt, one of which is invalid, is not structural error requiring that a conviction based on a general verdict be set aside on collateral review without regard to whether the flaw in the instruction prejudiced the defendant.  Hedgpeth, 555 U.S. at 61-62.

Instead, the flaw is subject to the harmless error analysis of Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  In Brecht, the Court explained that an error is not harmless if it "'had substantial and injurious effect or influence in determining the jury's verdict.'"  (quoting Kotteakos v. United States, 328 U.S.

750, 776 (1946)).   "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637.   Two years later, in O'Neal v. McAninch, 513 U.S. 432 (1995), the Court clarified its approach to the harmless error analysis after the Sixth Circuit in O'Neal placed the burden of establishing error on the petitioner.   In vacating and remanding the decision of the Sixth Circuit, the Court in O'Neal stated that while the Sixth Circuit set forth the proper standard from Brecht, "rather than ask whether the record's facts satisfied this standard, the court seemed to refer to a burden of proof." O'Neal, 513 U.S. at 436.   The Court in O'Neal explained that the judge should not shift the burden to help control the presentation of evidence at trial, but rather, the judge should apply a

> legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect. In such a case, we think it conceptually clearer for the judge to ask directly, "Do I, the judge, think that the error substantially influenced the jury's decision?" than for the judge to try to put the same question in terms of proof burdens (e.g., "Do I believe the party has borne its burden of showing ...?").

Id. at 436-37.   In short, "[w]hen a federal judge in a habeas proceeding is in grave doubt[6] about whether a trial error of

---

6   "Grave doubt" was defined by the Court as "in the judge's mind, the matter is so evenly balanced that he [or she] feels ... in virtual equipoise as to the harmlessness of the error."   O'Neal, 513 U.S. at 435.

120

federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless.  And the petitioner must win."  Id. at 436.  The Court in O'Neal acknowledged its own language from Brecht that suggests habeas petitioners must establish actual prejudice, Brecht, 507 U.S. at 637, but stated that "[t]his language, however, is not determinative.  The issue in Brecht involved a choice of substantive harmless-error standards:  the stricter [Chapman v. California, 386 U.S. 18, 24 (1967)], or the less strict Kotteakos, measure of harmlessness.  Both of those cases had resolved the issue now before us the same way, placing the risk of doubt on the State."  O'Neal, 513 U.S. at 438-39; contra Penry v. Johnson, 532 U.S. 782, 795 (2001) (stating that the petitioner must establish that the error had a substantial and injurious effect or influence in determining the jury's verdict pursuant to Brecht); but see Gray v. Moore, 520 F.3d 616, 625-26 (6th Cir. 2008), cert. denied, 555 U.S. 894 (2008) (acknowledging that under O'Neal, the harmless error inquiry "does not assign an affirmative burden of proof on Gray ... nor does it require Gray to show that the error was outcome-determinative, but instead 'plac[es] the risk of doubt on the State'") (quoting O'Neal, 513 U.S. at 439)).

More recently, in Fry v. Pliler, 551 U.S. 112, 121 n.3 (2007), the Court held that on collateral review by a federal habeas court of a criminal judgment by a state court, the federal court assesses

prejudicial impact of the state court's constitutional error under
Brecht instead of Chapman.  The Court stated in a footnote that it
was presented with the question of whether under Brecht, the
petitioner or the State bears the burden of persuasion on the
question of prejudice.  The Court stated in Fry:

> We have previously held that, when a court is "in virtual
> equipoise as to the harmlessness of the error" under the
> Brecht standard, the court should "treat the error ... as
> if it affected the verdict ...."  O'Neal v. McAninich,
> 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).
> The majority opinion below did not refer to O'Neal,
> presumably because the majority harbored no grave doubt
> as to the harmlessness of the error.  Neither did the
> dissenting judge refer to O'Neal, presumably because she
> did not think the majority harbored grave doubt as to the
> harmlessness of the error.  Moreover, the State has
> conceded throughout this § 2254 proceeding that it bears
> the burden of persuasion.  Thus, there is no basis on
> which to conclude that the court below ignored O'Neal.

Id.  While the Court does not answer the question presented
directly, it does acknowledge the State's concession that it bears
the burden of persuasion.  Id. at 122 (Stevens, J. concurring in
part and dissenting in part) ("[T]he Brecht standard ... imposes a
significant burden of persuasion on the State.")

Petitioner urges this court to rely on United States v.
Mandel, 862 F.2d 1067 (4th Cir. 1988), where mail fraud convictions
against the former governor of Maryland, Marvin Mandel, and others,
were vacated.  In Mandel, the jury was instructed

> solely on the theory that the State of Maryland had been
> denied the "faithful and loyal services of public
> officials."  This was annunciated by the fact that the
> bribery instruction offered by the defendants, requiring
> a finding that the State was defrauded of a money or

122

> property interest, was denied by the district court at
> the government's urging.

Mandel, 862 F.2d at 1074.  In Mandel, our Court of Appeals found

that "the jury instructions were insufficient and the convictions

for mail fraud cannot be upheld under McNally standards."  Id.

Mandel is distinguishable because, as discussed at length

herein, Counts One and Two involved alternative theories, whereas

Mandel did not.  Furthermore, in Mandel, the court found that

where the jury considered alternate theories of liability, "we

must reverse the convictions if either theory is an improper basis

for punishment." United States v. Mallas, 762 F.2d 361, 363 n.3

(4th Cir. 1985) (citing Chiarella v. United States, 445 U.S. 222,

237 n.21 (1980)).  If both theories were presented to and

considered by the jury, "we must be able to say 'with a high

degree of probability' that the jury did not rely on the legally

incorrect theory." Mandel, 862 F.2d at 1073 (quoting United

States v. Alexander, 748 F.2d 185, 189 (4th Cir. 1985)).  Post

Brecht and Hedgpeth, the standard is harmless error, and one

invalid alternative theory does not necessitate reversal.

Finally, there is an additional issue the court must address

related to the harmless error analysis.  There is a different

standard of review for harmless error which is applied on direct

review.  On remand in Skilling, the Fifth Circuit applied the

standard set forth in Neder v. United States, 527 U.S. 1, 19

(1999),[7] that an error is harmless if a court, after a "thorough examination of the record," is able to "'conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.'" Skilling, 638 F.3d 480, 482 (5th Cir. 2011) (quoting Neder, 527 U.S. at 19).

Neder and Skilling both involved direct appeals, rather than collateral review of a state-court proceeding, as was the case in Brecht, an action filed pursuant to § 2254. In § 2255 proceedings, courts have generally applied Brecht. See United States v. Dago, 441 F.3d 1238, 1246 (10th Cir. 2006) (applying Brecht); United States v. Montalvo, 331 F.3d 1052, 1057-58 (9th Cir. 2003) (same); Ross v. United States, 289 F.3d 677, 682 (11th Cir. 2002) (same); Murr v. United States, 200 F.3d 895, 906 (6th Cir. 2000) (same); contra Lanier v. United States, 220 F.3d 833, 839 (7th Cir. 2000) (applying Neder). The Fourth Circuit has not directly addressed the question of the proper harmless error standard for constitutional violations under § 2255. In United States v. Owen, 407 F.3d 222, 229 (4th Cir. 2005), the Fourth Circuit declined to address the issue because the petitioner could not meet either the Brecht or direct review harmless error

---

[7] Neder used the standard first set forth in Chapman, 386 U.S. at 24. (In Chapman, "we said, [the test] is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'").

analysis of <u>Chapman</u>, 386 U.S. at 24.[8]

Since <u>Skilling</u>, courts within the Seventh Circuit have continued to apply <u>Neder</u> in § 2255 proceedings attacking convictions post-<u>Skilling</u>. <u>Ryan v. United States</u>, No. 10 C 5512, 2010 WL 5495015, at *983 (N.D. Ill. Dec. 21, 2010); <u>Sorich v. United States</u>, Nos. 10 C 1069, 10 C 1089, 10 C 1091, 2011 WL 3420445, at *7 (N.D. Ill. Aug. 4, 2011).

