IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON


ELTON E. BRYAN,

      Petitioner,

v.                            CIVIL ACTION NO. 2:10-cv-01196

UNITED STATES OF AMERICA,

      Respondent.


OBJECTIONS OF THE UNITED STATES TO THE
MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION

**Counts One and Two**

The Magistrate Judge's Proposed Findings and Recommendation

The magistrate judge recommends that the jury's guilty verdicts on Counts One and Two of the Indictment be vacated. (P.F.R. p. 140)[1]. The magistrate judge supports this recommendation by her proposed findings that:

    1.     The monetary losses incurred by The Arnold Agency and IGT as a direct result of the Petitioner's deliberate and deceitful manipulation of the bid-evaluation process as charged in the Indictment and established at trial were not the Petitioner's "object or ultimate goal;" (P.F.R. p. 135),

    2.     The "focus of the closing argument was the deprivation of honest services" and the honest services aspect of the case "overshadow[ed]" the property fraud theory in the jury instructions. (P.F.R. p. 137-38) , and

---

[1] Citations to the magistrate judge's Proposed Findings and Recommendation will be indicated in this manner: (P.F.R. p__).

3.      The applicable standard of review is the harmless-error standard set forth in *Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (per curiam), and *Brecht v. Abrahamson*, 507 U.S. 619 (1993), as opposed to an "actual innocence" standard.  (P.F.R. pp. 125-26).

<u>The Objection of the United States</u>

The United States objects to the magistrate judge's recommendation that the jury's guilty verdict on Counts One and Two be vacated.   The magistrate judge's first reason for recommending vacation –  because the defrauding of the legitimate bidders was not the Petitioner's "object or ultimate goal" in the scheme – is a distinction of the magistrate judge's own making, has never been raised by the petitioner at any level, and is without legal basis or support.  In fact, the opinions upholding guilty verdicts in similar cases that the magistrate judge attempts to distinguish on this point actually involve property losses that are far less direct, concrete and foreseeable – and, thus, are less the defendants' objects or ultimate goals – than the immediate losses to the legitimate bidders in this case.  Thus, the cases cited by the magistrate judge actually support the notion that review is not based on what the perpetrator's subjective "object or ultimate goal" was in the scheme, but rather on what the immediate and necessary consequences and effects of the scheme were.  Thus, the cases the magistrate judge undertakes to distinguish are actually authority for the proposition that the jury's verdicts here should be left intact.

The magistrate judge's second reason for recommending that the verdicts be vacated – because the honest-services theory was emphasized more than the property fraud theory during closing argument and in jury instructions – is of little analytical value or weight where the only means of fraud alleged in the Indictment and proven at trial - under either theory - constituted a property fraud.

The Findings and Recommendation does not confront the question that all of the cases judging similar alternative-theory situations hold to be controlling: did the jury necessarily find facts that constitute a mail fraud offense under a valid theory?  In this case, where there is no factual basis

2

for a conviction under either count other than the charged bid-rigging schemes whereby innocent, legitimate bidders were defrauded out of money, the answer to the question is "yes."

Recent case law, together with sound policy considerations and the particular facts and history of this case, argue for the application of an "actual innocence" standard of review rather than a "harmless error" standard. The "actual innocence" standard is often applied on collateral review in the event of procedural default, but may be justified where, as here, the record establishes the petitioner's "actual, factual guilt" on several related counts and where the evidence credited by the jury, even on the contested counts, clearly establishes offenses under valid theories.

## THE COURT SHOULD REJECT THE MAGISTRATE JUDGE'S RECOMMENDATION THAT THE JURY'S GUILTY VERDICT ON COUNTS ONE AND TWO BE VACATED

Questions Presented

1.      The jury in petitioner's trial was instructed on alternative theories of guilt concerning Counts One and Two. The jury returned a general verdict of guilty on both counts. One of the theories on which it was instructed was later invalidated, but the other theory remains valid. Does the record show that the jury found facts that satisfy the elements of the still-valid theory?

2.      The jury convicted petitioner of securities fraud under 15 U.S.C. §§ 78j(b) and 78ff in Count Four of the Indictment. On direct appeal, the Fourth Circuit reversed the conviction on that Count, holding that the "misappropriation theory" of securities fraud employed by the prosecution was legally invalid. Thereafter, the United States Supreme Court, in another case, ruled that the same "misappropriation theory" was in fact a viable theory of prosecution under the statute and, thus, expressly abrogated the Fourth Circuit's ruling in the petitioner's direct appeal. Therefore, the securities fraud charge in Count Four is a "charge that was available to the prosecution" and of

which the petitioner is "actually, factually" guilty. Given the petitioner's actual, factual guilt on the charge in Count Four, can the Petitioner here show that justice demands the granting of coram nobis relief?

3.    Given that the magistrate judge recommends that the convictions of the petitioner on Counts Three and Five be left intact, can the petitioner show that justice demands the granting of coram nobis relief?

**Standards Of Review**

<u>Consideration of evidence and benefit of inferences</u>

On review, the evidence is to be considered in the light most favorable to the prosecution and the government is allowed "the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982).

<u>Standard for collateral review in alternative theory cases: harmless error</u>

When a jury rendering a general verdict was instructed on alternate theories of guilt and may have relied on an invalid theory, the case is to be reviewed under a harmless-error standard. *Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (per curiam). On collateral review, the court must decide whether the instructional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 58, (quoting *Brecht v. Abrahamson,* 507 U.S. 619,623 (1993) (*see* P.F.R. p. 125 where the magistrate judge recommends the *Brecht* harmless-error standard for collateral review).