The court disagrees with this approach in cases such as this one seeking coram nobis relief. The court in <u>Brecht</u> made clear that the "<u>Kotteakos</u> harmless-error standard is better tailored to the nature and purpose of collateral review than the <u>Chapman</u> standard ...." <u>Brecht</u>, 507 U.S. at 623. <u>Brecht</u> clearly addresses the situation at hand, a collateral attack[9] on Petitioner's

_____

[8]   In <u>Walker v. Rivera</u>, C/A No. 3:10-2464-RMG, 2011 WL 4480170, at *4 (D. S.C. Sept. 26, 2011), the United States District Court for the District of South Carolina acknowledged the Seventh Circuit's decision to follow <u>Neder</u> and the fact that the Fourth Circuit has not spoken on the issue. The court chose to utilize the harmless error analysis from <u>Brecht</u>. In comparison, in <u>Bereano v. United States</u>, WMN-11-961, 2012 WL 683545, at *2 (D. Md. Feb. 28, 2012), the United States District Court for the District of Maryland found that because "the error here would be harmless under either standard, and as other courts reviewing <u>Skilling</u>-related errors have employed the <u>Neder</u> standard, this Court will use the more stringent <u>Neder</u> standard as well." (citations omitted).

[9]   The fact that Petitioner seeks relief based on coram nobis rather than pursuant to § 2255 does not change the analysis. Section 2255 is not available because Petitioner is no longer in custody, but coram nobis relief is widely (and logically) viewed as collateral relief. <u>See</u> <u>United States v. Spellissy</u>, No. 11-10107, 2011 WL 3629910, at *2 (11th Cir. Aug. 16, 2011) (in post <u>Skilling</u> coram nobis proceeding, court observed that coram nobis is a form of collateral relief and that <u>Brecht</u> is the better standard for demonstrating harmless error); <u>Godoski v. United States</u>, 304 F.3d 761, 762 (7th Cir. 2002) ("<u>[C]oram nobis</u> is used only in those rare situations when the defendant is no longer 'in custody' (rendering § 2255 unavailable) yet collateral relief remains imperative to deal with lingering civil disabilities."); <u>Belcher v. United States</u>, Civil No. 1:10-0398, 2010 WL 2509870, at *4 (S.D. W. Va. Apr. 8, 2010) ("Collateral relief is available to

conviction, not a direct appeal.  As such, <u>Brecht</u> is the proper standard.

The undersigned proposes that the presiding District Judge find that where on collateral review, a petitioner is convicted of offenses as to which the evidence and the jury instructions presented alternative theories, one of which was invalid, the court must determine whether the error had a substantial and injurious effect or influence in determining the verdict.

### c. Petitioner was convicted of offenses as to which the jury instructions presented alternative theories as to Counts One and Two.

Counts One and Two involved multiple theories of guilt and did not allege that Petitioner received bribes or kickbacks.  As such, a harmless error analysis is in order.

Count One, alleging mail fraud related to the advertising contract, contains alternative theories in describing the "scheme and artifice" that form the basis of that count:

a.   To defraud the State of West Virginia, the West Virginia Lottery Commissioners, the Purchasing Division of the Department of Administration of the State of West Virginia and the citizens of the State of West Virginia of his loyal, honest, and faithful services as an employee, that is, Lottery Director, of the State of West Virginia; and

b.   To defraud a certain advertising agency, that is, the Arnold Agency, of the money expended in preparing and presenting proposals for an advertising campaign in pursuit of a certain contract, and to further defraud

---

persons who have completed their sentences and are therefore not in custody under very limited circumstances through Writs of Error <u>Coram</u> <u>Nobis</u> ....").

that agency of the award of that certain contract with the State of West Virginia.

(# 31, p. 5.)

Count Two also alleged mail fraud, this time involving the video lottery contract, in violation of 18 U.S.C. § 1341 and 1346. Count Two alleged that Petitioner did knowingly devise a scheme:

> a.  To defraud the State of West Virginia, the West Virginia Lottery, and the citizens of the State of West Virginia of his loyal, honest and faithful services as an employee, that is, Lottery Director, of the West Virginia Lottery; and

> b.  To defraud certain gaming equipment companies of the money expended in preparing and presenting proposals in pursuit of a state-wide video lottery contract, and to further defraud those companies of the award and of the income from that certain contract, to be let by and on behalf of the West Virginia Lottery.

(# 31, p. 15.)

In its trial brief, the United States stated that

> as one of **two alternative fraud** theories [footnote omitted] [it is alleged] that BRYAN defrauded the State and the citizens of the State of his honest services inasmuch as he intervened in and overturned a bid evaluation process which he had sponsored and endorsed, then subverted the legal processes of government by ordering state employees under his supervision to lie to the Lottery Commissioners, ... regarding the activity of the evaluation committee and the results of their deliberation.

(# 39, p. 12) (emphasis added).  In the footnote, the United States stated that "Count One also alleges a standard 'money and property' fraud theory in charging that BRYAN also defrauded the Arnold Agency and others out of money and property by subverting the bid evaluation process."  (# 39, p. 12 n.6.)

127

Regarding Count Two, the United States wrote that Count Two charged that Petitioner deceitfully manipulated "a state bid process, deprived the State of his honest services and several companies of money expended in pursuit of a contract with the Lottery and the income from that contract." (# 39, p. 15.)

In its opening statement, the United States asserted that

> [w]hat the defendant is charged with in count one is fixing that contract and in fixing that contract he defrauded the Arnold Agency of the money they spent in preparing their proposal. He also defrauded that company of the money that they would have made on that contract, and he also defrauded the State of West Virginia of his honest services. When he used the mails, he violated federal law.

(# 73, pp. 122, 126.)

As to Count Two, the United States stated that

> [w]hen the defendant schemed to fix this contract, fix the bidding process so that VLC would be awarded a monopoly in the State of West Virginia, he, again, defrauded the companies of the efforts that they put [into] this bid process. He defrauded those companies that were not able to bid. He defrauded the companies that might have been the winner in this process. But most importantly, ladies and gentlemen, he defrauded the citizens of the State of West Virginia of his honesty when he used the United States mails to violate the law.

(# 73, p. 136.)

In its closing statement, the United States asserted:

> What happened after these forms were destroyed? The West Virginia Lottery Commission ... was defrauded. They were defrauded out of this defendant's honest services. He owes them a duty of honesty. He works for them in a sense, and he has a duty to be honest with them. It just doesn't work if he doesn't. It's just a sham if he's not honest.

(# 78, p. 56 .)

    The United States continued:

        Let's talk about count two.  What happened there?
The defendant put the fix in on another bid process.  He
put the heat on Bill Woodford, his guy.  He told Woodford
he wanted VLC to win this contract.  He told Bob Wilhelm,
the other senior guy, he wanted VLC to win.

                                    \* \* \*

        Ladies and gentlemen, what's wrong here?  This – on
the outside this bid process appeared to be a legitimate
bonafide state bid process.  On the inside there is a
little secret track running all down there.  In other
words, it is something other than what it appears to be.
That is fraud.