Thus, an alternative-theory error is harmless if the jury, even if convicting under an invalid theory, necessarily found facts establishing guilt on a valid theory. *United States v. Hastings,* 134 F.3d 235, 241-42 (4th Cir. 1998) (direct appeal) ; *United States v. Skilling*, 638 F.3d 480, 482 (5th Cir. 2011) (direct appeal) (citing *United States v. Holley*, 23 F.3d 902 (5th Cir. 1994), and *United States v. Saks*, 964

F.2d 1514 (5th Cir. 1992)), *cert. denied*, No. 11-674, 2012 WL 1252835 (Apr. 16, 2012).  As the magistrate judge observes, in honest- services mail-fraud cases where alternative theories are charged "[C]ourts across the country, almost uniformly [conclude] that the instructional error was harmless where a deprivation of money or property was necessary to a finding of honest services fraud."  *Sorich v. United States*, Nos. 10C1069, 10C1089, 10C1091, 2011 WL 3420445, at *8 (Aug. 4, 2011)  (*citing United States v. Folak*, 865 F.2d 110, 113 (7th Cir. 1988); *United States v. Wellman*, 830 F.2d 1453, 1462-63 (7th Cir. 1987); *Ryan v. United States*, 795 F. Supp. 2d 975, 1005 n.14 (N.D. Ill. 2010); *United States v. Doherty*, 867 F.2d 47, 58 (1st Cir. 1989))."  (P.F.R. p. 133).  Courts rendering decisions after *Skilling* apply the same analysis. *See United States v. Segal*, 644 F.3d 364, 366 (7th Cir.) ("even if the jury concluded that there was an honest-services violation, that violation had to be premised on money/property fraud") *cert. denied*, 132 S.Ct. 1739 (2011); *United States v. Black*, 625 F.3d 386, 392–93 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 2932 (2011); *Ryan v. United States, 759* F. Supp. 2d *975, 1005-06* (N.D. Ill. 2010); *United States v. Botti,* 722 F. Supp. 2d 207, 217 (D. Conn. 2010) (defendant not entitled to judgment of acquittal or new trial where "there is absolutely no basis in the record to support any theory undergirding [defendant's] honest services mail fraud conviction other than bribery").

The Standard Of Review For Coram Nobis: Actual Innocence

In coram nobis cases, where equitable considerations should dominate, newly decided case law and profound policy reasons support the conclusion that the reviewing court should adopt an "actual innocence" standard such as is often applied in collateral review cases conducted under 18 U.S.C. § 2241 where the petitioners remain incarcerated.  *See Stephens v. Herrera*, 464 F.3d 895, 898 (9th Cir. 2006) (collecting cases, particularly *In re Jones*, 226 F.3d 328, 333-34 (4th Cir.2000)); and *United States*

5

*v. George*, ___F.3d___, 2012 WL 1292532, at *7 (1st Cir. 2012)[2] (guilty plea to honest-services mail-fraud charge acknowledging that coram nobis cases are "at the far end" of the review continuum –"Because custody no longer attaches and liberty is no longer at stake, an inquiring court should pay particular attention to whether there is 'some . . . basis for thinking the defendant is at least arguably guilty.'") (citing *United States v. Gandia-Maysonet*, 227 F.3d 1, 6 (1st Cir. 2000)). *See United States v. Denedo*, 556 U.S. 904, 911 (2009)(Writ is limited to "extraordinary cases" so that "finality is not a risk in a great number of cases . . .").

The harmless-error collateral-review standard adopted by the magistrate judge was developed in the context of habeas corpus cases[3]. That is, cases where the petitioner remained incarcerated and the societal interest in terminating an unjust punishment was very high. Where, as here, the collateral relief is sought under coram nobis, however, the interests to be considered on review weigh differently. *United States v. Frady*, 456 U.S. 152, 165-66 (1982). There is no continuing sentence of incarceration at issue and, given that coram nobis cases may arise long after the trial has ended and the verdict recorded, it is often the case that any retrial of the case is somewhere between highly impractical and impossible. Such is certainly the case here, where the verdict was rendered in the fall of 1993 and the work involved in attempting to reconstitute the complicated and extensive evidence would require more of an investment than the undoubtedly time-diminished prospect of success would ever justify.

The Supreme Court has contemplated the practical difficulties that inhere in such cases and has ruled that review under coram nobis should include consideration of the equities of the case in its entirety, holding that this writ should only issue "under circumstances compelling such action to

---

[2] *United States v. George*, supporting the idea that an actual innocence standard ought to be applied in coram nobis cases, was decided on April 17, 2012 after the filing of the magistrate judge's Proposed Findings and Recommendation.

[3] While developed in the context of habeas corpus, the *Hedgpeth/Brecht* harmless-error standard has been routinely applied in coram nobis cases.

achieve justice" *United States v. Morgan*, 346 U.S. 502, 511 (1954).   The Third Circuit compared the "natural solicitude of the law to end an unjust incarceration," applicable in the habeas corpus case, to the situation on coram nobis review where "nothing remains but some financial detriment."   In the latter circumstance, "the finality concept is of an overriding nature, more so than in other forms of collateral review" and, thus, "judicial incentive to excuse compliance with procedural prerequisites is of a lower order." *United States v. Osser*, 864 F.2d 1056, 1059-60 (3d Cir. 1988).