        Who suffered because of these frauds?  The Arnold
Agency? Obviously.  IGT? Obviously.  The State of West
Virginia and the Lottery Commission?

(# 78, p. 60.)

    In Judge Haden's jury instructions on Counts One and Two, he

explained that

    Counts one and two charge the defendant with mail fraud
    and that statute is found in 18 United States Code,
    Section 1341.  It provides in pertinent part as follows,
    quote, "Whoever having devised or intending to devise any
    scheme or artifice to defraud or for obtaining money or
    property by means [of] false or [fraudulent] pretenses,
    representations, or promises, and for the purpose of
    executing such scheme or artifice or attempting so to do
    places in any post office or authorized depository for
    mail ... any matter or thing whatever to be sent or
    delivered by the postal service or takes or receives
    therefrom or knowingly causes to be delivered by mail
    according to the directions thereon, shall be guilty of
    an offense against the United States," end of quote.
    That charges or that sets forth the criminal charge of
    mail fraud in the statute.

(# 78, p. 96.)

In order to establish the offense that is prohibited by the mail fraud statute, Judge Haden explained that the United States must prove three elements beyond a reasonable doubt:

> First, the government has to prove to you that the defendant knowingly devised or knowingly participated in a scheme or artifice to defraud as is set forth in counts one and two of the indictment.
>
> Secondly, that he did what he did with the intent to defraud.
>
> And, third, that in advancing or furthering or carrying out this scheme to defraud, the defendant either used the mails or caused the mails to be used.

(# 78, p. 97.)

In instructing on the "scheme and artifice to defraud definition," Judge Haden stated that

> [i]t may be properly charged under the mail fraud statute that a scheme violates or that it has one of its – – as one of its goals the violation of particular duties imposed by state law as is alleged in some instances in this indictment.  It is not necessary that the scheme be one which violates some particular state statute or regulation or that it has as its goal something which is a crime in and of itself.  Rather for the purpose of the mail fraud statute, any scheme involving deception that employs the mails in its execution that is contrary to public policy and conflicts with accepted standards of moral uprightness, fundamental honesty, fair play and right, may constitute a, quote, "scheme and artifice to defraud."

(# 78, pp. 98-99).

After giving the instruction on Count Three related to wire fraud, Judge Haden stated that

> [i]n both statutes I have spoken of "scheme" or "artifice".  The word "scheme" or "artifice" as used in the mail fraud and the wire fraud statutes **includes any**

130

**plan or course of action intended to deceive others and to obtain by false or fraudulent pretenses money or property from the person or organization so deceived.** For the purposes of both the mail fraud and the wire fraud statutes, the terms "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

(# 78, pp. 103-04) (emphasis added).

It is evident from the above recitation, that at the beginning of the case, particularly the opening statement (and the trial brief), Counts One and Two very distinctly included alternative theories.  By the closing statement, the focus of the government's case was on honest services, with a brief nod to the fraud on the Arnold Agency and the gaming companies.  Nevertheless, the jury instructions as to Counts One and Two contain instructions on the property fraud theory, though Judge Haden's focus also is arguably on honest services.

Based on the above, the undersigned proposes that the presiding District Judge find that the jury instructions included both the honest services mail fraud theory as well as the property fraud theory as to Counts One and Two.  Because one of those theories, honest services mail fraud, is invalid under Skilling, a harmless error analysis is necessary.

> d.  **The Skilling error was not harmless, as it had a "'substantial and injurious effect or influence in determining the verdict.'" Hedgpeth v. Pulido, 555 U.S. 57, 61 (2008) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).**

The undersigned proposes that the presiding District Judge find

that the <u>Skilling</u> error had a substantial and injurious influence in determining the jury's verdict on Counts One and Two.  In the superceding indictment, Counts One and Two alleged the alternative "schemes"[10] (now theories) of (1) defrauding the State, the Lottery Commissioners and others of Petitioner's honest services and (2) defrauding the Arnold Agency of money expended in preparing its proposals and defrauding that agency of the award of that contract in Count One; and in Count Two, (1) defrauding the State, the Lottery and others of his honest services and (2) defrauding the gaming companies of the money expended in preparing and presenting proposals in pursuit of the state-wide video lottery contract and to further defraud those companies of the award and of the income from that contract.  (# 31, p. 5.)  The underlying scheme for Count One was "to award and cause the awarding of an advertising contract with the West Virginia Lottery worth a maximum of approximately 2.8 million dollars to an advertising agency designated" by Petitioner. (# 31, p. 5.)  The underlying scheme for Count Two was "to award and cause the award of the single source manufacturing contract with the West Virginia Lottery, which contract was worth approximately 25 million dollars or more to a company designated by defendant ...,

---

[10]  The superseding indictment collectively describes the alternative theories in each count as the "scheme" and the activity underlying the scheme as the "purpose."  This is confusing, because the caselaw generally refers to underlying schemes and whether property fraud was an object of the underlying scheme. For ease of reference, consistency and because it is more logical as to these counts, the court will refer to the scheme that contained the alternative theories as the "alternative theories" and to the purpose as the "underlying scheme" or "scheme."

that is, to VLC, and to subvert a West Virginia Lottery bid and evaluation process to achieve that end." (# 32, pp. 5, 15-16.)

"[C]ourts across the country, almost uniformly [conclude] that the instructional error was harmless where a deprivation of money or property was necessary to a finding of honest services fraud." Sorich v. United States, 2011 WL 3420445, at *8 (citing United States v. Folak, 865 F.2d 110, 113 (7th Cir. 1988); United States v. Wellman, 830 F.2d 1453, 1462-63 (7th Cir. 1987); Ryan v. United States, 795 F. Supp.2d 975, 1005 n.14 (N.D. Ill. 2010); United States v. Doherty, 867 F.2d 47, 58 (1st Cir. 1989)). In Doherty, the defendants were charged with conspiracy to commit mail fraud and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") by illegally obtaining, selling and buying police entrance and promotional examinations.[11] The indictment invalidly charged a conspiracy to defraud citizens of their right to honest government, but also charged a conspiracy to defraud the government of money. Doherty, 867 F.2d at 55. The court found

> the error harmless, indeed harmless beyond any reasonable doubt, because we believe it virtually inconceivable that the jury could have found these appellants guilty of conspiracy to commit mail fraud without believing that they were conspiring to deprive the Commonwealth of money, in the form of salary payments to improperly promoted officers.

Id. at 58.

---

[11]   Messinger was decided after McNally held that § 1341 was limited to property rights only.

The court reasoned:

> We cannot understand how a jury, <u>believing</u> the
> government's account of the scheme to the extent of
> finding these appellants guilty, could, at the same time,
> have <u>not</u> believed that an object of the conspiracies was
> to obtain promotions and raises.   The scheme [the
> defendant] and the other witnesses described simply <u>was</u>
> a scheme dishonestly to obtain, and to help others
> obtain, promotions.  Only one type of scheme was proven,
> a scheme to steal, sell, and use exams; the alleged
> intangible rights violations were predicated on this
> scheme.   A finding that the defendants participated in
> this scheme logically entails a belief that they
> conspired to steal, sell, and use the exams to obtain
> promotions and raises through fraud.

<u>Id.</u>

In <u>Messinger v. United States</u>, 872 F.2d 217, 220 (7th Cir.
1989), the indictment alleged that the defendant, an attorney,
devised and participated in a scheme with a former county judge to
bribe the judge with respect to a certain case in which the
defendant was counsel for the accused in that case.  The judge would
make a favorable ruling for the defendant, resulting in the
dismissal of the case, in exchange for the cash bail bond refund
that would normally be returned to the defendant.   The district
court denied the defendant's § 2255 petition, finding that the
indictment and jury instructions properly alleged that he defrauded
the county and others of a property right, notwithstanding the
intangible rights language included in both the indictment and the
jury instructions.  <u>Id.</u> at 219.