Thus, here, where it is clear that the petitioner's acts were deceitful and that innocent bidders suffered direct property losses as a result of those actions, it simply cannot be said that justice demands that his convictions be set aside.   This record demands the conclusion that the petitioner deceitfully manipulated two bid processes at the West Virginia Lottery and, as a result of those manipulations, legitimate bidders were defrauded of money.   Moreover, it is clear that the petitioner's  actions as charged in the Indictment do in fact constitute mail fraud offenses.   Still further, it is now clearly established that the securities fraud conviction against the petitioner (Count Four of the Indictment) was erroneously reversed by the Fourth Circuit and, thus, the jury's guilty verdict on that Count, although not legally reinstated, nonetheless signifies a crime of which the petitioner is actually, factually[4] guilty.   Finally, the Proposed Findings and Recommendation conclude that the convictions

---

[4] *See Bousley v. United States*, 523 U.S. 614, 623-24 (1998) for the proposition that where actual innocence is the test for granting relief (there because of procedural default), the petitioner must prove himself *actually, factually* innocent not only of the charged crimes but of any charge available to the prosecution.  Such a test brings Count Four, the securities fraud charge of which the Petitioner was convicted at trial, back into consideration.  That count was reversed by the Fourth Circuit in *United States v. Bryan*, 58 F.3d 933 (4th Cir. 1995), but the Supreme Court later overruled the Fourth Circuit on the controlling point in *United States. v. O'Hagan*, 521 U.S. 642, 649-50 (1997), expressly abrogating the rule in *United States v. Bryan*.  Thus, the securities-fraud charge in Count Four was "a charge available to the prosecution" as defined in *Bousley*, and, under an actual-innocence standard

on Counts Three and Five must stand.  Thus, in any event based on the proposed findings, the petitioner will remain convicted of crimes stemming from his corruption of his office as Lottery Commissioner.  Where, then, are the circumstances "compelling" the issuance of this rare writ to "achieve justice?"  In fact, no such circumstances can be shown here and, thus, the petition should be denied in its entirety.

Therefore, the guilty verdicts of the jury on Counts One and Two of this case survive review under the direct-appeal harmless-error standard established for alternative-theory cases in *Neder v. United States*, 527 U.S. 1 (1999).  They likewise  survive under the harmless-error standard of review as defined in *Hedgpeth v. Pulido* and *Brecht* and under the actual-innocence standard applied in some 18 U.S.C. § 2241 cases where the petitioners actually remain incarcerated and which sound policy considerations suggest ought to be applied in this coram nobis case.

**Summary of Argument**

1.    Where alternative theories of guilt are alleged and instructed on and it is clear that the only basis for a guilty verdict on either theory is a finding that the defendant engaged in property fraud, the count must survive on review, even where one of the theories charged is legally invalid.   In such cases, the relative emphasis in argument and instruction between the two theories charged during trial is irrelevant.

2.    Because the only means of fraud charged and proven in support of Counts One and Two was the defendant's deceitful manipulation of bid-evaluation processes as a direct result of which,

---

of review, the petitioner here must prove himself actually, factually innocent of that charge before he can prevail.  *See* discussion in the magistrate judge's Proposed Findings and Recommendation in the companion case *Rebrook  v. United States* at pp. 87-89.

in Count One, The Arnold Agency, that had legitimately won the contract before the petitioner intervened, lost that contract, the over two million dollars in revenue that would have flowed to them under that contract and the over fifty-thousand dollars they had spent in their pursuit of that contract, and, in Count Two, IGT made substantial expenditures to participate in a bid-evaluation process that the Petitioner had corrupted, it is inconceivable that the jury could have returned its verdict of guilty under either theory charged or instructed on unless it had found that the defendant had defrauded The Arnold Agency and IGT of property. Thus, it is clear that the jury credited evidence establishing guilt under the valid, charged, property-fraud theory.

3. The notion that defrauding The Arnold Agency and IGT out of money was not the defendant's "object or ultimate goal" in the schemes does not support a conclusion that the schemes should not be viewed as a property frauds and it is not a valid reason to distinguish this case from the multitude of cases upholding jury verdicts in similar alternative-theory mail-fraud cases. Here it is established that Petitioner deceitfully manipulated both a bid-evaluation process that The Arnold Agency had legitimately won so that another party and not The Arnold Agency would receive the revenue from that contract and another bid-evaluation process that IGT, a legitimate bidder, had invested a substantial sum of money in. The magistrate judge suggests that since the Petitioner's first goal was that other agencies should get the contract, rather than that the legitimate bidders should lose it, the scheme should not be considered a property fraud. However, where a loss to a party is the necessary and inevitable result of deceitful action, intent to defraud the victim is inferred. There is no legal authority to support the notion the magistrate judge posits here, and the cases the magistrate

judge attempts to distinguish actually sustain mail-fraud convictions based on property frauds that are far less direct and foreseeable than the property fraud alleged and proven in this case.

4.  Where the record establishes the petitioner's clear legal and factual guilt on a related count that was erroneously reversed on appeal, the petitioner cannot show that justice demands issuance of the extraordinary writ.

5.  Where the record establishes petitioner's legal and factual guilt on related charges, the petitioner cannot show that justice demands the issuance of the extraordinary writ.

**Summary of Relevant Facts**

Count One

Count One of the Indictment charges defendant with perpetrating a mail-fraud scheme to defraud his employer of his honest services and to defraud The Arnold Agency of money. The essence of the scheme as charged and proved was the subversion of a legitimate bid-evaluation process undertaken by the West Virginia Lottery for the awarding of an advertising contract.[5] That contract would have issued in over $2 million in revenue to the winner. The evaluation process, in accordance with relevant state regulations, (Vol. 2, pp. 194-96)[6] involved live presentations by advertising agencies competing for the contract and a standardized, quantitative rating system applied by a panel of judges. (Vol. 2, pp. 4-8; 11-13).

---

[5] A fuller exposition of the proof of this scheme, complete with citations to the record, may be found at pp. 3-5 of the Response of the United States To Petition For A Writ Of Coram Nobis (Document 124, filed herein on January 7, 2011) .

[6] Citations to the trial transcript will be indicated in this manner: (Vol. __, p. __).