In affirming, the Seventh Circuit in <u>Messinger</u> found that
although the government "prosecuted the case" under an intangible

rights theory, it was necessary to "examine the indictment, the evidence, and the jury instructions to see if the jury necessarily had to convict [the defendant] for defrauding [the county] of its property right by wrongfully accelerating the refund of the cash bail bond, notwithstanding any intangible rights theory employed." Id. at 221.  The court concluded that "[b]ecause there was only one scheme alleged, the jury necessarily had to find Messinger guilty of defrauding [the county] of its property right in order to find him guilty of mail fraud."  Id. at 224.

The instant matter differs significantly from the preceding cases in that while there was only one scheme alleged, the object or ultimate goal of the scheme was not to deprive the Arnold Agency or the gaming companies of money or property.[12]  (# 31, p. 5.)  To the contrary, as to Count One, the purpose of the scheme was to award the advertising contract to Fahlgren Martin, while the object of the scheme in Count Two was to cause the award of a single source contract to VLC and to subvert the West Virginia Lottery bid and evaluation process to achieve that end.  (# 31, pp. 15-16.)  Petitioner achieved both schemes by defrauding the State, the Lottery Commissioners, the Purchasing Division and the citizens of

---

[12]  The United States concedes in its brief that "it was not Bryan's primary goal to cheat either the Arnold Agency or IGT.  Rather, his direct intent was to award contracts the victim agencies sought to other agencies through corrupt means."  (ECF No. 124, p. 28.)  The United States contends that because the necessary result was to injure others (the Arnold Agency and IGT), fraudulent intent may be inferred.  (# 124, p. 28 (citing United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994)).

West Virginia of his honest services.   That the Arnold Agency and the gaming companies were defrauded of property in the process was incidental to the primary object of Petitioner's fraudulent activity.

The evidence at trial describes succinctly how Petitioner went about manipulating the Lottery system and its employees to achieve the goal of awarding the advertising contract to Fahlgren Martin. Similarly, as to the sole source contract, the evidence at trial described not what activity Petitioner engaged in to defraud IGT of property and the contract, but rather, his efforts at ensuring that the sole source contract was awarded to VLC.   While there was evidence presented as to how much money the Arnold Agency spent in preparing its presentation and how much the contract was worth, such evidence was not even presented as to IGT.

In its closing, the United States did not describe the object of the Petitioner's fraudulent behavior as defrauding the Arnold Agency or IGT.   The United States stated that while the forms indicated that the Arnold Agency was the winner, they were destroyed at the direction of Petitioner. (# 78, p. 54.)  The United States asserted:

> What happened after these forms were destroyed?  The West Virginia Lottery Commission ... was defrauded.  They were defrauded out of this defendant's honest services.  He owes them a duty of honesty.  He works for them in a sense, and he has a duty to be honest with them.  It just doesn't work if he doesn't.  It's just a sham if he's not honest.

136

(# 78, p. 56.)

Likewise, as to Count Two, the United States stated

Let's talk about count two. What happened there? The defendant put the fix in on another bid process. He put the heat on Bill Woodford, his guy. He told Woodford he wanted VLC to win this contract. He told Bob Wilhelm, the other senior guy, he wanted VLC to win.

*  *  *

Ladies and gentlemen, what's wrong here? This – on the outside this bid process appeared to be a legitimate bonafide state bid process. On the inside there is a little secret track running all down there. In other words, it is something other than what it appears to be. That is fraud.

(# 78, p. 60.)

The United States contended that the Arnold Agency and IGT suffered because of Petitioner's frauds (# 78, p. 60), but the focus of the closing argument was the deprivation of honest services in manipulating the process so that the Fahlgren Martin agency received the contract and VLC was awarded a sole source contract. There is no doubt that the Arnold Agency and IGT suffered because of Petitioner's actions, but that does not mean that defrauding the Arnold Agency and IGT was the object of Petitioner's fraudulent scheme. The schemes alleged in the superceding indictment and proven at trial in Counts One and Two were predicated on a deprivation of intangible rights, i.e, a deprivation of honest services, not property fraud.

This becomes even more evident in the jury instructions. While the jury was instructed on alternative theories on the first and second count, the honest services aspect overshadows the

137

property fraud instruction in Judge Haden's instructions.

This case can be distinguished from ReBrook v. United States, No. 2:10-cv-01009, in which the undersigned recently filed proposed findings and recommendation that the Skilling error in that case was harmless. In ReBrook, the underlying scheme involved ReBrook "enrich[ing] and aggrandiz[ing]" himself "and his friends and associates through the unlawful personal exploitation and transfer of confidential nonpublic information," to which he was privy by virtue of his position as the attorney for the West Virginia Lottery. (ReBrook, 2:10-cv-01009, # 1, p. 3.) In ReBrook, the scheme to defraud the State of West Virginia and the Lottery of property, confidential nonpublic information, was the basis of both alternative theories (honest services, property fraud) for the count of wire fraud. Had the jury not believed that ReBrook engaged in this fraudulent activity, it could not have returned a guilty verdict on the count of wire fraud. As in Doherty, only one type of scheme was proven, a scheme based on deprivation of property, and any intangible rights violation was predicated on this scheme. Doherty, 867 F.2d at 58; Messinger, 872 F.2d at 222 ("Because there was only one scheme alleged, the jury necessarily had to find Messinger guilty of defrauding [the county] of its property right in order to find him guilty of mail fraud."); see also United States v. Bonansinga, 855 F.2d 476, 478-79 (7th Cir. 1988) ("[T]he indictment charges but a single scheme to defraud

138

which had the dual effect of depriving the public of <u>both</u> tangible (money and property) and intangible (honest and faithful service rights .... '[E]ven assuming that these allegations were (in form at least) separate, the government could not logically prove one scheme without proving the other since the elements of the two were identical.'") (quoting <u>Wellman</u>, 830 F.2d at 1463); <u>Bereano</u>, 2012 WL 683545, at *4 ("[I]t would be inconsistent for the jury to convict Bereano of honest services fraud but find him innocent of pecuniary fraud.  A conviction based on honest services fraud necessarily acknowledges that the jury accepts as true the scheme the Government has alleged, that Bereano knowingly took advantage of his client's trust by sending them false bills.").

Finally, the undersigned notes that this conclusion is consistent with the observation of our Court of Appeals, that the "[t]he government secured these convictions [on Counts One and Two] on the theory that Bryan defrauded the people of the State of West Virginia by depriving them of the right of the 'honest services' of their government officials" and that "[w]e see no reason, however, to read into the mail fraud statute an independent criminal violation requirement when the fraud conviction is based on the deprivation of the right to intangible services as opposed to the deprivation of property or money, as in <u>Carpenter</u>." <u>Bryan</u>, 58 F.3d at 939, 941.

The undersigned proposes that the presiding District Judge

find that the <u>Skilling</u> error in this matter was not harmless, as it had a substantial and injurious effect or influence in determining the verdict, thus necessitating reversal of Petitioner's convictions on Counts One and Two.  It is respectfully recommended that in light of the above analysis a writ of error coram nobis should issue because a more usual remedy is not available, valid reasons exist for not attacking the conviction earlier in light of <u>Skilling</u>, adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III, and the error is of the most fundamental character.  <u>Mandel</u>, 862 F.2d at 1077 (citing <u>Hirabayashi</u>, 828 F.2d at 604).  Petitioner's convictions as to Counts One and Two should be vacated.