When the defendant learned that The Arnold Agency had won the competition, he ordered the documentary evidence of the process – the judge's evaluation sheets – destroyed or confiscated. (Vol. 2, pp. 19, 29). He later ordered his subordinates - those who had executed the legitimate bid-evaluation process - to lie to the supervising Lottery Commission, as they sat in formal session. (Vol. 2, p. 25). He told his employees to tell the Commission that the evaluation process had actually resulted in Fahlgren-Martin winning the contract, rather than The Arnold Agency. (Vol. 2, pp. 21-33).

The scheme was successful. The contract and resultant revenue went to Fahlgren-Martin instead of The Arnold Agency. Thus, The Arnold Agency was defrauded not only of the revenue that would have been theirs, but for the defendant's deceit and manipulation, but also the money spent in pursuit of that contract.[7]

This subversion of that bid process is the only means of fraud alleged, argued or proven under the Count.

Count Two

The argument for preserving the jury's guilty verdict on Count Two is almost identical to that for Count One[8]. Count Two alleges that by subverting another bid process at the West Virginia Lottery, thereby "fixing" the award of the contract to another vendor, the petitioner defrauded not

---

[7]Evidence at trial suggested that The Arnold Agency had spent over $50,000 in pursuit of the contract. As a part of its sentence, the trial court ordered Petitioner to make restitution to The Arnold Agency in the amount of $50,000. That sum was paid.

[8]Count One is factually distinguishable from Count Two in that, in Count One, the legitimate bid-evaluation process had been completed resulting in The Arnold Agency winning the bid before the petitioner intervened. In Count Two, the bid-evaluation process was corrupted from the outset and never reached fruition.

only the Lottery of his honest services, but IGT, a vendor that had submitted a legitimate bid for the contract in question (Vol. 4, p. 101) of the money it had expended in pursuit of that contract.

As is the case with Count One, the only means of fraud charged or proven at trial was the subversion or rigging of a Lottery bid process.  Thus, the jury could not have returned a verdict of guilty on the Count without finding that Petitioner had in fact subverted or rigged the bid process.  And, if the bid process was rigged in such a manner to keep IGT from having a fair chance at the contract, then IGT was, just as the Indictment charges, defrauded of the money it spent in pursuit of that contract[9].

William Woodford was chief of security and computer services at the West Virginia Lottery.  He was hired into that position by the petitioner who had known Woodford since his adolescence. (Vol. 4, p. 37) Bryan appointed Woodford to the committee charged with evaluating bids for a video-lottery-machine contract.  The petitioner gave Woodford clear instructions that petitioner wanted the contract to be awarded to VLC (Vol. 4, p. 78, 80) a vendor headquartered in Montana.   Woodford consequently felt pressured to award the contract to VLC (Vol. 4, p. 78, 80), and thus slanted the process in VLC's favor.   (Vol. 4, pp. 79-80).  He met with representatives of VLC prior to the preparation of the RFP[10] that set the specifications for the proposed contract.  He took particular

---

[9]The record establishes that IGT spent a substantial amount of money to participate in a bid process that had been corrupted by the Petitioner (Vol. 4, p. 3-6, 10-15, 22, 66, 101; Vol. 6, pp. 198-99, 203) and stood to make even more money if awarded the contract (Vol. 3, p. 212; Vol. 4, p. 19).

[10]"RFP" stands for Request For Proposal.  It is a standard document issued by the State of West Virginia in the process of awarding large contracts.  This document includes specifications for the goods or services to be provided under the contract and is used by prospective bidders for the composition of bids and offers.

suggestions made by VLC and incorporated them into the Lottery's proposal (Vol. 4, pp. 67, 76) and allowed VLC to take the original of the RFP to VLC headquarters before it was published. (Vol. 4, pp. 78-79, 140-41). Although IGT asked for a copy of the RFP, Woodford denied it to them. (Vol. 4, p. 80).

Before seeing the presentations made by the competing bidders, Woodford knew he wanted VLC to win and felt pressure to award the contract to VLC, even as he sat as an evaluator, because that is "what the director (petitioner) wanted" (Vol. 4, pp. 112-13) and, therefore worked to "convince other members of the evaluation committee to give VLC a slightly higher score." (Vol. 4, p. 114). At trial, Woodford admitted that he had testified before the grand jury that he had done "everything in his power" to assure that VLC would win the contract. (Vol. 4, p. 113).

The petitioner appointed Robert Wilhelm, then deputy director of finance and administration of the West Virginia Lottery, to serve as chairman of the evaluation committee. (Vol. 3, p. 21; Vol. 3, p. 58). Wilhelm served at the will and pleasure of the Petitioner. (Vol. 3, p. 61). Before the formal evaluation began, petitioner called Wilhelm and other members of the committee into his office and instructed them in earnest tones that he wanted VLC to be awarded the contract. *Id.* From that point forward, Wilhelm testified, his objectivity was "shot" and he was unable to be fair in the evaluation. *Id.* Although the committee went through the motions of an evaluation and consideration of IGT's proposal, Wilhelm admitted that the process was skewed and unfair.

> I couldn't be totally objective or fair because I had a preconceived notion of what, you know,  the director wanted. . ."

(Vol. 3, p. 65-66) ; and

> Q:  Was it [the evaluation process] conducted fairly?

A:  No, I wouldn't say so.

(Vol. 3, p. 68).

When the evaluation committee submitted its final report to the Lottery Commission it contained the following representation:

> The evaluation process is in compliance with the Department of Administration's purchasing rules and regulations and is intended to ensure that the evaluation of vendor proposals by the committee is conducted with objectivity, fairness, and in a rigorous manner, while also satisfying objectives of the West Virginia Lottery.

(Vol. 3, p. 68.)