**2.  Count Three**.

**a.  On appeal as to Count Three, Petitioner did not challenge the honest services jury instruction as being unconstitutionally vague and, as a result, he is in procedural default unless he can show cause and prejudice or actual innocence.**

Although the United States has not challenged Petitioner's Petition on the grounds of procedural default, a close review of the Fourth Circuit's decision reveals that Petitioner did not previously challenge Count Three on constitutional grounds.[13]

In his motion for acquittal, Petitioner did raise the issue before Judge Haden:

---

[13]  The court has also reviewed the briefs submitted by Petitioner on appeal to the Fourth Circuit.  As to Count Three, Petitioner did not challenge the constitutionality of § 1346.

140

      b.  That  the  court  erroneously  permitted  the  jury  to
speculate  as  to  defendant's  guilt  or  innocence  of  mail
and  wire  fraud  by  permitting  them  to  deliberate  on  the
unconstitutionally  vague  concept  of  fair  and  honest
governmental  services  without  defining  said  term  or
without  requiring  the  government  to  prove  relevant,
connected  criminal  conduct.

(# 56, pp. 2-3.)

     However,  before  the  Fourth  Circuit,  Petitioner  challenged  his

conviction  on  Count  Three  because  it  "included  no  evidence  of

benefit  or  gain  accruing  to  him,  and  'no  proof  of  actual  or

constructive  fraud.'"  <u>Bryan</u>,  58  F.3d  at  943  (quoting  Appellant's

Br.  at  27).  There  is  no  mention  of  the  honest  services  jury

instruction  being  unconstitutionally  vague.

     The  Fourth  Circuit  rejected  the  two  arguments  raised  by

Petitioner  related  to  Count  Three,  finding  that

     Bryan's  sufficiency  challenge  reflects  a  misunderstanding
of  the  elements  of  the  crime  charged.  The  gravamen  of
the  offense  of  wire  fraud  is  simply  the  execution  of  a
"'scheme  to  defraud,'"  <u>[United  States  v.]  Barber</u>,  668
F.2d  [778,  784]  (4th  Cir.  1982)]  (quoting  <u>United  States
v.  George</u>,  477  F.2d  508,  512  (7th  Cir.),  <u>cert.</u>  <u>denied</u>,
414  U.S.  827,  94  S.Ct.  155,  158,  38  L.Ed.2d  61  (1973)),
and  "the  fraud  need  not  succeed"  for  a  defendant  to  be
convicted  of  wire  fraud,  <u>[United  States  v.]  Dischner</u>,  974
F.2d  1502,  1521  (9th  Cir.  1992).

<u>Bryan</u>,  58  F.3d  at  943.  Petitioner  makes  a  similarly  unconvincing

argument  before  this  court.

     The  Fourth  Circuit  further  found  that

     Bryan's  claim  that  the  jury  was  presented  with
insufficient  "proof  of  actual  or  constructive  fraud"
likewise  fails.  The  jury  was  presented  with  ample
evidence  that  Bryan  was  engaged  in  a  scheme  to  defraud
the  citizens  of  West  Virginia  of  their  right  to  his

honest services, and that he traded on confidential
information. Cf. Carpenter, 484 U.S. at 26, 108 S.Ct. at
320-21 (confidential information is "property," the
deprivation of which can constitute wire fraud).

Id.

The undersigned proposes that the presiding District Judge
find that Petitioner did not challenge his conviction for wire
fraud (Count Three) on appeal as being unconstitutionally vague,
and, as a result, he is in procedural default that can only be
excused by a showing of cause and prejudice or actual innocence.

> **b.    Petitioner cannot show cause and actual prejudice
> sufficient to excuse the procedural default.**
>
> **i.    The court need not conduct a cause analysis
> because Petitioner suffered no actual
> prejudice sufficient to excuse the procedural
> default.**

The issue of procedural default was not argued by the parties
and indeed, the United States conceded the issue at the hearing on
the Petition.  Nevertheless, as noted above, procedural default is
an issue as to Count Three.  Given the fact that Petitioner raised
the  constitutionality of § 1346 as to Counts One and Two, it is
unlikely that he could show cause as to his failure to raise it as
to Count Three.  However, the court "find[s] it unnecessary to
determine ... cause" because, as discussed further below, the court
"is confident [Petitioner] suffered no actual prejudice of a degree
sufficient to justify collateral relief ...." Frady, 456 U.S. at
168.

ii. **The standard for prejudice is harmless error as defined in** <u>Brecht v. Abrahamson</u>, **507 U.S. 619 (1993).**

As to prejudice, the court in <u>Tyler v. McCaughtry</u>, 293 F. Supp.2d 920, 925 (E.D. Wis. 2003), observed that "[t]he concept of prejudice in the cause and prejudice context is surrounded by uncertainties." (citing 2 Randy Hertz & James S. Liebman, <u>Federal Habeas Corpus Practice and Procedure</u> § 26.3c, at 1220-21 (4th ed. 2001)).

In <u>Frady</u>, 456 U.S. at 168, the Supreme Court acknowledged that it refrained in <u>Wainwright v. Sykes</u>, 433 U.S. 72, 91 (1977), from giving "precise content" to the term "prejudice," expressly leaving to future cases further elaboration of the significance of that term. In <u>Frady</u>, the Court reaffirmed an earlier formulation of prejudice, which stated that the instruction cannot be merely undesirable, erroneous or even universally condemned, but rather, the ailing instruction by itself must have so infected the entire trial that the resulting conviction violated due process. <u>Frady</u>, 456 U.S. at 169; <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977); <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973). In <u>Frady</u>, the Court wrote, "[c]ontrary to Frady's suggestion, he must shoulder the burden of showing, not merely that the errors at his trial created a <u>possibility</u> of prejudice, but that they worked to his <u>actual</u> and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." <u>Frady</u>, 456 U.S. at 170.

143

The court in Tyler observed that this formulation "offers little guidance" and that additionally, "the Court's decisions do not identify the standard by which the courts should determine whether the alleged error caused *enough* or the *right kind* of prejudice[.]" Tyler, 293 F. Supp.2d at 925 (quoting Hertz & Liebman, § 26.3c, at 1221).

In Tyler, the court noted that several possible standards have been suggested, including the harmless error standard from Brecht, 507 U.S. at 637, whether the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" (quoting Kotteakos, 328 U.S. at 776). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637. As discussed further above, the cases that followed, including O'Neal and to some extent, Fry, have further refined this standard.

In Smith v. Dixon, 14 F.3d 956, 976 (4th Cir. 1994), our Court of Appeals acknowledged that the "harmless error analysis [from Brecht] is essentially the same analysis we are required to perform in order to decide whether [the petitioner] has shown actual prejudice to excuse his procedural default ...." Smith was decided before O'Neal's statements regarding the "burden of proof" and its place in the harmless error analysis and Fry. Notably, Smith

144

further states that the "[h]armless error analysis ... requires a federal habeas court to review the cold record and draw a legal conclusion concerning the probable impact the error had in the context of the proceedings as a whole." Smith, 14 F.3d at 976.