Such a fair and unbiased process was exactly what the State rules regulating the award of contracts required and it is what the legitimate bidder, IGT, expected and had a legal right to expect. It was surely based on the notion that these rules of fair play would be observed that IGT invested in an effort to win the contract.  They spent money based on this promise.  (Vol. 4, pp. 3-6, 10-15, 22, 66, 101; Vol. 6, pp. 198-99, 203).  And this fair treatment is exactly what they were denied.  They did not get what they had paid for - what the Lottery had promised.  As the magistrate judge observed: "there is no doubt that . . . IGT suffered because of the petitioner's actions." (P.F.R. p. 137).  What did they suffer?  Monetary loss.

**Argument**

While the Proposed Findings and Recommendation restates the correct legal test that should decide this case, it fails to apply that standard in determining whether the instructional errors in Counts One and Two were harmless.   As the magistrate judge observes, where it is clear from the record that, in reaching a verdict of guilty, the jury had to have found that the defendant committed

acts that would constitute mail fraud under a valid, property-fraud theory, the conviction must be left

intact.  (P.F.R. p. 133).  However, nowhere in the Proposed Findings And Recommendation is that

standard applied to this case.

In this case, the jury had no basis for a guilty verdict on either Count One or Count Two other

than a finding that the Petitioner had deceitfully manipulated bid-evaluation processes.  It is likewise

undeniable–and, indeed, the magistrate judge does not deny –"that The Arnold Agency and IGT

suffered because of the petitioner's actions." (P.F.R. p. 137).  Indeed, the Fourth Circuit characterized

the schemes in Counts One and Two as  "Bryan's use of the mails in the course of rigging bids relating

to the West Virginia Lottery . . ." *Bryan*, 58 F.3d at 942.   Nonetheless, the magistrate judge

recommends that the jury's verdict be set aside because the losses to The Arnold Agency and IGT were

not the petitioner's "object or ultimate goal" in the schemes and because the honest-services theory

was emphasized over the property-fraud theory in closing argument and jury instructions.

The magistrate judge's attempt to distinguish this case from similar cases where jury verdicts

have been upheld is baseless, both legally and factually.

1.    **The Notion that the Losses To The Arnold Agency and IGT Were Not Petitioner's**
      **"Object or Ultimate Goal" Is Irrelevant In The Analysis Of This Case**

The magistrate judge rightly observes that Counts One and Two "each charge only one

scheme" (P.F.R. p. 135) and admits the obvious fact that Bryan's deceit ended in an actual property

loss to the legitimate bidders: "There is no doubt that The Arnold Agency and IGT suffered because

of Petitioner's actions. . ." (P.F.R. p. 137).  (*See Johnson v. United States,* 82 F.2d 500, 503 (6th Cir.

1936) (where defendant's fraudulently-postmarked bid for government contract undercut that of a

legitimate bidder, both government and undercut bidder were victims of the fraud).  Moreover, it has

15

been nowhere argued - either at trial or on direct appeal - that the legitimate bidders in the competitions that were corrupted as charged in Counts One and Two were not victimized or harmed by the subversion of the processes in which they unwittingly participated and invested.   Indeed, it is hard to argue against the proposition that these companies were "deprived of property interests" when they unwittingly invested money in the pursuit of State contracts where the purportedly statutorily-regulated bid processes were rigged or fixed for award to other companies.[11]

The Proposed Findings and Recommendation suggest, however, that this case is to be distinguished from other alternate-theory mail-fraud cases upholding jury verdicts because it was not the Petitioner's "object or ultimate goal" to hurt the legitimate bidders and that any harm they suffered was only incidental to the main purpose of the scheme.  (P.F.R. p. 135).  But the law does not distinguish in fraud cases between situations where the defendant's "object or ultimate goal" was not the occasioning of the losses that resulted from the fraud from cases where the perpetrator's primary aim may have actually been to hurt another party, rather than merely to enrich himself or another. There is simply no legal basis or support for such a notion.   The Proposed Findings and Recommendation does not cite any authority for the proposition and none is apparent.   The controlling principle here is that where the injury to another is a "necessary result" of the scheme in question, intent to defraud the victim may be inferred,  *United States v. D'Amato*, 39 F.3d 1249, 1257

---

[11]In fact, the district court ordered the petitioner to pay $50,000 in restitution to The Arnold Agency.  The petitioner paid that amount and, on direct appeal, did not challenge the notion that The Arnold Agency was a victim of the fraud.  Thus, the "law of the case" doctrine, that "forecloses litigation of issues decided by the district court but foregone on appeal," *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993), suggests that the argument that The Arnold Agency is not a victim of the property-fraud scheme charged in Count One has been waived.

16

(2d Cir. 1994) ("When the necessary result of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself.") (citation omitted); *United States v. Fernandez,* 282 F.3d 500, 507 (7th Cir. 2002); *United States v. Russo,* 166 Fed. Appx. 654, 659 (3d Cir. 2006) ("it is well established that, "[w]hen the 'necessary result' of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself"); *United States v. Lamoreaux,* 422 F.3d 750, 754 (8th Cir. 2005) ("But in a case like this, proof that a customer made substantial and secret kickbacks to a corporate fiduciary is sufficient to support a finding of intent to harm because actual harm may reasonably be inferred from the fact that the customer paid the fiduciary amounts to which the corporation was entitled"); *see also United States v. George,* 477 F.2d 508, 513-14 (7th Cir. 1973), and *United States v. Daniel,* 329 F.3d 480-88, (6th Cir. 2003) ("A scheme to defraud includes any plan or course of action by which someone intends to deprive another by deception of money[.]" (emphasis added); *Horman v. United States,* 116 F. 350, 352 (6th Cir. 1902) (noting that the intent in mail fraud "must be to injure, which doubtless may be inferred when the scheme has such effect as a necessary result of carrying it out"); *United States v. Starr,* 816 F.2d 94, 98 (2d Cir. 1987) ("Although the government is not required to prove actual injury, it must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent.") (emphasis omitted)). Daniel, however, would have us take the words "harm" and "deprive" in a grand sense. That is, though he admittedly intended to deprive Century and CBIZ of money in the short-term by taking improper loans, he did so in hopes of benefitting them in the long-term by repaying the loans and retaining the stock, and consequently he intended neither to harm the businesses nor deprive them of money. **But neither law nor policy**

**supports this approach, which would have the jury look beyond his bad conduct to his overall motives.**") (emphasis added).