The one potential inconsistency in utilizing a harmless error analysis to determine prejudice at the procedural default stage was aptly noted by the court in Tyler. In Tyler, the court acknowledged that the prejudice requirement of "cause and prejudice" for procedural default and the harmless error standard could differ in that, depending upon how the prejudice requirement is defined, "it could operate to shift the burden from the state, which appears to have the burden of showing that an error was harmless, ... to the petitioner, who must demonstrate prejudice [for purposes of excusing procedural default]...." Tyler, 293 F. Supp.2d at 928 n.9 (citing Brecht, 507 U.S. at 637; O'Neal, 513 U.S. at 438-39; Penry, 532 U.S. at 795).

The court in Tyler concluded that

> [t]o the extent there are differences between the two standards, application of a stricter standard to a petitioner who has shown cause would be fundamentally unfair. If a petitioner has shown cause, his default was, by definition, the result of factors beyond his control. See Murray, 477 U.S. at 488, 106 S.Ct. 2639 (holding the petitioner must show that some objective factor external to the defense caused default)....
>
> Further, the prejudice standard would be useless if it were less stringent than the Brecht harmless error standard. If a court determined that a petitioner had shown prejudice under the less-stringent standard, it would still have to consider the merits of his claims

> and, unless the state waived the harmless error defense,
> determine whether any constitutional error was harmless.
> It is hard to see any point in requiring courts to
> consider a petitioner's claims twice under these two,
> nearly identical standards.

Tyler, 293 F. Supp.2d at 928-29 (footnotes omitted).

In summary, the harmless error analysis from Brecht and its progeny is the proper test for determining prejudice under the cause and prejudice prong of the procedural default analysis (as well as the harmless error analysis itself in this coram nobis proceeding).

Based on the above, the undersigned proposes that the presiding District Judge utilize the harmless error analysis from Brecht and its progeny to determine actual prejudice for the purpose of overcoming procedural default. Obviously, if the court finds that any error was not harmless under Brecht, then Petitioner has met his burden of showing prejudice, but a "cause" analysis would be needed. As discussed further below, this is not proposed.

### iii. The Skilling error in this matter was harmless pursuant to Brecht and its progeny, and, as a result, Petitioner cannot show actual prejudice for the purpose of procedural default.

Count Three of the superceding indictment is structured differently than Counts One and Two, and the court has not altered the descriptions as it did with Counts One and Two. In the introductory paragraph, the superceding indictment states that Petitioner

146

> as Lottery Director, had access to confidential
> information regarding the business of the West Virginia
> Lottery and the bidding for the awarding of contracts
> with the West Virginia Lottery, which information
> defendant ... was specifically prohibited by law from
> using for his own personal benefit or the benefit of
> another.

(# 31, p. 25.)

In describing the "scheme," the superceding indictment does not specifically allege a violation of § 1346, but it refers to Petitioner devising a scheme to defraud the citizens of West Virginia and the Lottery of his honest and faithful services. (# 31, p. 25.) Count Three alleges that the scheme's "purpose" was to unlawfully enrich Petitioner in three ways: (1) through the unlawful exploitation and transfer of confidential information relating to the value and potential future value of certain publicly traded stock; (2) the unlawful acceptance of gifts, gratuities and other things of value from companies contracting or seeking to contract with the Lottery to supply gaming equipment to the Lottery; and (3) the concealment by Petitioner of all of the above from the citizens of West Virginia. (# 31, p. 26.)

The superceding indictment further states that it was

> part of the scheme that on or about the dates indicated
> below, unknown to the state of West Virginia, the West
> Virginia Lottery Commission and the citizens of West
> Virginia, defendant ... used confidential information,
> that information being that GTECH would likely benefit
> substantially from an ongoing contract under re-
> negotiation with the West Virginia Lottery, to which
> confidential information he was privy by virtue of his
> position as West Virginia Lottery Director, for his own
> personal enrichment ....

147

(# 31, p. 27.)

In its trial brief, the United States describes Count Three as follows:

> [t]he purpose of the scheme charged in Count Three, contrary to the first two counts, is to personally enrich BRYAN and several of his associates. That enrichment was achieved through the exploitation of confidential, non-public information and the acceptance of gratuities which came to BRYAN in the course of his duties as Lottery Director.

(# 39, p. 16.)

In its opening statement, the United States stated that

> Count three of the indictment ... also charges the defendant with engaging in a scheme to defraud the citizens of West Virginia of his honesty, but it differs from the first two counts in a couple of ways. First of all, it involves a wire transfer. I don't know how many of you are familiar with wire transfers, but it's a common mechanism used to transfer money and other things from one location to another.
>
> The second difference is that while the first two counts of the indictment allege that the defendant's scheme was to benefit some company or a bidder, his efforts in connection with count three were to benefit himself directly and his friends.

(# 73, p. 136.)

In closing, the United States concluded by stating that

> [t]his count charges the defendant again with defrauding the state of his honest services by violating two specific legal duties placed on him by state law. First of all, as the lottery director, he is strictly and absolutely forbidden to receive any gratuity.
>
> &ast;&ast;&ast;
>
> What else does he do? He takes confidential information that comes to him in the course of his duties as state lottery director and used it to play the stock market.

148

(# 78, pp. 61, 63.)

Judge Haden's jury instructions on Count Three provided instructions on the alternative theories of honest services and property fraud:

> [i]n both statutes I have spoken of "scheme" or "artifice". The word "scheme" or "artifice" as used in the mail fraud and the wire fraud statutes includes any plan or course of action intended to deceive others and to obtain by false or fraudulent pretenses money or property from the person or organization so deceived. For the purposes of both the mail fraud and the wire fraud statutes, the terms "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

(# 78, pp. 103-04.)

While the superceding indictment set forth three separate theories on which the honest services wire fraud claim was based, the jury instruction set forth above presented the alternative theories of honest services wire fraud and property fraud. There is no mention of the unlawful acceptance of gifts, gratuities and other things of value. Thus, the undersigned proposes that the presiding District Judge find that the jury instructions for Count Three included the alternative theories of honest services wire fraud and property fraud. As such, a harmless error analysis is in order pursuant to Skilling, Hedgpeth and Brecht.

The undersigned cannot propose a finding that the Skilling error in Count Three had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 623 (quoting Kotteakos, 328 U.S. at 776). Upon careful review of

149

the record, pursuant to O'Neal, the court is not even close to having "grave doubt" that such error had a substantial and injurious effect in determining the jury's verdict.

The United States stated in its response brief that Count Three "falls within the 'hard core' of honest-services cases that 18 U.S.C. § 1346 encompasses, Skilling, 130 S. Ct. at 2933-34, and may also be upheld under Carpenter v. United States, 484 U.S. 19 (1987))." (ECF No. 124, pp. 32-33.) However, at the hearing held after the United States filed its response brief, counsel for the United States stated that

> With regard to Mr. Bryan, it's a little more complicated. In the briefing we talked some about the gratuities, and they relate to Count Three, the gratuities that Mr. Bryan received there. There is some authority for the idea that gratuities may constitute kickbacks and therefore be actionable and survive Skilling. At this juncture - and, you know, Your Honor, I've looked at this over some time now. At this juncture, I believe that the better theory for upholding Count Three is that it can be upheld under a Carpenter theory. And, you know, I want to - - you know, I want to leave it just like that with the court. There is some support for the idea that gratuities might constitute kickbacks. At this point, it is not the Government's position that this is the better means for sustaining that count. I have an argument for sustaining that count, but that probably goes afield from what the court is looking at right now.

(ECF No. 130, p. 32.)

In its supplemental brief filed after the hearing, the United States argued that Petitioner's receipt of gratuities was not the "best theory" for upholding his conviction on Count Three and that the receipt of gratuities was "peripheral to the main thrust of the

charge." (ECF No. 134, p. 9.)