And here, on review, the prosecution is to be afforded "the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir. 1982).

Indeed, if the fact that a defendant's primary aim in a fraud scheme was simply to make money for himself or another or was something other than causing loss to victims meant that the law would not hold him criminally responsible for those losses, that would imply the forestalling of prosecutions in Ponzi-scheme cases where the conspirator's first aim is to gain money for themselves and any losses are viewed by the perpetrators as unintended consequences occasioned by the exhausting of the market. Likewise, prosecution of honest-services schemes, even those that would survive the ruling in *Skilling,* would be a thing of the past. Indeed, it is almost never the case that the perpetrator begins with the "ultimate goal" of depriving his employer of his honest services. Almost always the "object or ultimate goal" in any such scheme is the same as the Petitioner's object here: to get money for himself or his designee. The loss to the employer – of the perpetrator's honest-services – is, more than likely, the last thing on the perpetrator's mind. In this case, it was surely not the Petitioner's object or ultimate goal to defraud his employer of his honest services. That notion, being more or less a creature of the law as it then existed, may never have crossed the defendant's mind. The inevitable and immediate loss to The Arnold Agency resulting from the petitioner's intervention in this case is far more direct and tangible and cannot have been unforeseen by the Petitioner. Likewise, the Petitioner could not have been oblivious to the fact that his scripting of the bid award for the video-

18

lottery contract would defraud the other bidders in the process of the resources they had spent in their effort to obtain the bid.

An example of inferred intent in this context is the case of *United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989), which the Proposed Findings and Recommendation attempts to distinguish from the instant case. In *Doherty*, the defendants surreptitiously sold police entrance and promotion examinations. The buyers used the ill-gotten tests to prepare for department testing and thus obtained jobs or promotions that they were not rightly due. The case was indicted as an alternative-theory mail fraud. On the one hand, defendants were charged with defrauding their employer of their honest services. The alternative property-fraud theory was that the police department lost money by having to pay increased salaries to the officers who had cheated on the exams.

It hardly needs to be said that occasioning these "salary-increase" losses to the police department was not the perpetrator's primary aim in *Doherty*. Indeed, it is likely that the defendants there never even contemplated such "losses" since the police department would eventually have hired and promoted others in the absence of the scheme. Again, the property loss to The Arnold Agency resulting from the fraud scheme in the instant case is far more immediate, direct, inevitable and foreseeable a than the salary-increase losses inferred in *Doherty*. Yet the First Circuit upheld the guilty verdicts on direct appeal, reasoning that since the property losses were so directly resultant from the scheme, it would be "inconceivable that the jury could have found [defendants] guilty of conspiracy to commit mail fraud without believing that they were conspiring to deprive the Commonwealth of money in the form of salary payments to improperly promoted officers." *Id.* at 58.

19

Thus, *Doherty*, rather than providing a basis for distinguishing this case from others where guilty verdicts were upheld, instead serves the opposite purpose. The losses to The Arnold Agency here result far more immediately, foreseeably and directly from the defendant's fraudulent acts than the property losses held to be sufficient to uphold the conviction in *Doherty* under the stricter direct-appeal standard of review. Thus, the rule in *Doherty* stands for the proposition that the guilty verdicts here must be upheld.

The Proposed Findings and Recommendation also asserts that the instant case is distinguishable from *Messinger v. United States*, 872 F.2d 217 (7th Cir. 1989), another case where an "honest-services" charge was upheld post-*McNally*[12]. But the property loss involved in the *Messinger* case is, like that in *Doherty*, far less direct, inevitable and foreseeable than the property losses in this case. In *Messinger*, the Seventh Circuit found an honest-services instruction to the jury to be harmless and upheld the mail-fraud conviction since the one scheme charged in the case defrauded the county of its "security interest (an intangible property right) represented by the cash bail bond." It is almost ridiculous to imagine that the defendants in *Messinger* had as their "object or ultimate goal" in the scheme the defrauding of the county of something as ephemeral and rarefied as a "security interest represented by a cash bail bond." Indeed, while the substantial cash loss to The Arnold Agency was undoubtedly foreseen by Petitioner here (he was told that The Arnold Agency had won the contract before he intervened and shifted the award to Fahlgren-Martin), the defendants in *Messinger* more than likely had no idea what a "security interest represented by a cash bail bond" even was. And, likewise,

---

[12]The post-*McNally*, pre-18 U.S.C. § 1343, cases are almost analytically identical to post-*Skilling* honest-services appeals.

the loss to IGT occasioned by the Petitioner's corruption of that bid process is simply too obvious and direct for him to have ignored.