Indeed, the focus at trial on Count Three was not the receipt of gratuities, but Petitioner's exploitation of confidential information which he in turn used to make trades in the securities market to benefit himself and his friends.

Thus, despite the error at trial related to the honest services aspect of Count Three, such error did not substantially affect the jury's verdict. The Petitioner was charged with personally exploiting and transferring confidential information relating to the value and potential future value of publicly traded stocks to which he was privy by virtue of his position as Lottery Director. In fact, Petitioner admitted to Agent Tone that he had purchased stock in GTech, IGT and VLC and that he had purchased the VLC stock on September 23, 1992. (# 76, p. 186.) In August of 1992, Petitioner admitted that GTech was also doing business in West Virginia and there was some discussion in the summer of 1992 about expansion of an online travel game for GTech. (# 77, p. 167.) Petitioner sent a letter to the president of GTech On August 20, 1992, which referenced a contract expansion involving a new online game. Three days before Petitioner sent this letter, on August 17, 1992, he admitted purchasing 300 shares of GTech stock. (# 77, p. 168; ECF No. 119, pp. 20-21.) The jury found Petitioner guilty of purchasing the GTech stocks on August 17, 1992. (# 54.)

The instant matter presents a strong case for a finding of

harmless error.   On the verdict form the jury marked the wire transfer for the purchase of GTech stock on August 17, 1992, as the transfer it unanimously found Petitioner to have made in furtherance of the scheme. (# 54.)  The jury explicitly indicated on the verdict form that it found Petitioner guilty of the one aspect of Count Three that required a finding of deprivation of property, i.e., confidential business information related to GTech.[14]  Had the jury not believed that Petitioner engaged in this fraudulent activity related to GTech, it could not have returned a guilty verdict on Count Three, as it did.  See Bonansinga, 855 F.2d at 478-79 ("[T]he indictment charges but a single scheme to defraud which had the dual effect of depriving the public of both tangible (money and property) and intangible (honest and faithful service rights .... '[E]ven assuming that these allegations were (in form at least) separate, the government could not logically prove one scheme without proving the other since the elements of the two were identical.'") (quoting Wellman, 830 F.2d at 1463); Sorich, 2011 WL 3420445, at *10 ("Because the jury necessarily had to find property loss to convict petitioners on either theory, the court must conclude that the inclusion of the honest services instructions was harmless error.").

Notably, in its decision on appeal related to the Count Three,

---

[14]  In Carpenter, the Court recognized that "[c]onfidential business information has long been recognized as property."  Carpenter, 484 U.S. at 26.

the Fourth Circuit referred to § 1346 and stated that

> [t]he jury was presented with ample evidence that Bryan was engaged in a scheme to defraud the citizens of West Virginia of their right to his honest services, and that he traded on confidential information. <u>Cf.</u> <u>Carpenter</u>, 484 U.S. at 26, 108 S.Ct. at 320-21 (confidential information is "property," the deprivation of which can constitute fraud).

<u>Bryan</u>, 58 F.3d at 943.

Based on the above, the undersigned proposes that the presiding District Judge find that the <u>Skilling</u> error related to Count Three was harmless, as it did not have a substantial and injurious effect or influence in determining the verdict. Petitioner was prosecuted on a valid property fraud theory in Count Three. As such, Petitioner has not shown prejudice for the purpose of procedural default.

### c. Petitioner is not actually innocent.

As noted above, actual innocence "means factual innocence, not mere legal insufficiency." <u>Bousley</u>, 523 U.S. at 623. To prevail under an actual innocence theory, a petitioner must show that "'in light of all the evidence,'" "it is more likely than not that no reasonable juror would have convicted him." <u>Schlup v. Delo</u>, 513 U.S. 298, 328, 327 (1995) (internal quotations and citations omitted). "In cases where the Government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to those charges." <u>Bousley</u>, 523 U.S. at 624-25.

The undersigned proposes that the presiding District Judge find that Petitioner cannot show actual innocence as to Count Three; i.e., that Petitioner cannot show it is more likely that not, in light of all of the evidence, that no reasonable jury would have convicted Petitioner on Count Three. Petitioner has offered no evidence to the contrary suggesting that he did not engage in the fraud outlined above related to GTech.

The United States, in the actual innocence context, and the Petitioner in other contexts, argues for and against actual innocence related to other claims. While <u>Bousley</u> certainly mentions that "[i]n cases where the Government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to those charges," <u>Bousley</u>, 523 U.S. at 624, the actual innocence analysis is generally limited to the "challenged conviction or as to other charges dismissed as part of a plea bargain," <u>United States v. Holbrook</u>, 613 F. Supp.2d 745, 761 (W. D. Va. 2009) (citing <u>Bousley</u>, 523 U.S. at 623-24).[15]

Thus, the undersigned proposes that the presiding District Judge find that Petitioner has not shown actual innocence as to Count Three and, as a result, cannot be excused from his procedural default.

---

[15]   In <u>ReBrook</u>, the court unnecessarily addressed actual innocence as to all of Mr. ReBrook's convictions.

**d. Assuming Petitioner could overcome the procedural default in this matter, any <u>Skilling</u> error was harmless.**

Based on the reasoning above in analyzing actual prejudice related to Petitioner's procedural default, and assuming Petitioner could overcome the procedural default in this matter, the undersigned proposes that the presiding District Judge find that any error related to the honest services theory in Count Three was harmless.[16]

**3. Count Four.**

Petitioner's case is based on <u>Skilling</u> and the fact that honest services fraud as alleged in Counts One, Two and Three is no longer a basis for conviction under § 1346.  The Fourth Circuit reversed Petitioner's conviction for securities fraud under the misappropriation theory.  <u>Bryan</u>, 58 F.3d at 943-60.  In <u>O'Hagan</u>, 521 U.S. at 649-50, the Supreme Court expressly abrogated <u>Bryan</u>, and held that the misappropriation theory under 15 U.S.C. § 10(b) is viable.  While no further action can be taken against Petitioner on this count, the Court's ruling in <u>O'Hagan</u> does undermine any argument that coram nobis relief is appropriate.  <u>United States v. Morgan</u>, 346 U.S. 502 (1954).  No proposed finding as to Count Four is necessary.

**4. Count Five.**

---

[16]  Even under the more stringent standard used on direct review, the court's recommendation is the same.  "[B]eyond a reasonable doubt ... the jury verdict would have been the same absent the error."  <u>Neder</u>, 527 U.S. at 19.

   **a. Petitioner has procedurally defaulted his claims related to the perjury count, and he cannot show cause and actual prejudice or that he is actually innocent, such that his procedural default should be excused.**

  Petitioner makes a prejudicial spillover argument related to Count Five.  He asserts that the prosecution for perjury was an afterthought founded on evidence of other crimes that are no longer valid.

> Had Mr. Bryan been tried correctly, then the <u>only</u> thing the jury would have decided would have been whether Mr. Bryan was guilty of perjury.  But in the actual prosecution, the perjury allegation was simply a garbage, kitchen-sink part of the indictment (designed, presumably to enhance the likelihood of a plea) that was not the primary focus of the trial.  In a proper trial, however, it would have been the <u>entire</u> focus of the trial.  Therefore, can this Court honestly say that without the mountain of evidence tending to show that Mr. Bryan was corrupt, self-dealing and generally unsavory, the jury would have convicted him on the flimsy evidence that the Fourth Circuit itself had a hard time swallowing? The answer is obviously "no."

(ECF No. 112, p. 18) (footnotes omitted).