Once again, the case cited in the Proposed Findings and Recommendation as means to distinguish this case and vacate the verdict actually points the other way. The property losses in *Messinger* were far more speculative and less foreseeable than the immediate and quantifiable monetary losses to The Arnold Agency and IGT in this case. Moreover, the defendant's intent to cause the property losses in this case is far more obvious and undeniable than what was inferred in the *Messinger* case. Inasmuch as the Petitioner could not have been unaware aware that his award of the contract to Fahlgren Martin would take the same contract away from The Arnold Agency, it must be said, and the law acknowledges, that the defendant in fact intended to cheat or defraud The Arnold Agency. The idea that the defendants in *Messinger* intended to defraud the county of something so esoteric and abstract as an 'intangible security interest in cash bail bonds' is far more speculative and, thus, harder to infer. Thus, again, the *Messinger* case, like *Doherty,* is strong authority for the idea that the defendant's actions in this case did in fact constitute a property fraud and that the jury's guilty verdict here should not be disturbed.

*See also Ginsburg v. United States*, 909 F.2d 982 (7th Cir. 1990), where defendant, who had been convicted of mail fraud under an "intangible rights" charge petitioned for a reversal of his convictions in the wake of *McNally* under 2255. In dismissing the petition, the Seventh Circuit "examined whether the specific conduct alleged in the Indictment [was] clearly proscribed by the mail fraud statute" and found that the scheme set forth in the Indictment - even though charged solely in

"intangible rights" language - nonetheless established "both a scheme to defraud a victim of money or property, as well as some intangible right."

Ginsburg was charged with scheming to prevent his clients from paying their fair share of property taxes to the County. In spite of the fact that the net amount of revenue that the County collected was unaffected by the scheme, the court nonetheless found that the scheme contemplated a property loss since the other taxpayers (everyone in the county who was not involved in the defendant's scheme) would have their taxes proportionately raised to make up for fact that Ginsburg's clients were not paying. Again, the property losses involved in *Ginsburg* are not as direct and immediate as those suffered by the innocent bidders in this case. It clearly was not Ginsburg's "principle object or goal" to visit these minuscule "losses" on all of the other taxpayers in the County and the Indictment in *Ginsburg* did not even charge a property fraud theory. Nonetheless, the court looked not to the words used to describe the fraud, but to the actual conduct charged in the Indictment.

> There was only one way in which County and its citizens were sought to be deprived of honest government - of the honest services of Board employees - and that was by Ginsburg's seeking to subvert the tax assessment system . . .
>
> To put it simply, if there were indeed a scheme to defraud County and its citizens of intangible rights, it necessarily took the form of a money-property deprivation scheme. . .

*Ginsburg,* 909 F.2d at 990.

Under *Ginsburg* and *Messinger*, the State of West Virginia is also a property-fraud victim in this case.

In both *Ginsburg* and *Messinger*, the Indictment charged only one theory – honest-services fraud. The courts in those cases, nonetheless, upheld the guilty verdicts since the actions charged in the Indictment constituted mail fraud under a valid property theory.

> [W]e are required to look beyond how the scheme is legally characterized in the indictment and "examine whether 'the specific conduct alleged in the indictment is clearly proscribed by the mail-fraud statute'"
>
> *McNally* does not require setting aside the conviction where a single set of facts establishes both a scheme to defraud a victim of money or property, as well as a deprivation of some intangible right.

*Ginsburg*, 909 F.2d at 984 (citations omitted). *See also Messinger*, 872 F.2d at 221-22. If the same logic were applied in this case, this Court could also consider the State of West Virginia and the West Virginia Lottery as property-fraud victims. Even though they are not named as such in the Indictment, nonetheless, the acts charged in the Indictment show them to have been defrauded of money through the schemes.

The acts charged in Counts One and Two - the acts comprising the schemes and the acts the jury must have agreed on to return any verdict of guilty under either theory charged - also establish that the defendant defrauded the State of West Virginia and the West Virginia Lottery out of property. That is, the defendant, through his deceitful manipulation of the bid-evaluation processes as described in the two Counts, defrauded the State out of the money they paid or would have paid to the bidder to whom the Petitioner demanded win the bid - in Count One, to the Fahlgren-Martin agency, in Count Two to VLC. The mail fraud statute only requires proof of a "scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. §

23

1341. It does not require proof that the schemer obtained or intended to obtain the money or property for himself. *McNally v. United States*, 483 U.S. 350, 355 (1987). Since the Petitioner subverted both of the legitimate bid processes, the State's money was (Count One) or would have been (Count Two) obtained by means of "false or fraudulent pretenses."

In this case, the Petitioner plied his schemes to obtain the money of the State of West Virginia for Fahlgren-Martin agency in Count One and for VLC in Count Two. Thus, in both Counts, the State's money was or could have been obtained by "means of false and fraudulent pretenses" and the State may be considered a victim under a property-fraud theory.

### 2.  The Relative Emphasis at Trial Between the Honest Services Theory and the Property Theory is of No Moment in This Case

Secondly, the magistrate judge asserts that the government emphasized the "honest services" aspect of the case in closing argument and that the instructions to the jury outlining the honest services theory "overshadow[ed]" the instructions relating to the property fraud.[13]  (P.F.R. p. 137).