  The undersigned proposes that the presiding District Judge find that as to his perjury conviction, Petitioner is in procedural default and has not shown cause and prejudice or actual innocence to overcome his default and, as such, his Petition seeking coram nobis relief as to Count Five should be denied.

    **i. Petitioner did not challenge his perjury conviction on the grounds of prejudicial spillover either at trial or on direct appeal and, as a result, is in procedural default.**

  Petitioner concedes that he did not challenge his perjury

156

conviction on the grounds of prejudicial spillover either at trial or on direct appeal. (ECF No. 126, p. 16.) Therefore, the undersigned proposes that the presiding District Judge find that Petitioner is in procedural default as to his claims related to the perjury conviction and must show cause and prejudice or actual innocence.

### ii. Petitioner has not shown cause and prejudice.

Petitioner's only effort at showing cause is to argue that he would have looked "stupid" if he had argued on appeal that he was both innocent of perjury on the one hand and that there was evidentiary error as well. (ECF No. 126, p. 16.) Petitioner further asserts that

> [a]lthough reversal of the insider trading count was foreseeable based on various circuit courts' reluctance to adopt the misappropriation theory, the judicial narrowing of the deprivation of honest services theory, given the pre-McNally precedent, was entirely unforeseeable. Indeed, Butch's position now is that he is not guilty of perjury and that if all of the prejudicial, inadmissible evidence had been excluded and the trial had focused on alleged perjury alone, he would not have been convicted.

(ECF No. 126, p. 16.)

On appeal to the Fourth Circuit, Petitioner challenged his mail fraud conviction based on the constitutionality of § 1346. He also challenged the wire fraud, insider trading and perjury convictions. Petitioner offers no valid reason as to why he did not raise a prejudicial spillover argument at trial or on appeal as to the perjury count. Petitioner has shown no objective factor

157

external to the defense that impeded counsel's efforts in this regard. <u>Murray</u>, 477 U.S. at 488. As a result, the undersigned proposes that the presiding District Judge find that Petitioner has not shown cause. Because Petitioner must show both cause and prejudice, the court need not reach prejudice. <u>McCleskey v. Zant</u>, 499 U.S. 467, 502 (1991) (If a petitioner fails to show cause, the court need not proceed to the issue of prejudice.); <u>Rodriquez v. Johnson</u>, 104 F.3d 694, 697 (5th Cir. 1997) (same).

### iii. Petitioner is not actually innocent of perjury.

The undersigned further proposes that the presiding District Judge find that Petitioner cannot show actual innocence as to the perjury count. The superceding indictment alleged that Petitioner committed perjury before the grand jury by (1) denying that he was aware of a secret plan to allow the use of video lottery machines on a state wide basis and that such plan was to be effectuated after the general election in November 1992; (2) denying that agents of VLC had input into the drafting of the bid proposal for the video lottery machine contract; (3) denying meeting with Larry Lippon, president of VLC; and (4) denying the receipt of a job offer from VLC.[17] (# 31, pp. 33-40; # 39, p. 4.) The jury convicted Petitioner of denying that agents of VLC had input into

---

[17] The final aspect of the perjury count alleging that Petitioner lied about receiving a job offer from Larry Lippon of VLC was not ultimately pursued by the United States based on evidentiary objections sustained by Judge Haden at trial. (# 75, p. 47.)

the drafting of the bid proposal for the video lottery machine contract. (# 54.)

As noted above, actual innocence "means factual innocence, not mere legal insufficiency." Bousley, 523 U.S. at 623.  To prevail under an actual innocence theory, a petitioner must show that "'in light of all the evidence,'" "it is more likely than not that no reasonable juror would have convicted him." Schlup v. Delo, 513 U.S. 298, 328, 327 (1995) (internal quotations and citations omitted).

Regarding the act of perjury for which he was convicted, lying about the authorship of the RFP, it is likely that reasonable jurors would have convicted him of this charge.  Petitioner was asked at the grand jury proceedings who wrote the RFP, and he responded that it was put together by a "committee of specialized people at the lottery," including Pam Lopez, William Woodford, Bob Wilhelm, Tammy Gunnoe, and Petitioner.   (# 31, pp. 36-37.) Petitioner was asked:

> Q.  Anyone else have input into the drafting of the RFP, as far as you know?
> A.  Well, they may have called upon people within their sections to provide information.
> Q.  As far as you know, did anyone else have input into it?
> A.  No, they were the people that I assigned to prepare it.

(# 31, p. 37.)

In reality, the evidence at trial showed that in September of 1992, Mr. Babcock of VLC traveled to West Virginia and attended a

meeting at the Marriott with Petitioner and others at which he had input into the RFP:

> Q. At this meeting on September 21st here in Charleston, did you [Mr. Babcock] discuss what was to go into the RFP?
> A. Oh sure. I mean that's a normal thing that we would do is to find out where the lottery is coming from in terms of the kinds of games, bets, number of terminals, that they are going to propose – things that would go into the rules or regulations or RFP. It's important that you understand the parameters of the program and that's basically what we were talking about.

(# 75, p. 184.)

Mr. Woodford testified that on September 1, 1992, he attended a meeting at the Marriott with Petitioner, Mr. Babcock and Mr. Boyle of VLC. There were no representatives from IGT present. The purpose of the meeting was to discuss video lottery issues and the RFP in general terms. (# 76, p. 60.) Mr. Woodford took his notes dealing with the RFP and read them aloud at the meeting. (# 76, p. 61.) Mr. Woodford took notes at this meeting, and the notes reflect that VLC had indicated that with a sole source contract there would be a monopoly situation and, as a result, there needed to be a method in place to keep the pricing competitive. They suggested tying the price to similar terminals in competitive markets. (# 76, p. 64.) Some of VLC's suggestions were included in the RFP. (# 76, p. 67.)

Petitioner asserts that the Fourth Circuit viewed the perjury count as weak, but in reality, the evidence cited above and the Fourth Circuit's statement belie this assertion. On appeal,

Petitioner challenged his perjury conviction, and the Fourth Circuit, affirming the perjury conviction, found that

> [g]iven the Supreme Court's command to construe the perjury statute narrowly, we are sympathetic to Bryan's claim. The questioner's initial focus on committee members could well have led Bryan to believe that the question, "Did anyone else have input into it," only pertained to committee members. Bryan's response of "No, they were the people that I assigned to prepare it" evinces such an understanding. **Nonetheless, we are satisfied that the prosecution's repeated inquiry into whether "anyone else" contributed to the RFP provided the jury an adequate basis upon which to conclude that Bryan understood that the focus of the questioning had changed from the committee members to anyone else who might have had input into the RFP and that he deliberately lied to the grand jury when he answered that no one else had been involved.**

Bryan, 58 F.3d at 960 (emphasis added).

Based on the above, the undersigned proposes that the presiding District Judge **FIND** that Petitioner is not actually innocent of perjury related to authorship and input into the RFP and that he has procedurally defaulted any argument related to his perjury conviction.

<u>Conclusion</u>

It is respectfully **RECOMMENDED** that the Petition for a Writ of Error Coram Nobis be **GRANTED** as to Counts One and Two and otherwise **DENIED** as set forth more fully above. It is further **RECOMMENDED** that the presiding District Judge determine the amount of assessments and restitution which should be refunded to Petitioner and by whom.

<div align="center">161</div>

The parties are notified that this Proposed Findings and Recommendations is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Rule 72(b)(1) of the Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommmendations within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendations to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be served on the United States Attorney and Judge Copenhaver.

The Clerk is directed to transmit this Proposed Findings and Recommendation to counsel of record.

March 15, 2012
      Date

Mary E. Stanley
United States Magistrate Judge