_____

[13]Again, the centrality of the property-fraud aspect of this case, and its explicit inclusion at every phase of the trial makes this case far stronger on the point than almost any of the numerous decisions in alternative-theory cases where the jurys' guilty verdicts have been left intact. As has been noted herein, in some of those cases the property fraud theory was not even charged in the Indictment or instructed on but was rather implied or inherent in the acts charged in the Indictment. In this case the property theory is clearly charged, is expressly argued by the government in opening statement and it is clearly established by the evidence. The magistrate judge's decision to distinguish this case from all of those alternate-theory cases where verdicts have been preserved is based on the judgment that the government focused on the honest services aspect of the scheme in its closing argument. (P.F.R. p. 137). Of course, such a focus is not nearly enough to justify the reversal of the jury verdict in this case, according to every precedent on the point, but even in closing argument the government emphasized that The Arnold Agency and IGT lost money because of the frauds charged in the Counts. (Vol. 7, pp. 60-61). Moreover, the closing argument never departs from a description of the schemes as charged in the Indictment – the schemes through which The Arnold Agency and IGT lost money. Indeed, the magistrate judge observes that the property-fraud theories were charged and that the property-fraud theories were advocated for in opening statement and, at the very least, alluded to in

Again, in this context, such relative emphasis is of no analytical value.  It is simply inescapable here that the only means by which this fraud was alleged or proven was through the subversion of the bid-evaluation process.  As the magistrate judge observed in her upholding of the charge in the companion case: "Had the jury not believed that ReBrook engaged in this fraudulent activity [a property fraud] it could not have returned a guilty verdict on the count of wire fraud." (P.F.R. p. 138).  The same is true for the Petitioner here.  Had the jury not found that petitioner, through manipulating the bid evaluation processes, had defrauded The Arnold Agency and IGT, they could not have returned a guilty verdict under either theory.  The defendant's subversion of those bid-evaluation processes directly and inevitably resulted in the legitimate bidders sustaining tangible property losses.  It does not matter that those losses were not the defendant's overriding aim, and it likewise does not matter which aspect of the scheme – property loss verses loss of honest services – the government or the trial court emphasized in the trial.  What the Court here must consider is what evidence the jury must have credited in order to reach a guilty verdict.

The fact that property-fraud theories were charged in the Indictment, argued by the prosecution throughout the trial[14] and again related to the jury during instructions is relevant here to show what the frauds in this case actually were.  That is, these things establish that the fraudulent acts

---

closing.  The Proposed Findings and Recommendation, however, virtually ignore the fact that the property-fraud schemes were clearly established by the evidence and that any verdict of guilt had to have been based on the conclusion that the schemes charged were executed as charged and that the property losses necessarily ensued.  As the multiple authorities make clear, these are the important, indeed, the defining questions.

[14]In-trial references to the fraud against The Arnold Agency are detailed in the Response of the United States To Petition For A Writ Of Coram Nobis (Document 124, filed herein on January 7, 2011) at pp. 20-26.

that were the basis for the Counts were acts through which The Arnold Agency and IGT were defrauded of money.   Once it is established that there is one scheme (that point has never been in contention in this case) and that a property loss was a necessary result of that scheme, and that the jury found that the defendant committed the conduct comprising that scheme, it does not matter, under harmless-error review, what you call it, or what the jury might have called it.

Any onlooker must conclude that the jury's guilty verdict on Counts One and Two  had to have been based on their conclusion that the defendant intentionally and deceitfully subverted the bid-evaluation processes described in the Indictment.  There is no other conceivable factual basis for such a verdict on either Count.  As a result of the defendant's execution of the schemes, The Arnold Agency, IGT (and, under the rule in *Messinger* and *Ginsburg*, the State of West Virginia and the West Virginia Lottery) incurred real, tangible property losses.  When that much can be said, the conviction survives, even under a direct-appeal standard of review.


Because the Record and History of this Case Establish that the Petitioner is "Actually, Factually" Guilty of Counts Three, Four and Five, The Petitioner Cannot Show that Justice Demands the Granting of any Relief Under Coram Nobis

Finally, much weight must be given to the fact that this case is not on direct appeal and does not involve habeas corpus inasmuch as the Petitioner here has long since been released from jail. Moreover, inasmuch as 19 years have passed since these convictions were obtained, it is now virtually impossible for the government to muster assets to retry this case.

In such instances, reviewing courts must look to the equitable realities in the case.  Here the Petitioner was convicted by a jury of perpetrating a fraud scheme that everyone admits resulted in

26

actual property losses to real victims.  It is simply undeniable that the acts alleged in the Indictment, even if the honest-services language were removed, would constitute a violation of the mail fraud statute.  Moreover, it is now clear that the jury's guilty verdict on Count Four of the Indictment – the securities fraud count – was, contrary to the holding of the Fourth Circuit, in fact based on a viable theory of prosecution.  The fact that Petitioner's conviction on the Count was reversed is simply an unmerited windfall.  Finally, the Proposed Findings and Recommendation concludes that the Petitioner cannot meet his burden with regard to Counts Three and Five.

The line of authority defining and circumscribing the coram nobis writ makes clear that relief is only to be granted in those cases where it is necessary to avoid a miscarriage of justice.  In this case, however, the verdicts of jury – even the one later reversed by the Fourth Circuit – are just.  They are based on solid factual foundations, involve *malum in se*, and satisfy the elements of proof under valid legal theories.  The story this case told – and still tells – is one of brazen misuse of official authority.  Thus, to grant coram nobis relief in this case would undermine, not further, the cause of justice.

Respectfully submitted,

R. BOOTH GOODWIN II
United States Attorney


By:    s/Larry R. Ellis
       LARRY R. ELLIS, WV Bar No. 1122
       Assistant U.S. Attorney
       P.O. Box 1713
       Charleston, WV  25326
       Telephone:  (304) 345-2200
       Fax: (304) 347-5706
       E-mail: larry.ellis@usdoj.gov

27

<u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing "Objections of the United States to the Magistrate Judge's Findings and Recommendations" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this the 14th day of May, 2012, to:

        Richard Neely
        NEELY & CALLAGHAN
        159 Summers Street
        Charleston, WV 25301

               By:    <u>s/Larry R. Ellis          </u>
                      LARRY R. ELLIS
                      WV Bar No.  1122
                      Assistant U.S. Attorney
                      P.O. Box 1713
                      Charleston, WV  25326
                      Telephone:  (304) 345-2200
                      Fax:  (304) 347-5706
                      E-mail: larry.ellis@usdoj.gov